**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

JEAN A., HAMAD B., MONA C.,
YASMINE D., SAM E., ABDO F.,
INTERNATIONAL INSTITUTE OF NEW
ENGLAND, and JEWISH FAMILY
SERVICE OF WESTERN
MASSACHUSETTS,

     *Plaintiffs*,

     v.

KRISTI NOEM, in her official capacity as
Secretary of Homeland Security; UNITED
STATES DEPARTMENT OF HOMELAND
SECURITY; UNITED STATES
IMMIGRATION AND CUSTOMS
ENFORCEMENT; UNITED STATES
CITIZENSHIP AND IMMIGRATION
SERVICES; TODD LYONS, in his official
capacity as Senior Official Performing the
Duties of the Director of ICE; and JOSEPH
B. EDLOW, in his official capacity as the
Director of USCIS

     *Defendants*.

Case No.

**CLASS ACTION COMPLAINT FOR VACATUR, PRELIMINARY AND PERMANENT
INJUNCTIVE RELIEF, AND DECLARATORY RELIEF UNDER THE
ADMINISTRATIVE PROCEDURE ACT AND THE CONSTITUTION**

## INTRODUCTION

1.      This lawsuit challenges the Trump-Vance Administration's policy of subjecting individuals lawfully admitted to the United States as refugees under the Immigration and Nationality Act (INA) to warrantless arrest and indefinite, punitive, and unlawful detention.

2.      The 1980 Refugee Act amendments to the INA codified the United States' promise, following the horrors of World War II, to offer safety to people fleeing oppression. Since then, it has been the "policy of the United States to respond to the urgent needs of persons subject to persecution in their homelands," Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102, § 101(a)—people at risk of grave harm or death simply because of who they are—including through welcoming and resettling such persons in this country following careful and extensive vetting. And for decades the United States has welcomed refugees with no choice but to flee their homes, providing refugees and their families a pathway to permanent lawful status. Until now.

3.      The Administration is systematically implementing policies that are hostile to refugees, with the end goal of terminating their refugee status and expelling refugees *en masse*. Consistent with that goal, Defendants Department of Homeland Security (DHS), and its subcomponents United States Citizenship and Information Services (USCIS)  and Immigration and Customs Enforcement (ICE), have taken multiple agency actions that target refugees, including by refusing to adjudicate green card and other benefit applications for refugees and by directing agency employees to harass, arrest (often violently), detain, and interrogate refugees in a coordinated effort to further their anti-refugee agenda.

4.      On January 9, 2026, in furtherance of this scheme, DHS announced the launch of "Operation Post-Admission Refugee Reverification and Integrity Strengthening" (Operation PARRIS), a purported examination into "fraud" that would target for investigation 5,600 lawfully admitted refugees residing in Minnesota, then a focus of DHS enforcement tactics. On that same

date, DHS agents began banging on doors, entering homes without judicial warrants or consent, following cars, and appearing at workplaces and schools of hundreds of lawfully present refugees.

5.      Although Operation PARRIS has primarily targeted Minnesota, multiple statements and memoranda from DHS, ICE, and USCIS officials make clear that the endgame of DHS's actions is to use these baseless detentions and coercive interviews as fishing expeditions to trigger a mass termination of refugee status and to render refugees vulnerable to removal nationwide. This goal represents an egregious and unlawful betrayal of the promise made to refugees, pursuant to the Refugee Act of 1980, to offer safety and stability in a new home.

6.      To prepare for this policy of mass arrest, detention, termination, and removal, Defendants took two additional, distinct actions that Plaintiffs challenge here. First, on December 18, 2025, the Acting Executive Associate Director for ICE, Marcos Charles, issued a directive, *Rescission of ICE Policy No. 11039.1: Detention of Refugees Admitted Under INA § 207 Who Have Failed to Adjust to Lawful Permanent Resident Status* (May 10, 2010) (the Refugee Rescission Memo) (attached as Exhibit 1). That Memo rescinded a 2010 Policy that prohibited the detention of refugees solely on the basis that they had not adjusted status. The Refugee Rescission Memo therefore purported to authorize the detention of all lawfully admitted refugees who have not yet adjusted their status to lawful permanent resident.

7.      Second, on February 18, 2026, USCIS and ICE jointly issued a memorandum, "Detention of Refugees Who Have Failed to Adjust to Lawful Permanent Resident Status," (the Refugee Detention Memo) (attached as Exhibit 2), which purported to provide legal justification for rescinding the 2010 Policy and mandating potentially indefinite detention of all unadjusted refugees present more than one year.

8.      Together, these two actions comprise a policy of warrantless arrest, unauthorized detention, and coercive interrogation of refugees (the Refugee Detention Policy) that is unlawful.

The policy flouts fundamental constitutional principles, namely the Fourth Amendment's prohibition on warrantless seizure and the Fifth Amendment's guarantees of Due Process and Equal Protection. The Refugee Detention Policy also cannot be reconciled with limitations on Defendants' statutory authority to arrest and detain noncitizens in lawful status without individualized suspicion that they have violated immigration laws and individualized findings that their detention is necessary based on flight risk and dangerousness concerns.

9.  The Refugee Detention Policy also upends, without warning or reason, Defendants' longstanding policy against arresting and detaining refugees awaiting adjudication of their green card applications. In suddenly changing course, DHS ignores that it has disavowed the legality of such a policy for over a decade and breaks with 46 years of practice and agency guidance.

10.  The Refugee Detention Policy is therefore contrary to law, arbitrary and capricious, and in disregard of statutorily required procedures in violation of the Administrative Procedure Act as well as the Fourth and Fifth Amendments to the United States Constitution.

11.  Without relief from this Court, individual Plaintiffs, all lawfully present refugees who are at risk of being detained without cause, will be irreparably harmed by being separated from their families and communities, held in detention with no legal basis, deprived of work and other opportunities, suffer worsening medical and psychological conditions, and potentially face removal to the very dangers from which they fled when seeking refugee protection in this country. And organizational Plaintiffs International Institute of New England and Jewish Family Service of Western Massachusetts, whose core missions include serving resettled refugees, face a certain depletion and diversion of resources needed to address the crisis of their client communities facing mass interrogation, arrest, and unlimited detention.

## JURISDICTION AND VENUE

12.  The Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because the

claims arise under federal law, including the Administrative Procedure Act, 5 U.S.C. §§ 551 et seq.

13.     This case arises under the United States Constitution; the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 et seq.; and the Immigration and Nationality Act (INA), 8 U.S.C. § 1101 et seq. and its implementing regulations.

14.     Venue is proper in this District under 28 U.S.C. § 1391(e)(1) because it is the judicial district where Jean A. resides and where the International Institute of New England and Jewish Family Service of Western Massachusetts are incorporated.

## THE PARTIES

15.     **Plaintiff Jean A.** was born in a refugee camp in Rwanda and was admitted to the United States as a refugee in September of 2022. He lives with his mother and three of his siblings in Massachusetts. His older brother is still in a refugee camp because his application for refugee status was paused due to President Trump's shutdown of the refugee program in January 2025. Jean A's mother started the process for his family to come to the United States as refugees in 2012. Jean A. and his family submitted their adjustment applications in the spring of 2024, but they have not received a request for an interview or a decision on their applications.

16.     When Jean A. heard on the news that all refugees without green cards would be at risk of arrest and being sent to jail, he became very worried. He was driving for a rideshare service when he learned the news but went straight home because he was afraid of being arrested. Even though Jean A. submitted an application for lawful permanent residence to USCIS more than a year ago, he is terrified that he will be arrested and detained indefinitely because USCIS has never acted on his application.

17.     **Plaintiff Hamad B.** was born in Iraq. He and his wife fled Iraq after being threatened because of their religion, arriving to Turkey in 2014. Soon after, they began the process

to apply for refugee status through the United States Refugee Admissions Program (USRAP). In May of 2023, with their young son, they were admitted to the United States as refugees and were resettled in North Carolina. They now have a two-year-old daughter, who is a United States citizen. Hamad B. and his wife and son submitted applications for adjustment of status in March 2025, but they have not received any requests for interviews or decisions on their applications.

