**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

JEAN A., *et al.*,

     *Plaintiffs*,

v.

KRISTI NOEM, in her official capacity as
Secretary of Homeland Security, *et al.*,

     *Defendants*.

Case No. 3:26-cv-30031

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR A STAY
OF AGENCY ACTION UNDER 5 U.S.C. § 705**

**INTRODUCTION**

This suit challenges the Trump administration's unlawful decision to subject over 100,000 lawfully admitted refugees to warrantless arrests and mandatory, indefinite detention without statutory authority and in violation of the Fourth and Fifth Amendments. Defendants' Refugee Detention Policy, set forth in two agency memoranda, reverses over 45 years of practice, which limited detention of refugees to the same circumstances that govern detention of any noncitizen – that is, circumstances or conduct that render them removable.[1] Under the Refugee Detention Policy, any lawfully admitted refugee who has not adjusted their status to lawful permanent residence after one year in the United States can be subject to warrantless arrest and indefinite detention. Defendants seek to impose this extraordinary policy even though, by law, refugees are not permitted to adjust their status until they have been in the United States for one year and even though Defendants themselves have control over the timing of the adjudication of refugees' applications for lawful permanent residence.

The Refugee Detention Policy is illegal because it violates the very statute it relies on, fails to provide a reasoned justification for its dramatic departure from over 45 years of practice, and was implemented without the notice and comment procedures required under the Administrative Procedure Act (APA). Moreover, Defendants' legal position represents a remarkable and dangerous expansion of the government's purported authority to arrest and detain lawfully present individuals who have not violated any law without any process whatsoever to challenge their arrest or detention. Defendants' Refugee Detention Policy not only violates the constitution, it betrays

---

[1] *See* ECF 1-3, Marcos Charles, *Rescission ICE Policy No. 11039.1: Detention of Refugees Admitted Under INA § 207 Who Have Failed to Adjust to Lawful Permanent Resident Status (May 10, 2010*) (Dec. 18, 2025) ("Refugee Rescission Memo"); ECF 1-4, Joseph B. Edlow & Todd M. Lyons, *Detention of Refugees Who Have Failed to Adjust to Lawful Permanent Resident Status* (Feb. 18, 2026) ("Refugee Detention Memo").

the United States' longstanding commitment to provide a safe haven for refugees whom we have invited to live in our communities.

Given the imminent threat to Plaintiffs—refugees resettled in this country and organizations that serve them—Plaintiffs ask that the Court stay the agency memoranda underlying the Refugee Detention Policy pursuant to 5 U.S.C. § 705, pending final resolution on the merits. Defendants' actions place Individual Plaintiffs and tens of thousands of other refugees at imminent risk of arrest, detention, and separation from their families and communities without lawful process. The court should therefore grant preliminary relief and should stay the Refugee Detention Policy pending resolution of this case.

## BACKGROUND

### I. Refugee Processing and Adjustment of Status

Congress amended the Immigration and Nationality Act (INA) in 1980 by enacting the Refugee Act, which embodies the U.S. commitment to humanitarian assistance for those fleeing persecution. Pub. L. No. 96-212, 94 Stat. 102 (1980). In enacting the Refugee Act, Congress sought to "provide a permanent and systematic procedure for the admission . . . of refugees of special humanitarian concern to the United States, and to provide comprehensive and uniform provisions for the effective resettlement and absorption of those refugees who are admitted." *Id*. § 101(b). A "refugee" is a person facing displacement from his or her country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion. *See* 8 U.S.C. § 1101(a)(42).

The Refugee Act sets out detailed policies and procedures governing refugee admission and resettlement in the United States. *See id*. § 1157 *et seq*. Refugees must go through extensive, often years-long vetting before they may even be considered for resettlement in this country. *See*

2

USCIS, Refugee Processing and Security Screening.[2] The DHS Secretary is authorized to admit to the United States "any refugee who is not firmly resettled in any foreign country, is determined to be of special humanitarian concern to the United States, and is admissible . . . as an immigrant." 8 U.S.C. § 1157(c)(1); *see* 8 C.F.R. §§ 207.1–207.7. A refugee's spouse or child is entitled to admission as a refugee even without meeting the statutory definition. 8 U.S.C. § 1157(c)(2)(A).

An individual's refugee status may be terminated only if DHS "determines that the [noncitizen] was not in fact a refugee within the meaning of section 1101(a)(42) of this title at the time of the [noncitizen's] admission." *Id*. § 1157(c)(4); 8 C.F.R. § 207.9. Before refugee status is terminated, USCIS must notify the individual in writing of its intent to terminate their refugee status, and the individual has 30 days from the date notice is served upon them to present evidence to show why their status should not be terminated. 8 C.F.R. § 207.9. If USCIS terminates refugee status, USCIS then processes the individual for removal, *id*., meaning USCIS issues a notice to appear and initiates removal proceedings under 8 U.S.C. § 1229a.

Separately, Congress provided that all individuals admitted as refugees will have their status adjusted to that of a lawful permanent resident so long as their refugee admission has not been terminated and they are not found, upon inspection after one year, to be inadmissible to the United States. 8 U.S.C. § 1159(a)(1); 8 C.F.R. § 209.1. By regulation refugees are required to apply to USCIS one year after entry in order for USCIS to determine their admissibility. 8 C.F.R. § 209.1(a)(1). Interviews are not mandatory and occur only case-by-case. *Id.* If the applicant is found to be admissible for permanent residence, USCIS must approve the application, admit the applicant for lawful permanent residence as of the date of the noncitizen's arrival in the United States, and issue proof of such status. *Id*. § 209.1(e); *see* 8 U.S.C. § 1159(a)(2). If USCIS denies

---

[2] *Available at* https://perma.cc/86KA-FPKP (archived Feb. 25, 2026).

the application, it must "notify an applicant of the right to renew the request for permanent residence" in full removal proceedings under 8 U.S.C. § 1229a. 8 C.F.R. § 209.1(e).

Prior to the actions challenged here, DHS' policy on detention of unadjusted refugees was reflected in a 2010 ICE Memorandum. *See* ECF 1-5, *ICE Policy No. 11039.1: Detention of Refugees Admitted Under INA § 207 Who Have Failed to Adjust to Lawful Permanent Resident Status* (May 10, 2010) ("2010 ICE Policy"). This Policy confirmed that, consistent with § 1159, a refugee's failure to adjust status or to apply for adjustment "is not sufficient grounds to place them in removal proceedings, and therefore not a proper basis for detaining them." *Id*. at 2.

## II. Defendants' Scheme to Detain and Punish Refugees

### A. The Government Pauses Processing Refugee Adjustment Applications

On November 21, 2025, Defendant Edlow directed USCIS to immediately pause processing of all adjustment of status applications filed by refugees admitted to the country between January 20, 2021, and February 20, 2025, with the purpose, among other things, of ensuring "that all principal refugees admitted to the United States warranted a favorable exercise of discretion." *See* ECF 1-6, Joseph B. Edlow, *Reinterview of Certain Refugees Admitted to the United States and an Immediate Hold on Certain Refugees with a Pending I-485 Application to Register Permanent Residence or Adjust Status* at 2 (Nov. 21, 2025).[3] Then, on December 2, 2025 and January 1 2026, USCIS issued two memoranda directing the pause of all USCIS benefit applications, including applications to adjust status by refugees, for all individuals from countries listed in two Presidential Proclamations barring entry of nationals from many countries.[4]

---

[3] USCIS later partially unfroze this processing pause in response to litigation in Minnesota. *See* ECF 1-8, Nathan Stiefel, *Decision on Lifting Hold for Operation PARRIS* (Jan. 13, 2026).
[4] *See* USCIS, PM-602-0192, *Hold and Review of all Pending Asylum Applications and all USCIS Benefit Applications Filed by Aliens from High-Risk Countries* (Dec. 2, 2025), https://perma.cc/VG95-6Z2V; USCIS, PM-602-0194, *Hold and Review of USCIS Benefit*

### B. Operation PARRIS

On January 9, 2026, USCIS announced "Operation PARRIS" to "target[]" allegedly "fraudulent refugee applications in Minnesota" by "reexamining thousands of refugee cases through new background checks and intensive verification of refugee claims." USCIS announced that "[t]he initial focus is on Minnesota's 5,600 refugees who have not yet been given lawful permanent resident status (Green Cards)," but left open the likelihood that the operation would later expand to refugees in other states.[5]

