# Exhibit 8

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| JEAN A. *et al.*, <br><br>       *Plaintiffs*, <br><br> v. <br><br> KRISTI NOEM, in her official capacity as Secretary of Homeland Security, *et al.*, <br><br>       *Defendants*. | Case No. 3:26-cv-30031 |

**DECLARATION OF JEFFREY D. THIELMAN**

I, Jeffrey D. Thielman, upon my personal knowledge and pursuant to 28 U.S.C. § 1946, hereby declare as follows:

1. I am the President and Chief Executive Officer (CEO) of the International Institute of New England (IINE). The facts set forth in this declaration are based on my personal knowledge, my conversations with my staff, and the information kept in the ordinary course of business at IINE.

2. I make this declaration because the new and unprecedented Department of Homeland Security (DHS) policy to detain unadjusted refugees is causing and will continue to cause significant harm to our organization and the refugees we serve.

**International Institute of New England**

3. The International Institute of New England, founded in 1918, is a non-profit social service organization, headquartered in Boston, Massachusetts, that is committed to welcoming refugees and immigrants and helping them restart their lives in the United

States. IINE is the oldest organization exclusively serving refugees and immigrants in New England.

4. We create opportunities for refugees and immigrants to succeed through resettlement, education, career advancement, and pathways to citizenship. We provide services to noncitizens living in thirteen counties across Massachusetts and New Hampshire.

5. IINE's primary focus is serving humanitarian populations lawfully admitted to the United States, primarily those eligible for federally funded Office of Refugee Resettlement (ORR) services, including refugees, asylees, Cuban and Haitian entrants, Unaccompanied Minor Children, Victims of Human Trafficking, and humanitarian parolees. IINE provides comprehensive, trauma-informed, wraparound services designed to help refugees and immigrants integrate into and contribute to local communities.

6. IINE is governed by a Board of Directors and operates under the laws of the Commonwealth of Massachusetts for non-profit organizations. The Board of Directors appoints the President and CEO, who oversees the operations of IINE.

7. I have served as the President and CEO of IINE since July 1, 2015. Reporting to the Board of Directors, my role is to lead an organization that serves a broad range of immigrants with a focus on populations fleeing persecution and violence in their homeland. I oversee all departments within IINE, including programming, external relations, finances, fundraising, and human resources.

8. I have a long history of experience working with and on behalf of immigrant populations. Prior to working at IINE, I worked in the Cristo Rey schools, a network of high schools for low-income students established by the Jesuits, a religious order of the Roman Catholic Church. Students at the Cristo Rey schools come from low-income families, and

many are immigrants or the children of immigrants. I worked at the original Cristo Rey school in Chicago from 1998 to 2000, oversaw the scale up of the Cristo Rey schools across the country from 2001 to 2008, and from 2009 to 2015, served as President of Cristo Rey Boston High School, which is located in the Dorchester section of Boston. Prior to my career with the Cristo Rey schools, I practiced law in Boston for a small firm that served mostly Spanish-speaking clients and worked for an insurance company. Following graduation from college and prior to entering law school, I served as a Jesuit International Volunteer in Peru, South America for three-and-a-half years where I taught at a high school and established a program for street children. I am fluent in Spanish.

9. Through my past and current work, I am deeply familiar with IINE's operations and with the process for resettling and integrating refugees in the United States.

10. IINE receives recently resettled refugees as a resettlement agency, providing intensive case management and comprehensive transitional assistance to new arrivals during their first year in the United States. Our work helps newly arrived refugees to become fully engaged members of our New England communities.

11. Before the current administration paused the United States Refugee Admission Program and stopped admitting new refugees, IINE resettled between 400 and 700 new refugees each year. This resettlement work starts with meeting new arrivals at the airport, placing them in housing, helping them navigate the healthcare system, connecting them with public benefits, and enrolling children in public schools. We also provide families with cultural orientation, place adults in English classes, and help refugees find employment and career pathways in their new communities. Refugee clients are eligible for federal ORR services for their first five years in the United States. IINE supplements public

funding for our work with private funding that enables our organization to provide comprehensive services to these new populations.

12. IINE also provides longer-term support to refugees and their families beyond the first year of arrival, including adult education and skills training classes; employment placement programming; and case management, in which trained staff help clients revise family budgets, troubleshoot issues with landlords, support families facing domestic violence, support clients navigating health and mental healthcare issues, provide cultural support to clients navigating systems in other agencies, educate other providers about the unique cultural needs of our clients, and supporting reapplications for public benefits.

13. One of the important services we provide is legal assistance to refugees in filing their applications for lawful permanent residency (LPR) status. Our legal staff files a Form G-28, Notice of Entry of Appearance, with U.S. Citizenship and Immigration Services (USCIS) for each refugee client we represent, allowing our team to manage the client's case and represent the client through the entire adjustment of status process. Refugees who have been in the United States for more than one year are entitled to file for and receive LPR status. However, many refugees struggle to complete and file an application on their own, and outside attorneys charge significant fees to assist with this application. IINE represents refugees without charging for these legal services. There are also other costs associated with this application, including the cost of medical examinations and translation services. IINE's legal team organizes Civil Surgeon (medical examination) days for our refugee clients to ease the financial burden of obtaining medical examinations. IINE's legal representation includes document gathering and review, preparation of the required forms, filing the application with USCIS, monitoring all

correspondence from USCIS, responding to requests for evidence from USCIS, interview preparation, and attendance at USCIS interviews for our refugee clients.

