# Exhibit 9

Case 3:26-cv-30031-RGS    Document 9-10    Filed 02/27/26    Page 2 of 9

1997 GENERAL COUNSEL'S OPINIONS, 9 Immigration Law Service 2d PSD 1997...

9 Immigration Law Service 2d PSD 1997 General Counsel Opinions

**Immigration Law Service, Second Edition** | November 2025 Update

**INS General Counsel Opinions**

# 1997 GENERAL COUNSEL'S OPINIONS

## TABLE OF CONTENTS

| Opinion No. | Title | Author |
|---|---|---|
| 97-1 | Electronic Completion of Section 1 of the I-9 | Busch |
| 97-2 | Whether a personal interview is required for all refugee and asylee adjustment of status applications | D. Smith |
| 97-3 | Allocation of adjustment of status filing fee and the Section 245(i) surcharge-revised | Cameron |
| 97-4 | Notice to Employers of Possible Debarment Consequences of Section 274A "Knowing Employment" Final Orders | Busch |
| 97-5 | The effect of an intent to immigrate permanently on an alien's admissibility as a nonimmigrant | Sheridan |
| 97-6 | Special Immigrant Juveniles | London |
| 97-7 | Carrier liability for 273 fines for presentation of improperly documented in-transit aliens at preinspection stations | Hinds |
| 97-8 | Consular authority to retain forms I-94 | Sheridan |
| 97-9 | Validity of Foreign Divorces and subsequent remarriage | |
| 97-10 | Domicile | Sheridan |
| 97-11 | Adjustment applicants who "age out" | Sheridan |
| 97-12 | Interpretation of the 45-minute inspection standard | Hinds |
| 97-13 | Corrections/Amendments to petitions for Naturalization and Naturalization certificates | Mc Gee |
| 97-14 | Eligibility for Derivative Refugee Status under INA 207(c)(2) | Whitney |

**Legal Opinion No. 97-1**

**Subject: Legal Opinion: Electronic Completion of Section 1 of the I-9**

**From: Office of the General Counsel**

**January 8, 1997**

**To: T. Alexander Aleinikoff, Executive Associate Commissioner Programs**

**I. Question Presented**

The Electronic I-9 Demonstration Project working group has requested our opinion on the following question: Can an employer institute an employment verification procedure in which the employer would complete Section 1 of the Form I-9 on a computer screen based upon answers provided by the new employee, a Form I-9 would be printed containing the answers to Section 1, and the new employee would then review and sign Section 1?

**II. Summary Answer**

Because this scenario does not specifically violate any statutory or regulatory requirement, and because it is not inconsistent with the INS? employer sanctions goals, it is legally acceptable.

### III. Discussion

Section 274A(b)(2) of the Immigration and Nationality Act, 🚩8 U.S.C. § 1324a(b)(2), requires that an individual hired for employment in the United States attest under penalty of perjury on the designated form that he or she is a citizen or national of the United States or an alien authorized to work.

The INS has elaborated on this requirement in its regulations at 8 C.F.R. Part 274a, and on the designated form (Form I-9) and its instructions. Section 274a.2(b)(i) of the regulations states that an employer must ensure that the individual hired properly completes Section 1 of the Form I-9, which requests the individual's name, address, date of birth, social security number, and citizenship or immigration status, at the time of hire.

The regulations allow necessary assistance to be given to the individual:

> (A) [I]f an individual is unable to complete the Form I-9 or needs it translated, someone may assist him or her. The preparer or translator must read the Form to the individual, assist him or her in completing Section 1

> — "Employee Information and Verification," and have the individual sign or mark the Form in the appropriate place. The preparer or translator must then complete the "Preparer/Translator Certification" portion of the Form I-9; and (B) Present to the employer … documentation … establishing his or her identity and employment eligibility within the time limits set forth.

