**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| JEAN A., *et al.*,<br><br>　　　　　*Plaintiffs*,<br><br>v.<br><br>KRISTI NOEM, in her official capacity as Secretary of Homeland Security, *et al.*,<br><br>　　　　　*Defendants*. | Case No. 3:26-cv-30031 |

**BRIEF OF AMICUS CURIAE IN SUPPORT OF PLAINTIFFS' MOTION
FOR A STAY OF AGENCY ACTION UNDER 5 U.S.C. § 705**

**CONTENTS**

BRIEF OF AMICUS CURIAE.................................................................................................. 1

INTEREST OF AMICUS CURIAE ......................................................................................... 1

SUMMARY OF ARGUMENT ................................................................................................ 2

ARGUMENT ........................................................................................................................... 3

    I.    The U.S. Refugee Admissions Program Involves Complex Eligibility Requirements and Multiple Layers of Screening and Review to Balance the U.S.'s Responsibility to Protect Persecuted People with the Safety of the American Public ....................................................... 3

        A.    Pre-Arrival Vetting ........................................................................................... 5

        B.    Post-Arrival Vetting........................................................................................... 8

        C.    Further Vetting at Adjustment of Status Stage ............................................... 11

    II.    Immigration Detention is an Extreme and Inappropriate Method to Conduct Any Additional Vetting of Admitted Refugees ................................................................................. 14

CONCLUSION...................................................................................................................... 16

## TABLE OF AUTHORITIES

**Cases**

*Bell v. Wolfish*, 441 U.S. 520, 538 (1979)..............................................................................17

*Flemming v. Nestor*, 363 U.S. 603, 617 (1960).....................................................................17

*Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168-69 (1963)................................................17

*Matter of D-K-*, 25 I&N Dec. 761 (BIA 2012) .....................................................................12

**Statutes**

8 U.S.C. § 1101(a)(42) ..............................................................................................................5

8 U.S.C. § 1157(c)(4)...............................................................................................................12

8 U.S.C. § 1159(a)(1)...............................................................................................................12

8 U.S.C. § 1159(a)(2)...............................................................................................................14

8 U.S.C. § 1159(c)....................................................................................................................15

8 U.S.C. § 1182.........................................................................................................................14

8 U.S.C. § 1227.........................................................................................................................12

8 U.S.C. § 1229a.......................................................................................................................12

8 USC 1182(a) ...........................................................................................................................7

8 U.S.C. § 1305.........................................................................................................................11

**Other Authorities**

A.S. Keller et. al., *Mental Health of Detained Asylum Seekers*, 362 The Lancet 1721 §23 (Nov. 22, 2003) ..............................................................................................................18

Alina Das, *The Law and Lawlessness of U.S. Immigration Detention*, 138 Harv. L. Rev. 1186 (Mar. 2025)..............................................................................................................17

Dir. Chaparro, ICE Policy Memorandum 11039.1, "Detention of Refugees Admitted under INA s 207 Who Have Failed to Adjust to Lawful Permanent Resident Status" (May 10, 2010). ...17

*Invisible Scars: Immigration Detention and Mental Health*, International Detention Coalition (Oct. 9, 2024) ..............................................................................................................18

Lauren-Brooke Eisen, *Private Prison Companies' Enormous Windfall: Who Stands to Gain as ICE Expands*, Brennan Center for Justice (Oct. 1, 2025) ...............................................18

National Immigration Forum, *Fact Sheet: U.S. Refugee Resettlement* (Dec. 4, 2025). .........9, 11

*See* Edward M. Kennedy, *The International Migration Review*, 15 Refugees Today 141, 142 (Spring–Summer, 1981)................................................................................................3

United States Department of State, Refugee Admissions, ....................................................5, 7

USCIS Policy Manual, Vol. 7, Part A, Ch. 5. ........................................................................14

USCIS Policy Alert, PA-2018-04, "Adjustment of Status Interview Guidelines and Waiver Criteria" (May 15, 2018) ............................................................................................14

World Health Organization, *Refugee and Migrant Health* (2 May 2022)..................................4

**Regulations**

8 C.F.R. § 207.9 ...................................................................................................... 12

I.N.A. § 209(a)(1)..................................................................................................... 16

I.N.A. § 237 ............................................................................................................. 17