18.     In January 2026, Hamad B. was in Texas, working with a friend to deliver packages. While in his friend's vehicle, Hamad B. and his friend were stopped at a border patrol checkpoint. Immigration officers asked him if he was a U.S. citizen. He told them he wasn't, but he showed an expired work permit and offered to provide more documentation of his refugee status, including an I-94 documenting his lawful admission. But officers refused, and instead arrested Hamad B. and his friend and eventually sent them to a detention facility in another state, where Hamad was held for more than three weeks, until he was released after filing a habeas petition in federal court.

19.     Detention was a terrible experience. Hamad B. was terrified that he would be removed to Iraq or another country despite his valid refugee status. Because the government still has not made a decision on his pending adjustment of status application, he fears being arrested and detained again as a result of the Refugee Detention Policy, and he fears the same could happen to his wife and son.

20.     **Plaintiff Mona C.** is Hamad B.'s wife. She, her husband, and their son were admitted to the United States as refugees in May of 2023 and settled in North Carolina. Mona C. was born in Syria but moved to Iraq, where she married Hamad B. After being threatened due to their religion, Mona C. and her husband fled to Turkey in 2014 and applied for refugee status in the United States. Along with her husband and son, Mona C. applied for adjustment of status in March of 2025. Their applications are still pending.

21.     During the three weeks her husband was detained, Mona C. lived in constant fear, frightened about what would happen to her husband and if he would be sent back to Iraq and worried about her two young children, one of whom is a U.S. citizen. Mona C. does not work, so while her husband was detained, they had no income. She is terrified that ICE might arrest her or even her son next and that there will be no one to care for her children.

22.     **Plaintiff Yasmine D.,** her husband, and their son were admitted to the United States as refugees in April of 2023 and settled in Texas. Yasmine D. was born in Iraq but fled to Turkey in 2014 after being targeted by militias who disapproved of her interfaith marriage. She and her family applied for adjustment of status in March of 2025.

23.     In January 2026, Yasmine D.'s husband was arrested by immigration officers at a border patrol checkpoint along with Hamad B. Yasmine D.'s husband is a refugee, and like Hamad B., he was arrested despite showing documentation that he had an adjustment of status application pending. When Yasmine D.'s husband was arrested, they took all of his documents and left his van on the street. Because Yasmine D.'s documents were in the van too, she was without her documents. Her husband was beaten and pushed around in detention and struggled psychologically. Yasmine D. and her son were also greatly impacted by her husband's detention. Her son had nervous attacks and missed school, and Yasmine D. had to miss work because her son was too scared of being without her.

24.     Yasmine D.'s husband was released from detention after attorneys filed a habeas petition for him, but Yasmine D. is worried that ICE will come for her next. Her son is worried that he will disappear like his father. When ICE showed up near her workplace recently, Yasmine D. left immediately. She has also missed medical appointments out of fear of going out. She worries about being arrested, detained, and deported along with her family. She cannot believe that, after coming to the United States to escape persecution and harm, she and her family are faced

with it all over again.

25.    **Plaintiff Sam E.** was born in Afghanistan and, after fleeing to Pakistan with his parents and four of his siblings, was admitted to the United States in October of 2024. The family was resettled in Connecticut, where Sam E. is enrolled in high school. He is eighteen years old and recently found an after-school job. He and his parents and siblings have been working on preparing their adjustment of status applications. But they are required to submit medical examinations with their applications, and appointments with doctors authorized to conduct those examinations are limited, so they are waiting for appointments to become available.

26.    Sam E. is scared that he or his parents and siblings are vulnerable to arrest and detention because of the government's new policies to arrest refugees who have not yet obtained green cards. They have adjusted to life in the United States, where they have reunited with Sam's older brother, and they fear not only lengthy detention and separation but also deportation from their new home to dangerous conditions in Afghanistan or to a third country where they have no ties.

27.    **Plaintiff Abdo F.** was admitted to the United States as a refugee in May 2024. Abdo F. was born in Sudan and fled persecution from government authorities in 2020, arriving in Jordan. In Jordan, Abdo F. was referred to the U.S. Refugee Admissions Program and, after several interviews, medical exams, and security checks, approved for refugee status. He was resettled in Nebraska with the help of a resettlement agency in Omaha, which helped him find a home and enroll in English classes.

28.    Abdo F. has faced numerous obstacles to submitting his adjustment of status application. As the anniversary of his admission to the United States approached, Abdo F. sought assistance from the local resettlement agency to complete his application for adjustment of status, but they recommended he seek an attorney. He was unable to find a local attorney but eventually

obtained representation. But obtaining his medical clearances has been another struggle. His health insurance covered the medical exam, but he has to pay out of pocket for a series of vaccinations and had to wait to start his course of vaccines, which his doctors are requiring that he take over a period of weeks or month rather than all at once.

29.     Abdo F. has been diagnosed with Parkinson's disease, for which he takes medication and receives treatment. He is extremely scared that because he has not yet adjusted his status, he will be arrested and detained without access to crucial medical care and medicine. Without treatment, his condition will worsen, and he may lose the ability to walk or move. And if detention leads to deportation to Sudan, his life is at tremendous risk.

30.     **Plaintiff International Institute of New England (IINE)** is a non-profit social service organization, headquartered in Boston, Massachusetts, that is committed to welcoming refugees and immigrants and helping them restart their lives in the United States. IINE is the oldest organization exclusively serving refugees and immigrants in New England. IINE staff have diverted resources from providing refugee clients with life-saving assistance like food distribution to proactively engaging all refugees we have resettled between January 20, 2021, and February 19, 2025, to ensure that they are taking steps to prepare themselves for contact with immigration officials.

31.     Because IINE's resources are limited, they are seeking to hire additional staff for their Immigration Legal Services program in anticipation of an increased need due to the Refugee Detention Policy. IINE has engaged in an organization-wide effort to marshal volunteers and engage with community partners to prepare for the roll-out of the Refugee Detention Policy. This effort has detracted from the IINE's ability to conduct day-to-day duties because of the great increase in the senior management team's time engaging with external partners and front-line staff's work to address the fears of our clients. IINE staff, who previously conducted

approximately one Know Your Rights (KYR) workshop per year, have already conducted three KYR trainings in 2026, and anticipate conducting more on an increased and regular basis. IINE staff has also developed and scheduled family preparedness workshops to ensure immigrant families are prepared in the event someone in their family is detained by immigration enforcement officers. These new workshops to respond to the Refugee Detention Policy will occur on a weekly basis starting in March 2026.

32.     The Refugee Detention Policy is also likely to impact IINE in other significant ways. If unadjusted refugee clients are sent notices to attend re-vetting interviews, IINE staff will need to devote significant time to prepare for and accompany its refugee clients to interviews that could end in arrest and detention. And IINE will need to dip into financial reserves in order to provide support for families whose wage-earners lose time due to arrest and detention.

33.     **Plaintiff Jewish Family Service of Western Massachusetts (JFS-WMA) is a** non-profit social services organization that plays a leading regional role in refugee resettlement and other immigration services such as naturalization assistance. One of the largest refugee-serving agencies in Massachusetts, JFS-WMA employs case workers, behavioral health staff and mental health counselors, health navigators, youth workers, and elder services providers who provide critical services for over 4,000 clients annually and receive community support from nearly 2,000 community members through engagement, advocacy, and educational programs. Refugee resettlement work is core to their mission and is rooted in Jewish values and the lived Jewish experience of immigration. Among JFS-WMA's 99 employees are many staff members who have lived experience as refugees and now serve as community leaders.

34.     Among the services that JFS-WMA provides to immigrants is assistance to refugees in filing their applications for lawful permanent residency after they have been in the United States for more than one year. JFS-WMA employs an accredited immigration

representative who helps JFS-WMA's clients complete these applications at no cost. JFS-WMA has more than 1000 refugees with pending applications for adjustment of status who are vulnerable to arrest and detention due to the Refugee Detention Policy.

35.    Until January 2026, JFS-WMA did not have any clients who had been called in for re-vetting interviews. But after the implementation of Operation PARRIS in Minnesota, one client received a notice to appear for an interview. JFS-WMA's lone accredited representative spent hours preparing for and representing that individual. If more unadjusted refugee clients are sent notices to attend re-vetting interviews, JFS-WMA staff would need to reallocate resources to devote time to the same for up to 1000 clients, including diverting the work of translators, case workers, and drivers. In addition, if refugees JFS-WMA serves or employs are arrested, detained, and placed in removal proceedings, JFS-WMA staff will spend large amounts of time searching for and contacting possible legal referrals to represent these individuals in removal proceedings and/or federal habeas petitions, as detained removal work is outside the scope of the legal services that JFS-WMA provides. And if JFS-WMA's refugee clients are detained and unable to work, their families will be left without their income, and JFS-WMA will have to dip further into its limited emergency funds to provide financial assistance to impacted families. All of this will divert resources from JFS-WMA's current programming.