DHS took the position that § 1159 mandates indefinite detention of all unadjusted refugees after they have been in the United States for one year. *See. e.g.*, *U.H.A. v. Bondi*, No. 26-cv-417, 2026 WL 222226, at *1 (D. Minn. Jan. 28, 2026). On January 28, 2026, a Judge in the U.S. District Court for the District of Minnesota issued a temporary restraining order on behalf of a putative class of refugees resident in Minnesota, enjoining Defendants from arresting or detaining refugees on the basis of being an unadjusted refugee and ordering the immediate return and release of the detained members of a putative subclass. *U.H.A.*, 2026 WL 222226, at *1. On February 27, 2026 that same judge issued a preliminary injunction enjoining defendants in that case from arresting or detaining unadjusted refugees in Minnesota on the same basis. *U.H.A. v. Bondi*, 26-cv-417 (D. Minn. Jan. 31, 2026), Dkt. No. 133. The Court held that "Section 1159(a) did not give the Government" the "arrest-and-detention power" it claimed "when Congress passed this provision in 1980, and it does not give the Government the authority to do so now." *Id.* at 3; *see id.* at 22-31. The Court further held that arresting without warrant and detaining unadjusted refugees

---

*Applications Filed by Aliens from Additional High-Risk Countries* (Jan. 1, 2026), https://perma.cc/FMR8-7M86.
[5] USCIS, *DHS Launches Landmark USCIS Fraud Investigation in Minnesota* (Jan. 9, 2026), https://perma.cc/X2VN-DNDA (archived Feb. 25, 2026).

violated refugees' substantive and procedural due process and Fourth Amendment rights. *Id* at 32-44. And the Court found that the government's arrest-and-detention scheme violated the APA. *Id.* at 44-49. The Court did not address the Refugee Detention Memo that is the subject of this lawsuit, which is not challenged in that case. *See id.* at 49 n. 32.

### C.  The Refugee Detention Policy

The rescission of the 2010 ICE Policy, disclosed for the first time on January 31, 2026, in the *UHA* litigation, purported to authorize the detention of all lawfully admitted refugees who have not yet adjusted their status to lawful permanent resident. *See* ECF 1-3, Marcos Charles, *Rescission ICE Policy No. 11039.1: Detention of Refugees Admitted Under INA § 207 Who Have Failed to Adjust to Lawful Permanent Resident Status (May 10, 2010*) (Dec. 18, 2025) ("Refugee Rescission Memo"). The Refugee Rescission Memo is one sentence long, and relies only on a December 16, 2025, Presidential Proclamation that states it "shall not apply to an individual who has been granted asylum by the United States or to a refugee who has already been admitted to the United States." *Restricting and Limiting the Entry of Foreign Nationals to Protect the Security of the United States*. Presidential Proclamation 10998, 90 Fed. Reg. 59,717, 59,728, (Dec. 19, 2025).

On February 18, 2026, Defendants Edlow and Lyons issued a memorandum establishing a purported "new policy," directing that § 1159(a)(1) mandates potentially indefinite detention of all unadjusted refugees after one year. ECF 1-4 at 1–2, Joseph B. Edlow & Todd M. Lyons, *Detention of Refugees Who Have Failed to Adjust to Lawful Permanent Resident Status* (Feb. 18, 2026) ("Refugee Detention Memo"). The Refugee Detention Memo asserts that lawfully admitted refugees are admitted "conditionally" and that after one year they become "applicants for admission" seeking lawful entry to the country. *Id.* at 3–4. The Refugee Detention Memo further contends that refugees are subject "to the same detention-and-inspection framework that applies

6

to other applicants for admission," and "detention during this process is expected and required" merely because § 1159(a)(1) references § 1225. *Id.* at 4.

The Refugee Detention Memo posits that indefinite detention is necessary to ensure the re-vetting of lawfully admitted refugees, contending, without evidence, that varying percentages of certain groups of refugees present public safety concerns or engaged in fraud in procuring refugee admission. *Id.* at 4–5. It dismisses the reliance interests of refugees who entered the United States prior to February 18, 2026, contending that notwithstanding longstanding government practice, such refugees could not reasonably rely on not being subject to indefinite detention after one year in this country. *Id.* at 6. The Refugee Detention Memo, issued without public notice and comment, has immediate effect on all unadjusted refugees.

### D.  The Refugee Detention Policy Harms Plaintiffs

Individual Plaintiffs are six refugees from all over the country who have not yet adjusted status and two non-profit refugee-serving organizations based in Massachusetts. Even though none of them has been charged with removability, Individual Plaintiffs fear that they will be arrested and detained because they have not been able to submit their applications for adjustment of status, or because their applications for adjustment of status have not been adjudicated. Ex. 1, Decl. of Jean A. ("Jean A. Decl.") ¶¶ 11–13, 15–19; Ex. 2 Decl. of Hamad B. ("Hamad B. Decl."), ¶¶ 13–16; Ex. 3, Decl. of Mona C. ("Mona C. Decl.") ¶¶ 7, 16; Ex. 4, Decl. of Yasmine D. ("Yasmine D. Decl.") ¶¶ 7, 17–21; Ex. 5, Decl. of Sam E. ("Sam E. Decl.") ¶¶ 8–11; Ex. 6, Decl. of Abdo F. ("Abdo F. Decl.") ¶¶ 11–13. For three of the individual plaintiffs, this fear is based on their own recent experience: Hamad B. (the husband of Mona C.) and the husband of Yasmine D. were both arrested in late January at a border patrol checkpoint in Texas and detained for weeks despite being

lawfully admitted refugees with pending adjustment of status applications. Ex. 2, Hamad B. Decl. ¶¶ 9–15; Ex. 3, Mona C. Decl. ¶¶ 8–16; Ex. 4, Yasmine D. Decl. ¶¶ 8–16.

Similarly, organizational Plaintiffs Jewish Family Service of Western Massachusetts ("JFS-WMA") and International Institute of New England ("IINE") face a "sustained emergency" as a result of the Refugee Detention Policy. Ex. 7, Decl. of Rabbi James Greene ("Greene Decl.") ¶ 2. These non-profit refugee-serving organizations have already re-allocated resources away from the social services they routinely provide to address the needs of terrified refugees who face lengthy re-vetting interviews as well as the high risk of warrantless arrest and mandatory detention. Ex. 7, Greene Decl. ¶¶ 17–21; Ex. 8, Decl. of Jeffrey Thielman ("Thielman Decl.") ¶¶ 16–21. Instead of executing their core missions to protect family unity and assist refugees with adjustment to their new homes, they have and will be expending significant resources to refer detained refugees for legal representation and digging into emergency resources to assist families who have lost the income of arrested family members. *Id*.

## LEGAL STANDARD

Section 705 of the APA authorizes courts "to postpone the effective date of an agency action" or "preserve status or rights" pending resolution of the proceedings when "necessary to prevent irreparable injury." 5 U.S.C. § 705. Such stays may be issued by courts *after* the effective date of challenged agency action. *E.g.*, *Doe v. Noem*, 784 F. Supp. 3d 437, 470 (D. Mass. 2025). Courts also have equitable authority to grant emergency or preliminary relief. Fed. R. Civ. P. 65. To obtain relief, the movant must show "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Together Emps. v. Mass Gen. Brigham Inc.*, 32 F.4th 82, 85 (1st Cir. 2022); *see, e.g., Doe v. Noem*, No. 25-cv-10495, 2026 WL 77330, at

*3 (D. Mass. Jan. 10, 2026).

## ARGUMENT

### III. Plaintiffs Are Likely to Succeed on the Merits.

Plaintiffs are likely to establish that the Refugee Detention Policy: (1) is contrary to law, (2) is arbitrary and capricious, and (3) was promulgated without notice and comment procedures.

#### A.  The Refugee Detention Policy is Contrary to Law.

##### 1.    The Refugee Detention Policy Is Contrary to the INA and Constitution.

Agency decisions premised on an incorrect understanding of the law cannot stand. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 391 (2024). Here, Plaintiffs are likely to succeed on their claim that Defendants erroneously interpreted the INA in concluding that 8 U.S.C. § 1159(a) authorizes the warrantless arrest and potentially indefinite detention of lawfully admitted refugees who have been physically present for one year and have not yet adjusted status to lawful permanent residence. Because Defendants premise the Refugee Detention Policy on an erroneous legal interpretation, the APA requires that this Court stay implementation of the Refugee Rescission Memo and the Refugee Detention Memo. *Loper Bright*, 603 U.S. at 391; *see also City of Providence v. Barr*, 954 F.3d 23, 31 (1st Cir. 2020) ("Any action that an agency takes outside the bounds of its statutory authority . . . violates the Administrative Procedure Act.").

###### a.   8 U.S.C. § 1159 does not authorize detention.

The plain language of § 1159(a) by its terms does not authorize arrest or detention of refugees. Section 1159(a), within a section titled "Adjustment of status of refugees," provides that a refugee whose status has not been terminated, has been physically present in the United States for one year, and has not acquired permanent resident status, "shall, at the end of such year period, return or be returned to the custody of the Department of Homeland Security for inspection and

examination for admission to the United States as an immigrant in accordance with the provisions of sections 1225, 1229a, and 1231 of this title." The words "arrest," "detain," and "detention" appear nowhere in this statute.