**DHS' Refugee Detention Policy**

14. IINE currently provides services to approximately 700 refugees who have not yet adjusted to LPR status. Many of these individuals have already filed their applications for permanent residency but have been waiting for many months—sometimes years—for the government to adjudicate their applications. IINE files green card applications or has filed applications for most of this population, and some of these clients remain enrolled in our case management, adult education, and employment programming. Some members of this population are refugee children who are participants in our refugee youth program.

15. On February 18, 2026, USCIS and ICE announced in a new policy memo that they will arrest and detain refugees who have been in the United States for more than one year but have not yet obtained LPR status. The memo also stated that USCIS would be conducting re-vetting investigations to determine if a refugee may remain in the United States as a lawful permanent resident, should have their refugee status terminated, or should be placed into removal proceedings.

16. DHS' increased targeting of refugees is already disrupting IINE's core work and efforts to support resettled refugees. IINE staff have diverted resources from providing refugee clients with life-saving assistance like food distribution to proactively engaging all refugees we have resettled between January 20, 2021, and February 19, 2025 to ensure that they are taking steps to prepare themselves for contact with immigration officials. For instance, IINE staff are working around the clock to contact refugee clients by phone, email, WhatsApp, and text and to remind them to carry with them at all times copies of

their I-94 arrival documents, refugee travel documents, and a receipt notice of their green card application, if they have filed one. Additionally, we have communicated to our clients that they should contact us if they are detained by ICE. Because IINE's resources are limited, we are currently seeking an additional attorney for our Immigration Legal Services program in anticipation of an increased need due to the Refugee Detention Policy. Although we are beyond our approved budget, we are also exploring avenues for adding more staff, such as two paralegals, to our Immigration Legal Services program if an ICE surge targeting refugees occurs here in Massachusetts, as was the case in Minneapolis. We are also engaging in internal discussions regarding the logistics of managing volunteers to support refugee families who may be impacted by the Refugee Detention Policy. This has been a widespread organizational endeavor: our staff, including our senior management team, has been calling and speaking with volunteers, as well as meeting with community partners on a weekly basis to discuss community needs and assess IINE's response. This effort has detracted from the senior leadership team's ability to engage in their day-to-day duties; overall, the senior management team has seen a fourfold increase in time engaging in external outreach. At the same time, front line staff are themselves spending more time engaging in outreach to address client fears arising from the government's Refugee Detention Policy. In essence, IINE staff have moved from operating under an immigration case management and client support posture to one geared towards disaster mitigation.

17. The February 18, 2026, DHS memo has created intense fear in the refugee community, and many of our refugee clients are reaching out to our staff seeking Know Your Rights (KYR) trainings and emergency preparedness workshops. Previously, IINE provided

community members with one KYR training per year. Since January 2026, IINE staff have already conducted three KYR trainings and anticipate conducting KYR trainings on an increased and regular basis. Our most recent KYR training was in response to a request from our refugee youth program in Lowell, Massachusetts. We have not previously conducted a KYR training for this program, but because the program participants were concerned about their safety as a result of the Refugee Detention Policy, we prioritized conducting this KYR training. Our staff have also recently developed and scheduled family preparedness workshops to ensure immigrant families are prepared in the event someone in their family is detained by immigration enforcement officers. Due to staffing constraints, these workshops are capped at 15 families per session. As such, these workshops are set to occur on a weekly basis once they begin in March 2026 in order to reach as many of our clients as possible.

18. The Refugee Detention Policy is also likely to impact IINE in other significant ways. If unadjusted refugee clients are sent notices to attend re-vetting interviews, IINE staff will need to devote significant time to prepare for and accompany our refugee clients to these interviews.

19. If refugees we serve are arrested, detained, and placed in removal proceedings, IINE staff will spend large amounts of time searching for and contacting possible legal referrals to represent these individuals in removal proceedings and/or federal habeas petitions, as detained removal work is outside the scope of the legal services IINE can provide. It is very time-consuming for our staff to identify and secure low- or pro-bono referrals for these types of cases.

20. If our adult refugee clients are detained and unable to work, their families will be left without their income. Most of our refugee clients do not have significant financial resources, and their families rely on the paychecks of every adult in the household who can work to survive. To support these families who have lost a source of income, IINE will have to dip into our financial reserves to provide financial assistance to refugee families affected by the detention policy. In addition, we expect to spend resources on additional staff and/or overtime for our current staff to meet the needs of our refugee families who will be searching for ways to make ends meet.

21. Devoting a significant amount of IINE's resources to responding to DHS's new refugee detention policy will set back our organization's priorities and existing work. In particular, diverting staff time and money to supporting detained refugees and their families will significantly set back our organization's existing work on behalf of other immigrant communities, and will interfere with the services we provide in the normal course of business.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.


Jeffrey D. Thielman

Executed: Boston, MA

Date: February, 27, 2026