8 C.F.R. § 274a.2(b)(i). In other words, the regulations envision the preparer/translator as playing a role only if necessary, but requiring substantive participation once that role is assumed. The preparer/translator, rather than the employee, is responsible for presenting the documents needed to complete Section 2 of the Form I-9 if a preparer/translator is used. The preparer/translator certification on the Form I-9 states that it is "to be completed and signed if Section 1 is prepared by a person other than the employee," and requires the preparer/translator to attest under penalty of perjury that he or she has assisted in the completion of the form and that to the best of his or her knowledge the information is true and correct. The instructions to the Form I-9 add that a preparer/translator "may be used only when the employee is unable to complete Section 1 on his/her own." We do not interpret the regulations to prohibit clerical assistance in preparing the Form I-9 (such as a secretary typing the form), or to require a merely clerical preparer to execute the preparer/translator certification. Instead, they require that substantive assistance with the Form I-9 be limited to situations where it is necessary, and that such substantive assistance be documented in the preparer/translator block.

The regulations also address the question of electronic reproduction and generation of the Form I-9. Until very recently, although the regulations in theory allowed electronic reproduction, the requirement that reproduced Forms I-9 meet the strict test of complete identicality (including double-sided reproduction) in 8 C.F.R. § 299.4(b) made this option a practical impossibility. By interim rule published on October 7, 1996, the INS amended 8 C.F.R. § 274a.2(a) to relax this rigid requirement so as to make electronic generation actually achievable:

> Employers may electronically generate blank Forms I-9, provided that: the resulting form is legible; there is no change to the name, content, or sequence of the data elements and instructions; no additional data elements or language are inserted; and the paper used meets the standards for retention and production for inspection specified under 274a.2(b). When copying or printing the Form I-9, the text of the two-sided form may be reproduced by making either double-sided or single-sided copies.

Case 3:26-cv-30031-RGS    Document 9-10    Filed 02/27/26    Page 4 of 9

1997 GENERAL COUNSEL'S OPINIONS, 9 Immigration Law Service 2d PSD 1997...

8 C.F.R. § 274a.2(a) (as amended by 61 Fed. Reg. 52235 (1996)).

An employer has proposed an electronic I-9 demonstration project in which the blank Form I-9 would be stored in a computer system. The employer's representative responsible for employer sanctions compliance would use Form I-9 compliance software developed by the employer to guide both employer and employee through the verification process. At the appropriate time in the process, the software would prompt the employer to ask the employee to provide the information necessary to fill in the blanks in Section 1 of the Form I-9. The employer would type in the information provided by the employee on the computer screen Form I-9. The employee would have been provided with a printed copy of a blank Form I-9 for reference and to ensure that the employee has received the Form I-9 instructions (which include important anti-discrimination notices as well as other information), but that blank Form I-9 would not actually be used for verification. After Section 1 had been completed, the employer would print out the computer Form I-9 with the Section 1 blanks filled in with the information relevant to that employee, and the employee would review the form and attest in writing to its correctness. The process would then move on to Section 2 (showing the documents), and the paper Form I-9 would be retained in the normal manner. This proposal requires the INS to consider whether the current regulations allow it, both as an interpretation issue that is likely to arise again as office technology improves, and in order to determine whether any enforcement waivers of possible employer sanctions violations would be required in order to proceed with this pilot project.

This proposal does not neatly fit within the regulations. Because the electronically generated Form I-9 is not "blank," but instead has Section 1 filled in, it is not specifically authorized by the new regulation allowing electronic generation of the blank Form I-9. Neither, however, does the new regulation prohibit it, because partial completion prior to generation is simply outside the ambit of the regulation, which did not address the manner of completion. The prohibition against adding data elements to the "blank" Form I-9 means that the employer cannot change the questions or the instructions; it was not intended to govern how the employee may provide the answers.

From the standpoint of completion, rather than generation, the regulations envision that the employee completes Section 1 of the Form I-9 unless he or she is substantively unable to complete it. In this proposal, the employer, rather than the employee, physically enters the data on the form, and the "inability" of the employee to fill in the data himself or herself is solely a matter of clerical efficiency rather than a substantive inability such as inability to read English. Nor does the regulatory provision for assistance by a preparer/translator address this situation, because it is directed to substantive rather than merely clerical assistance. Furthermore, since there is only one preparer/translator box on the Form I-9, and since if we required this certification in this situation the box would have to be completed on every Form I-9 completed by that employer, there would be no way to document or distinguish those situations in which a preparer or translator (particularly one other than the employer's representative) substantively assisted in the preparation of Section 1, which is the purpose of that requirement. As discussed above, this proposal involves purely clerical assistance, which is not specifically authorized in the regulations but which we do not read them to prohibit.