**BRIEF OF AMICUS CURIAE**

Amicus HIAS Inc. submits this brief supporting Plaintiffs Jean A., et. al's Motion for a Stay of Agency Action to stay the Refugee Rescission and the Refugee Detention memos under 5 U.S.C. § 705 and stay the implementation of the Refugee Detention Policy pending the resolution of the proceedings in Court File No. 3:26-cv-30031.[1]

**INTEREST OF AMICUS CURIAE**

Amicus HIAS Inc. was founded in 1902 to support Jews fleeing pogroms in Central and Eastern Europe and is the oldest refugee-serving organization in the United States. Decades before the passage of the Refugee Act, when the U.S. formalized its commitment to assisting persecuted people, HIAS recognized the global and moral imperative of welcoming and protecting the stranger. HIAS has been deeply involved in the work of supporting the world's most vulnerable, providing comprehensive support as they rebuild their lives in safety and security. Serving refugees is an expression of the Jewish value of *tikkun olam* (repairing the world).

Today, HIAS provides services to refugees, asylum seekers, and other forcibly displaced populations regardless of their national, ethnic, or religious background in the United States and around the globe. In the U.S., HIAS provides legal services to those who have fled violence, persecution, and torture, helping them secure humanitarian legal status and keep their families united through reunification.

---

[1] No counsel for a party authored this brief in whole or in part. No person or entity other than Amici, their members, or counsel made a monetary contribution for preparation or submission of this brief.

## SUMMARY OF ARGUMENT

To resettle in the United States, secure permanent legal immigration status, and rebuild their life here, a refugee must first meet rigid legal requirements and undergo multiple levels of stringent vetting procedures mandated by statute and regulation. In response to the historical ad hoc nature of refugee protection in the U.S., Congress passed the Refugee Act in 1980. Among other things, the Refugee Act established the Refugee Admissions Program, a federally coordinated process to receive referrals for, review, screen, vet, and admit persecuted people into the U.S., providing both legal protection and the comprehensive community integration support necessary to both recover from trauma and thrive.

Because refugees are already subjected to an exhaustive vetting process, and because those who have already arrived in the United States are deeply involved in rebuilding their lives and recovering from persecution and displacement, it is unwarranted, costly, unnecessary, inefficient, and extraordinarily cruel to arrest and detain them to conduct additional screenings. The U.S. undoubtedly has security interests in ensuring that any immigrant admitted to the United States does not pose a threat to the American public. But these interests are fully and comprehensively addressed through existing processes before entry, at entry, and during post-arrival adjudications. If additional vetting were necessary in a refugee case, such investigations could be, and commonly are, completed through the standard USCIS adjustment of status process, which is less restrictive and traumatizing to the refugee, less costly to the American taxpayer, and consistent with statutory and regulatory safeguards. Conducting any additional necessary vetting at that stage would ensure that the refugee has access to their civil and due process right to counsel, where provided by law, in their immigration matters. We urge this Honorable Court to recognize the unnecessary and

unlawful nature of civil immigration detention to conduct additional screenings of a resettled refugee and grant the Petitioner's petition for habeas corpus.

## ARGUMENT

I. **The U.S. Refugee Admissions Program Involves Complex Eligibility Requirements and Multiple Layers of Screening and Review to Balance the U.S.'s Responsibility to Protect Persecuted People with the Safety of the American Public**

Established in the 1980 Refugee Act, the U.S. Refugee Admissions Program formalized the United States' commitment to protecting some of the world's most vulnerable populations—people at risk of harm or death because of who they are—through a congressionally mandated and executive-administered program. Senator Ted Kennedy, reflecting upon the passage of the Refugee Act, reiterated among Congress' basic goals in passing the Refugee Act was to recognize "the historic policy of the United States to respond to the urgent needs of persons subject to persecution in their homelands," including to provide "humanitarian assistance for their care . . . opportunities for resettlement . . . admission [] of refugees of special humanitarian concern . . . and transitional assistance to refugees in the United States . . . ." *See* Edward M. Kennedy, *The International Migration Review*, 15 REFUGEES TODAY 141, 142 (Spring–Summer, 1981). The Refugee Act established the U.S. Refugee Admissions Program largely as we know it today, as well as the numerous government-funded social and economic integration opportunities offered to refugees arriving in the United States.