36.    **Defendant Kristi Noem** is sued in her official capacity as the Secretary of Homeland Security. In this capacity, she directs each of the component agencies within DHS, including Immigration and Customs Enforcement and U.S. Citizenship and Immigration Services. In her official capacity, Defendant Noem is responsible for the administration of the immigration laws pursuant to 8 U.S.C. § 1103.

37.    **Defendant DHS** is an executive agency of the United States headquartered in Washington, D.C. DHS and its components, including ICE and USCIS, are the agencies

principally charged with implementing and enforcing the immigration laws and policies of the United States.

42. **Defendant ICE** is the sub-agency within DHS headquartered in Washington, D.C. responsible for carrying out immigration enforcement and detention in the interior of the United States and for representing DHS in proceedings before the immigration courts.

39. **Defendant USCIS** is the sub-agency within DHS headquartered in Camp Springs, MD, responsible for, among other things, processing refugee and asylum applications and conducting credible fear screenings.

40. **Defendant Todd Lyons** is sued in his official capacity as Senior Official Performing the Duties of the Director of ICE.

41. **Defendant Joseph B. Edlow** is sued in his official capacity as the Director of USCIS.

## BACKGROUND

### I.    Refugee Admissions and Adjustment of Status

42. Congress has enacted a comprehensive statutory scheme to regulate immigration—the INA, 8 U.S.C. § 1101 et seq.—which empowers various federal agencies to enforce and administer immigration law.

43. Congress amended the INA in 1980 by enacting the Refugee Act, which embodies the U.S. commitment to humanitarian assistance for those fleeing persecution. Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102.

44. In enacting the Refugee Act, Congress sought to "provide a permanent and systematic procedure for the admission . . . of refugees of special humanitarian concern to the United States, and to provide comprehensive and uniform provisions for the effective resettlement and absorption of those refugees who are admitted." *Id*. § 101(b). It declares that "it is the historic

policy of the United States to respond to the urgent needs of persons subject to persecution in their homelands," including through resettlement of such persons to this country. *Id*. § 101(a).

45.     Under U.S. law, and consistent with U.S. treaty obligations, a "refugee" is a person facing displacement from his or her country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion. *See* 8 U.S.C. § 1101(a)(42).

46.     The Refugee Act sets out detailed policies and procedures that govern the admission and resettlement of refugees in the United States, which together create the U.S. Refugee Admissions Program (USRAP). *See* 8 U.S.C. § 1157 et seq.

47.     The USRAP embodies and effectuates the United States' commitment to offering a safe haven for people around the world fleeing persecution.

48.     Individuals outside of the United States seeking admission as refugees are processed through the USRAP, which is managed by the State Department in cooperation with the DHS and the Department of Health and Human Services (HHS).

49.     The State Department is responsible for facilitating the overall refugee application process, while DHS is responsible for determining an applicant's eligibility for refugee admission under U.S. law.

50.     Refugees are the most thoroughly screened and vetted group to enter the United States. Refugee applicants undergo rigorous background checks, as well as biometric checks for those within certain age limits. U.S. Dep't of State, U.S. Dep't of Homeland Sec., & U.S. Dep't of Health and Hum. Servs., *Report to the Congress: Proposed Refugee Admissions for Fiscal Year 2025* 28, https://perma.cc/YK4A-AFXN.

51.     To be considered for refugee resettlement to the United States, an individual must typically first be referred to USRAP by either the United Nations High Commissioner for Refugees

(UNHCR), a U.S. Embassy, a designated non-governmental organization, or a group of private citizens through a program known as Welcome Corps. In limited circumstances, refugees may access USRAP directly due to their membership in groups designated by statute or by the State Department in its joint reports to Congress. The overwhelming majority of refugee applicants are referred by UNHCR based on its determination that they meet the international definition of a refugee—which is largely consistent with the definition in 8 U.S.C. § 1101(a)(42)—and require resettlement as a durable solution to protect them from harm. Of the more than 30 million refugees worldwide, UNHCR refers fewer than 1% for resettlement to any country in any given year. *See* U.S. Dep't of State, *Refugee Admissions*, https://perma.cc/W5QX-KCUH (last accessed Feb. 25, 2026).

52.     After a referral, the security screening process typically takes 18 to 36 months or longer and involves multiple federal agencies, including the National Counterterrorism Center, the FBI's Terrorist Screening Center, the Department of Defense, and multiple DHS components. Applicants' biographic information is screened against numerous databases, including the Consular Lookout and Support System, the Treasury Enforcement Communications System, the National Crime Information Center, and classified databases. *See* U.S. Citizenship and Immigration Services, *Refugee Processing and Security Screening,* https://www.uscis.gov/humanitarian/refugees-and-asylum/refugees/refugeeprocessing-and-security-screening (last accessed Feb. 22, 2026); U.S. Dep't of State, U.S. Dep't of Homeland Sec., & U.S. Dep't of Health and Hum. Servs., *Report to the Congress: Proposed Refugee Admissions for Fiscal Year 2025* 28, https://perma.cc/YK4A-AFXN.

53.     Following initial security screening, refugee applicants are interviewed under oath by a specially trained USCIS Refugee Officer who assesses the applicant's eligibility for refugee status and evaluates the credibility of the applicant's claim. The Refugee Officer has the authority

to approve or deny the refugee application based on whether the applicant meets the statutory definition of refugee and does not fall within any of the bars to refugee admission, including those who have participated in persecution, pose a danger to U.S. security, or have provided "material support" to U.S. designated terrorist organizations.

54.     Applicants who are conditionally approved by USCIS must undergo a medical examination by physicians designated by the Department of State and complete a cultural orientation program. Prior to travel, all applicants undergo additional recurrent security checks to ensure no new derogatory information has emerged.

55.     Under the Refugee Act, the DHS Secretary is authorized to admit to the United States "any refugee who is not firmly resettled in any foreign country, is determined to be of special humanitarian concern to the United States, and is admissible . . . as an immigrant." 8 U.S.C. § 1157(c)(1); *see* 8 C.F.R. §§ 207.1–207.7. A refugee's spouse or child is entitled to admission as a refugee even without meeting the statutory definition. 8 U.S.C. § 1157(c)(2)(A).

56.     Once a refugee is admitted to the country, refugees receive statutorily authorized support services—including employment training and placements, direct cash support, and English-language training—from their sponsoring resettlement agency or its affiliates. *See generally* 8 U.S.C. § 1522. Those agencies use federal funding, private donations, and volunteer support to facilitate effective resettlement with the goal of placing "employable refugees . . . on jobs as soon as possible after their arrival" to cultivate "economic self-sufficiency," *id.* § 1522(a)(1), with the goal of enabling refugees "to become effectively resettled as quickly as possible." *Id.* § 1522(a)(1).

57.     Once a refugee is admitted, their refugee status may be terminated only if DHS determines that the noncitizen "was not in fact a refugee within the meaning of section 1101(a)(42) of this title at the time of . . .   admission." 8 U.S.C. § 1157(c)(4); 8 C.F.R. § 207.9.

58.     USCIS is required to notify a refugee in writing of its intent to terminate their refugee status and provide the refugee with 30 days from the date notice was served upon them to present written or oral evidence to show why their refugee status should not be terminated. 8 C.F.R. § 207.9. If USCIS terminates refugee status, USCIS then "process[es] the [individual for removal] under sections 235, 240, and 241 of the Act," 8 C.F.R. § 207.9, meaning USCIS issues a notice to appear and initiates removal proceedings under 8 U.S.C. § 1229a. *See, e.g.*, *Mukantagara v. U.S. Dep't of Homeland Sec.*, 67 F.4th 1113, 1116 (10th Cir. 2023).