Rather, the government's authority to arrest or detain noncitizens is codified at 8 U.S.C. §§ 1225, 1226, 1231, and 1357, and is limited to arrests for the purpose of removing inadmissible or deportable noncitizens from the country. DHS generally may only arrest a noncitizen upon the issuance of a "warrant." 8 U.S.C. § 1226(a). An immigration officer may only make warrantless arrests "if he has reason to believe" that an individual "is in the United States in violation of [the immigration laws] and is likely to escape before a warrant can be obtained for his arrest." *Id*. § 1357(a)(2). No other provision of the INA authorizes arresting noncitizens.

The relevant provisions permit detention if a noncitizen is subject to removal proceedings or is subject to a final order of removal. For "applicants for admission"—which admitted refugees are not—the INA authorizes detention incident to a determination whether a noncitizen will be admitted to or removed from the country. *See id*. § 1225(b)(1)(B)(ii)–(iii), (b)(2)(A). For those already present in the United States, the INA authorizes detention during removal proceedings or upon issuance of a final order of removal. *Id.* §§ 1226(a), (c); 1226a; 1231(a). No other provision of the INA relevant here authorizes detention of noncitizens.

Moreover, since the passage of the Refugee Act of 1980, DHS and its predecessor the Immigration and Naturalization Service (INS) interpreted the phrase "return . . . to the custody of [the agency] for inspection and examination" in § 1159(a) to require only that refugees be reviewed for adjustment of status and potentially appear for an interview before the agency.

Following enactment of the Refugee Act of 1980, the statute's implementing regulations contemplated merely that a "[n]otice [would] be sent to all refugees after one year to report for an

10

interview." *Aliens and Nationality; Refugee and Asylum Procedures*, 46 Fed. Reg. 45,116, 45,117 (Sept. 10, 1981) (Final Rules); *see also Aliens and Nationality; Refugee and Asylum Procedures*, 45 Fed. Reg. 37,392, 37,392 (June 2, 1980) (Interim Regulations). Nothing in these early implementing regulations contemplated the arrest or detention of unadjusted refugees—let alone arrest without a warrant or notice. Later, the INS amended the regulations to require interviews on a case-by-case basis, explaining:

> The "custody" requirement for refugees applying for adjustment of status can be met if the Service maintains sufficient control over the applicants to make a determination of their admissibility to the United States as immigrants and to institute removal procedures if they should be found to be inadmissible. Additionally, a procedure that requires refugees to apply for adjustment of status and gives the Service the authority to compel them to appear before an officer of the Service satisfies the requirements of the Act. Although the Service may require refugees seeking adjustment of status to be interviewed by an immigration officer, the Service does not have to interview each and every refugee.

*Adjustment of Status of Refugees and Asylees: Processing Under Direct Mail Program*, 63 Fed. Reg. 30,105, 30,106 (1998). As the INS General Counsel reasoned in 1997, "it seems doubtful that Congress intended the Service to detain refugees applying for adjustment of status. . . . [I]t is reasonable to interpret the term "custody" in § 209(a) to mean something other than physical restraint. It should be understood to mean sufficient control over a [noncitizen] to carry out the purpose of section 209(a)—that is, sufficient control to make a determination of a refugee's admissibility to the United States as an immigrant . . . ." Ex. 9, David A. Martin, INS General Counsel's Office, Legal Opinion No. 97-2: Opinion on whether a personal interview is required for all refugee and asylee adjustment of status applications under INA § 209, 9 Immigration Law Service 2d PSD 1997 (1997).

That understanding persisted for decades. As recently as 2010, ICE's own guidance expressly acknowledged that § 1159 is "not a proper basis for detaining" refugees who fail to apply

for adjustment after one year. ECF 1-5, 2010 ICE Policy at 2. Instead, immigration officers must have a "reasonable belief that" a refugee "is removable" before arresting a refugee under existing arrest and detention authorities. *Id.* (citing 8 U.S.C. §§ 1225, 1226, 1357(a)(2)). While that guidance was purportedly rescinded in December 2025, the agency's historical practice is strong evidence that the plain text of § 1159(a)(1) does not authorize DHS to arrest and detain unadjusted refugees, absent any ground of removability. And governing federal regulations do not contemplate arrest or detention of unadjusted refugees, as they make no reference to arrest or detention at the one-year anniversary of admission. *See* 8 C.F.R. § 209.1(b), (d).

Defendants primarily rely on the fact § 1159(a)(1) uses the term "custody." ECF 1-4, Refugee Detention Memo at 2–4. That erroneously "conflate[s] custody with mandatory detention." *Darvin M. v. Bondi*, No. 26-cv-437, 2026 WL 184843, at *2 (D. Minn. Jan. 24, 2026). Starting with that term's ordinary meaning, custody is not synonymous with physical imprisonment and was not at the time Congress passed the Refugee Act in 1980. *See Custody*, *Black's Law Dictionary* (5th ed. 1979) ("The care and control of a thing or person."); *Custody, Black's Law Dictionary* (12th ed. 2024) (defining custody as "[t]he care and control of a thing or person for inspection, preservation, or security," of which "physical custody" is one type). Where Congress wanted to equate "custody" with detention, it said so explicitly. *See, e.g.*, 8 U.S.C. § 1226(c) (providing for "detention of criminal [noncitizens]" and directing DHS to "take into custody" certain noncitizens with criminal offenses "when the [noncitizen] is released" from the custody of other law enforcement entities). The choice not to equate custody with detention in § 1159(a), is meaningful. *See Russello v. United States*, 464 U.S. 16, 23 (1983) ("where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate

12

inclusion or exclusion").

Read most naturally, "§ 1159 contemplates that a refugee be returned, temporarily, to the control of DHS because they have the responsibility to inspect and examine the refugee for admission." *U.H.A.*, 2026 WL 222226, at *8; *A.D.G. v. Bondi*, No. 26-cv-516, 2026 WL 207352, at *2 (D. Minn. Jan. 27, 2026) ("The 'custody' contemplated by § 1159 is for a limited time to serve a specified purpose—inspection and examination. Such authority is not equivalent to authority to detain . . . .").

Nor does context support the government's reading. First, § 1159(a) directs that refugees "*return* or be returned" (emphasis added), which evinces an intent that refugees present themselves voluntarily for an interview rather than be forcibly arrested and held against their will; *compare id*. with 8 U.S.C. § 1226(c) (in section entitled "Apprehension and detention of [noncitizens]" and subsection entitled "Detention of criminal [noncitizens]," authorizing the Attorney General to "*take into* custody" certain noncitizens charged with or convicted of specified crimes) (emphasis added)). Obviously, refugees who were aware of and availed themselves of the opportunity to apply for adjustment of status through the procedure required by Defendants' regulations have opted to "return" to the agency, and those who have not applied yet may still do so.

Second, the provision contemplates that an individual "be returned to the custody" of DHS. *Id*. § 1159(a). But refugees are not detained upon admission to this country. Instead, they are inspected at a port of entry and then permitted to enter the country after establishing their admissibility as refugees. *See id*. § 1157(c)(1). So whatever refugees are "returning" to under § 1159, it cannot be detention. *See U.H.A. v. Bondi*, No. 26-cv-417, 2026 WL 357636, at *4 (D. Minn. Feb. 9, 2026) ("Because refugees were not detained when they arrived, it is impossible for them 'return' to detention.").

13

Third, the "return . . . to custody" must be "for inspection and examination for admission to the United States as an immigrant" (i.e., adjustment of status). 8 U.S.C. § 1159(a)(3). Such limited purpose does not contemplate detention for other purposes, including re-vetting a previously approved application or subjecting a refugee to removal proceedings. "'[C]ustody'" thus "contemplates the exercise of control absent physical detention" for purposes of inspection and examination. *See Darvin M.*, 2026 WL 184843, at *2.

The Supreme Court has interpreted another INA provision containing nearly identical language to rule out detention. The parole provision provides that a noncitizen whose parole ends "shall return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any applicant for admission." 8 U.S.C. § 1182(d)(5)(A). In *Clark v. Martinez*, the Court found "nothing in this text that affirmatively authorizes detention," and concluded that a noncitizen whose parole is revoked is subject to detention only to the extent "any other applicant for admission" would be subject to detention under other parts of the INA. 543 U.S. 371, 385 (2005). "[W]hen Congress uses the same language in two statutes having similar purposes. . . it is appropriate to presume that Congress intended that text to have the same meaning." *U.H.A. v. Bondi*, 24-cv-417, ECF 133 at 26-27. The phrase "return [to] custody" in § 1159 thus does not establish any independent detention authority.