The fact that this proposal is not specifically authorized by the clear text of the regulations does not necessarily mean that it would violate them, absent any specific provision of statute or regulation that prohibits it.

We attempt to give common-sense interpretations to INS regulations that best serve the ultimate goals of promoting employer sanctions compliance, assisting INS employer sanctions enforcement, and minimizing the regulatory burden on employers. See 52 Fed. Reg. 16216, 16217 (1987) (comment on final rule promulgating 8 C.F.R. Part 274a that "INS expects that these guidelines will prove sufficiently flexible so that employers and others required to comply with statutory and regulatory procedures will be able to do so in ways that suit current personnel hiring, recruiting and referring practices with minimal disruption".

The regulations require a hard-copy Form I-9 (either single or double-sided) that is complete, and to which the employee has attested with his or her signature, that will be retained and available for INS inspection. This proposal results in such a form. Whether or not the data (other than the signature) is written on a paper form or is typed on a computer screen and then printed out, and whether the typist who actually enters the employee's data (as opposed to providing substantive translation or other assistance) is the employee or the employer, is therefore not important. If — as is the case — this proposal does not violate a specific regulatory requirement, and it assists the employer by ensuring more accurate and efficient employment verification, it is legally acceptable. This is not to say that regulatory changes should not be considered to deal more specifically with this situation, but this would be more appropriate after assessment of this pilot project than before.

Case 3:26-cv-30031-RGS    Document 9-10    Filed 02/27/26    Page 5 of 9

1997 GENERAL COUNSEL'S OPINIONS, 9 Immigration Law Service 2d PSD 1997...

## IV. Conclusion

It would not violate the employer sanctions regulations for an employer to type Section 1 Form I-9 data provided by its employee on a computer screen, and then print out the form with Section 1 completed for the employee's review and signature.

The employer should not use the preparer/translator certification box unless the assistance is substantive rather than purely clerical.

I hope this information is helpful. If you have additional questions, please contact Dea D. Carpenter, Associate General Counsel, Chief, Employer

Sanctions & Civil Document Fraud Division, at —.

/s/ David A. Martin

FN??1. No doubt the employer could change its proposal slightly to have the employee actually enter the data on the screen. This would make the process less efficient, however, because the employee would have to be instructed in how to use the computer, and would seem rather pointless in the absence of an unduly rigid INS interpretation of its regulations as prohibiting clerical assistance with Section 1 unless that assistance rises to the level of substantive assistance requiring completion of the preparer/translator certification.

**Legal Opinion No. 97-2**

**Subject: LEGAL OPINION Opinion on whether a personal interview is required for all refugee and asylee adjustment of status applications under INA § 209.**

**From: Office of the General Counsel**

**January 15, 1997**

**To: Michael Strauss, Acting Chief, Immigrant Branch Office of Adjudications**

## I. QUESTIONS

1) Does the Immigration and Nationality Act (INA) require the Service to conduct a personal interview of all asylee and refugee applicants for adjustment of status?

2) Does the INA impede the Service from making certain changes in the procedures for applying for adjustment of status?

3) May the Service implement the necessary changes by public notice in the Federal Register?

## II. SUMMARY CONCLUSIONS

1) The INA does not require the Service to conduct a personal interview of all asylee and refugee applicants for adjustment of status.

2) The INA does not impede the Service from making certain changes in the procedures for applying for adjustment of status.

3) The Service may implement the necessary changes either by promulgating a final rule that does not require a prior opportunity for public notice and comment or as an interim rule that will be effective immediately.

## III. ANALYSIS

1) The question of whether the personal interview may be waived must be answered separately for asylees and refugees.

### a) Asylees

There is clearly no statutory impediment to eliminating the personal interview requirement for asylees. INA § 209(b) places no restrictions on the Attorney General's discretion to establish the procedure for adjusting the status of asylees. However, there are certain circumstances in which the adjudication of the adjustment application may require an interview of the applicant. For instance, when changed circumstances in the asylee's country of origin suggest that he or she may no longer be a refugee, a personal interview may be necessary to determine whether the asylee in fact continues to fall within the refugee definition.