Providing a pathway to permanent legal resettlement as well as social integration support is critical for the well-being and support of the population. According to the World Health Organization, "[r]efugees and migrants remain among the most vulnerable members of society and are often faced with xenophobia; discrimination; substandard living, housing and working

conditions; and inadequate or restricted access to mainstream health services."[2]  Prior to their migration, many refugees face violence, or the threat of violence or persecution in their home countries, or elsewhere.  Many also face challenging or life-threatening conditions while fleeing from their home countries, including arrest and detention by state authorities, family separation, and lack of services to address basic needs. Comprehensive support that addresses basic human needs, security, and health care positively influences both the mental health and recovery of traumatized refugees, as well as their successful integration into the fabric of American society, an investment the federal government has already made through resettlement.

To even be considered for resettlement, one must meet the legal definition of a refugee: they must be "outside [their] country of  [] nationality or, in the case of a person having no nationality, [] outside any country in which [they] last habitually resided," and they must be "unable or unwilling to return to, and . . . unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion."  8 U.S.C. § 1101(a)(42).  Thereafter, they must submit various applications, provide extensive information for background checks and vetting, and attend in-person interviews before being permitted to travel to the U.S. as refugees.  HIAS details below the numerous steps a refugee must take, and the myriad incidents of screening and vetting to which a refugee must submit, before they will be permitted to travel to the U.S. and enter as a refugee.

---

[2]  World Health Organization, *Refugee and Migrant Health* (2 May 2022) https://www.who.int/news-room/fact-sheets/detail/refugee-and-migrant-health (last accessed 18 Jan. 2026).

## A. Pre-Arrival Vetting

*Step One: Registration with UNHCR*

A refugee's journey to resettlement begins with the United Nations High Commissioner for Refugees (UNHCR).  A prospective refugee must first register with UNHCR in the country to which they fled.  UNHCR provides an initial case review under UNHCR's resettlement criteria to identify individuals for whom safe return or local integration are not viable and third-country resettlement is the best – or only – option to enable them to meaningfully rebuild their lives. UNHCR referrals are discretionary and highly selective. The U.S. Department of State estimated that only about 1% of individuals who register with UNHCR as refugees are generally referred for third-country resettlement.[3]

*Step Two: Refugee Application and Processing before U.S. Department of State*

A refugee referred for resettlement in the U.S. must undergo further processing, including attending several appointments and submitting to multiple background investigations, with subagencies of the Department of State, including Resettlement Support Centers (RSCs).

The RSCs pre-screen refugees referred by UNHCR to ensure that those referred to the U.S. qualify for resettlement based on the U.S. government's annual outlined priorities (either involving certain nationalities or certain backgrounds).  RSCs create files for each case and prepare refugees for the following steps of their refugee process, including their refugee application and interview with Refugee Officers from the Department of Homeland Security's U.S. Citizenship and Immigration Services (USCIS). RSCs also collect and transmit biographic data to U.S. agencies.

---

[3] See United States Department of State, *Refugee Admissions*, https://2021-2025.state.gov/refugee-admissions/ (last accessed 19 Jan. 2026)

*Step Three: USCIS Application and Interview*

Thereafter, to be considered for resettlement in the U.S., the refugee must prepare and file, under penalty of perjury,  Form I-590, Registration for Classification as Refugee, a 16-page form which requires the refugee to provide details about the harm they fear or fled, as well as comprehensive background information including address history, employment and education history, and any military service or criminal arrest history. Submission of Form I-590 does not result in an automatic interview; rather, cases must be reviewed and scheduled for an interview by USCIS based on officer availability, regional access, and operational priorities.

The prospective refugee must also provide their fingerprints and photograph for a biometric background check, which are run against multiple law enforcement and intelligence databases, including the Federal Bureau of Investigation, Department of Homeland Security, and Department of Defense. Law enforcement and intelligence officers conducting background checks are tasked with ensuring that "only those applicants who have completed all required checks, are found to qualify for refugee status under U.S. law, have no other inadmissibilities,[4] and have no unresolved national security concerns, are approved for resettlement."[5] These law enforcement agencies search for information about the individual, using their name, date of birth, biometric data, as well as other data points; the agencies also search for connections to any bad actors, and outstanding warrants/immigration or criminal violations. Background checks are conducted before an interview is scheduled and may take months to complete.

---

[4] The grounds under which a noncitizen may be found ineligible (or "inadmissible") to enter the United States are outlined in 8 USC 1182(a).