59.     Separately, Congress provided that all individuals admitted as refugees may adjust their status to that of a lawful permanent resident so long as their refugee status has not been terminated and they are not found, upon inspection after one year, to be inadmissible to the United States. 8 U.S.C. § 1159(a)(1); 8 C.F.R. § 209.1. To this end, one year after entry, a refugee "shall . . . return or be returned to the custody of the Department of Homeland Security for inspection and examination for admission to the United States as an immigrant." 8 U.S.C. § 1159(a); *see* 8 C.F.R. § 209.1(a)(1). The reference to admission "as an immigrant" makes plain that the limited purpose of this provision is solely to allow USCIS to determine whether the refugee will be adjusted to lawful permanent resident status; it contains no reference to, and does not contemplate, detention of a refugee.

60.     Until the Refugee Detention Policy challenged in this lawsuit, DHS understood the purpose of this provision to be solely to allow USCIS to determine whether the refugee will be adjusted to lawful permanent resident status.

61.     The regulations require refugees to submit an adjustment application and the results of a medical exam, as well as have up-to-date biometrics results, 8 C.F.R. § 209.1(b)-(c). Then USCIS determines, on a case-by-case basis, whether an interview is necessary to determine if the refugee is admissible. *Id*. § 209.1(d).

62. USCIS must notify the refugee in writing of its decision on their application to adjust status to a lawful permanent resident. If the refugee applicant is found to be admissible for permanent residence, USCIS must approve the application, admit the refugee applicant for lawful permanent residence as of the date of the refugee's arrival in the United States, and issue proof of lawful permanent resident status. 8 C.F.R. § 209.1(e); *see* 8 U.S.C. § 1159(a)(2).

63. If USCIS denies a refugee's application to adjust status, USCIS must "notify an applicant of the right to renew the request for permanent residence in removal proceedings under section 240 of the Act," 8 C.F.R. § 209.1(e), that is, in full removal proceedings under 8 U.S.C. § 1229a. Admitted refugees thus retain lawful status and are protected from removal unless and until the DHS proves their deportability in removal proceedings under 8 U.S.C. §1229a and a final order of removal is entered against them.

64. To secure a removal order against a refugee under 8 U.S.C. § 1229a, DHS must establish that the refugee was removable by clear and convincing evidence. *Id*. § 1229a(c)(3)(A).

65. In addition, in Section 240 removal proceedings, refugees are entitled to raise any other defense to removal, in addition to having the right to renew their application to adjust status. 8 C.F.R. § 209.1(e).

66. Even though admitted refugees are required to apply to adjust their status after being present in the United States for one year, refugee admission is an indefinite status that has no expiration date. Therefore, a refugee who has not yet adjusted their status to that of an LPR is not removable from the United States solely on this basis. This is reflected in the USCIS Policy Manual eligibility criteria for adjustment of status for refugees, which states that a refugee must have been "[p]hysically present in the United States as a refugee for at least 1 year," recognizing that – unless their refugee status is revoked – a refugee remains eligible to adjust indefinitely. U.S. Citizenship and Immigr. Servs., *Chapter 2- Eligibility Requirements*, https://perma.cc/QJ62-L868

(last visited Feb. 25, 2026).

67.    In addition, consistent with statutory language, a 2010 ICE Directive confirmed that a refugee's failure to adjust or even to apply for adjustment is not grounds for removal. *See* Ex. 3, *Detention of Refugees Admitted Under INA § 207 Who Have Failed to Adjust to Lawful Permanent Resident Status* (May 2010) (2010 ICE Directive). The 2010 ICE Directive further clarifies, "[f]ailure by [refugees who have been physically present for one year] to apply for adjustment of status is not sufficient grounds to place them in removal proceedings, and therefore not a proper basis for detaining them."

**II.    Arrest and Detention Under the INA**

68.    The INA provides immigration agents with only limited authority to conduct arrests. To conduct a civil immigration arrest without a warrant, an officer must have "reason to believe" the person is violating the immigration laws and that the person "is likely to escape before a warrant can be obtained," i.e., is a flight risk. 8 U.S.C. § 1357(a)(2). The "reason to believe" phrase in § 1357 "must be read in light of constitutional standards, so that 'reason to believe' must be considered the equivalent of probable cause." *Morales v. Chadbourne*, 793 F.3d 208, 216 (1st Cir. 2015) (citation omitted).

69.    Regulations reinforce this requirement, permitting a warrantless civil immigration arrest only when there is "reason to believe that the person to be arrested has committed an offense against the United States or is a[] [noncitizen] illegally in the United States." 8 C.F.R. § 287.8(c)(2)(i).

70.    Regulations also require that, in the case of anyone arrested without a warrant, "a determination will be made within 48 hours of the arrest, except in the event of an emergency or other extraordinary circumstance in which case a determination will be made within an additional reasonable period of time, whether the noncitizen will be continued in custody or released on bond

or recognizance and whether a notice to appear and warrant of arrest as prescribed in 8 CFR parts 236 and 239 will be issued." 8 C.F.R. § 287.3(d).

71.     Detention of noncitizens beyond a limited custodial arrest is authorized primarily through the following provisions of the INA, and only when removal proceedings are initiated.

72.     Section 1225(b) sets forth DHS's detention authority related to the "inspection" process for certain "applicants for admission" who are "arriving in the United States" and certain others "who have not been admitted or paroled" and who are detained for removal proceedings. 8 U.S.C. § 1225(a), (b). It does not apply to those who have already been admitted, like refugees.

73.     Section 1225(b)(1) governs the detention of noncitizens placed in "expedited removal" proceedings, a fast-track form of removal that historically has applied only to people arriving at the border and ports of entry. Expedited removal may be applied only to certain individuals coming to the United States who are inadmissible because they engaged in fraud or misrepresentation to procure admission or other immigration benefits, 8 U.S.C. § 1182(a)(6)(C), or they lack the requisite documents for admission, *id.* § 1182(a)(7). *See* 8 U.S.C. § 1225(b)(1). Expedited removal applies only to noncitizens charged under those specific grounds of inadmissibility and does not apply to noncitizens removable for other reasons. *See* 8 C.F.R. § 235.3(b)(1), (b)(3); *see generally* Inspection and Expedited Removal of Aliens; Conduct of Removal Proceedings; Asylum Procedures, 62 Fed. Reg. 10,312 (Mar. 6, 1997).

74.     Section 1225(b)(2) governs the detention of noncitizens who are "applicant[s] for admission"—that is, those "present in the United States who ha[ve] not been admitted or who arrive[] in the United States," 8 U.S.C. § 1225(a)— actively "seeking admission or readmission," and are "not clearly and beyond a doubt entitled to be admitted," but who are placed in removal proceedings before an immigration judge (also known as "Section 240 proceedings" or proceedings under 8 U.S.C. § 1229a rather than expedited removal).

75.     Section 1226 governs the detention of noncitizens "already in the country pending the outcome of removal proceedings." *Jennings v. Rodriguez*, 583 U.S. 281, 289 (2018). Section 1226(a) authorizes, but does not require, DHS to detain certain noncitizens in Section 240 proceedings. It is colloquially referred to as the discretionary detention provision. That provision allows DHS to detain a noncitizen "[o]n a warrant issued by the Attorney General . . . pending a decision on whether the [noncitizen] is to be removed from the United States." But this provision applies only to those whom DHS places into removal proceedings under 8 U.S.C. § 1229a pursuant to a charge that the noncitizen is removable. For an admitted noncitizen such as a refugee, DHS may commence removal proceedings, and thus justify § 1226(a) detention, only if the noncitizen is alleged to have triggered one or more grounds of deportability under 8 U.S.C. § 1227.

76.     A narrower subsection, section 1226(c), mandates detention for certain noncitizens based on criminal conduct or terrorist activity that subjects them to removability based on deportability or inadmissibility grounds.

77.     Other sections apply to the "detention of suspected terrorists," 8 U.S.C. § 1226a, and the detention and removal of noncitizens with final removal orders, 8 U.S.C. § 1231(a). These three provisions are colloquially known as "mandatory detention" provisions.

78.     None of these mandatory detention provisions apply to a refugee who has been admitted to the United States, lacks a criminal history that falls within § 1226(c), is not suspected of terrorism, and has never been subjected to any prior removal process. 8 U.S.C. § 1226(a).