Indeed, in every other instance where the INA authorizes arrest or detention of noncitizens, it does so explicitly. For "applicants for admission" the INA repeatedly refers to detention—not custody—pending completion of removal proceedings. *See* 8 U.S.C. § 1225(b)(1)(B)(ii) ("shall be detained for further consideration of the application for asylum"); *id.* § 1225(b)(1)(B)(iii)(IV) ("shall be detained pending a final determination of credible fear of persecution and, if found not to have such a fear, until removed"); *id.* § 1225(b)(2)(A) ("shall be detained for a proceeding under

14

section 1229a of this title"). For those already present in the United States, the INA specifically refers to arrests or detention and where relevant "tak[ing] into custody." *Id.* § 1226(a) ("On a warrant issued by the Attorney General, an [noncitizen] may be arrested and detained pending a decision on whether the [noncitizen] is to be removed from the United States."); *id*. § 1226(c) (providing for mandatory "detention of criminal [noncitizens]" and requiring DHS to "take into custody" such individuals after their release from other law enforcement entities); *id.* § 1357(a)(2) (authorizing immigration officers "to arrest any [noncitizen] in the United States, if he has reason to believe that the [noncitizen] so arrested is in the United States in violation [of the immigration laws] and is likely to escape before a warrant can be obtained for his arrest"). And for those with final orders of removal, the INA, once more, refers to detention, not custody. *Id.* § 1231 (a)(2)(A) (addressing "Detention, release, and removal of [noncitizens] ordered removed" and providing that "[d]uring the removal period, the Attorney General shall detain the [noncitizen].").

In addition, interpreting the phrase "be returned to the custody" in § 1159(a) as mandating detention would lead to absurd results. *Aroostook Band of Micmacs v. Ryan*, 484 F.3d 41, 61 (1st Cir. 2007) ("[I]nterpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with legislative purpose are available."). Because § 1159(a) and agency regulations make refugees ineligible for adjustment until one year after entry, Defendants' interpretation would subject every refugee to detention, unless USCIS conducted the inspection and examination precisely at the one-year mark. "That outcome is nonsensical and would cause many unadjusted refugees to celebrate their one-year anniversary in this country in a jail cell." *U.H.A.*, 2026 WL 222226, at *8; *see also* Dkt No. 133 at 28, 26-cv-417 (D. Minn).

Thus, in light of the text, history, and purpose of § 1159(a), "'custody' is best read to mean 'responsibility' or 'control,' rather than prolonged detention." *Id*. Even if § 1159 somehow

15

authorized temporary detention for "inspection and examination" of whether a refugee can adjust status, Defendants are detaining refugees for an unrelated purpose—"mandatory re-vetting" at the "one-year mark" to determine whether to "terminate" someone's refugee status and place them in removal proceedings. ECF 1-4, Detention Memo at 4. Importantly, refugee status termination is governed by a separate part of the INA, that clearly contains no arrest or detention authority. 8 U.S.C. § 1157(c)(4). Defendants conflate § 1157 and § 1159, contending that § 1159 authorizes an inquiry into whether a refugee "did not meet the refugee definition . . . at the time of admission." ECF 1-4 at 3. But the inspection under § 1159(a) is limited to whether a refugee is subject to any applicable inadmissibility bar at the time of *adjustment*. 8 U.S.C. § 1159(a), (c). And the statute explicitly distinguishes refugees—who do not need to continue to be refugees in order to adjust— from asylees, who do. *Compare* 8 U.S.C. § 1159(a) *with id.* § 1159(b)(3) (in asylee adjustment provision, explicitly authorizing assessment of whether applicant "continues to be a refugee"); *see Azarmanesh v. Bondi*, No. 23-cv-5210, 2025 WL 965955, at *13 (N.D. Cal. Mar. 31, 2025) (noting distinction between "admitted refugee" and "individual with asylum status" who "must continue to meet the definition of a refugee at the time" of adjustment).

While some information related to the admissibility determination for adjustment-of-status might be relevant to refugee status termination proceedings and vice versa, § 1159(a)(1) does not contemplate a wide-ranging fishing expedition to re-adjudicate refugee claims, or an end-run around the requirement that refugees be provided 30 days' notice before being required to offer evidence that their status should not be terminated, 8 C.F.R. § 207. Thus, whatever "custody" might be authorized by § 1159(a) cannot be for "re-vetting" interviews aimed at terminating status and removing refugees, as contemplated by the Refugee Detention Memo.

b.    <u>8 U.S.C. § 1225 does not authorize detention</u>.

16

The only other argument Defendants present in support of their novel mandatory arrest and detention theory is their observation that § 1159(a) refers to § 1225. ECF 1-4, Detention Memo at 4. As Defendants tell it, "Congress linked the refugee one-year inspection to the same [mandatory] detention-and-inspection framework that applies to other applicants for admission" because § 1159(a)(1) provides that the "return" to DHS "custody" be made "in accordance with . . . sections 1225, 1229a, and 1231." *Id.* Not so.

First, § 1225, titled "Inspection by immigration officers, expedited removal for inadmissible arriving [noncitizens]; referral for hearing," does not primarily address detention. To the extent that it authorizes detention, it does so only for "applicants for admission" who are subject to expedited or full removal proceedings. 8 U.S.C. § 1225(a), (b). An applicant for admission is defined as a noncitizen "present in the United States *who has not been admitted* or *who arrives in the United States*." *Id*. § 1225(a)(1) (emphasis added). A previously admitted refugee is neither.

As to admission, the INA defines "[t]he terms 'admission' and 'admitted,'" including as used in §§ 1157 and 1159, to mean "the lawful entry of the [noncitizen] into the United States after inspection and authorization by an immigration officer." *Id*. § 1101(a)(13)(A). A lawful "entry" thus refers to the specific moment "when a noncitizen seeks permission to physically enter United States territory" and an immigration officer inspects and authorizes an individual to cross into the interior of the country. *See, e.g.*, *Torres v. Barr*, 976 F.3d 918, 924 (9th Cir. 2020) (en banc). It does not refer to some "continuous period as opposed to just a single point in time." *Id.* at 926. Taken together, the phrase "has not been," modifying the phrase "admitted," must refer to some event in that past—lawful entry—and not some ongoing entry that continues into the future. A previously admitted refugee thus cannot be an individual "who has not been admitted" because they have as a matter of fact and law been *admitted* into the United States. *See Matter of D-K-,* 25

17

I&N Dec. 761, 769 (BIA 2012) (noncitizen "admitted to the United States as a refugee has been 'admitted' for purposes of section 101(a)(13)(A) of the Act.").

Nor can lawfully admitted refugees "arrive[] in the United States," as they have already been inspected and admitted at a port of entry and are physically present on the interior for over a year. Indeed "arrive" means "to reach a destination" or "to make an appearance." *Coal. for Humane Immigrant Rts. v. Noem*, 805 F. Supp. 3d 48, 90 (D.D.C. 2025) (citation modified). "Read according to its plain meaning, a noncitizen 'arriving' in the United States would be one who is in the process of reaching his or her destination (the United States) and making an appearance here." *Id*. Thus, "[u]nder the statutory language, if [noncitizen] applicants [for admission] are apprehended while crossing the border (whether or not at a check point), they are 'arriving' applicants under the statute, and if apprehended at some point thereafter, they are not 'arriving,' but rather '[noncitizens] present in the United States who [have] not been admitted.'" *Bollat Vasquez v. Wolf*, 460 F. Supp. 3d 99, 111 (D. Mass. 2020) (quoting 8 U.S.C. § 1225(a)(1)). But in no sense is someone previously lawfully admitted somehow also "arriving."

Against this, Defendants advance only one basic argument: because § 1159(a)(1) requires a refugee who has been physically present for at least one year to be inspected and examined regarding their ability to adjust their status to that of an LPR, refugee admissions are "conditional," and terminate by operation of law at the one-year mark; therefore refugees become "applicants for admission" again. ECF 1-4, Refugee Detention Memo at 3–4. But the word "conditional" appears nowhere in section 1159, *see infra* at 19-21, and Defendants conflate admission with status. *See Sanchez v. Mayorkas*, 593 U.S. 409, 415 (2021) ("[l]awful status and admission . . . are distinct concepts in immigration law"). As the Supreme Court observed in *Sanchez*, "[o]n the one hand, a foreign national can be admitted but not in lawful status—think of someone who legally entered

18

the United States on a student visa, but stayed in the country long past graduation. On the other hand, a foreign national can be in lawful status but not admitted—think of someone who entered the country unlawfully, but then received asylum." *Id.* That is the case here. A refugee could conceivably have their *status* as a refugee terminated at some point *after* a lawful admission. *See* 8 U.S.C. § 1157(c)(4) ("The refugee *status* of any [noncitizen] . . . may be terminated . . . if . . . the [noncitizen] was not in fact a refugee . . . at the time of the [noncitizen's] admission.") (emphasis added); 8 C.F.R. § 207.9 (establishing process for termination of refugee *status*). But that does not change the fact that this same refugee was previously *admitted* following inspection by an immigration officer, which occurs at a specific moment in time. It is a descriptive fact that refugees *have been* admitted, and that admission cannot, unlike status, be rescinded later.