### b) Refugees

Eliminating the personal interview requirement for refugees presents a more difficult question of statutory interpretation. Section 209(a) of the INA, as amended by Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208 (1996 Act), requires that a refugee eligible to adjust status "shall … return or be returned to the custody of the Service for inspection and examination for admission to the United States as an immigrant in accordance with the provisions of sections 235, 240 and 241."

To determine whether refugees applying for adjustment of status must receive a personal interview we must look at the terms of INA sections 209 and 235 together. Section 235(a) establishes the INA's inspection and examination requirement. It was amended by the 1996 Act to read:

> … (3) All aliens (including alien crewmen) who are applicants for admission or otherwise seeking admission or readmission to or transit through the United States shall be inspected by immigration officers.

The Office of General Counsel has consistently held that the language in the former INA Section 235(a) created a requirement that aliens at a port of entry applying for admission be inspected in person. See Legal Opinions 80-43, 83-8, and 85/86-89. The new Section 235(a)(3) does not change the essence of the requirement, and does not alter the interpretation of that section. Our conclusion that the Service may waive the in-person interview for refugees applying for adjustment of status does not require us to reverse this position.

Under certain limited circumstances, the Service may separate the inspection process into different steps so that the in-person inspection takes place prior to the actual entry or adjustment of status of the alien. For example, the Service has established several dedicated commuter lanes (DCL) at land border ports of entry. The inspections process for persons participating in DCL programs has been separated into two stages. First, a person seeking to enter the United States at a DCL port must file an application. The regulations require that each "applicant must present himself or herself for inspection and positive identification prior to approval of the application." 8 C.F.R. § 235.13(a)(4)(i), published in 60 F.R. 50386, 50389 (Sept. 29, 1995). The Service performs an in-person inspection of the individual at this time, and the inspection process is completed when the person actually seeks to enter the United States. 8 C.F.R. § 235.13(b)(4). The initial in-person inspection satisfies the requirements of INA Section 235 because the Service positively identifies each DCL participant each time he or she seeks to enter the United States and completes the inspection and admission process at that time. Id.

The procedure for admitting refugees into the United States as permanent residents, like the DCL programs, divides the inspection process into two steps. The process begins when the Service screens refugees overseas and inspects them for admission as refugees at the port of entry upon arrival to the United States. 8 C.F.R. §§ 207.2(b) and 235.1. This process includes an in-person inspection by an immigration officer as required by INA Section 235(a). Questions of identity, eligibility for refugee status and admissibility to the United States are resolved at this time. The next step is the adjustment of status of the refugees for their admission to the United States as immigrants. The only substantive issues left to be resolved at this stage of the process are whether the refugee has engaged in some conduct after admission that would render him or her excludable under those grounds of exclusion that are applicable to refugees and perhaps whether some fraud occurred at the time of the initial application. It is only the exceptional case in which a second face-to-face interview is necessary to complete the inspection process. For such cases the Service clearly retains the authority to require an applicant for adjustment of status to appear before a Service officer.

This reading of Section **209**(a) is consistent with the plain language of the statute. That language indicates that Congress considered the admission of refugees as immigrants under Section **209**(a) to be an adjustment of status and part of the entire refugee admission process rather than a separate procedure requiring a second in-person inspection. To begin with, the title of the section is "Adjustment of Status of Refugees," and INA Section **209**(c) specifically refers to the procedures established in Section **209**(a) as an "adjustment of status." The legislative history of the Refugee Act of 1980, Pub. L. No.. 96-212, 94 Stat. 102, supports this interpretation. The Senate version of the Refugee Act provided that refugees arriving as a part of the non-emergency provisions of INA Section 207 would be admitted as lawful permanent residents. The House amendment

> provided that all refugees entering the United States be admitted conditionally as "refugees" with retroactive adjustment of status to lawful permanent residents after two years.

The Conference [Committee adopted] the House version with adjustment of status permitted after a period of one year.

House Conference Report No. 96-781, 1980 U.S.C.C.A.N. 162 (emphasis added).