[5] See United States Department of State, *Refugee Admissions*, https://2021-2025.state.gov/refugee-admissions/ (last accessed 19 Jan. 2026); see also U.S. Citizenship and Immigration Services, *Refugee Processing and Security Screening*, https://www.uscis.gov/humanitarian/refugees-and-asylum/refugees/refugee-processing-and-security-screening (last accessed 20 Jan. 2026).

Thereafter, a USCIS officer interviews the prospective refugee in-person to confirm the details that they provided in their refugee application to ensure that the applicant is credible and to verify that the applicant is indeed eligible for refugee protection in the U.S. USCIS refugee interviews are typically conducted overseas through "circuit rides," which require officers to travel to the country where the prospective refugee resides; as a result, applicants may wait extended periods for interviews depending on staffing levels, security conditions, and logistical constraints. Each principal applicant and all accompanying derivatives, including spouses and children, must be individually interviewed and cleared by USCIS.

Even if they otherwise qualify under the law, certain factors in a prospective refugee's background or immigration history may disqualify them from resettlement in the U.S.  For example, if the principal refugee applicant has already been granted asylum or permanent immigration status in a third country, they may be found to have been "firmly resettled" under U.S. law, and therefore be ineligible for resettlement in the U.S.

*Step Four: Additional Medical and Security Checks*

After passing a UNHCR screening and a USCIS interview, a prospective refugee applicant must submit to further security checks, as well as a medical examination, to confirm their vaccination history and ensure that they have no contagious medical conditions that could pose a risk to the American public.

The interagency security vetting includes the completion and clearance of all required background checks by multiple federal agencies. These post-interview security checks may involve further review of previously submitted biographic and biometric data, and adjudication may be paused until all participating agencies have provided the necessary clearances. These

7

checks are conducted shortly before travel, and all clearances must be current at the time of admission.

The medical exam screens for tuberculosis and sexually transmitted diseases, among other conditions designated by public health authorities.  If a refugee applicant tests positive, they must undergo medical treatment before they are permitted to travel to the United States.

*Step Five: Cultural Orientation and Travel*

If the prospective refugee passes those multiple levels of screening and vetting, they normally must then attend a cultural orientation provided by the International Organization for Migration (IOM), to gain familiarity with what to expect when they arrive in the U.S., like how to call for help in an emergency. Until recent changes implemented by the Trump Administration in 2025, attendance at cultural orientation was mandatory and occurred only after all required security and medical clearances have been completed.

Then, they are issued a Transportation Boarding Letter and are cleared to travel to the United States.  Only after completing all prior steps, often many months or years after initial referral, is a refugee authorized to travel. Overall, it commonly takes at least 18 to 36 months, and in many cases longer, for a prospective refugee to complete the required processing and vetting abroad before they arrive in the U.S. and are admitted as a refugee.[6]

### B. Post-Arrival Vetting

*Step One: Admission by Customs and Border Protection*

Before being granted access to the United States, every noncitizen who arrives at a U.S. air or land border must present themselves to Customs and Border Protection (CBP) agents for

---

[6] *See* National Immigration Forum, *Fact Sheet: U.S. Refugee Resettlement* (Dec. 4, 2025), https://forumtogether.org/article/fact-sheet-u-s-refugee-resettlement/ (last accessed 18 Jan. 2026).

questioning.  Customs agents verify that the non-citizen's requested basis for admission is appropriate, including review of existing security and admissibility determinations, and can conduct further investigation if necessary.  Once a Customs agent reviews a prospective refugee's entry documents, the agency will admit them as a refugee, formalizing the refugee's lawful immigration status in the U.S.

An individual granted refugee status is accorded a form of legal protection that does not expire by its own terms.  They are also authorized to seek and obtain employment in the United States incident to their status as a refugee.

*Step Two: Arrival and Coordination with Refugee Resettlement Agencies*

Typically, where a refugee will relocate within the U.S. depends on if they have any U.S.-based family or community members to help receive them and support in their adjustment and acclimation to their new country.  This adjustment is also comprehensively supported by a refugee resettlement agency in coordination with the Office of Refugee Resettlement, as well as state and local authorities.  Historically, ten mainly faith-based organizations partnered with the U.S. government to support the resettlement and integration of refugees; HIAS is one of those agencies. The resettlement agencies work together with community-based organizations to administer the provision of resettlement benefits, which are funded by the U.S. government through federal cooperative agreements.