### III.     Constitutional Limitations on Arrest and Detention

79.     The invasion of noncitizens' liberty interests may not occur at the whim of the government and in the absence of any statutory or constitutional authority. The Fourth Amendment, barring unreasonable searches and seizures, applies to immigration authorities. *United States v. Brignoni-Ponce*, 422 U.S. 873, 884 (1975) (applying Fourth Amendment

principles from criminal context to "limit" scope of immigration agents' seizure authority). And

its prohibition on unreasonable seizure applies to noncitizens inside the United States as it does to

citizens. *See Morales v. Chadbourne*, 793 F.3d 208, 216 (1st Cir. 2015); *see also INS v. Lopez-*

*Mendoza*, 468 U.S. 1032, 1044 (1984) (acknowledging that deportation proceedings are civil, but

the Fourth Amendment still applies to the "seizure" of the person).

80.    As a general matter, the Fourth Amendment requires that all arrests entail a neutral,

judicial determination of probable cause. *See Gerstein v. Pugh*, 420 U.S. 103, 114 (1975). Courts

have a strong preference that immigration arrests be based on warrants, *Arizona v. U.S.*, 567 U.S.

387, 407–08 (2012), and a warrantless arrest without probable cause violates the Fourth

Amendment. *Michigan v. Summers*, 452 U.S. 692, 700 (1981). In the civil immigration context,

probable cause requires individualized reason to believe that a non-citizen has committed a civil

immigration offense for which arrest is permitted. *See United States v. Lopez*, 482 F.3d 1067, 1072

(9th Cir. 2007).

81.    In addition, where a warrantless arrest occurs, "the Fourth Amendment requires a

judicial determination of probable cause as a prerequisite to extended restraint of liberty following

arrest." *Gerstein*, 420 U.S. at 126. That determination must be "timely," *id.* meaning it must occur

"within 48 hours after arrest" absent "the existence of a bona fide emergency or other extraordinary

circumstance." *Cnty. of Riverside v. Mclaughlin*, 500 U.S. 44, 57 (1991). That rule applies equally

to civil immigration arrests. *Gonzalez v. ICE*, 975 F.3d 788, 824–26 (9th Cir. 2020).

82.    The Due Process Clause also protects noncitizens, including refugees within the

United States, from arbitrary or discriminatory government action to deprive them of liberty.

"Freedom from imprisonment—from government custody, detention, or other forms of physical

restraint—lies at the heart of the liberty that [the Due Process] Clause protects." *Zadvydas v. Davis*,

533 U.S. 678, 690 (2001). Because immigration detention is nominally for civil, as opposed to

criminal, process, it is generally only permitted where it serves its only permissible justifications: mitigating risk of flight or dangerousness to the community during the removal process. *Id*. Detention for other reasons unconstitutional. *See id*.

83.    The Due Process Clause "imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests," requiring "that a person in jeopardy of serious loss [be given] notice of the case against him and the opportunity to meet it." *Mathews v. Eldridge*, 424 U.S. 319, 322, 348 (1976). And those due process protections extend to "all 'persons' within the United States, including [noncitizens], whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas*, 533 U.S. at 679.

## IV.    The Government's Targeting of Refugees in the United States

84.    On the first day of his second term, President Trump signed dozens of executive orders, including one titled "Realigning the United States Refugee Admissions Program." Exec. Order No. 14,163, 90 Fed. Reg. 8459 (Jan. 30, 2025) (Refugee Ban EO).

85.    The Refugee Ban EO imposes an indefinite suspension of "entry into the United States of refugees under the USRAP" as well as a suspension on "decisions on applications for refugee status" until President Trump finds that decisions on refugee applications and admissions can resume. *See* Refugee Ban EO, § 3(a)–(b). The Refugee Ban EO did not provide any deadline by which the President will determine whether the USRAP can resume, if ever.[1]

86.    Section 2 of the Refugee Ban EO details President Trump's stated policies for refugee admissions, which the Order explains will be the basis of his finding of whether "resumption of the USRAP is in the interests of the United States." It states that "it is the policy

---

[1] In February and March 2025, a federal district court in the Western District of Washington enjoined the ban on refugee entry and the freeze on refugee processing. *Pacito v. Trump*, 768 F. Supp. 3d 1199 (W.D. Wash. 2025); 772 F. Supp. 3d 1204 (W.D. Wash. 2025). Those injunctions have been largely stayed in the Ninth Circuit pending appeal. 152 F.4th 1082 (9th Cir. 2025).

of the United States . . . that public safety and national security are paramount considerations in the administration of the USRAP, and to admit only those refugees who can fully and appropriately assimilate into the United States and to ensure that the United States preserves taxpayer resources for its citizens." Refugee Ban EO, § 2.

87.     The requirement that refugees appear able to "fully and appropriately assimilate" before being permitted to enter appears nowhere in the statutory definition of refugee. *See* 8 U.S.C. §1101(a)(42).

88.     But the President's meaning became clear soon after issuing the Refugee Ban EO. Thousands of refugees from Africa, Asia, Latin America, and the Middle East with scheduled travel into the United States—including the immediate relatives of refugees who had already been admitted—were refused resettlement under Refugee Ban EO. But on February 7, 2025, President Trump issued a new Executive Order authorizing the establishment of a program of refugee resettlement exclusively for white Afrikaners from South Africa. This group began arriving in the United States on a government-chartered jet on May 12, 2025.

89.     And on October 31, 2025, President Trump issued a new Presidential Determination setting forth the numbers of refugees who would be admitted in Fiscal Year 2026, without withdrawing the Refugee Ban EO. Presidential Determination No. 2025-13, 90 Fed. Reg. 49005 (Oct. 31, 2025). The Presidential Determination set the cap for refugee admissions to a historic low of 7,500, compared to many tens of thousands in years prior and directed that these admissions numbers "primarily be allocated among Afrikaners from South Africa." *Id*.

90.     Soon thereafter, the Trump Administration began implementing new policies to target refugees within the United States. On November 21, 2025, Director of USCIS Joseph Edlow issued a memorandum directing USCIS to review refugee admissions and re-interview all refugees admitted to the country between January 20, 2021, and February 20, 2025—that is, refugees who

had already been vetted and approved, but whose admission into the United States occurred under the Biden Administration. *See* Ex. 4, Memorandum from Joseph B. Edlow, Director of U.S. Citizenship and Immigr. Servs. to Sarah Kendall, Ted Kim, and Andrew Davidson, Associate Directors of U.S. Citizenship and Immigr. Servs., *Reinterview of Certain Refugees Admitted to the United States and an Immediate Hold on Certain Refugees with a Pending I-485 Application to Register Permanent Residence or Adjust Status* (Nov. 21, 2025).[2] The memorandum directs USCIS officers to "hold" all pending refugee applications for lawful permanent residence—i.e. the very adjustment of status applications contemplated by 8 U.S.C. § 1159—"until the USCIS Director lifts the hold in a subsequent memo." *Id.* at 2. The memorandum states that "USCIS's top priority is to ensure that all principal refugees admitted to the United States warranted a favorable exercise of discretion." *Id.*

91.     Notably, the refugees targeted by this announcement exclude the white Afrikaner beneficiaries of the Administration's new refugee resettlement efforts.

92.     On December 2, 2025, USCIS issued a memorandum directing an additional pause of all USCIS benefit applications, including applications to adjust status by refugees, for all individuals "from countries listed in" Proclamation 10,949, the "travel ban" that suspended the entry of nationals from 19 countries, including Afghanistan, Somalia, and Sudan. Ex. 5, PM-602-0192, *Hold and Review of all Pending Asylum Applications and all USCIS Benefit Applications Filed by Aliens from High-Risk Countries* (Dec. 2, 2025)*.* On January 1, 2026, USCIS issued a supplemental memorandum expanding the hold to the countries covered by the new travel ban proclamation issued by President Trump in December, which covers twenty additional countries, including South Sudan, Syria, and Venezuela. U.S. Citizenship and Immigr. Servs., *Hold and*

---

[2] USCIS later partially unfroze this processing pause in response to litigation in Minnesota. *See* Ex. 6, Nathan Stiefel, *Decision on Lifting Hold for Operation PARRIS* (Jan. 13, 2026).

*Review of USCIS Benefit Applications Filed by Aliens from Additional High-Risk Countries* (Jan. 1, 2026), https://perma.cc/B6YE-M4QT (citing Pres. Proc. No. 10,998, 90 Fed. Reg. 59717 (Dec. 19, 2025)).