Defendants declare without citation that refugee admissions are conditional and after one year a refugee is again an "applicant for admission." ECF 1-4, Refugee Detention Memo at 4. Whether a refugee's "admission" somehow retroactively terminates is a "question of statutory interpretation," and that inquiry "begins and ends with the text" of the statute. *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 553 (2014). The term "conditional" appears nowhere in the provisions governing refugee admissions. Rather, Congress has provided one uniform definition for "admission." *See* 8 U.S.C. § 1101(a)(13)(A). "Congress," of course "says in a statute what it means and means in a statute what it says there." *Hartford Underwriters Ins. Co. v. Union Planters Bank,* 530 U.S. 1, 6 (2000). Had Congress wished to define "admission" to be "conditional" for some immigrants but not others, it knew how to do so, *see* 8 U.S.C. § 1186a (establishing categories of conditional status), and the fact that it did not is compelling evidence it did not intend that construction. *Russello*, 464 U.S. at 23 (noting presumption that "Congress acts intentionally and purposely in the disparate inclusion or exclusion" of statutory language).

19

The legislative history demonstrates an intentional rejection of "conditional" entry or admission. *See I.N.S. v. Cardoza-Fonseca*, 480 U.S. 421, 442–43 (1987) ("Few principles of statutory construction are more compelling than the proposition that Congress does not intend *sub silentio* to enact statutory language that it has earlier discarded in favor of other language"). Prior to the 1980 Refugee Act, the entry of refugees was conditional: the INA provided for refugee resettlement through the use of parole procedures at 8 U.S.C. § 1182(d)(5). Pub. L. No. 86-648,74 Stat. 504 (1960), and explicitly noted the "conditional entry of refugees." H.R. Rep. No. 89-745, at 15 (1965); S. Rep. No. 89-7 48, at 16–17 (1965).

Early versions of the bill contained the notion of "conditional" admission, but such a notion was rejected in the final version. Initially, "conditional" admission would have applied to a proposed category of refugees admitted due to "emergency situation[]," but who would not obtain LPR status immediately upon admission. *See* S. 643, 96th Cong. § 201(b) (1979); H.R. 2816, 96th Cong. § 201(b) (1979). The Senate version retained this scheme, S. Rep. No. 96-256, at 27 (1979), while the House version dropped the "conditional" modifier, referring throughout to "refugee admission," 125 Cong. Rec. 37,242–47 (1979), but not providing for immediate LPR status upon admission. H.R. Rep. No. 96-608, at 16 (1979). The final version of the bill used the House draft's admission language, excluding any explicit reference to "conditional," Refugee Act of 1980, Pub. L. No. 96-212, §§ 207–209, 94 Stat. at 103–06, and the term "admission" was used to describe refugees' manner of resettling in the United States; the only arguable and relevant "condition" set in the bill applied to refugee *status*, which could be revoked upon a finding that the noncitizen did not meet the definition of "refugee" at the time of "admission."

Underscoring this rejection, this same Congress also amended the parole statute to make clear that refugees going forward must be *admitted*, rather than *paroled* into the country. 8 U.S.C.

§ 1182(d)(5)(B); *see Amanullah v. Nelson*, 811 F.2d 1, 12 (1st Cir. 1987). The INA elsewhere defines parole as temporary and distinct from admission. *see* 8 U.S.C. § 1101(a)(13)(B) (describing individuals paroled under this section as not "admitted"); *id.* § 1182(d)(5)(A) (same). The same Congress that said refugees must be "admitted . . . under section 1157" absent "compelling circumstances" permitting parole, which "shall not be considered" an "admission," could not have possibly intended for refugee admissions to function the same as parole.

Noncitizens seeking to adjust their status regularly seek two "admissions," first as an applicant for admission when they arrive at a port of entry, and then again during the adjustment process after they physically present. *See Matter of Alyazji*, 25 I&N Dec. 397, 399–404 (BIA 2011). A noncitizen cannot adjust status to that of an LPR without having first been admitted, and therefore the second admission comes at the adjustment of status stage. *See id.* The second admission is not an admission under 8 U.S.C. § 1225, i.e. "lawful entry of the [noncitizen] into the United States after inspection and authorization by an immigration officer," 8 U.S.C. § 1101(a)(13)(A), and so in no sense does an applicant to adjust status somehow again become an "applicant for admission" under § 1225(a)(1) when applying for that second "admission" as an LPR. *See id*. § 1255 ("[t]he status of [a noncitizen] who was inspected and *admitted or paroled* into the United States . . . may be adjusted") (emphasis added).

c.   The INA does not otherwise authorize arrest or detention.

No other statutory provisions discussed or alluded to in the Refugee Detention Memo authorize detention. First, § 1229a, applies to "removal proceedings" and contains no standalone detention provisions. *See* 8 U.S.C. § 1229a. Nothing in the Refugee Detention Memo demonstrates that any detained refugees have been placed in removal proceedings. Second, § 1226 provides that "[o]n a warrant issued by the Attorney General, [a noncitizen] may be arrested and detained pending a decision on whether the [noncitizen] is to be removed from the United States." *Id.* §

21

1226(a). But the Refugee Detention Memo directs detention of refugees without the issuance of a warrant or any basis to believes a refugee is removable from the United States. Nor does § 1226(c) authorize detention as, again, no warrant has issued and no individual determination that a refugee is removable has been made. Fourth, § 1231 provides for the mandatory detention and removal of noncitizens ordered removed, *id.* § 1231(a)(1), (2)(A), and none of the refugees subject to the Refugee Detention Memo's purported mandatory detention authority has been ordered removed.

The Refugee Detention Memo also exceeds Defendants' authority to make warrantless arrests under § 1357(a)(2). That provision permits such arrests only if the arresting officer "has reason to believe that the [noncitizen] so arrested is in the United States in violation of [the immigration laws] and is likely to escape before a warrant can be obtained for his arrest." *Id*. § 1357(a)(2); *see* 8 C.F.R. § 287.3(d). But individual refugees are not in violation of the INA, and nothing in the Refugee Detention Memo articulates why they would be likely to escape before a warrant can be obtained. Indeed, such a claim would be nonsensical—the same refugees must apply to adjust status and present themselves to DHS for adjustment by way of an application or interview if requested. The Refugee Detention Memo nowhere bothers to explain how an entire population of lawfully admitted refugees can be categorized as flight risks.

d. <u>The Constitution does not otherwise authorize arrest or detention</u>.

For the same reasons, the Refugee Detention Memo is contrary to the Fourth Amendment. Section 1357's "reason to believe" standard is considered "the equivalent of probable cause." *Morales v. Chadbourne*, 793 F.3d 208, 216 (1st Cir. 2015). "Probable cause" requires an inquiry that is "particularized with respect to that person." *Maryland v. Pringle*, 540 U.S. 366, 373 (2003). Accordingly, § 1357(a)(2) unequivocally demands that, before an immigration officer can make an immigration arrest without a warrant, the officer must first make an individualized

determination of probable cause that the person is both in the United States unlawfully and is a flight risk. On top of that, "the Fourth Amendment requires a judicial determination of probable cause as a prerequisite to extended restraint of liberty following arrest." *Gerstein v. Pugh*, 420 U.S. 103, 114 (1975). That determination must be "timely," *id.* at 126, meaning it must occur "within 48 hours of arrest" absent "the existence of a bona fide emergency or other extraordinary circumstance." *Cnty. of Riverside v. McLaughlin*, 500 U.S. 44, 56, 57 (1991); *see Gonzalez v. ICE*, 975 F.3d 788, 824–26 (9th Cir. 2020) (explaining "48 hour" rule applies to civil immigration arrests). ICE regulations codify this standard. 8 C.F.R. § 287.3(d). However, the Detention Memo claims that detention under § 1159 is not limited to 48 hours but rather "may last for the reasonable length of time it takes to inspect and examine the [noncitizen] to determine whether he or she is admissible." ECF 1-4 at 4. Authorization of unlimited detention without any probable cause of violations of the INA exceeds Defendants' authority under the Fourth Amendment. *See U.H.A. v. Bondi*, 26-cv-417, Dkt No. 133 at 40-43.