Moreover, the admission of refugees as permanent residents is directly tied to their admission as refugees. Section **209**(a)(2) provides that a refugee admitted as an immigrant under Section **209** "shall … be regarded as lawfully admitted to the United States for permanent residence as of the date of such alien's arrival into the United States."

As a result, the second step in the refugee admission process is not an entirely new inspection as if the refugee left the country and attempted to enter under a new status. Rather, the adjustment of status completes the refugee resettlement process by changing the refugee's status to that of lawful permanent resident. Thus, the determination of admissibility as an immigrant does not require a second in-person interview because the initial inspection for admission as a refugee adequately discharges the personal inspection requirements of Section 235.

The preceding discussion does not entirely resolve the in-person interview question. Apart from the requirements of INA Section 235(a), the language "shall … return or be returned to the custody of the Service for inspection and examination … " could itself be read to require such an interview. The exact meaning of this phrase is not clear. The legislative history of the Refugee Act of 1980 does not shed light on its meaning.

Section **209**(a) was adopted almost verbatim from prior sections 203(g) and (h) of the INA, which provided for adjustment of status of refugees admitted as conditional entrants under old Section 203(a)(7). See Section 3 of the Immigration and Nationality Act of 1965, Pub. L. No. 89-236, 79 Stat. 912.

These sections were repealed by the Refugee Act. The legislative history of the 1965 Act helps little to clarify the issue. It merely states that

> subsections (g) and (h) provide for the inspection of refugees after they have been in the United States for at least 2 years and retroactive adjustment of status to that of an alien lawfully admitted for permanent residence as of the date of their arrival in the United States.

Senate Report No. 748, 1965 U.S.C.C.A.N. 3328, 3341.

The crucial question here is whether the use of the term "custody" requires the Service to take actual physical control over refugees adjusting status when their admissibility is determined. Current practice does not include the taking of this type of custody over a refugee, and it seems doubtful that Congress intended the Service to detain refugees applying for adjustment of status. Both in common usage and as a technical legal term, custody denotes many different types of control over a person short of physical restraint. Webster's Dictionary defines custody as "judicial or penal safekeeping: control of a thing or individual with such actual or constructive possession as fulfills the purpose of the law or duty requiring it." Webster's 3rd New International

Case 3:26-cv-30031-RGS    Document 9-10    Filed 02/27/26    Page 8 of 9

1997 GENERAL COUNSEL'S OPINIONS, 9 Immigration Law Service 2d PSD 1997...

Dictionary of the English Language, Unabridged, C. & G. Merrian Co., Springfield (1976). Black's Law Dictionary similarly defines custody as

> the detainer of a man's person by virtue of lawful process or authority.

The term is very elastic and may mean actual imprisonment or physical detention or mere power, legal or physical, of imprisoning or taking manual possession.

Black's Law Dictionary, West Publishing Co., St. Paul (6th Ed., 1990). The judicial doctrine of constructive custody developed in habeas corpus proceedings, including immigration cases, is consistent with the idea that custody is not limited to actual physical control. For example, a prisoner released from jail and placed on parole or supervised release remains in custody for habeas purposes. Maleng v. Cook, 490 U.S. 488, 491 (1989).

Likewise, aliens under a deportation order subject to deportation without further notice, though not actually arrested, have been held to be in custody and thus permitted to file for habeas relief. Flores v. INS, 524 F. 2d 627 (9th Cir. 1975). Though in the minority, some courts have even held that the mere filing of an INS detainer on a person in state prison is sufficient custody for habeas purposes. Vargas v. Swan, 854 F.2d 1028 (7th Cir. 1988).

Therefore, it is reasonable to interpret the term "custody" in Section 209(a) to mean something other than physical restraint. It should be understood to mean sufficient control over an alien to carry out the purpose of Section 209(a) — that is, sufficient control to make a determination of a refugee's admissibility to the United States as an immigrant and to institute removal procedures against a refugee if he or she is found not to be admissible. A procedure that obligates refugees to apply for adjustment of status and gives the Service the power to compel them to appear before an officer of the Service satisfies this requirement.