Resettlement agencies, funded in part by the federal government, prepare for incoming refugees to arrive in their communities by arranging for housing, providing basic furnishings including weather-appropriate clothing for each family member, and obtaining culturally familiar cooking ingredients.  A representative of the resettlement agency picks up the refugees at the airport and brings them to their new home.  In the days and months after the refugees' arrival, the

9

resettlement agency, through case management support, works closely with the refugee family to help them start acclimating to their new life in the U.S.; they may assist the refugees in applying for local identity documents and social security cards; they may help register children for school; they may help the family navigate public transportation and find important local landmarks; they may help schedule medical appointments.[7] Refugee resettlement agencies also assist in registering refugees for government benefits for which they are eligible, which may include short-term cash and medical assistance, as well as language, employment, and other social services, subject to eligibility requirements and reporting obligations. *Id.*

### Step Three: Potential for Immigration Enforcement if New Issues Arise

Although a refugee's immigration status in the United States does not expire, it is not immune from review or enforcement. Like any noncitizen admitted to the United States, a refugee still must comply with all local and federal laws, and violation of law may result in criminal arrest and prosecution. And just like any noncitizen in the United States, a refugee must maintain their physical address up to date with the U.S. government, advising USCIS of any change within 10 days of moving. 8 U.S.C. § 1305. A refugee is required to update their address with USCIS, even after they acquire lawful permanent residency; this requirement only ceases if and when the refugee becomes a U.S. citizen.

Even after a refugee has been admitted to the U.S., if – at any time – they engage in certain criminal (or other nefarious) activity, they may be considered "deportable." *See generally* 8 U.S.C. § 1227. A refugee accused of triggering a ground of deportability may be subject to immigration enforcement, including arrest, immigration detention, and civil removal proceedings, where – after

---

[7] *See* National Immigration Forum, *Fact Sheet: U.S. Refugee Resettlement* (Dec. 4, 2025) https://forumtogether.org/article/fact-sheet-u-s-refugee-resettlement/ (last accessed 18 Jan. 2026).

10

notice and an opportunity to be heard – an immigration judge may determine whether to order their removal from the United States. *See Matter of D-K-*, 25 I&N Dec. 761 (BIA 2012) (acknowledging the Attorney General may commence removal proceedings against statutory Refugees to determine removability under 8 U.S.C. 1227); *see generally* 8 U.S.C. § 1229a (establishing the parameters of Removal Proceedings). Termination of refugee status is governed by statute and regulation and requires specific findings; it does not occur automatically and does not authorize detention absent a valid ground of removability. *See* 8 U.S.C. § 1157(c)(4); 8 C.F.R. § 207.9.

### C. Further Vetting at Adjustment of Status Stage

<u>Step One: Apply for Adjustment of Status</u>

Adjustment of status is the process by which a noncitizen applies for lawful permanent residency (a "green card") in the United States. By statute, a refugee is required to apply for adjustment of status after having accumulated one year of physical presence in the U.S. as a refugee; however, but the statute does not impose a filing deadline enforced by detention or removal. 8 U.S.C. § 1159(a)(1).

To apply for adjustment of status, a refugee must complete Form I-485, Application to Register Permanent Residence or Adjust Status. Every individual seeking adjustment of status – even minor children – must complete and submit their own application regardless of prior vetting. Each individual – including minor children – must also attend an appointment with a USCIS-designated civil surgeon to complete an additional medical exam, prepared by the medical professional on Form I-693, Report of Immigration Medical Examination and Vaccine Record.[8]

---

[8] Although historically refugees were permitted to complete abbreviated versions of the I-693, Report of Immigration Medical Examination, in our experience, USCIS has requested that most refugees obtain the complete medical examination before the agency will grant adjustment of status.

USCIS civil surgeons charge their own fees for these appointments and for the completion of the I-693 form, which generally range from $200 to $500, depending on the locality; the refugee applicant is responsible for these fees. This exam is separate from the overseas medical examination conducted prior to arrival.