93.     Trump Administration officials also directed hostile rhetoric towards refugees. On December 1, 2025, Secretary Noem posted on social media that she had met with the President and was recommending "a full travel ban on every damn country that's been flooding our nation," describing immigrants as "killers," "leeches," and "foreign invaders," and stating, "WE DON'T WANT THEM. NOT ONE."[3]

94.     Similar statements focused primarily on those from Afghanistan and Somalia.[4] On December 2, 2025, President Trump declared at a cabinet meeting, "We're going to go the wrong way if we keep taking in garbage into our country," specifically referring to individuals from Somalia. "I don't want them in our country. I'll be honest with you.... Their country stinks. And we don't want them in our country. I could say that about other countries too."[5]

95.     On December 9, 2025, President Trump praised his administration's decision to bar nationals of 19 countries – all non-white and non-European – from entering the United States, stating, "I've also announced a permanent pause on third world migration, including hellholes like Afghanistan, Haiti, and Somalia and many other countries."[6]

96.     On January 9, 2026, USCIS issued a press release announcing, "Operation

---

[3] Secretary Kristi Noem (@Sec_Noem), X (Dec. 1, 2025, at 6:52 PM) https://perma.cc/8DP3-KFS9.

[4] Shawn McCreesh, *Trump Uses National Guard Shooting to Cast Suspicion on Refugees*, New York Times (Nov. 27, 2025), https://perma.cc/T6N5-ZUDN.

[5] PBS News, *WATCH: Trump says he doesn't want Somali migrants in the U.S., calls people 'garbage'* (Dec. 2, 2025), https://perma.cc/6VHQ-Q62A.

[6] Alexandra Marquez, *Trump revives slur while discussing immigrants from Somalia and other 'disgusting' nations*, NBC News (Dec. 10, 2025), https://perma.cc/E3Z7-M7X7.

PARRIS," to "target[]" allegedly "fraudulent refugee applications in Minnesota"[7] by "reexamining thousands of refugee cases through new background checks and intensive verification of refugee claims."

97.    USCIS announced that "[t]he initial focus is on Minnesota's 5,600 refugees who have not yet been given lawful permanent resident status (Green Cards)," but left open the likelihood that the operation would later expand to refugees residing in other states.

98.    Upon information and belief, Operation PARRIS does not target refugees based on individualized indicia of fraud. Rather, it targets all unadjusted refugees in Minnesota, even while USCIS initially froze adjudicating refugee adjustment of status applications on behalf of the same population.

99.    Under Operation PARRIS, refugees were typically detained briefly in Minnesota. Many have been flown to Texas where they are detained and subjected to interrogation about their initial refugee applications. Those who are interrogated are not given the opportunity to review their applications and often have no chance to seek legal assistance.

100.    Some refugees have been released onto the streets of Texas cities after several days in detention, but without their documents or any means of returning home. Others have been detained without release. Yet others have been issued notices, following interrogation, that the government intends to revoke their refugee admission.

101.    As part of this detention scheme, DHS took the position, in response to multiple habeas petitions filed in the District of Minnesota, that 8 U.S.C. §1159 mandates indefinite detention of all unadjusted refugees after one year.

102.    On January 28, 2026, a district court in the District of Minnesota issued a temporary

---

[7] Press Release, U.S. Citizenship and Immigr. Servs., DHS Launches Landmark USCIS Fraud Investigation in Minnesota (Jan. 9, 2026), https://perma.cc/Z92V-NTP7.

restraining order on behalf of class of refugees resident in Minnesota, enjoining Defendants from arresting or detaining refugees in Minnesota on the basis that they have not yet adjusted to lawful permanent resident status and ordering the immediate return and release of the members of a putative subclass consisting of those refugees who are presently detained under the policy. *See U.H.A. v. Bondi*, No. 26-417 (JRT/DLM), 2026 WL 222226, at *1 (D. Minn. Jan. 28, 2026).

103.    On January 31, 2026, the government sought to dissolve the TRO arguing, among other things, that the 2010 ICE Policy, that interpreted the INA to prohibit the detention of refugees on the sole basis that they had not yet applied for adjustment to LPR status, had been rescinded on December 18, 2025 and could not serve as the basis for the court's order. *See id.*, Dkt. No. 56 (Motion to Dissolve TRO) at 12, n.5. The court denied that request on February 9, 2026. *See id.*, Dkt. No. 109 (Order).

## V.    The Refugee Detention Policy

104.    The December 18, 2025, rescission of the 2010 ICE Policy was made public for the first time in late January as part of the *UHA* litigation. *See* Ex. 1, Refugee Rescission Memo. In the Refugee Rescission Memo, the Acting Executive Associate Director for ICE, Marcos Charles, purported to authorize the detention of all lawfully admitted refugees who have not yet adjusted their status to lawful permanent resident by rescinding a 2010 ICE Policy Memo that said the opposite: that a refugee's failure to adjust status was not grounds for detention. The one-sentence memo authorized this about face by citing to the December 16, 2025, Presidential Proclamation mentioned above.[8] But that Proclamation provides that it "shall not apply to an individual who has been granted asylum by the United States or to a refugee who has already been admitted to the United States." Proclamation No. 10998, 90 Fed. Reg. 59717 § 8(d) (Dec. 19, 2025).

---

[8] Proclamation No. 10998, 90 Fed. Reg. 59717 (Dec. 16, 2025).

105.     On February 18, 2026, despite the court order in Minnesota, Defendants Edlow and Lyons issued a memorandum titled "Detention of Refugees Who Have Failed to Adjust to Lawful Permanent Resident Status," (the Refugee Detention Memo). Ex. 2. The Refugee Detention Memo purports to establish a "new policy," interpreting 8 U.S.C. § 1159(a)(1) to mandate potentially indefinite detention of all unadjusted refugees after one year. *Id.* at 1-2. The Refugee Detention Memo asserts that refugee admissions under section 1157 are "conditional" and so refugees become, again, "applicants for admission" seeking lawful entry to the country after one year. *Id.* at 3-4. The Refugee Detention Memo further contends that because section 1159(a)(1) references, among other things, 8 U.S.C. § 1225, that therefore refugees are subject "to the same detention-and-inspection framework that applies to other applicants for admission," and "detention during this process is expected and required." *Id.* at 4. The Refugee Detention Memo also purports to authorize arrests for purposes of detention under section 1159 without a warrant. *Id.*

106.     The Refugee Detention Memo also asserts that indefinite detention is necessary to ensure that the government can re-vet lawfully admitted refugees, contending, without evidence, that significant percentages of lawfully admitted refugees present public safety concerns or engage in fraud in procuring their refugee admission. *Id.* at 4-5.

107.     Finally, the Refugee Detention Memo dismissed the reliance interests of refugees who entered the United States prior to February 18, 2026, contending that notwithstanding longstanding government policy and the 2010 ICE Policy, such refugees could not reasonably rely on not being subject to indefinite detention after one year of physical presence in this country. *Id.* at 6.

108.     The Refugee Rescission Memo and Refugee Detention Memo have immediate effect and were not issued using notice and comment procedures required for legislative rules that alter the substantive rights of regulated parties.

109.    Together the two distinct agency actions, the Refugee Rescission Memo and the Refugee Detention Memo, constitute Defendant's Refugee Detention Policy.

## CLASS ACTION ALLEGATIONS

110.    Individual Plaintiffs seek to represent a class of individuals who have been or will be subjected to the Refugee Detention Policy this lawsuit challenges.

111.    Plaintiffs Jean A., Hamad B., Mona C., Yasmine D., Sam E., and Abdo F. seek to represent a class under Federal Rule Civil Procedure 23(a) and (b)(2) consisting of: All individuals with refugee status who have not yet adjusted to lawful permanent resident status who have been or will be detained pursuant to the Refugee Detention Policy.

112.    The proposed Class satisfies Rule 23(a)(1) because the class is so numerous that joinder of all members is impracticable. On information and belief, over 100,000 unadjusted refugees are in the United States.