The Refugee Detention Policy also exceeds Defendants' authority under the Fifth Amendment. "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects." *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001). The Refugee Detention Policy mandates detention for refugees who are not in removal proceedings, let alone subject to removal, and is therefore categorically unconstitutional. *See id.* But even were any refugee in removal proceedings, immigration detention is for civil, as opposed to criminal, process, and so only permitted where it serves is permissible justifications: mitigating risk of flight or dangerousness to the community during the removal process. *See id.* Nothing in the Refugee Detention Memo purports to conduct this analysis as to any individual refugee, let alone refugees categorically as a class, and that failure

23

to provide pre-deprivation notice and opportunity to be heard before depriving refugees of their liberty violates both substantive and procedural Due Process. *See id*. at 690–92; *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976); *see also U.H.A. v. Bondi*, 24-cv-417, Dkt No.133 at 32-40.

Where, as here, the government's arguments result in systematic violations of noncitizens' Fourth and Fifth Amendment and statutory rights, the Court must avoid construing statutes "in a manner that would render [them] clearly unconstitutional" when "there is another reasonable interpretation available." *Edmond v. United States*, 520 U.S. 651, 658 (1997). That reasonable interpretation is the same one the government advanced for over 45 years, until its promulgation of the Refugee Detention Policy. Therefore, Plaintiffs are likely to succeed on their claim that Defendants' actions violate the INA, the Constitution, and the APA.

### B. Plaintiffs Are Likely to Succeed on Their Claim That Defendants Failed to Comply with Notice-And-Comment Procedures in Issuing the Memoranda.

The Rescission and Detention Memos also violate the APA's notice-and-comment procedures. The APA generally requires substantive or legislative rules to be promulgated through notice-and-comment rulemaking. 5 U.S.C. § 553. "Failure to abide by these requirements renders a rule procedurally invalid." *N.H. Hosp. Ass'n v. Azar*, 887 F.3d 62, 70 (1st Cir. 2018). The Refugee Rescission Memo and Refugee Detention Memo are legislative rules.

"[A] legislative rule is one that creates rights, assigns duties, or imposes obligations, the basic tenor of which is not already outlined in the law itself." *Id*. at 70 (internal quotation omitted). The Refugee Detention Memo assigns duties and imposes obligations on refugees not already outlined in the law by rewriting longstanding policies and practice that until the challenged actions (1) prohibited detaining lawfully admitted refugees for failure to adjust status after one year, (2) understood § 1159(a)(1)'s reference to "custody" to mean that the limited purpose of § 1159 was solely to allow USCIS to determine whether the refugee will be adjusted to lawful permanent

resident status, and (3) only permitted ongoing detention of a refugee if removal proceedings had been initiated against them based on their individual circumstances. The Refugee Detention Policy upends the long-settled understanding of the Refugee Act and the INA in ways that impose a significant obligation on refugees: to voluntarily return to the custody of DHS after one year in the United States or be subject to warrantless arrest and indefinite detention.

The Refugee Rescission and Refugee Detention Memos also are legislative rules because they are in tension with and alter obligations imposed by an existing regulation: 8 C.F.R. § 209.1. *N.H. Hosp. Assn*., 887 F.3d at 73 (in determining whether a rule is legislative courts "look to whether the rule is 'inconsistent with another rule having the force of law,' or otherwise "alter[s] or enlarg[es] obligations imposed by a preexisting regulation'") (internal quotations omitted). The current regulation addressing refugee adjustment of status does not contemplate the arrest or detention of adjusted refugees if they fail to voluntarily return to "custody" after one year in the United States. In fact, 8 C.F.R. § 209.1 makes no reference to arrest or detention, nor does it even require a refugee to appear for an adjustment of status interview in all cases. 8 C.F.R. § 209.1(b), (d) ("sole and exclusive procedure for adjustment of status by a refugee," provides that USCIS decides whether to call in refugees for an interview on a case-by-case basis). The 2010 ICE Policy correctly interpreted 8 C.F.R. § 209.1 to not permit detention of refugees on the basis that they had not adjusted status. By rescinding that Policy, the Refugee Rescission Memo reversed course on that interpretation and therefore altered obligations imposed by that regulation. The Refugee Detention Memo's reinterpretation of a requirement to adjust status after one year into a requirement to voluntarily return to the custody of DHS at the one-year mark or be subject to warrantless arrest and indefinite detention also plainly "alters or enlarges obligations imposed by a preexisting regulation." *N.H. Hosp. Ass'n*, 887 F.3d at 73 (citation modified).

25

Because the Refugee Rescission and Detention Memos "announce[] a new policy on a matter of considerable import," *id*. at 74, they are legislative rules. DHS' failure to engage in notice and comment rulemaking therefore renders them invalid.

### C. Plaintiffs Are Likely to Succeed on Their Claim That the Refugee Rescission and Refugee Detention Memos Are Arbitrary and Capricious.

The Refugee Rescission and Refugee Detention Memos are arbitrary and capricious because they fail to provide a reasoned explanation for DHS' dramatic departure from its prior interpretations or meaningfully consider the serious reliance interests implicated in such a sweeping change. In issuing a rule, an agency must "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983) (quotation omitted). An agency action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id*.

Moreover, an agency must provide a "reasoned explanation" for departing from prior policy and must provide "a more detailed justification than what would suffice for a new policy" when "its prior policy has engendered serious reliance interests that must be taken into account." *FCC v. Fox Television Stations, Inc*., 556 U.S. 502, 515 (2009); *accord DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020) (agency action arbitrary and capricious if, "[w]hen an agency changes course," it fails to consider "that longstanding policies may have engendered serious reliance interests"). Although an agency need not "consider all policy alternatives in reaching [its] decision," where the agency is "not writing on a blank slate, . . . it [is] required to assess whether

26

there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Regents*, 591 at 33 (citation modified).

The Refugee Rescission and Refugee Detention Memos are arbitrary and capricious for multiple reasons. First, the Refugee Rescission Memo rescinds a 16-year old policy with no explanation at all. *See* ECF 1-3, Refugee Rescission Memo. The only rationale for the one-sentence decision to rescind the 2010 ICE Policy was a reference to a December 16, 2025, Presidential Proclamation that "does not apply to an individual who has been granted asylum by the United States or to a refugee who has already been admitted to the United States." Pres. Proclamation 10998 § 8.d, 90 Fed Reg. at 59,717. Because the Refugee Rescission Memo provides no factual basis or legal analysis, and relies only on a Presidential Proclamation that, on its face, does not apply to refugees, the Refugee Rescission Memo's remarkable change in position is inherently arbitrary and capricious. *Fox Television*, 556 U.S. at 515 (an agency cannot "depart from a prior policy *sub silentio* or simply disregard rules that are still on the books").

DHS justified the Refugee Detention Memo by saying that, while ICE "believes" the Refugee Rescission Memo was "valid," DHS undertook a "fresh look at the past policies and rescinds them anew." ECF 1-4, Refugee Detention Memo at 1. This "fresh look" is still arbitrary and capricious. As explained above, the Refugee Detention Memo reverses DHS' longstanding interpretation regarding the detention of refugees without providing a "reasoned explanation" for departing from its prior policy or "a more detailed justification than what would suffice for a new policy." *Fox Television*, 556 U.S. at 515. DHS mischaracterizes the Refugee Detention Memo, saying that "prior policy decisions and operational guidance resulted in *incomplete* implementation of" the requirements of § 1159 (emphasis added). ECF 1-4 at 1. But the Refugee Detention Memo does not implement § 1159. Rather, it upends DHS' prior longstanding

27

interpretation that limited the detention of refugees to circumstances where they are removable and replaces it with a default mandatory detention policy for refugees who have been in the United States for more than one year and have not been charged with any ground of removability.[6] Moreover, the 2010 ICE Policy was consistent with § 1159, because refugee status is not conditional and the failure to adjust status at the one-year mark is not a basis for removal or detention, for the reasons discussed above. *See* Argument § I.A.1.a, *supra*.

DHS justifies its about-face by saying that it better enforces the statutory requirement in § 1159, even though § 1159 does not say that refugee admission is conditional, require mandatory review after one year of physical presence, or impose mandatory detention after one year. *See* ECF 1-4 at 1. And even if § 1159 permitted detention of refugees (it does not), Defendants fail to explain why mandatory detention better enforces the statutory requirement that refugees apply to adjust their status after one year in the United States than the prior policy. The Refugee Detention Memo presents no evidence that detention is necessary to implement § 1159's adjustment of status provision or show that the policy that applied for over 45 years was insufficient. The Refugee Detention Memo also does not explain why arrest and detention is needed to determine whether a refugee is entitled to adjustment of status, as opposed to continuing to rely on the processes that currently exist for conducting non-detained adjustment of status interviews, terminating refugee status, and placing refugees in removal proceedings. The Refugee Detention Memo also fails to consider other obvious ways that DHS could "enforce" the requirement to apply for adjustment of status, such as by sending notices to refugees who have not applied for adjustment after a certain

---

[6] While the Refugee Detention Memo claims detention of refugees is not novel, ECF 1-4 at 3, DHS presents no evidence of any prior practice to detain refugees who have not adjusted status after one year in the United States. In fact, the cases they cite from 2006 and 2007 purporting to authorize detention of refugees involved refugees who were detained following serious criminal convictions. *Id.* at 3–4.

period of time or not detaining refugees while their applications for adjustment of status are pending. *Regents*, 591 U.S. at 28–29 (finding DACA rescission arbitrary and capricious where the Secretary failed to give any consideration to a less sweeping policy change).