The above interpretation of Section 209(a) as authorizing the Service to require an in-person interview for refugees adjusting status but not obligating it to conduct such interviews is consistent with the treatment of all other classes of aliens eligible to adjust their status to that of lawful permanent resident under the INA. See INA §§ 245 and 245A. The regulations implementing the general adjustment of status provisions in INA Section 245 permit the Service to waive an in-person interview "when it is determined by the Service that an interview is unnecessary." 8 C.F.R. § 245.6.

The treatment of persons paroled into the United States pursuant to INA Section 212(d)(5)(A) is particularly relevant. Under INA Section 245(a) the Service may adjust the status of an alien paroled into the United States.

The power to waive the adjustment of status interview under 8 C.F.R. § 245.6 applies to parolees. In language similar to that in Section 209(a), Section 212(d)(5)(A) requires that when the purposes of an alien's parole have been served

> the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States.

8 U.S.C. § 1182(d)(5)(A). The Service has not construed this language as requiring that parolees be treated differently from other aliens with respect to the waiver of the in-person interview for adjustment of status.

In sum, while the Service certainly may require that refugees who seek adjustment of status under INA Section 209(a) present themselves before an immigration officer, the INA does not obligate the Service to do so in each and every case.

2) The INA does not impede the Service from making the proposed changes in the procedures for refugees and asylees applying for adjustment of status. Specifically, the Service would like to make the following changes: a) change the venue for filing and

Case 3:26-cv-30031-RGS    Document 9-10    Filed 02/27/26    Page 9 of 9

1997 GENERAL COUNSEL'S OPINIONS, 9 Immigration Law Service 2d PSD 1997...

adjudicating applications of refugees and asylees for adjustment of status from the District Directors to the Regional Service Centers; b) require refugees applying for adjustment of status to file application Form I-485; and c) require that Form I-730 be filed with the Service Centers instead of with the District Directors.

The INA does not specify the procedures for filing and adjudicating applications for adjustment of status under Section **209**. As a result, the Attorney General (and the Service by delegation) has discretion to determine the precise procedures for adjusting the status of refugees and asylees. None of the proposed changes in any way contravenes the statutory requirements for adjustment of status, nor could they be considered an abuse of discretion. Therefore, there is no statutory impediment to the proposed changes.

3) Finally, the Service may implement all the proposed changes either by publishing a final rule that does not require prior notice and opportunity for public comment or by publishing an interim rule that is effective immediately and provides the public with an opportunity to comment. In our opinion, all the proposed changes would be "rules of agency organization, procedure or practice" and therefore would be exempt from the notice and comment requirements of Section 553(b) of Title 5 of the United States Code. 5 U.S.C. § 553(b)(A).

/s/ **David** A. **Martin**

General Counsel

FN??1. However, 8 CFR § **209**.2(e) mandates interviews for asylee adjustment applications. This regulation must be changed in order to remove the interview requirement. See the answer to question 3 of this opinion.

FN??2. The limited legislative history of this section does not help to determine the meaning of the phrase "return or be returned to the custody." See 1952 U.S.C.C.A.N. 1653, 1706.

**Legal Opinion No. 97-3**

**Subject: Legal Opinion Allocation of Adjustment of Status filing fee And the Section 245(i) surcharge-revised**

**From: Office of the General Counsel**

**March 3, 1997**

**To: Office of Budget**
This memorandum revises the Legal Opinion issued by this office on January 14, **1997**, in order to incorporate additional guidance regarding the allocation of the statutory sum between the Immigration Examinations Fee Account and the Immigration Detention Account. Both the original and revised Legal Opinions were prepared in response to your memorandum of October 8, 1996, wherein you requested an interpretation of Section 376 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("1996 Act"),Pub. L. No. 104-208, Div. C., 110 Stat. 3009 (1996). [1]

**I. QUESTIONS PRESENTED**
1. What is the proper fee to charge applicants for adjustment of status under Section 245(i) of the Immigration and Nationality Act ("Act") in light of the amendment to that section made by Section 376 of the 1996 Act?

2. What is the proper allocation of the funds collected for such applications between the Immigration Examinations Fee Account ("IEFA") and the Immigration Detention Account ("IDA")?

3. How does the amendment to Section 245(i) of the Act affect the fee study currently being conducted by the **Immigration** and **Naturalization Service** ("INS")? If supported by the fee study, may the INS impose a user fee for the adjustment of status application which exceeds $200.00?