*Step Two: Vetting Through Adjustment of Status Process*

After a refugee files their Adjustment of Status application with USCIS, USCIS will issue a receipt notice, confirming that the application is being processed.  Thereafter, USCIS will issue a notice regarding the processing of the application, involving further security checks and vetting; most refugees have already submitted their fingerprints and other biometric data to the U.S. government, so USCIS can typically conduct these additional background checks across multiple federal databases by "re-running" the previously-captured data. However, individuals with issues providing their fingerprints (for example, individuals with scarring or other permanent marks on their fingers) may be asked to attend an appointment with a local USCIS Application Support Center to provide their fingerprints again.  Also, because children under 14 years of age are typically not required to provide their fingerprints, any child who has since turned 14 after being admitted as a refugee may be asked to attend a biometrics appointment and provide their fingerprints for further vetting.

As part of the adjustment of status adjudication process, most applicants are required to attend an interview, under oath, at a local USCIS field office.  At this interview, a USCIS officer will again review the applicant's background and history and will closely review the application with the applicant to verify the information, ensure consistency, and address any issues of concern. An adjustment of status applicant has the right to counsel here, at their own expense, both in the preparation of the application and at this interview.

Historically, because refugees had been thoroughly and fairly recently vetted by this stage – including in-person interview prior to their entry–USCIS used to waive the interview requirement for refugees. DHS reversed this policy in 2018, under the first Trump administration, and although the policy reverted in 2021 under President Biden, the agency now requires all refugees to attend interviews with USCIS prior to granting adjustment of status, as an additional safeguard.[9]

Although, as noted, a refugee is (until naturalization) always potentially subject to grounds of deportation outlined at 8 U.S.C. § 1227, at the stage of seeking adjustment of status, they are also subject to broader screening criteria, grounds of inadmissibility contained at 8 U.S.C. § 1182. *See* 8 U.S.C. § 1159(a)(2).  Even if a refugee is deemed inadmissible, an immigration official adjudicating the adjustment of status of refugees may, in their discretion, grant a waiver of that inadmissibility ground, if at least one of three factors are present: if there are "humanitarian" reasons to grant the waiver; if granting the waiver will "assure family unity," or if granting the refugee the waiver is "otherwise in the public interest."  8 U.S.C. § 1159(c).

### *Step Three: Post-Adjustment of Status Vetting*

Even after a refugee has obtained lawful permanent residency, they are not immune from review of their immigration status.  As noted, even as a lawful permanent resident, a former refugee must maintain their address information up-to-date with USCIS; this ensures that immigration authorities know how and where to contact the individual if any issue or concern arises.

Although lawful permanent residency is a more secure and durable immigration status for a former refugee, it is not irrevocable.  Even after a refugee has obtained lawful permanent

---

[9] USCIS Policy Manual, Vol. 7, Part A, Ch. 5.; *see also* USCIS Policy Alert, PA-2018-04, "Adjustment of Status Interview Guidelines and Waiver Criteria" (May 15, 2018).

residency, if they engage in certain criminal activity, they may trigger a ground of "deportability," and be subject to immigration enforcement (arrest and detention) as well as removal proceedings before an immigration judge, after notice and an opportunity to be heard.

## II.     Immigration Detention is an Extreme and Inappropriate Method to Conduct Any Additional Vetting of Admitted Refugees

*Congress Did Not Envision the Arrest and Detention of Refugees Seeking Adjustment of Status*

The statute that controls the adjustment of status of refugees provides that a refugee whose status has not been terminated, who has been physically present for at least one year, and who has not yet acquired permanent resident status "shall . . . return or be returned to the custody of the Department of Homeland Security for inspection and examination for admission to the United States as an immigrant."  I.N.A. § 209(a)(1).  Although the statute utilizes the word "custody," this section of the act has never - in the 45 years since its passage - been applied to mean "detention" of refugees seeking adjustment of status by regulation, agency practice, or judicial interpretation.

Even if a refugee submitted their application to adjust status as soon as they were eligible, due to lengthy USCIS processing times, it often takes one to two years or longer for such status to be approved.  Reading this section of the statute to require the detention of refugees who have not acquired adjustment of status after accumulating one year of physical presence would essentially require the detention of every single refugee, regardless of their diligence in seeking adjustment of status, or their criminal or immigration history. Given the tremendous cost—the human psychological and emotional cost as well as taxpayer and agency expense to detain individuals innocent of any criminal or immigration infraction—this is an unreasonable and untenable interpretation of the statute.