113.    The proposed Class satisfies Rule 23 (a)(2) because there are multiple questions of law and fact common to all members of the proposed class. Those common questions include, but are not limited to:

A.    Whether Defendants' policy of arresting and detaining unadjusted refugees with the knowledge that they are not removable and not a flight risk violates the INA, the APA, and the Constitution;

B.    Whether Defendants' policy of detaining refugees solely based on their failure to adjust status within one year violates the INA, the APA, and the Fourth and Fifth Amendments to the Constitution;

C.    Whether the Refugee Rescission Memo and Refugee Detention Memo are invalid because they are legislative rules and DHS did not go through notice and comment procedures before implementing them; and

D.     Whether the Refugee Rescission Memo and Refugee Detention Memo are arbitrary and capricious under the APA.

114.    The proposed Class satisfies Rule 23(a)(3) because the claims of the Named Plaintiffs are typical of the claims of the class. Each class member's claims arise from Defendants' adoption of the Refugee Detention Policy, and each class member has experienced or will experience the same primary injuries.

115.    The proposed Class satisfies Rule 23(a)(4) because the proposed class representatives are committed to fairly and adequately defending the rights of all proposed class members. Individual Plaintiffs seek the same relief as all members of the class, and their interests are not in conflict with the interests of the class. They have obtained counsel at Democracy Forward Foundation and International Refugee Assistance Project, who have substantial experience litigating class action lawsuits and other complex federal litigation on behalf of noncitizens.

116.    The proposed Class also satisfies Rule 23(b)(2) because Defendants have acted on grounds that apply generally to the class so that the relief sought is appropriate as to the class as a whole.

## CLAIMS FOR RELIEF

## COUNT I

**Violation of the INA, 8 U.S.C. §§ 1159, 1225(b), 1226, 1357, Fourth and Fifth Amendments of the U.S. Constitution, APA, 5 U.S.C. § 706(2)(A), (B) – Contrary to Law and Constitutional Right**

117.    The paragraphs above are incorporated and reasserted as if fully set forth herein.

118.    A reviewing court must "hold unlawful and set aside agency action" that is "not in accordance with law," "contrary to constitutional right, or in "excess of statutory . . . authority." 5 U.S.C. § 706(2)(A), (B).

119.    The Refugee Rescission Memo and Refugee Detention Memo are final agency actions under the APA. 5 U.S.C. § 704.

120.    The Refugee Detention Policy, as articulated in the Refugee Rescission Memo and the Refugee Detention Memo, exceeds Defendants' statutory authority under the INA. Lawfully admitted refugees, who have entered the country following inspection by an immigration officer, and who have not been issued a notice to appear for removal proceedings may not be detained under any of the provisions on which Defendants rely.

121.    8 U.S.C. § 1159(a) does not authorize Defendants to promulgate a policy of mandatory detention of refugees and does not authorize, let alone mandate, detention of unadjusted refugees. It merely confers upon DHS the responsibility to inspect and examine refugees in order to adjust their status to lawful permanent resident under § 1159(a)(2).

122.    Nor do sections 1225, 1229a, or 1231 authorize let alone mandate detention. Section 1225 applies only to certain "applicants for admission," that is, a noncitizen "present in the United States who *has not been admitted* or who *arrives in* the United States." 8 U.S.C. § 1225(a)(1) (emphasis added). A noncitizen who has been admitted to the United States as a refugee and has been physically present for at least one year is not an applicant for admission, is not seeking admission, and is not arriving in the country.

123.    Section 1229a simply authorizes removal proceedings for those charged with removability. 8 U.S.C. § 1229a. And section 1231 authorizes detention for noncitizens subject to final orders of removal. 8 U.S.C. § 1231(a).

124.    Finally, section 1357 does not authorize warrantless arrest or detention of refugees. That provision limits Defendants' authority to engage in warrantless arrests, such as those the Refugee Detention Policy authorizes, to circumstances where "[the officer] has reason to believe that the [noncitizen] so arrested is in the United States in violation of [the immigration laws] and

is likely to escape before a warrant can be obtained for his arrest, but the [noncitizen] arrested shall be taken without unnecessary delay for examination before an officer of the Service having authority to examine [noncitizens] as to their right to enter or remain in the United States." 8 U.S.C. § 1357(a)(2). Lawfully admitted refugees have not violated any immigration law and Defendants' Refugee Detention Policy identifies no basis to categorically treat all unadjusted refugees as violating any law or regulation, let alone treat them as likely to escape before a warrant can be obtained. Section 1357 does authorize or mandate detention.

125.    Because no statute authorizes the government's Refugee Detention Policy, it is not in accordance with law and must be set aside under 5 U.S.C. § 706(2)(A). The Refugee Detention Policy also violates the Fourth and Fifth Amendments to the U.S. Constitution, *see supra*, and is contrary to law and constitutional right on that basis.

## COUNT II

### Violation of the APA, 5 U.S.C. § 706(2)(A) – Arbitrary and Capricious

126.    The paragraphs above are incorporated and reasserted as if fully set forth herein.

127.    The APA provides that courts "shall . . . hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

128.    The Refugee Rescission Memo and Refugee Detention Memo are final agency actions under the APA. 5 U.S.C. § 704.

129.    Among other reasons, the Refugee Rescission Memo and Refugee Detention Memo are arbitrary and capricious because, in adopting the new Refugee Detention Policy and abandoning the prior policy, including the 2010 ICE Policy, Defendants have failed to articulate a reasoned explanation for their decision, which represents a change in the agency's longstanding policy; entirely failed to consider important aspects of the problem; offered explanations for their

decision that run counter to the evidence before the agency; relied on incorrect and inaccurate data; failed to consider reasonable alternatives; and failed to consider reliance interests.

130.    Because the Refugee Detention Policy, as articulated in the Refugee Rescission Memo and Refugee Detention Memo, and its purported revocation of the 2010 ICE guidance is arbitrary and capricious, it must be set aside under 5 U.S.C. § 706(2)(A).

## COUNT III

### Violation of the APA, 5 U.S.C. § 553, 706(2)(D) – Notice and Comment and Without Observance of Procedure Required by Law

131.    The paragraphs above are incorporated and reasserted as if fully set forth herein.

132.    A reviewing court must "hold unlawful and set aside agency action" that is "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

133.    The APA, 5 U.S.C. § 553, requires that agencies provide public notice of, and opportunity to comment on, legislative rules before their promulgation. *See* 5 U.S.C. § 553(b), (c).

134.    The APA also requires that any substantive rule must be published at least 30 days prior to its effective date. *See* 5 U.S.C. § 553(d).

135.    The Refugee Rescission Memo and Refugee Detention Memo are legislative rules within the meaning of the APA.

136.    DHS did not comply with the APA's procedural requirements when it made the Refugee Rescission Memo and Refugee Detention Memos immediately effective without providing any opportunity for the public to submit comments. DHS also did not make the December 18, 2025, Refugee Rescission Memo public until January 31, 2026, and only did so as an exhibit to a brief in pending litigation.

137.    No exception to notice-and-comment procedures applies to the Refugee Rescission Memo or the Refugee Detention Memo.

138.    Defendants' failure to provide for notice and comment violates 5 U.S.C. § 553(b) and (c) and renders the Refugee Rescission Memo and Refugee Detention Meme invalid.

139.    Defendants' failure to publish the Refugee Rescission Memo and Refugee Detention Memo 30 days before their effective date violates 5 U.S.C. § 553(d) and renders the Memos procedurally invalid.

## COUNT IV

### Violation of the APA, 5 U.S.C. § 706(2), 8 C.F.R. § 207.9, 287.3, 287.8, USCIS Policy Manual – *Accardi* Doctrine

140.    The paragraphs above are incorporated and reasserted as if fully set forth herein.

141.    The Refugee Detention Policy, as articulated in the Refugee Rescission Memo and the Refugee Detention Memo, is contrary to the express terms of the statute and the implementing regulations described above, and should therefore be set aside under the principle articulated in *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954).

142.    The Refugee Detention Policy also violates 8 C.F.R. § 207.9, which sets out limited circumstances under which refugee status may be revoked and provides a process, including notice and an opportunity to respond. By detaining Plaintiffs, Defendants treat them as removable in violation of DHS's policies and procedures for revocation of status.

143.    The Refugee Detention Policy also violates 8 C.F.R. § 209.1. That regulation requires refugees to submit an application and await a determination "whether an interview [on a case-by-case basis] by an immigration officer is necessary to determine the applicant's admissibility for permanent resident status under this part." The regulation does not require detention let alone a return to DHS for purposes of submitting to detention and instead requires only submission of an application to return to custody. Yet the Refugee Detention Policy does not consider submitting an application to be a "return to custody" notwithstanding binding regulations

that provide otherwise.