The Refugee Detention Memo justifies detention as furthering the "public policy interest in thorough vetting," ECF 1-4 at 2, but § 1159 does not permit a re-vetting, let alone the boundless fishing expedition the Memo promotes. Rather, § 1159 requires that a refugee be granted adjustment of status if their status has not been terminated, they have been present in the U.S. for at least one year, and they are admissible. In any event, refugees are the most thoroughly vetted group of noncitizens who are admitted to the United States and that vetting is completed by the time they arrive in the U.S. *See* 8 U.S.C. [7] *seq.* And there are mechanisms in place to address any concerns that may arise after a refugee's admission. For example, refugees must advise USCIS of any address change within 10 days of moving. 8 U.S.C. § 1305. If a refugee poses a public safety threat after they arrive in the United States because they, for example, commit a violent crime, then they can be placed in removal proceedings and potentially detained during those proceedings. *Id*. § 1227(a)(2) (setting forth grounds on which admitted noncitizens can be removed based on criminal offenses); *id*. § 1226(c) (detention of noncitizens with certain criminal convictions).

The Refugee Detention Memo says that the prior system "may have failed to flag refugees who posed risks," ECF 1-4 at 5, but DHS cannot rely on speculation to justify a dramatic change in policy. *See State Farm*, 463 U.S. at 43 (agency must "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made"). DHS also provides no evidence to support its claim that prior policies "prioritized speed and volume of refugee admissions over depth and quality." ECF 1-4 at 5.

---

[7] *See* USCIS, *Refugee Processing and Security Screening,* https://perma.cc/86KA-FPKP.

DHS points to a recent "USCIS Review" of recently admitted refugees to justify a supposed need for mandatory re-vetting but does not make the findings of that review public or define the parameters of the review in such a way as to make their dependence on it reliable. *See Dist. Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46, 56–57 (D.C. Cir. 2015) ("[A]gencies do not have free rein to use inaccurate data."). For example, DHS does not say how many cases were reviewed, how the cases were chosen, or why the particular cases were chosen. The Refugee Detention Memo says that this "USCIS Review" showed that 10% of the studied refugee cases "had evidence of public safety concerns . . . that were not addressed." *Id*. But DHS does not explain what this evidence was, how much evidence was found, what standard was used to evaluate the evidence, or the basis for the statement that the concerns were not addressed. *See, e.g. City of New Orleans v. S.E.C.*, 969 F.2d 1163, 1167 (D.C. Cir. 1992) ("[R]eliance on a report or study without ascertaining the accuracy of the data contained in the study or the methodology used to collect the data 'is arbitrary agency action, and the findings based on [such a] study are unsupported by substantial evidence.'") It also does not define "public safety concern." The Refugee Detention Memo also says that 42% of the cases studied had been "insufficiently vetted . . . due to an inability to fully verify identity." *Id.* at 6. But DHS does not explain why this vetting was considered "insufficient" or what it means to "not fully verify identity." And even if the USCIS data wasn't flawed for the reasons discussed, the Memo says that fewer than 47% of the cases reviewed "could be conclusively found to not represent a public safety concern." *Id*. The meaning of this proposition is hard to follow, but taking the statement at face value what it actually shows is that Defendants are proposing a mandatory arrest and detention policy for all unadjusted refugees even though their own study showed that at least 46% of the reviewed cases were conclusively found not to present a public safety concern.

The Refugee Detention Memo also is arbitrary and capricious because, under DHS'

30

regime, a refugee would have to apply for adjustment of status far enough in advance and have their adjustment application decided no earlier and no later than their 366th day in the United States to avoid potential mandatory detention. This policy makes no allowance for the need to obtain scarce legal assistance to complete the adjustment of status applications, *see* Ex. 6 ¶ 9, or the difficulty in obtaining the medical examinations that must be submitted with the adjustment applications, *see* Ex. 5 ¶ 6; Ex. 6 ¶ 10. In addition, individual plaintiffs Jean A., Hamad B., Mona C., and Yasmine D., are among the nearly 100,000 refugees whose adjustment of status applications are pending with USCIS, which takes an average of 8.5 months to process them and until recently had a categorical "adjudicative hold" on all refugee adjustment applications. ECF 1-6, Memorandum from Joseph B. Edlow at 1 (Nov. 21, 2025) ("Edlow Memo"); even these refugees are characterized in the Refugee Detention Memo as "voluntarily returning to custody."[8] The Refugee Detention Memo does not say, for example, that refugees will have a way to voluntarily appear on their 366th day to be interviewed for adjustment of status to avoid arrest and detention.

Finally, the Refugee Detention Memo dismisses the reliance interests of refugees. ECF 1-4 at 6–7. It first disclaims any valid reliance interest, saying the statutory mandate for detention is clear. *Id*. at 6. But this is incorrect and runs counter to DHS' interpretation for the last 45 years. *Supra* Argument § III.A. The Refugee Detention Memo also relies on a claim that refugees are told that they need to apply for adjustment of status after one year in the United States, *see* ECF 1-4 at 6, but does not claim that refugees have been advised that they will be subject to mandatory detention if they fail to do so at exactly the right time. Indeed, there would be no reason for refugees to receive such notice, because it has never been the policy.

---

[8] USCIS, *Immigration and Citizenship Data*, *FY22 Appropriations Reporting Requirement - Application Processing Data for October 2025* (Dec. 17, 2025), *available for download at* https://perma.cc/GP5F-DTKK (archived Feb. 26, 2026).

DHS mentions the very real consequences that can flow from detention, such as financial consequences from missing work, unmet household and family obligations, and a delay in securing representation, but then cursorily dismisses them as "strongly outweighed by the public policy interest in full compliance with the statute." *Id.* at 6–7. There is no public policy interest in unlawful agency action, however. *New York v. Kennedy*, 155 F.4th 67, 77 (1st Cir. 2025) ("There is generally no public interest in the perpetuation of unlawful agency action.") (citation modified).

The Refugee Detention Memo also fails to identify other reliance interests that lawfully admitted refugees developed over 45 years. Lawfully admitted refugees uproot their lives and come to the United States relying on a promise that they will become lawful permanent residents after one year. Detention was never considered as a potential risk for law-abiding refugees or organizations that serve them when they chose to resettle in the United States. The Refugee Detention Memo also ignored that significant benefits are inherent in refugee status, including indefinite work authorization, other benefits like drivers licenses, and mandatory non-discretionary adjustment of status after one year if they meet the legal requirements set out in § 1159 (as opposed to extra-statutory factors like those identified in the Refugee Detention Memo).

Given the very real reliance interests at stake for a vulnerable population invited to this country, the Memo falls far short of providing a reasoned explanation or detailed justification necessary to justify departing from 45 years of prior practice and is therefore arbitrary and capricious. *Am. Hosp. Ass'n v. Kennedy*, 164 F.4th 28, 33 (1st Cir. 2026) (consideration of reliance interests is "a critical factor in the analysis of an arbitrary-and-capricious claim").

## IV. The Refugee Detention Policy Irreparably Harms Plaintiffs.

Plaintiffs face immediate and irreparable harm absent an order staying the Refugee Rescission and Refugee Detention Memos. For individual Plaintiffs, these harms include unlawful warrantless arrest, indefinite detention, and family separation as well as loss of refugee status after

mandatory re-vetting procedures not contemplated by the statute. The Refugee Detention Memo makes clear that where any lawfully admitted refugee does not "voluntarily return at the one-year mark" DHS is required "to take the affirmative actions of locating, arresting, and taking the [refugee] into custody." ECF 1-4 at 3. But it provides no mechanism for refugees to "voluntarily return at the one-year mark." The Memo subjects every lawfully admitted refugee who has not adjusted status to immediate arrest and detention without process.