14

*Detention of Non-Deportable Refugees Violates ICE Policy and Regulation*

A refugee is statutorily required to seek adjustment of status after accruing one year of physical presence in the United States.  However, per ICE's own policy, "[f]ailure by such individuals to apply for adjustment of status … is not a sufficient ground to place them in removal proceedings, and therefore is not a proper basis for detaining them."   Dir. Chaparro, ICE Policy Memorandum 11039.1, "Detention of Refugees Admitted under INA s 207 Who Have Failed to Adjust to Lawful Permanent Resident Status" (May 10, 2010).  That a refugee has not yet obtained lawful permanent residency is not a legal basis to detain them.

 Prior to the challenged practice, HIAS is not aware of any circumstances wherein a refugee, who was not otherwise subject to the deportability grounds of I.N.A. § 237, would be detained for a re-examination of the grounds of their refugee admission, or during their adjustment of status process. Until Operation PARRIS, HIAS has never seen a policy of field arrests and body-transfers to distant detention centers to effectuate I.N.A. § 209(a)'s command to "return" the refugee to "custody" for inspection for adjustment of status. The protracted detention of refugees who are not subject to deportability grounds of I.N.A. § 237 is inappropriate and contravenes ICE policy, and longstanding agency practice, and regulation.

*Detention of Non-Deportable Refugees is Unnecessary and Harmful*

Immigration detention is civil in nature, and accordingly, individuals detained by immigration agencies should not be subject to conditions intended to punish them.  *See Bell v. Wolfish*, 441 U.S. 520, 538 (1979) (quoting *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168-69 (1963)) (citing *Flemming v. Nestor*, 363 U.S. 603, 617 (1960)); *see also* Alina Das, *The Law and Lawlessness of U.S. Immigration Detention*, 138 HARV. L. REV. 1186 (Mar. 2025).  However, in practice, immigration detention facilities are nearly identical to private prisons used

15

for federal criminal incarceration; many are operated by the two biggest private prison companies in the United States: CoreCivic and GEO Group. *See* Lauren-Brooke Eisen, *Private Prison Companies' Enormous Windfall: Who Stands to Gain as ICE Expands*, BRENNAN CENTER FOR JUSTICE (Oct. 1, 2025).

While the private prison industry's profits have flourished over the past year, the mental health and safety of the immigrants in civil detention are at high risk.   A study published by the U.S. healthcare journal The Lancet found that 86% of immigrant detainees showed signs of depression, and 50% displaced symptoms of PTSD, which worsened as their period of detention lengthened. *See* A.S. Keller et. al., *Mental Health of Detained Asylum Seekers*, 362 THE LANCET 1721 §23 (Nov. 22, 2003).    Immigrants in detention often have fewer safeguards than criminal detainees, including less access to medical care, legal advice, or access to family or community support outside prison walls.[10] The detention of refugees, many of whom already suffer physical and/or psychological symptoms due to past trauma, causes unnecessary and profound harm to an already vulnerable population without advancing any legitimate vetting or public safety objective.

## CONCLUSION

Refugees are some of the most extensively and thoroughly vetted populations of immigrants to the United States, undergoing careful screening and background checks through multiple federal agencies before their arrival, at the time of their entry, and a year or more later, while applying for adjustment of status.  Detaining refugees who have violated no U.S. laws, who, by contrast, are seeking to comply with U.S. regulations by applying for adjustment of

---

[10] *Invisible Scars: Immigration Detention and Mental Health*, International Detention Coalition (Oct. 9, 2024) https://idcoalition.org/news_features/the-long-term-mental-health-impact-of-immigration-detention/ (last accessed 18 Jan. 2026).

16

status, is both unnecessary and extraordinarily harmful to their often already delicate psychological and physical health without advancing any legitimate public safety or vetting objective. This Court should grant a preliminary relief, stay the Refugee Rescission and the Refugee Detention Memos under 5 U.S.C. § 705, and stay the implementation of the Refugee Detention Policy pending the resolution of these proceedings.

Dated: March 19, 2026                    Respectfully submitted,

                                         /s/ Nathan S. Gargan
                                         Nathan S. Gargan (MA BBO 694877)
                                         HIAS, Inc.
                                         1359 Broadway, Suite 810
                                         New York, NY 10018-7123
                                         Telephone: 202.940.5714
                                         Email: Nathan.gargan@hias.org


                                         *Counsel for [Proposed] Amicus Curiae HIAS,
                                         Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants on the Notice of Electronic Filing (NEF) on March 19, 2026.

Dated: March 19, 2026

/s/ *Nathan S. Gargan*
Nathan S. Gargan (BBO No. 694877)

18