144.    Defendants also violate 8 C.F.R. § 287.8(c)(2)(i) by arresting refugees without "reason to believe that the person to be arrested has committed an offense against the United States or is a[] [noncitizen] illegally in the United States." Lawfully admitted refugees in valid status have never violated immigration laws. Further, Defendants openly admit that they do not target individuals they have "reason to believe" are deportable or whose status is revocable; rather, they seek to detain all unadjusted refugees for mandatory detention.

145.    Finally, Defendants violate 8 C.F.R. 287.3(d), which requires that following a warrantless arrest "a determination will be made within 48 hours of the arrest, except in the event of an emergency or other extraordinary circumstance in which case a determination will be made within an additional reasonable period of time, whether the [noncitizen] will be continued in custody or released on bond or recognizance and whether a notice to appear and warrant of arrest as prescribed in 8 CFR parts 236 and 239 will be issued." The Refugee Detention Policy purports to authorize detention beyond 48 hours and provides no explanation warranting ignoring 8 C.F.R. § 287.3(d).

146.    Defendants' actions, as set forth above, fail to comply with the issuing agencies' regulations and controlling policies and are therefore arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, in violation of the APA, 5 U.S.C. § 706(2)(A).

## COUNT V

### Violation of the Fourth Amendment

147.    The paragraphs above are incorporated and reasserted as if fully set forth herein.

148.    The Fourth Amendment bars unreasonable searches and seizures, including noncitizens lawfully admitted as refugees. *United States v. Brignoni-Ponce*, 422 U.S. 873, 884 (1975).

149.    The Fourth Amendment requires that all arrests entail a neutral, judicial determination of probable cause. *See Gerstein v. Pugh*, 420 U.S. 103, 114 (1975). Courts have a strong preference that immigration arrests be based on warrants, *Arizona v. U.S.*, 567 U.S. 387, 407–08 (2012), and a warrantless arrest without probable cause violates the Fourth Amendment. *Michigan v. Summers*, 452 U.S. 692, 700 (1981). In the civil immigration context, probable cause requires individualized reason to believe that a non-citizen has committed a civil immigration offense for which arrest is permitted. *See, e.g.*, *United States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007).

150.    In addition, where a warrantless arrest occurs, "the Fourth Amendment requires a judicial determination of probable cause as a prerequisite to extended restraint of liberty following arrest." *Gerstein*, 420 U.S. at 126. That determination must be "timely," *id.* meaning it must occur "within 48 hours of arrest" absent "the existence of a bona fide emergency or other extraordinary circumstance." *Cnty. of Riverside v. Mclaughlin*, 500 U.S. 44, 57 (1991).

151.    The Refugee Detention Policy authorizes warrantless arrests without probable cause, causing prolonged restraint on liberty following arrest, i.e., longer than 48 hours, in violation of the Fourth Amendment.

152.    The Refugee Detention Policy of arresting refugees who are in lawful status and detaining them longer than 48 hours when they have not been charged with any ground of removability violates the Fourth Amendment of the U.S. Constitution.

## COUNT VI

### Violation of the Due Process and Equal Protection Clauses of the Fifth Amendment to the United States Constitution

153.    The paragraphs above are incorporated and reasserted as if fully set forth herein.

154.    The Due Process Clause of the Fifth Amendment provides that "[n]o person shall .

. . be deprived of life, liberty, or property, without due process of law. . . ."

155.    The Refugee Detention Policy requires detaining lawfully present refugees with no

lawful basis or justification.

156.    The Refugee Detention Policy mandates detention for refugees who are not in

removal proceedings let alone subject to removal and is therefore categorically unconstitutional.

*See Zadvydas*, 533 U.S. at 690-92 (discussing constitutional limitations on civil detention).

157.    And even if removal were at issue, the Refugee Detention Policy does not provide

any explanation as to why unadjusted, lawfully admitted refugees are a flight risk or danger. *See

id.* Detention is therefore unconstitutional and absent any basis to otherwise detain is strictly

punitive.

158.    Even if Defendants' proffered basis for detention under 8 U.S.C. §1159 were

legally viable (which it is not), by its own words it confers custodial authority for the sole purpose

of adjudicating adjustment of status from "refugee" to "immigrant." The need to perform an

interview for the purpose of adjustment of status neither justifies nor requires any other action the

Refugee Detention Memo directs DHS employees to take in arresting and detaining refugees.

159.    Because Defendants have no legitimate, non-punitive objective in detaining

Plaintiffs, their detention violates the substantive component of the Due Process Clause of the Fifth

Amendment to the U.S. Constitution.

160.    The Due Process Clause also requires notice and opportunity to be heard prior to a

deprivation of a liberty interest. *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976). The Refugee

Detention Policy provides no meaningful pre-deprivation process prior to the arrest and detention.

161.    The policy of arresting and detaining refugees in lawful status without providing

any explanation, notice of the reasons for their detention or meaningful opportunity to respond

violates procedural due process under the Fifth Amendment to the U.S. Constitution.

162.    As a result of Defendants' unlawful policy, refugees face imminent deprivation of liberty without notice and opportunity to be heard.

163.    The Due Process Clause of the Fifth Amendment also prohibits the federal government from denying individuals the equal protection of the law

164.    As demonstrated by President Trump's and Secretary Noem's own words, by their disregard of statutory requirements, by the pretextual reasons given for arresting and detaining refugees from nonwhite countries and those admitted during the Biden administration, and by their efforts to remove nonwhite immigrants while simultaneously facilitating the entry of white immigrants, the Refugee Detention Policy was, at least in part, improperly motivated by animus and discriminatory intent based on race and ethnicity.

165.    Defendants' discriminatory animus and lack of rational basis to target unadjusted refugees for arrest and detention pursuant to the Refugee Detention Policy thus violates the equal protection component of the Due Process Clause.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

1.    Declare that the Refugee Rescission Memo and Refugee Detention Memo are contrary to law, regulation, and the Constitution, and also arbitrary and capricious.

2.    Temporarily restrain, preliminarily enjoin and/or stay the Refugee Rescission Memo, Refugee Detention Memo, and Refugee Detention Policy pursuant to Federal Rule of Civil Procedure 65(a) and (b) and/or 5 U.S.C. § 705 during the pendency of this suit;

3.    Permanently enjoin the Refugee Rescission Memo, Refugee Detention Memo, and Refugee Detention Policy;

4. Enter an order vacating and setting aside the Refugee Rescission Memo and the Refugee Detention Memo pursuant to 5 U.S.C. § 706;

5. Certify the Class and appoint Named Plaintiffs as class representatives and appoint undersigned counsel as class counsel;

6. Award Plaintiffs' counsel attorneys' fees and costs for this action; and

7. Award such other and further relief that the Court may deem just, equitable, and proper.

Dated: February 27, 2026

Ghita Schwarz*
Guadalupe V. Aguirre*
Mevlüde Akay Alp*
Kimberly Grano*
Pedro Sepulveda*
**INTERNATIONAL REFUGEE ASSISTANCE PROJECT**
One Battery Plaza, 33rd floor
New York, New York 10004
Telephone: (646) 939-9169
Facsimile: (516) 324-2267
gschwarz@refugeerights.org
laguirre@refugeerights.org
makayalp@refugeerights.org
kgrano@refugeerights.org
psepulveda@refugeerights.org

Dalia Fuleihan*
**INTERNATIONAL REFUGEE ASSISTANCE PROJECT**
P.O. Box 47611
Chicago, IL 60647
Telephone: (646) 740-6271
Facsimile: (516) 324-2267
dfuleihan@refugeerights.org

*/s/ Kali Schellenberg*
Kali Schellenberg (MA BBO No. 694875)
Erez Reuveni* (CA Bar No. 264124)
Jennie L. Kneedler* (DC Bar No. 500261)
Ryan Cooper* (DC Bar No. 1645301)
Steven Y. Bressler* (DC Bar No. 482492)
Robin F. Thurston* (DC Bar No. 1531399)
**DEMOCRACY FORWARD FOUNDATION**
P.O. Box 34553
Washington, DC 20043
Phone: (202) 573-7950 (Schellenberg)
kschellenberg@democracyforward.org
ereuveni@democracyforward.org
jkneedler@democracyforward.org
rcooper@democracyforward.org
sbressler@democracyforward.org
rthurston@democracyforward.org

*Counsel for All Plaintiffs*

* Motion to appear *pro hac vice* forthcoming