In fact, Hamad B. and the husband of Yasmine D. already have suffered warrantless arrest and detention despite their refugee status and pending adjustment applications. Ex. 2 ¶¶ 9–12; Ex. 3 ¶¶ 8–16. The threat of detention therefore is immediate and real. Being subjected to immigration detention causes irreparable harm to the individual plaintiffs, their families, and their larger communities. Plaintiff Yasmine D. and her son suffered acutely when her husband was detained; her son missed school out of anxiety, causing Yasmine to miss work and income to care for him. Ex. 3 ¶¶ 13–15. After Hamad B. was detained for weeks and released without being adjusted to LPR status, he fears re-detention and his wife Mona C. fears ICE will arrest her next, with all the trauma for their children those detentions will entail. Ex. 3 ¶¶ 14-15; Ex. 4 ¶ 16. Since hearing about the Refugee Detention Policy, Jean A. has avoided going outside and has warned his family members to stay home because of the risk of arrest and detention. Ex. 1 ¶¶ 15–19. If Sam E. is detained, he faces loss of schooling as well as the life he has built in his new community, Ex. 5 ¶¶ 7, 10, and Abdo F. will lose not only his freedom but also access to critical medical care, Ex 6 at ¶¶ 13-14. *See Guerrero Orellano v. Moniz*, 802 F. Supp. 3d 297, 312 (D. Mass. 2025) (indefinite immigration detention absent preliminary injunctive relief constituted irreparable harm); *Ramirez v. ICE*, 310 F. Supp. 3d 7, 31 (D.D.C. 2018) ("[T]he harm from detention surely cannot be remediated after the fact" and is a quintessential irreparable harm); *Rodriguez Vazquez v. Bostock*,

779 F. Supp. 3d 1239, 1262 (W.D. Wash. 2025) (Detention causes "potentially irreparable harm every day [one] remains in custody."); *see also Hernandez v. Sessions*, 872 F.3d 976, 995 (9th Cir. 2017) (highlighting the "irreparable harms imposed on anyone subject to immigration detention").

The organizational plaintiffs also face irreparable harm to their missions and activities. Plaintiff International Institute of New England has diverted staff resources to proactively engage all refugees resettled by the organization during the Biden Administration to ensure they are prepared for possible contact with immigration officials, is seeking to hire an additional attorney in anticipation of increased need due to the Refugee Detention Policy, and is working with partners to prepare a response to increased detention of their clients. Ex. 8 ¶¶ 16-17. IINE is also preparing to expend staff resources on preparing clients for re-vetting interviews, finding removal defense and habeas counsel for their clients who are detained, and supporting client families who lose income as a result of a loved one's detention. *Id*. ¶¶ 18-21. Jewish Family Service of Western Massachusetts has already represented one refugee family in a re-vetting interview and has obtained training in anticipation of an increased number of interviews. Ex. 7 ¶ 13. JFS-WA is preparing to divert resources from other work to represent refugee clients in re-vetting interviews, obtain removal defense and habeas counsel for detained clients, and support families whose lose income due to detention. *Id*. ¶¶ 15-21. *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 19 (1st Cir. 1996) ("[i]f the plaintiff suffers a substantial injury that is not accurately measurable or adequately compensable by money damages, irreparable harm is a natural sequel"); *Massachusetts v. NIH*, 770 F. Supp. 3d 277, 322 (D. Mass. 2025)("'[o]bstacles that unquestionably make it more difficult for the plaintiff to accomplish its primary mission provide injury for purposes of irreparable harm.'") ((internal quotation marks, citation, and alterations omitted)); *Nat'l Educ. Ass'n v. U.S. Dep't of Educ.*, 779 F. Supp. 3d 149, 200 (D.N.H. 2025) (finding

plaintiffs faced irreparable harm to their organizational missions and core activities).

## V.  The Balance of Equities and the Public Interest Strongly Favors a Stay

The balance of equities and public interest factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Here, these factors weigh heavily in favor of a stay of the Rescission and Detention Memos pursuant to § 705. *First*, as described above, the Memos violate § 1159, DHS' own regulations, and the Constitution. "'[T]here is generally no public interest in the perpetuation of unlawful agency action.'" *New York v. Kennedy*, 155 F.4th at 77 (quoting *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016)).

*Second*, the Refugee Detention Policy purports to enhance DHS' efforts to combat alleged fraud and public safety concerns with the refugee "vetting" system. But Defendants can demonstrate no harm from simply abiding by their preexisting policies: interviewing refugees applying for adjustment of status and referring individuals to section 240 removal proceedings if their refugee status is terminated or their application to adjust status is denied. *Nat'l Educ. Ass'n*, 779 F. Supp. 3d at 201 ("defendants stand to suffer little harm if a preliminary injunction is granted . . . . a preliminary injunction would merely maintain the status quo prior to the 2025 Letter's enactment—a status quo which, as recently as 2023, the Department believed was . . . lawful"); *Guerrero Orellano*, 802 F. Supp. 3d at 313 ("Providing bond hearings to noncitizens in Guerrero Orellana's position was the government's consistent practice until very recently, so a preliminary injunction here merely returns the parties to that status quo."); *Make the Rd. N.Y. v. Noem*, No. 25-5320, 2025 WL 3563313, at *32 (D.C. Cir. Nov. 22, 2025) (rejecting argument that district court's stay order harmed the government because that order "maintains the status quo that has existed for decades"). Staying the Rescission Memo and the Detention Memo until the Court can determine their lawfulness simply continues the "decades-long practice" for adjusting the status of lawfully

35

admitted refugees "for a short period of time while this court adjudicates the merits." *Id.*; *see also*

*RAICES v. Noem*, No. 25-5243, 2025 U.S. App. LEXIS 19422, at \*53 (D.C. Cir. Aug. 1, 2025)

(denying government's request for a stay pending appeal because the district court's stay order

"simply requires the government to adhere to mandatory statutory procedures and standards").

When weighed against the severe, irreparable and constitutional harm to Plaintiffs, their

families, and communities both the balance of the equities and the public interest favor issuing a

stay of the Rescission and Detention memos.

## VI. The Court Should Stay the Memos in Their Entireties

Because Plaintiffs have demonstrated that they are entitled to relief under Section 705 of

the APA, the proper remedy is to stay the Refugee Rescission and Refugee Detention Memos in

their entireties. *R.I. Coal. Against Domestic Violence v. Bondi*, 794 F. Supp. 3d 58, 73  (D.R.I.

2025); *Woonasquatucket River Watershed Council v. USDA*, 778 F. Supp. 3d 440, 478–79 (D.R.I.

2025) (staying funding freeze orders in their entirety under Section 705 of the APA);

*Massachusetts v. NIH*, 770 F. Supp. 3d at 322 (preliminarily enjoining agency action in its entirety

in APA case); *Make the Rd. N.Y.*, 2025 WL 3563313, at \*35–36 ("Section 705 stays operate on

the legal source of authority for an agency to act at all" and "empower[] the judiciary to act directly

against the challenged agency action"); *see also Trump v. CASA*, 606 U.S. 831, 847 n.10 (2025)

("Nothing we say today resolves the distinct question whether the Administrative Procedure Act

authorizes federal courts to vacate federal agency action.").

## CONCLUSION

For the foregoing reasons, the Court should grant a preliminary relief, stay the Refugee

Rescission and the Refugee Detention Memos under 5 U.S.C. § 705, and stay the implementation

of the Refugee Detention Policy pending the resolution of these proceedings.

36

Dated: February 27, 2026

Ghita Schwarz*
Guadalupe V. Aguirre*
Mevlüde Akay Alp*
Kimberly Grano*
Pedro Sepulveda*
**INTERNATIONAL REFUGEE
ASSISTANCE PROJECT**
One Battery Plaza, 33rd floor
New York, New York 10004
Telephone: (646) 939-9169
Facsimile: (516) 324-2267
gschwarz@refugeerights.org
laguirre@refugeerights.org
makayalp@refugeerights.org
kgrano@refugeerights.org
psepulveda@refugeerights.org

Dalia Fuleihan*
**INTERNATIONAL REFUGEE
ASSISTANCE PROJECT**
P.O. Box 47611
Chicago, IL 60647
Telephone: (646) 740-6271
Facsimile: (516) 324-2267
dfuleihan@refugeerights.org

Respectfully submitted,

*/s/ Kali Schellenberg*
Kali Schellenberg (MA BBO No. 694875)
Erez Reuveni* (CA Bar No. 264124)
Jennie L. Kneedler* (DC Bar No. 500261)
Ryan Cooper* (DC Bar No. 1645301)
Steven Y. Bressler* (DC Bar No. 482492)
Robin F. Thurston* (DC Bar No. 1531399)
**DEMOCRACY FORWARD
FOUNDATION**
P.O. Box 34553
Washington, DC 20043
Phone: (202) 573-7950 (Schellenberg)
kschellenberg@democracyforward.org
ereuveni@democracyforward.org
jkneedler@democracyforward.org
rcooper@democracyforward.org
sbressler@democracyforward.org
rthurston@democracyforward.org

*Counsel for All Plaintiffs*

\* Motion to appear *pro hac vice* forthcoming

37