**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| JEAN A., *et al.*,<br><br>       *Plaintiffs*,<br><br>v.<br><br>KRISTI NOEM, in her official capacity as<br>Secretary of Homeland Security, *et al.*,<br><br>       *Defendants*. | Case No. 3:26-cv-30031 |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR
PARTIAL SUMMARY JUDGMENT AND VACATUR UNDER 5 U.S.C. § 706**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

BACKGROUND ............................................................................................................... 2

I.     Refugee Processing and Adjustment of Status ................................................... 2

II.    Defendants' Scheme to Detain and Punish Refugees ........................................ 4

       A.    The Government Pauses Processing Refugee Adjustment Applications ............... 4

       B.    Operation PARRIS ......................................................................................... 4

       C.    The Refugee Detention Policy ........................................................................ 5

       D.    This Case ....................................................................................................... 7

       E.    Plaintiffs Are Harmed by the Refugee Detention Policy ................................ 8

LEGAL STANDARD ........................................................................................................ 9

ARGUMENT .................................................................................................................... 9

I.    The Refugee Detention Policy Violates the APA ............................................... 9

       A.    The Refugee Detention Policy is Contrary to Law ....................................... 10

           a.    8 U.S.C. § 1159 Does Not Authorize Detention ..................................... 10

           b.    8 U.S.C. § 1225 Does Not Authorize Detention ..................................... 18

           c.    8 U.S.C. §§ 1226, 1229a, and 1231 Do Not Authorize Arrest or Detention ................................................................................................. 23

           d.    8 U.S.C. § 1357 Does Not Authorize Arrest or Detention ....................... 24

           e.    The Refugee Detention Policy Violates DHS's Own Regulations ........... 25

       B.    The Refugee Detention Policy is Arbitrary and Capricious ........................... 27

           a.    The Administrative Record Alone Shows the Policy is Arbitrary and Capricious ....................................................................................... 28

           b.    The Refugee Rescission Memo Is Arbitrary and Capricious .................... 28

           c.    The Refugee Detention Memo Is Arbitrary and Capricious ..................... 29

B.      Defendants Failed to Comply with Notice-and-Comment Procedures in Issuing the Memoranda. ................................................................................................... 36

II.      The Court Should Vacate Both Memos in their Entireties and Declare Them Unlawful. ..................................................................................................................... 38

CONCLUSION .......................................................................................................................... 40

# TABLE OF AUTHORITIES

**Cases**             **Page(s)**

*A.D.G. v. Bondi*,
No. 26-cv-516, 2026 WL 207352 (D. Minn. Jan. 27, 2026) ....................................................14

*U.S. ex rel. Accardi v. Shaughnessy*,
347 U.S. 260 (1954)...............................................................................................................25

*Al Otro Lado v. Mullin*,
609 U.S. ___, 2026 WL 1825741 (U.S. June 25, 2026) ........................................................20

*Alizadeh v. Kane*,
2010 WL 5146743 (D. Ariz. Dec. 13, 2010) .........................................................................13

*Matter of Alyazji*,
25 I&N Dec. 397 (BIA 2011) ................................................................................................23

*Am. Hosp. Ass'n v. Kennedy*,
164 F.4th 28 (1st Cir. 2026)...................................................................................................35

*Am. Hosp. Ass'n v. Kennedy*,
820 F. Supp. 3d 30 (D. Me. 2025) ...................................................................................28, 39

*Am. Pub. Health Ass'n v. NIH*,
145 F.4th 39 (1st Cir. 2025)...................................................................................................28

*Amanullah v. Nelson*,
811 F.2d 1 (1st Cir. 1987)......................................................................................................22

*Aroostook Band of Micmacs v. Ryan*,
484 F.3d 41 (1st Cir. 2007)....................................................................................................17

*Ass'n of Am. Univs. v. DOD*,
792 F. Supp. 3d 143 (D. Mass. 2025) ....................................................................................31

*Ass'n of Am. Univs. v. DOD*,
806 F. Supp. 3d 79 (D. Mass. 2025) .................................................................................38, 39

*Ass'n of Am. Univs. v. Nat'l Sci. Found.*,
788 F. Supp. 3d 106 (D. Mass. 2025) ...............................................................................39, 40

*Azarmanesh v. Bondi*,
No. 23-cv-5210, 2025 WL 965955 (N.D. Cal. Mar. 31, 2025) .............................................18

*Billamay v. Kane*,
2010 WL 5888673 (D. Ariz. Nov. 15, 2010).........................................................................13

*Bollat Vasquez v. Wolf*,
460 F. Supp. 3d 99 (D. Mass. 2020) ..........................................................................20

*Bos. Redev. Auth. v. Nat'l Park Serv.*,
838 F.3d 42 (1st Cir. 2016)..........................................................................................9

*Bowser v. Noem*,
2026 WL 555624 (D. Mass. Feb. 27, 2026) ............................................................36

*Buzancic v. Kane*,
2011 WL 1792538 (D. Ariz. May 11, 2011) ............................................................13

*Cent. Me. Power Co. v. FERC*,
252 F.3d 34 (1st Cir. 2001)........................................................................................39

*City of Providence v. Barr*,
954 F.3d 23 (1st Cir. 2020)........................................................................................10

*Clark v. Martinez*,
543 U.S. 371 (2005)....................................................................................................16

*Cnty. of Riverside v. McLaughlin*,
500 U.S. 44 (1991)......................................................................................................25

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*,
603 U.S. 799 (2024) (Kavanaugh, J., concurring)............................................38, 39

*Matter of D-K-*,
25 I&N Dec. 761 (BIA 2012) ..................................................................19, 23, 32

*Darvin M. v. Bondi*,
817 F. Supp. 3d 740 (D. Minn. Jan. 24, 2026) ..................................................13, 15

*DHS v. Regents of the Univ. of Cal.*,
591 U.S. 1 (2020)...................................................................................................27, 31

*Dist. Hosp. Partners, L.P. v. Burwell*,
786 F.3d 46 (D.C. Cir. 2015)....................................................................................34

*Doe v. Noem*,
784 F. Supp. 3d 437 (D. Mass. 2025) ......................................................................31

*Doe v. Noem*,
817 F. Supp. 3d 27 (D. Mass. 2026) ............................................................31, 32, 36

*Doe v. Trump*,
No. 1:25-CV-13946-JEK, 2026 WL 1170971 (D. Mass. Apr. 30, 2026)..............25

*Dong v. Holder*,
2011 WL 1119072 (D. Ariz. Mar. 28, 2011)........................................................................13

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009)........................................................................................27, 28, 29

*Gerstein v. Pugh*,
420 U.S. 103 (1975)........................................................................................25

*Gonzalez v. ICE*,
975 F.3d 788 (9th Cir. 2020) ........................................................................25

*Harmon v. Thornburgh*,
878 F.2d 484 (D.C. Cir. 1989)........................................................................39

*Hartford Underwriters Ins. Co. v. Union Planters Bank*,
530 U.S. 1 (2000)........................................................................................21

*I.N.S. v. Cardoza-Fonseca*,
480 U.S. 421 (1987)........................................................................................21

*Illinois v. FEMA*,
801 F. Supp. 3d 75 (D.R.I. 2025) ................................................................39

*Kolok v. Holder*,
2011 WL 587159 (D. Ariz. Feb. 10, 2011)..................................................13

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024)..............................................................................10, 13

*Make the Rd. New York v. Noem*,
No. 25-5320, 2025 WL 3563313 (D.C. Cir. Nov. 22, 2025)........................39

*Maryland v. Pringle*,
540 U.S. 366 (2003)........................................................................................24

*Massachusetts v. Dep't. of Ed.*,
--- F. Supp. 3d -----, 2026 WL 1114877 (D. Mass. 2026) ..........................39

*Massachusetts v. NIH*,
770 F. Supp. 3d 277 (D. Mass. 2025), *aff'd*, 164 F.4th 28 (1st Cir. 2026) .............28, 30, 35, 39

*Minnesota v. USDA*,
826 F. Supp. 3d 975 (D. Minn. 2026)..........................................................33

*Morales v. Chadbourne*,
793 F.3d 208 (1st Cir. 2015)........................................................................24

v

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) .................................................................................................... 27, 31, 34

*N.H. Hosp. Ass'n v. Azar*,
887 F.3d 62 (1st Cir. 2018) ........................................................................................ 36, 37, 38

*Nat. Res. Def. Council v. Wheeler*,
955 F.3d 68 (D.C. Cir. 2020) ............................................................................................ 39

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*,
572 U.S. 545 (2014) .......................................................................................................... 21

*Presidents' All. on Higher Educ. & Immigr. v. Noem*,
824 F. Supp. 3d 168 (D. Mass. 2026) ................................................................................ 25

*Roe v. Mayorkas*,
No. 22-CV-10808-ADB, 2023 WL 3466327 (D. Mass. May 12, 2023) ................................. 25

*Rotinsulu v. Mukasey*,
515 F.3d 68 (1st Cir. 2008) .............................................................................................. 25

*Russello v. United States*,
464 U.S. 16 (1983) ...................................................................................................... 14, 21

*Sanchez v. Mayorkas*,
593 U.S. 409 (2021) .......................................................................................................... 20

*Smith v. City of Jackson, Miss.*,
544 U.S. 228 (2005) .......................................................................................................... 16

*Sondah v. Holder*,
2010 WL 5811611 (D. Ariz. Nov. 12, 2010) ....................................................................... 13

*Sondah v. Holder*,
2011 WL 587957 (D. Ariz. Feb. 9, 2011) ........................................................................... 13

*Torres v. Barr*,
976 F.3d 918 (9th Cir. 2020) (en banc) ............................................................................. 19

*U.H.A. v. Bondi*,
817 F. Supp. 3d 752 (D. Minn. 2026) .......................................................................... 5, 14, 17

*U.H.A. v. Bondi*,
819 F. Supp. 3d 946 (D. Minn. 2026) ................................................................................ 15

*U.H.A. v. Bondi*,
822 F. Supp. 3d 1007 (D. Minn. 2026) ........................................................................ 5, 16, 17

*Union de Empleados de Muelles de P.R., Inc. v. Int'l Longshoremen's Ass'n,*
   884 F.3d 48 (1st Cir. 2018)............................................................................................40

*Vue v. Kane,*
   2011 WL 43465 (D. Ariz. Jan. 6, 2011) .......................................................................13

**Statutes**

5 U.S.C. § 553.......................................................................................................................36

5 U.S.C. § 703.......................................................................................................................40

5 U.S.C. § 706....................................................................................................................9, 38

8 U.S.C. § 1152.....................................................................................................................31

8 U.S.C. § 1101................................................................................................2, 19, 21, 22, 23

8 U.S.C. § 1157...................................................................................................2, 3, 15, 18, 20

8 U.S.C. § 1159................................................................................................................ *passim*

8 U.S.C. § 1182...........................................................................................................16, 21, 22

8 U.S.C. § 1186a...................................................................................................................21

8 U.S.C. § 1225............................................................................................................... *passim*

8 U.S.C. § 1226............................................................................................................... *passim*

8 U.S.C. § 1227.....................................................................................................................32

8 U.S.C. § 1229a................................................................................................................3, 23

8 U.S.C. § 1231.................................................................................................................17, 24

8 U.S.C. § 1255.....................................................................................................................23

8 U.S.C. § 1305.....................................................................................................................31

8 U.S.C. § 1357........................................................................................................11, 17, 24, 25

Pub. L. No. 86-648, 74 Stat. 504 (1960)..............................................................................22

Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102 (1980) ....................................2, 22

**Other Authorities**

8 C.F.R. § 207.......................................................................................................................18

8 C.F.R. § 207.9 ................................................................................................3, 24, 26

8 C.F.R. § 209.1 ...........................................................................................3, 13, 26, 37

8 C.F.R. § 287.3 ....................................................................................................24, 25

8 C.F.R. § 287.8 ............................................................................................................26

125 Cong. Rec. 37,242–47 (1979) ...............................................................................22

*Adjustment of Status of Refugees and Asylees: Processing Under Direct Mail Program*, 63 Fed. Reg. 30105, 30106 (June 3, 1998)................................................12

*Aliens and Nationality; Refugee and Asylum Procedures*, 46 Fed. Reg. 45116, 45117 (Sep. 10, 1981)................................................................................................11

*Aliens and Nationality; Refugee and Asylum Procedures*, 45 Fed. Reg. 37392, 37392 (June 2, 1980)................................................................................................12

Beth C. Caldwell, *Why tattoos are such an unreliable marker of gang membership*, The Conversation (Apr. 3, 2025), https://perma.cc/PUL3-JU9S .......................35

*Custody*, *Black's Law Dictionary* (5th ed. 1979)..........................................................14

*Custody, Black's Law Dictionary* (12th ed. 2024)........................................................14

Fed. R. Civ. P. 56 .............................................................................................................9

H.R. Rep. No. 89-745 (1965)........................................................................................22

H.R. Rep. No. 96-608 (1979).........................................................................................22

Just Security, *The Missing Due Process for Gang Allegations* (March 26, 2025), https://perma.cc/QR44-8N66 ...............................................................................35

*Restricting and Limiting the Entry of Foreign Nationals to Protect the Security of the United States*, Proclamation No. 10998, 90 Fed. Reg. 59717, 59728 (Dec. 19, 2025) ..............................................................................................................6, 28

S. 643, 96th Cong. § 201(b) (1979); H.R. 2816, 96th Cong. § 201(b) (1979) .............22

S. Rep. No. 89-748 (1965)..............................................................................................22

S. Rep. No. 96-256 (1979)..............................................................................................22

USCIS, *Refugee Processing and Security Screening*, https://perma.cc/86KA-FPKP (archived Feb. 25, 2026)..............................................................................2

USCIS, *Immigration and Citizenship Data*, *FY22 Appropriations Reporting Requirement - Application Processing Data for April 2026* (June 15, 2026), *available for download at* https://www.uscis.gov/tools/reports-and-studies/immigration-and-citizenship-data ................................................................33

**INTRODUCTION**

This suit challenges the Trump administration's unlawful decision to subject over 100,000 lawfully admitted refugees to warrantless arrests and mandatory, potentially indefinite detention without statutory authority. Defendants' Refugee Detention Policy, set forth in two agency memoranda, reverses decades of practice which limited detention of refugees to the same circumstances that govern detention of any noncitizen — that is, circumstances or conduct that render them removable. Under the Refugee Detention Policy, any lawfully admitted refugee who has not adjusted their status to lawful permanent residence after one year in the United States can be subject to warrantless arrest and indefinite detention. Defendants seek to impose this extraordinary policy even though, by law, refugees are not permitted to adjust their status until they have been in the United States for one year and even though Defendants themselves have control over the timing of the adjudication of refugees' applications for lawful permanent residence.

The Refugee Detention Policy is illegal because it violates the very statute it relies on, fails to provide a reasoned justification for its dramatic departure from over decades of practice, and was implemented without the notice and comment procedures required under the Administrative Procedure Act (APA). Moreover, Defendants' legal position represents a remarkable and dangerous expansion of the government's purported authority to arrest and detain lawfully present individuals who have not violated any law, without any process whatsoever to challenge their arrest or detention. Defendants' Refugee Detention Policy not only violates the law many times over, it betrays the United States' longstanding commitment to provide a safe haven for refugees whom we have invited to live in our communities.

The court should therefore grant summary judgment to Plaintiffs on Counts I–IV, declare

the challenged policies unlawful, and vacate them in full.[1]

**BACKGROUND**

**I.      Refugee Processing and Adjustment of Status**

The Refugee Act of 1980 embodies the U.S. commitment to humanitarian assistance for those fleeing persecution. Pub. L. No. 96-212, 94 Stat. 102 (1980); Statement of Undisputed Material Facts ("SUF") ¶ 2. In enacting the Refugee Act, Congress sought to "provide a permanent and systematic procedure for the admission . . . of refugees of special humanitarian concern to the United States, and to provide comprehensive and uniform provisions for the effective resettlement and absorption of those refugees who are admitted." Pub. L. No. 96-212, § 101(b), SUF ¶ 3. A "refugee" is a person facing displacement from his or her country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion. *See* 8 U.S.C. § 1101(a)(42), SUF ¶ 1.

The Refugee Act sets out detailed policies and procedures governing refugee admission and resettlement in the United States. *See* 8 U.S.C. §§ 1157 *et seq*. Refugees must go through extensive, often years-long vetting before they may even be considered for resettlement in this country. *See* USCIS, *Refugee Processing and Security Screening*, https://perma.cc/86KA-FPKP (archived Feb. 25, 2026). The DHS Secretary is authorized to admit to the United States "any refugee who is not firmly resettled in any foreign country, is determined to be of special humanitarian concern to the United States, and is admissible . . . as an immigrant." 8 U.S.C. § 1157(c)(1); *see* 8 C.F.R. §§ 207.1–207.7, SUF ¶ 4. A refugee's spouse or child is entitled to admission as a refugee even without meeting the statutory definition. 8 U.S.C. § 1157(c)(2)(A), SUF ¶ 5.

---

[1] By agreement, Plaintiffs move for summary judgment on Counts I–IV only. *See* ECF 61.

An individual's refugee status may be terminated only if DHS "determines that the [non-citizen] was not in fact a refugee within the meaning of section 1101(a)(42) of this title at the time of the [noncitizen's] admission." *Id*. § 1157(c)(4); 8 C.F.R. § 207.9, SUF ¶ 7. Before refugee status is terminated, USCIS must notify the individual in writing of its intent to terminate their refugee status, and the individual has 30 days from the date notice is served upon them to present evidence to show why their status should not be terminated. 8 C.F.R. § 207.9, SUF ¶¶ 8–9. If USCIS terminates refugee status, USCIS then processes the individual for removal, *id.*, meaning USCIS issues a notice to appear and initiates removal proceedings under 8 U.S.C. § 1229a. SUF ¶ 10.

Separately, Congress provided that all individuals admitted as refugees will have their status adjusted to that of a lawful permanent resident so long as their refugee admission has not been terminated and they are not found, upon inspection after one year, to be inadmissible to the United States. 8 U.S.C. § 1159(a)(1); 8 C.F.R. § 209.1, SUF ¶ 11. By regulation refugees are required to apply to USCIS one year after entry in order for USCIS to determine their admissibility. 8 C.F.R. § 209.1(a)(1), SUF ¶ 12. Interviews are not mandatory and occur only case-by-case. 8 C.F.R. § 209.1(d), SUF ¶ 14. If the applicant is found to be admissible for permanent residence, USCIS must approve the application, admit the applicant for lawful permanent residence as of the date of the noncitizen's arrival in the United States, and issue proof of such status. 8 C.F.R. § 209.1(e), SUF ¶ 15; *see* 8 U.S.C. § 1159(a)(2), SUF ¶ 16. If USCIS denies the application, it must "notify an applicant of the right to renew the request for permanent residence" in full removal proceedings under 8 U.S.C. § 1229a. 8 C.F.R. § 209.1(e), SUF ¶ 17.

Prior to the actions challenged here, DHS' policy on detention of unadjusted refugees was reflected in a 2010 ICE Memorandum. *See ICE Policy No. 11039.1: Detention of Refugees Admitted Under INA § 207 Who Have Failed to Adjust to Lawful Permanent Resident Status* (May

10, 2010) ("2010 ICE Policy") (Compl. Ex. 3, ECF 1-5), SUF ¶¶ 30–33. This Policy confirmed that, consistent with §1159, a refugee's failure to adjust status or to apply for adjustment "is not sufficient grounds to place them in removal proceedings, and therefore not a proper basis for detaining them." 2010 ICE Policy at 2, SUF ¶ 30.

## II.    Defendants' Scheme to Detain and Punish Refugees

### A.  The Government Pauses Processing Refugee Adjustment Applications.

On November 21, 2025, Defendant Edlow directed USCIS to immediately pause processing of all adjustment of status applications filed by refugees admitted to the country between January 20, 2021, and February 20, 2025, with the purpose, among other things, of ensuring "that all principal refugees admitted to the United States warranted a favorable exercise of discretion." *See* Joseph B. Edlow, *Reinterview of Certain Refugees Admitted to the United States and an Immediate Hold on Certain Refugees with a Pending I-485 Application to Register Permanent Residence or Adjust Status*, at 2 (Nov. 21, 2025) (Compl. Ex. 4, ECF 1-6), SUF ¶ 55.[2] Then, on December 2, 2025 and January 1, 2026, USCIS issued two memoranda directing the pause of all USCIS benefit applications, including applications to adjust status by refugees, for all individuals from countries listed in two Presidential Proclamations barring entry of nationals from many countries. SUF ¶¶ 57–58.

### B.  Operation PARRIS

On January 9, 2026, USCIS announced "Operation PARRIS" to "target[]" allegedly "fraudulent refugee applications in Minnesota" by "reexamining thousands of refugee cases

---

[2] USCIS later partially unfroze this processing pause for the small number of refugees who had gone through "revetting" interviews in response to litigation in Minnesota. *See* SUF ¶ 58; Mem. from Nathan Stiefel to Joseph Edlow, *Decision on Lifting Hold for Operation PARRIS* (Jan. 13, 2026) (Compl. Ex. 6, ECF 1-8).

through new background checks and intensive verification of refugee claims." USCIS announced that "[t]he initial focus is on Minnesota's 5,600 refugees who have not yet been given lawful permanent resident status (Green Cards)," but left open the likelihood that the operation would later expand to refugees in other states. SUF ¶¶ 59–60.

DHS took the position that § 1159 mandates indefinite detention of all unadjusted refugees after they have been in the United States for one year. *See. e.g.*, *U.H.A. v. Bondi*, 817 F. Supp. 3d 752 (D. Minn. 2026) ("*U.H.A.*"). On January 28, 2026, the U.S. District Court for the District of Minnesota issued a temporary restraining order on behalf of a putative class of refugees residing in Minnesota, enjoining Defendants from arresting or detaining refugees on the basis of not having adjusted and ordering the immediate return and release of the detained members of a putative subclass. *Id*. at 772, SUF ¶ 64. The opinion and order found that the replacement of "prior agency policy with abrupt arrest and detention—often without a warrant or notice" was likely unlawful because the term "custody" in § 1159 did not authorize detention of unadjusted refugees, and because the authorization for prolonged detention found in 8 U.S.C. §§ 1225, 1229a, and 1231 did not apply to lawfully present and admitted refugees. *U.H.A.*, 817 F. Supp. 3d at 766–67; *see also U.H.A. v. Bondi*, 822 F. Supp. 3d 1007 (D. Minn. 2026) ("*U.H.A. II*") (issuing preliminary injunction on same grounds); SUF ¶ 68.

### C. The Refugee Detention Policy

On January 31, 2026, following the issuance of the temporary restraining order in *U.H.A.*, Defendants filed with the Minnesota district court a memorandum from ICE rescinding the 2010 ICE Policy. SUF ¶ 45; *see* Marcos Charles, *Rescission ICE Policy No. 11039.1: Detention of Refugees Admitted Under INA § 207 Who Have Failed to Adjust to Lawful Permanent Resident Status (May 10, 2010*) (Dec. 18, 2025) ("Refugee Rescission Memo") (Compl. Ex. 3, ECF 1-3).

5

Although the Refugee Rescission Memo was dated December 18, 2025, the filing in the *U.H.A.* litigation was the first public disclosure. The Refugee Rescission Memo is one sentence long, SUF ¶ 44, and relies only on a December 16, 2025, Presidential Proclamation restricting entry of certain foreign nationals into the U.S. but stating on its face that it "shall not apply to an individual who has been granted asylum by the United States or to a refugee who has already been admitted to the United States." *Restricting and Limiting the Entry of Foreign Nationals to Protect the Security of the United States*, Proclamation No. 10998, 90 Fed. Reg. 59717, 59728 (Dec. 19, 2025).

On February 18, 2026, also revealed for the first time in a public filing in the *U.H.A.* litigation, Defendants Edlow and Lyons issued a memorandum establishing a purported "new policy," directing that § 1159(a)(1) mandates potentially indefinite detention of all unadjusted refugees after one year. SUF ¶¶ 46, 48, 51; Mem. from Joseph B. Edlow & Todd M. Lyons, *Detention of Refugees Who Have Failed to Adjust to Lawful Permanent Resident Status* (Feb. 18, 2026) ("Refugee Detention Memo") (Compl. Ex. 2, ECF 1-4), SUF ¶ 46. The Refugee Detention Memo asserts that lawfully admitted refugees are admitted "conditionally" and that after one year they become "applicants for admission" seeking lawful entry to the country. SUF ¶ 50. The Refugee Detention Memo further contends that refugees are subject "to the same detention-and-inspection framework that applies to other applicants for admission," and "detention during this process is expected and required" merely because § 1159(a)(1) references § 1225. *Id.*

The Refugee Detention Memo posits that indefinite detention is necessary to ensure the re-vetting of lawfully admitted refugees, contending, without evidence, that varying percentages of certain groups of refugees present public safety concerns or engaged in fraud in procuring refugee admission. *Id.* ¶¶ 53, 54. It states that, where any lawfully admitted refugee does not "voluntarily return at the one-year mark," DHS is required "to take the affirmative actions of locating, arresting,

6

and taking the [refugee] into custody." *Id*. ¶ 49. But it provides no mechanism for refugees to "voluntarily return at the one-year mark." *Id*. The Refugee Detention Memo dismisses the reliance interests of refugees who entered the United States prior to February 18, 2026, contending that notwithstanding longstanding government practice, such refugees could not reasonably rely on avoiding indefinite detention after one year in this country. *Id.* ¶ 54.

The Refugee Detention Policy, issued without public notice and comment, purported to have immediate effect on all unadjusted refugees, and subjected every lawfully admitted refugee who has not adjusted status to immediate arrest and detention without process.

### D.  This Case

In a complaint filed with this Court on February 27, 2026, Plaintiffs—six individual refugees who have not yet adjusted status and face the risk of detention and two refugee-serving nonprofit organizations—challenged the Refugee Rescission Memo and the Refugee Detention Memo (together, the "Refugee Detention Policy"). SUF ¶ 69. That same day, Plaintiffs filed a motion for a stay of the Refugee Detention Policy under Section 705 of the APA. Defendants failed to respond to the motion, and the Court granted the stay on March 23, 2026, finding that the Refugee Detention Policy was likely contrary to law and that Plaintiffs faced irreparable harm absent a stay. *See* Order Granting Stay, ECF 51 ("Stay Order").

On May 15, 2026 Defendants produced identical 91-page Certified Administrative Records (CARs) from ICE and from USCIS, consisting primarily of Westlaw printouts of some federal cases, SUF ¶ 72, as well as: (1) a 2001 Memorandum from the General Counsel of the Immigration and Naturalization Service discussing removability of unadjusted refugees, ("2001 INS Memo"), SUF ¶¶ 25, 73; (2) the 2010 ICE Policy, SUF ¶¶ 29, 73; (3) the Refugee Rescission Detention Memos, SUF ¶¶ 43, 73; (4) two pages of archived material from the Department of State website

7

documenting requirements on resettlement agencies from 2009 to 2017, SUF ¶ 74; (5) five pages of current material from the USCIS website, titled "Green Cards for Refugees," that explain that refugees must apply for lawful permanent resident status "*after* they have been physically present in the United States for *at least* one year", SUF ¶ 75 (emphasis added); and (6) a two-page memorandum titled "Stateside Review of Refugee Cases Admitted Between 2021 and 2024" and dated October 22, 2025 ("5-Country Refugee Review Memo"), purporting to summarize a USCIS review of the cases of 31,000 refugees admitted from Ecuador, El Salvador, Guatemala, Honduras, and Venezuela, SUF ¶ 76. Only the 5-Country Refugee Review Memo had been unavailable to the public, and none of the agency documents pre-dating the Refugee Detention Policy authorizes indefinite detention.

### E. Plaintiffs Are Harmed by the Refugee Detention Policy.

Individual Plaintiffs are six refugees from all over the country who have not yet adjusted status and two non-profit refugee-serving organizations based in Massachusetts. *See* ECF 73, Sepulveda Decl. Exs. K–R, ECF 73-11–73-18; Stay Mot. Exs. 1–8, ECF 9-2–9-9.

All six Individual Plaintiffs were admitted to the United States between 2021 and 2024 through the USRAP. SUF ¶¶ 81, 84, 88, 92, 96, 99. Even though none of them have been charged with removability, Individual Plaintiffs are subject to arrest and detention under the Refugee Detention Policy because their applications for adjustment of status have been submitted but are not yet adjudicated. SUF ¶¶ 82, 85, 89, 93, 97, 100. Indeed, individual plaintiff Hamad B. and the husband of individual plaintiff Yasmine D. were both arrested in late January at a border patrol checkpoint in Texas and detained for weeks despite being lawfully admitted refugees with pending adjustment of status applications. SUF ¶¶ 86, 94.

Similarly, organizational Plaintiffs Jewish Family Service of Western Massachusetts ("JFS-WMA") and International Institute of New England ("IINE") face a "sustained emergency" as a result of the Refugee Detention Policy. SUF ¶ 114. These non-profit refugee-serving organizations have re-allocated resources away from the social services they routinely provide to address the needs of terrified refugees who face lengthy re-vetting interviews as well as the high risk of warrantless arrest and mandatory detention. SUF ¶¶ 103–06; *id.* ¶¶ 107–13. Instead of executing their core missions to protect family unity and assist refugees with adjustment to their new homes, they have and will be expending significant resources to refer detained refugees for legal representation and digging into emergency resources to assist families who have lost the income of arrested family members.

## LEGAL STANDARD

A movant prevails on summary judgment where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). But in cases brought under the APA, a motion for summary judgment "is simply a vehicle to tee up a case for judicial review." *Bos. Redev. Auth. v. Nat'l Park Serv.*, 838 F.3d 42, 47 (1st Cir. 2016). Thus, "an inquiring court must review an agency action not to determine whether a dispute of fact remains but, rather, to determine whether the agency action" was unlawful. *Id.*

## ARGUMENT

**I.   The Refugee Detention Policy Violates the APA.**

The Refugee Detention Policy violates the APA because it (1) is contrary to law, (2) is arbitrary and capricious, and (3) was promulgated without notice and comment procedures. *See* 5 U.S.C. § 706(2)(A)–(D).

9

### A.  The Refugee Detention Policy is Contrary to Law.

Agency decisions premised on an incorrect understanding and application of the law cannot stand. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 391 (2024). Plaintiffs are entitled to summary judgment because 8 U.S.C. § 1159(a) does not authorize the warrantless arrest and potentially indefinite detention of lawfully admitted refugees who have been physically present for one year and have not yet adjusted status to lawful permanent residence. Indeed, as this Court already found, the Refugee Detention Policy is likely contrary to law because it erroneously equates "custody" authorized by section 1159 with "detention." Stay Order. Because Defendants premise the Refugee Detention Policy on an erroneous legal interpretation, the Refugee Rescission Memo and the Refugee Detention Memo must be set aside. *See City of Providence v. Barr*, 954 F.3d 23, 31 (1st Cir. 2020) ("action that an agency takes outside the bounds of its statutory authority . . . violates the [APA]."). Further, because no other provision of the INA authorizes the policy, and because it is contrary to controlling regulations, it is likewise contrary to law and must be set aside.

#### a.   8 U.S.C. § 1159 Does Not Authorize Detention.

The plain language of § 1159(a) by its terms does not authorize arrest or detention of refugees, much less the indefinite detention as contemplated by Defendants' policy. Section 1159(a), within a section titled "Adjustment of status of refugees," provides that a refugee whose status has not been terminated, has been physically present in the United States for one year, and has not acquired permanent resident status, "shall, at the end of such year period, return or be returned to the custody of the Department of Homeland Security for inspection and examination for admission to the United States as an immigrant in accordance with the provisions of sections 1225, 1229a, and 1231 of this title." 8 U.S.C. § 1159(a)(1)(C). The words "arrest," "detain," and

10

"detention" appear nowhere in § 1159.

Rather, the government's authority to arrest or detain noncitizens is codified at 8 U.S.C. §§ 1225, 1226, 1231, and 1357, and is limited to arrests for the purpose of removing inadmissible or deportable noncitizens from the country. DHS generally may only arrest a noncitizen upon the issuance of a "warrant." 8 U.S.C. § 1226(a). An immigration officer may make warrantless arrests only "if he has reason to believe" that an individual "is in the United States in violation of [the immigration laws] and is likely to escape before a warrant can be obtained for his arrest." *Id*. § 1357(a)(2). No other provision of the INA authorizes arresting noncitizens.

The relevant provisions of the INA permit detention if a noncitizen is subject to removal proceedings or is subject to a final order of removal. For "applicants for admission"—which admitted refugees are not—the INA authorizes detention incident to a determination whether a noncitizen will be admitted to or removed from the country. *See id*. § 1225(b)(1)(B)(ii)–(iii), (b)(2)(A). For those already present in the United States, the INA authorizes detention during removal proceedings or upon issuance of a final order of removal. *Id.* §§ 1226(a), (c); 1226a; 1231(a). No other provision of the INA relevant here authorizes detention of noncitizens.

Moreover, since the passage of the Refugee Act of 1980, DHS and its predecessor the Immigration and Naturalization Service (INS) interpreted the phrase "return . . . to the custody of [the agency] for inspection and examination" in § 1159(a) to require only that refugees be reviewed for adjustment of status and potentially–not even necessarily–appear for an interview before the agency.

Following enactment of the Refugee Act of 1980, the statute's implementing regulations contemplated merely that a "[n]otice [would] be sent to all refugees after one year to report for an interview." *Aliens and Nationality; Refugee and Asylum Procedures*, 46 Fed. Reg. 45116, 45117

11

(Sep. 10, 1981) (Final Rules); *see also Aliens and Nationality; Refugee and Asylum Procedures*, 45 Fed. Reg. 37392, 37392 (June 2, 1980) (Interim Regulations). Nothing in these early implementing regulations contemplated the arrest or detention of unadjusted refugees—let alone arrest without a warrant or notice. Later, the INS amended the regulations to require interviews on a case-by-case basis, explaining:

> The "custody" requirement for refugees applying for adjustment of status can be met if the Service maintains sufficient control over the applicants to make a determination of their admissibility to the United States as immigrants and to institute removal procedures if they should be found to be inadmissible. Additionally, a procedure that requires refugees to apply for adjustment of status and gives the Service the authority to compel them to appear before an officer of the Service satisfies the requirements of the Act. Although the Service may require refugees seeking adjustment of status to be interviewed by an immigration officer, the Service does not have to interview each and every refugee.

*Adjustment of Status of Refugees and Asylees: Processing Under Direct Mail Program*, 63 Fed. Reg. 30105, 30106 (June 3, 1998). As the INS General Counsel reasoned in 1997, "it seems doubtful that Congress intended the Service to detain refugees applying for adjustment of status. . . . [I]t is reasonable to interpret the term "custody" in § 209(a) to mean something other than physical restraint. It should be understood to mean sufficient control over a [noncitizen] to carry out the purpose of section 209(a)—that is, sufficient control to make a determination of a refugee's admissibility to the United States as an immigrant . . . ." David A. Martin, INS General Counsel's Office, Legal Opinion No. 97-2: Opinion on whether a personal interview is required for all refugee and asylee adjustment of status applications under INA § 209, 9 Immigration Law Service 2d PSD 1997 (1997) (Stay Mot. Ex. 9, ECF 9-10), SUF ¶ 21.

With one exception, that understanding persisted for decades. As recently as 2010, ICE's own guidance expressly acknowledged that § 1159 is "not a proper basis for detaining" refugees

12

who fail to apply for adjustment after one year.[3] 2010 ICE Policy at 2; SUF ¶¶ 30–33. Instead, immigration officers must have a "reasonable belief that" a refugee "is removable" before arresting a refugee under existing arrest and detention authorities. *Id.* (citing 8 U.S.C. §§ 1225, 1226, 1357(a)(2)). While that guidance was purportedly rescinded in December 2025, the agency's historical practice is strong evidence that the plain text of § 1159(a)(1) does not authorize DHS to arrest and detain unadjusted refugees, absent any ground of removability. *See, e.g., Loper Bright*, 603 U.S. at 386 (longstanding government practice can inform "what the law is."). And governing federal regulations do not contemplate arrest or detention of any unadjusted refugees just because they have not yet adjusted, as they make no reference to arrest or detention at the one-year anniversary of admission. *See* 8 C.F.R. § 209.1(b), (d).

To justify their unprecedented reach for authority to detain unadjusted refugees en masse, Defendants primarily rely on the fact that § 1159(a)(1) uses the term "custody." SUF ¶¶ 49–50. But as this Court already found, "the term 'custody' has not historically been treated as synonymous with the term 'detention.'" Stay Order. Indeed, that erroneously "conflate[s] custody with mandatory detention." *Darvin M. v. Bondi*, 817 F. Supp. 3d 740, 746 (D. Minn. Jan. 24, 2026).

---

[3] The only exception is found in an outdated 2001 INS Memo which authorizes detention under §1159 for a subset of refugees who have been lawfully present for one year: those who have failed to apply for adjustment of status. SUF ¶ 26; ICE_AR 1, USCIS_CAR 1. This memo was ultimately superseded by ICE's 2010 guidance expressly acknowledging that § 1159 is "not a proper basis for detaining" refugees who fail to apply for adjustment after one year. SUF ¶ 30; ICE_AR 0021, USCIS_AR 0021. ICE issued its 2010 guidance after several detained refugees filed habeas challenges to their detention under § 1159 in Arizona between 2009 and 2011. The Arizona District Court dismissed the habeas petitions as moot following the issuance of ICE's 2010 guidance stating § 1159 was not a proper basis for detention. *See Buzancic v. Kane*, 2011 WL 1792538 (D. Ariz. May 11, 2011); *Sondah v. Holder*, 2010 WL 5811611 (D. Ariz. Nov. 12, 2010); *Alizadeh v. Kane*, 2010 WL 5146743 (D. Ariz. Dec. 13, 2010); *Vue v. Kane*, 2011 WL 43465 (D. Ariz. Jan. 6, 2011); *Billamay v. Kane*, 2010 WL 5888673 (D. Ariz. Nov. 15, 2010); *Kolok v. Holder*, 2011 WL 587159 (D. Ariz. Feb. 10, 2011); *Sondah v. Holder*, 2011 WL 587957 (D. Ariz. Feb. 9, 2011); *Dong v. Holder*, 2011 WL 1119072 (D. Ariz. Mar. 28, 2011).

Starting with the term's ordinary meaning, custody is not synonymous with physical imprisonment and was not at the time Congress passed the Refugee Act in 1980. *See Custody*, *Black's Law Dictionary* (5th ed. 1979) ("The care and control of a thing or person."); *Custody, Black's Law Dictionary* (12th ed. 2024) (defining custody as "[t]he care and control of a thing or person for inspection, preservation, or security," of which "physical custody" is one type). Where Congress wanted to equate "custody" with detention, it said so explicitly. *See, e.g.*, 8 U.S.C. § 1226(c) (providing for "detention of criminal [noncitizens]" and directing DHS to "take into custody" certain noncitizens with criminal offenses "when the [noncitizen] is released" from the custody of other law enforcement entities). The choice not to equate custody with detention in § 1159(a) is meaningful. *See Russello v. United States*, 464 U.S. 16, 23 (1983) ("where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion").

Read most naturally, "§ 1159 contemplates that a refugee be returned, temporarily, to the control of DHS because they have the responsibility to inspect and examine the refugee for admission." *U.H.A.*, 817 F. Supp. 3d at 766; *A.D.G. v. Bondi*, No. 26-cv-516, 2026 WL 207352, at \*2 (D. Minn. Jan. 27, 2026) ("The 'custody' contemplated by § 1159 is for a limited time to serve a specified purpose—inspection and examination. Such authority is not equivalent to authority to detain . . . .") (citation omitted).

Nor does context support the government's reading. To the contrary, "context clues. . . compel the conclusion that there is a distinction between the words" custody and detention. Stay Order. First, § 1159(a) directs that refugees "*return* or be returned" (emphasis added), which evinces an intent that refugees present themselves voluntarily for an interview rather than be

14

forcibly arrested and held against their will; *compare id*. with 8 U.S.C. § 1226(c) (in section entitled "Apprehension and detention of [noncitizens]" and subsection entitled "Detention of criminal [noncitizens]," authorizing the Attorney General to "*take into* custody" certain noncitizens charged with or convicted of specified crimes) (emphasis added)). Obviously, refugees who were aware of and availed themselves of the opportunity to apply for adjustment of status through the procedure required by Defendants' regulations have opted to "return" to the agency, and those who have not applied yet may still do so.

Second, the provision contemplates that an individual may "be returned to the custody" of DHS. *Id*. § 1159(a). But refugees are not detained upon admission to this country. Instead, they are inspected at a port of entry and then permitted to enter the country after establishing their admissibility as refugees. *See id*. § 1157(c)(1). So whatever refugees are "returning" to under § 1159, it cannot be detention. *See U.H.A. v. Bondi*, 819 F. Supp. 3d 946, 955 (D. Minn. 2026) ("Because refugees were not detained when they arrived, it is impossible for them 'return' to detention."). As this Court has found, "the statute refers to a 'return' to 'custody.' Refugees are not detained upon arrival and thus cannot be 'returned' to detention." Stay Order.

Third, the "return . . . to custody" must be "for inspection and examination for admission to the United States as an immigrant" (i.e., adjustment of status). 8 U.S.C. § 1159(a)(3). As this Court has found, "the purpose of the 'custody' is to ensure an administrative adjustment of status, not to ensure physical presence for removal." Stay Order. Such limited purpose does not contemplate detention for other purposes, including re-vetting a previously approved application or subjecting a refugee to removal proceedings. "'[C]ustody'" thus "contemplates the exercise of control absent physical detention" for purposes of inspection and examination. *See Darvin M.*, 817 F. Supp. 3d at 746.

Moreover, the Supreme Court has interpreted another INA provision containing nearly identical language to rule out detention. The parole provision provides that a noncitizen whose parole ends "shall return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any applicant for admission." 8 U.S.C. § 1182(d)(5)(A). In *Clark v. Martinez*, the Court found "nothing in this text that affirmatively authorizes detention," and concluded that a noncitizen whose parole is revoked is subject to detention only to the extent "any other applicant for admission" would be subject to detention under other parts of the INA. 543 U.S. 371, 385 (2005). "[W]hen Congress uses the same language in two statutes having similar purposes. . . it is appropriate to presume that Congress intended that text to have the same meaning." *U.H.A. II*, 822 F. Supp. 3d at 1030 (citing *Smith v. City of Jackson, Miss.*, 544 U.S. 228, 233 (2005)). The phrase "return [to] custody" in § 1159 thus does not establish any independent detention authority.

Indeed, in every other instance where the INA authorizes arrest or detention of noncitizens, it does so explicitly. For "applicants for admission," the INA repeatedly refers to detention—not custody—pending completion of removal proceedings. *See* 8 U.S.C. § 1225(b)(1)(B)(ii) ("shall be detained for further consideration of the application for asylum"); *id.* § 1225(b)(1)(B)(iii)(IV) ("shall be detained pending a final determination of credible fear of persecution and, if found not to have such a fear, until removed"); *id.* § 1225(b)(2)(A) ("shall be detained for a proceeding under section 1229a of this title"). For those already present in the United States, the INA specifically refers to arrests or detention and where relevant "tak[ing] into custody." *Id.* § 1226(a) ("On a warrant issued by the Attorney General, an [noncitizen] may be arrested and detained pending a decision on whether the [noncitizen] is to be removed from the United States."); *id.* § 1226(c) (providing for mandatory "detention of criminal [noncitizens]" and requiring DHS to "take into

16

custody" such individuals after their release from other law enforcement entities); *id.* § 1357(a)(2) (authorizing immigration officers "to arrest any [noncitizen] in the United States, if he has reason to believe that the [noncitizen] so arrested is in the United States in violation [of the immigration laws] and is likely to escape before a warrant can be obtained for his arrest"). And for those with final orders of removal, the INA, once more, refers to detention, not custody. *Id.* § 1231(a)(2)(A) (addressing "Detention, release, and removal of [noncitizens] ordered removed" and providing that "[d]uring the removal period, the Attorney General shall detain the [noncitizen].").

In addition, interpreting the phrase "be returned to the custody" in § 1159(a) as mandating detention would lead to absurd results. *Aroostook Band of Micmacs v. Ryan*, 484 F.3d 41, 61 (1st Cir. 2007) ("[I]nterpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with legislative purpose are available."). Because § 1159(a) and agency regulations make refugees ineligible for adjustment until one year after entry, Defendants' interpretation would subject every refugee to detention, unless USCIS conducted the inspection and examination precisely at the one-year mark. "That outcome is nonsensical and would cause many unadjusted refugees to celebrate their one-year anniversary in this country in a jail cell." *U.H.A.*, 817 F. Supp. 3d at 767; *see also U.H.A. II*, 822 F. Supp. 3d at 1031.

Thus, in light of the text, history, and purpose of § 1159(a), "'custody' is best read to mean 'responsibility' or 'control,' rather than prolonged detention." *U.H.A.*, 817 F. Supp. 3d at 766. Even if § 1159 somehow authorized temporary detention for "inspection and examination" of whether a refugee can adjust status, Defendants are detaining refugees under the policy for an unrelated purpose—"mandatory re-vetting" at the "one-year mark" to determine whether to "terminate" someone's refugee status and place them in removal proceedings. Refugee Detention Memo at 4. Importantly, refugee status termination is governed by a separate part of the INA that

17

clearly contains no arrest or detention authority. 8 U.S.C. § 1157(c)(4). Defendants conflate § 1157 and § 1159, contending that § 1159 authorizes an inquiry into whether a refugee "did not meet the refugee definition . . . at the time of admission." Refugee Detention Memo at 3. But the inspection under § 1159(a) is limited to whether a refugee is subject to any applicable inadmissibility bar at the time of *adjustment*. 8 U.S.C. § 1159(a), (c). And the statute explicitly distinguishes refugees—who do not need to continue to be refugees in order to adjust—from asylees, who do. *Compare* 8 U.S.C. § 1159(a) *with id.* § 1159(b)(3) (in asylee adjustment provision, explicitly authorizing assessment of whether applicant "continues to be a refugee"); *see Azarmanesh v. Bondi*, No. 23-cv-5210, 2025 WL 965955, at *13 (N.D. Cal. Mar. 31, 2025) (noting distinction between "admitted refugee" and "individual with asylum status" who "must continue to meet the definition of a refugee at the time" of adjustment).

While some information related to the admissibility determination for adjustment-of-status might be relevant to refugee status termination proceedings and vice versa, § 1159(a)(1) does not contemplate a wide-ranging fishing expedition to re-adjudicate refugee claims, or an end-run around the requirement that refugees be provided 30 days' notice before being required to offer evidence that their status should not be terminated, 8 C.F.R. § 207. Thus, whatever "custody" might be authorized by § 1159(a) cannot be for "re-vetting" interviews aimed at terminating status and removing refugees, as contemplated by the Refugee Detention Memo.

    b.   <u>8 U.S.C. § 1225 Does Not Authorize Detention.</u>

The only other argument Defendants present in support of their novel mandatory arrest and detention theory is their observation that § 1159(a) refers to § 1225. Refugee Detention Memo at 4, ICE_AR 81, USCIS_AR 81. As Defendants tell it, "Congress linked the refugee one-year inspection to the same [mandatory] detention-and-inspection framework that applies to other

applicants for admission" because § 1159(a)(1) provides that the "return" to DHS "custody" be made "in accordance with . . . sections 1225, 1229a, and 1231." *Id.* Not so.

First, § 1225, titled "Inspection by immigration officers, expedited removal for inadmissible arriving [noncitizens]; referral for hearing," does not primarily address detention. To the extent that it authorizes detention, it does so only for "applicants for admission" who are subject to expedited or full removal proceedings. 8 U.S.C. § 1225(a), (b). An applicant for admission is defined as a noncitizen "present in the United States *who has not been admitted* or *who arrives in the United States.*" *Id*. § 1225(a)(1) (emphasis added). A previously admitted refugee is neither.

As to admission, the INA defines "[t]he terms 'admission' and 'admitted,'" including as used in §§ 1157 and 1159, to mean "the lawful entry of the [noncitizen] into the United States after inspection and authorization by an immigration officer." *Id*. § 1101(a)(13)(A). A lawful "entry" thus refers to the specific moment "when a noncitizen seeks permission to physically enter United States territory" and an immigration officer inspects and authorizes an individual to cross into the interior of the country. *See, e.g.*, *Torres v. Barr*, 976 F.3d 918, 924 (9th Cir. 2020) (en banc). It does not refer to some "continuous period as opposed to just a single point in time." *Id.* at 926. Taken together, the phrase "has not been," modifying the phrase "admitted," must refer to some event in the past—lawful entry—and not some ongoing entry that continues into the future. A previously admitted refugee thus cannot be an individual "who has not been admitted" because they have as a matter of fact and law been *admitted* into the United States. *See Matter of D-K-,* 25 I&N Dec. 761, 769 (BIA 2012) (noncitizen "admitted to the United States as a refugee has been 'admitted' for purposes of section 101(a)(13)(A) of the Act.").

Nor can lawfully admitted refugees "arrive[] in the United States," as they have already been inspected and admitted at a port of entry and are physically present on the interior for over a

19

year. Indeed, "[t]o 'arrive' means 'to reach a destination.'" *Al Otro Lado v. Mullin*, 609 U.S. ___, 2026 WL 1825741, at *5 (U.S. June 25, 2026) (cleaned up). Thus, "[u]nder the statutory language, if [noncitizen] applicants [for admission] are apprehended while crossing the border (whether or not at a check point), they are 'arriving' applicants under the statute, and if apprehended at some point thereafter, they are not 'arriving,' but rather '[noncitizens] present in the United States who [have] not been admitted.'" *Bollat Vasquez v. Wolf*, 460 F. Supp. 3d 99, 111 (D. Mass. 2020) (quoting 8 U.S.C. § 1225(a)(1)). But in no sense is someone previously lawfully admitted somehow also "arriving."

Against this, the policy memoranda advance only one basic argument: because § 1159(a)(1) requires a refugee who has been physically present for at least one year to be inspected and examined regarding their ability to adjust their status to that of an LPR, refugee admissions are "conditional," and terminate by operation of law at the one-year mark; therefore, refugees become "applicants for admission" again. Refugee Detention Memo at 3–4, ICE_AR 80–81; USCIS_AR 80–81. But the word "conditional" appears nowhere in § 1159, *see infra* at 19–21, and Defendants conflate admission with status. *See Sanchez v. Mayorkas*, 593 U.S. 409, 415 (2021) ("[l]awful status and admission . . . are distinct concepts in immigration law"). As the Supreme Court observed in *Sanchez*, "[o]n the one hand, a foreign national can be admitted but not in lawful status—think of someone who legally entered the United States on a student visa, but stayed in the country long past graduation. On the other hand, a foreign national can be in lawful status but not admitted—think of someone who entered the country unlawfully, but then received asylum." *Id.* That is the case here. A refugee could conceivably have their *status* as a refugee terminated at some point *after* a lawful admission. *See* 8 U.S.C. § 1157(c)(4) ("The refugee *status* of any [noncitizen] . . . may be terminated . . . if . . . the [noncitizen] was not in fact a refugee . . . at the

20

time of the [noncitizen's] admission.") (emphasis added); 8 C.F.R. § 207.9 (establishing process for termination of refugee *status*). But that does not change the fact that this same refugee was previously *admitted* following inspection by an immigration officer, which occurs at a specific moment in time. It is a descriptive fact that refugees *have been* admitted, and that admission cannot, unlike status, be rescinded later.

Whether a refugee's admission somehow retroactively terminates is a question of statutory interpretation, and that inquiry "begins and ends with the text" of the statute. *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 553 (2014). The term "conditional" appears nowhere in the statutory provisions governing refugee admissions. Rather, Congress has provided one uniform definition for "admission." *See* 8 U.S.C. § 1101(a)(13)(A). "Congress," of course "says in a statute what it means and means in a statute what it says there." *Hartford Underwriters Ins. Co. v. Union Planters Bank,* 530 U.S. 1, 6 (2000) (citation omitted). Had Congress wished to define "admission" to be "conditional" for some immigrants but not others, it knew how to do so, *see* 8 U.S.C. § 1186a (establishing categories of conditional status), and the fact that it did not is compelling evidence it did not intend that construction. *Russello*, 464 U.S. at 23 (noting presumption that "Congress acts intentionally and purposely in the disparate inclusion or exclusion" of statutory language (citation omitted)).

The legislative history demonstrates an intentional rejection of "conditional" entry or admission. *See I.N.S. v. Cardoza-Fonseca*, 480 U.S. 421, 442–43 (1987) ("Few principles of statutory construction are more compelling than the proposition that Congress does not intend *sub silentio* to enact statutory language that it has earlier discarded in favor of other language" (citation omitted)). Prior to the 1980 Refugee Act, the entry of refugees was conditional: the INA provided for refugee resettlement through the use of parole procedures at 8 U.S.C. § 1182(d)(5), *see* Pub. L.

21

No. 86-648,74 Stat. 504 (1960), and explicitly noted the "conditional entry of refugees." H.R. Rep. No. 89-745, at 15 (1965); S. Rep. No. 89-748, at 16–17 (1965).

Early versions of the bill contained the notion of "conditional" admission, but such a notion was rejected in the final version. Initially, "conditional" admission would have applied to a proposed category of refugees admitted due to "emergency situation[]," but who would not obtain LPR status immediately upon admission. *See* S. 643, 96th Cong. § 201(b) (1979); H.R. 2816, 96th Cong. § 201(b) (1979). The Senate version retained this scheme, S. Rep. No. 96-256, at 27 (1979), while the House version dropped the "conditional" modifier, referring throughout to "refugee admission," 125 Cong. Rec. 37,242–47 (1979), but not providing for immediate LPR status upon admission. H.R. Rep. No. 96-608, at 16 (1979). The final version of the bill used the House draft's admission language, excluding any explicit reference to "conditional," Refugee Act of 1980, Pub. L. No. 96-212, §§ 207–209, 94 Stat. at 103–06, and the term "admission" was used to describe refugees' manner of resettling in the United States; the only arguable and relevant "condition" set in the bill applied to refugee *status*, which could be revoked upon a finding that the noncitizen did not meet the definition of "refugee" at the time of "admission."

Underscoring this rejection, this same Congress also amended the parole statute to make clear that refugees going forward must be *admitted*, rather than *paroled* into the country. 8 U.S.C. § 1182(d)(5)(B); *see Amanullah v. Nelson*, 811 F.2d 1, 12 (1st Cir. 1987). The INA elsewhere defines parole as temporary and distinct from admission. *see* 8 U.S.C. § 1101(a)(13)(B) (describing individuals paroled under this section as not "admitted"); *id.* § 1182(d)(5)(A) (same). The same Congress that said refugees must be "admitted . . . under section 1157" absent "compelling circumstances" permitting parole, which "shall not be considered" an "admission," could not have possibly intended for refugee admissions to function the same as parole.

22

Further, the BIA in *Matter of D-K-* explained that the "conditional" nature of a refugee admission means that refugees who adjust their "will have been 'admitted' twice—first, upon conditional admission under section 207 of the Act, and second, upon reinspection and adjustment of status…" as all others who enter on a nonimmigrant visa and later adjust their status must do. *Matter of D-K-*, 25 I&N Dec. at 767–68. Indeed, noncitizens seeking to adjust their status regularly seek two "admissions," first as an applicant for admission when they arrive at a port of entry, and then again during the adjustment process after they physically present. *See Matter of Alyazji*, 25 I&N Dec. 397, 399–404 (BIA 2011). A noncitizen cannot adjust status to that of an LPR without having first been admitted, and therefore the second admission comes at the adjustment of status stage. *See id.* The second admission is not an admission under 8 U.S.C. § 1225, i.e. "lawful entry of the [noncitizen] into the United States after inspection and authorization by an immigration officer," 8 U.S.C. § 1101(a)(13)(A), and so in no sense does an applicant to adjust status somehow again become an "applicant for admission" under § 1225(a)(1) when applying for that second "admission" as an LPR. *See id.* § 1255 ("[t]he status of [a noncitizen] who was inspected and *admitted or paroled* into the United States . . . may be adjusted") (emphasis added).

c.   <u>8 U.S.C. §§ 1226, 1229a, and 1231 Do Not Authorize Arrest or Detention.</u>

No other statutory provisions discussed or alluded to in the Refugee Detention Memo authorize detention. First, § 1229a applies to "removal proceedings" and contains no standalone detention provisions. *See* 8 U.S.C. § 1229a. Nothing in the Refugee Detention Memo demonstrates that any detained refugees have been placed in removal proceedings. Second, § 1226 provides that "[o]n a warrant issued by the Attorney General, [a noncitizen] may be arrested and detained pending a decision on whether the [noncitizen] is to be removed from the United States." *Id.* § 1226(a). But the Refugee Detention Memo directs detention of refugees *without* the issuance of a

23

warrant or any basis to believes a refugee is removable from the United States. The individual Plaintiffs are not in removal proceedings. *See, e.g.,* SUF ¶¶ 81, 84, 96, 99. Nor does § 1226(c) authorize detention where, again, no warrant has issued and no individual determination that a refugee is removable has been made. Fourth, § 1231 provides for the mandatory detention and removal of noncitizens ordered removed, *id.* § 1231(a)(1), (a)(2)(A), and none of the refugees subject to the Refugee Detention Memo's purported mandatory detention authority has been ordered removed. SUF ¶¶ 60–61.

### d.   8 U.S.C. § 1357 Does Not Authorize Arrest or Detention.

The Refugee Detention Memo also exceeds Defendants' authority to make warrantless arrests under § 1357(a)(2). That provision permits such arrests only if the arresting officer "has reason to believe that the [noncitizen] so arrested is in the United States in violation of [the immigration laws] and is likely to escape before a warrant can be obtained for his arrest." *Id.* § 1357(a)(2); *see* 8 C.F.R. § 287.3(d).

Section 1357's "reason to believe" standard is considered "the equivalent of [the] probable cause" standard under the Fourth Amendment. *Morales v. Chadbourne*, 793 F.3d 208, 216 (1st Cir. 2015). "Probable cause" requires an inquiry that is "particularized with respect to that person." *Maryland v. Pringle*, 540 U.S. 366, 373 (2003). Accordingly, § 1357(a)(2) unequivocally demands that, *before* an immigration officer can make an immigration arrest without a warrant, the officer must first make an individualized determination of probable cause that the person is both in the United States unlawfully and is a flight risk. But individual refugees who have resettled in the United States are not in violation of the INA, and nothing in the Refugee Detention Memo articulates why they would be likely to escape before a warrant can be obtained. Indeed, such a claim would be nonsensical—the same refugees must apply to adjust status and present themselves

24

to DHS for adjustment by way of an application or interview if requested. The Refugee Detention Memo does not mandate any particularized determination and nowhere bothers to explain how an entire population of lawfully admitted refugees, integrated into their communities and working toward permanent status, can be categorized as flight risks.

On top of that, "the Fourth Amendment requires a judicial determination of probable cause as a prerequisite to extended restraint of liberty following arrest." *Gerstein v. Pugh*, 420 U.S. 103, 114 (1975). That determination must be "timely," *id.* at 126, meaning it must occur "within 48 hours of arrest" absent "the existence of a bona fide emergency or other extraordinary circumstance." *Cnty. of Riverside v. McLaughlin*, 500 U.S. 44, 56, 57 (1991); *see Gonzalez v. ICE*, 975 F.3d 788, 824–26 (9th Cir. 2020) (explaining "48 hour" rule applies to civil immigration arrests). ICE regulations codify this standard. 8 C.F.R. § 287.3(d). However, the Refugee Detention Memo claims that detention under § 1159 is not limited to 48 hours but rather "may last for the reasonable length of time it takes to inspect and examine the [noncitizen] to determine whether he or she is admissible." SUF ¶ 51. Authorization of potentially indefinite detention without any probable cause of violations of the INA exceeds Defendants' authority under § 1357.

e. The Refugee Detention Policy Violates DHS's Own Regulations.

The Refugee Detention Policy also violates the *Accardi* doctrine, which requires federal agencies to follow their own binding regulations. *See U.S. ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954); *Rotinsulu v. Mukasey*, 515 F.3d 68, 72 (1st Cir. 2008).[4]

---

Although many district courts in this circuit have analyzed *Accardi* violations under the contrary to law prong of the APA, *see, e.g.*, *Doe v. Trump*, No. 1:25-CV-13946-JEK, 2026 WL 1170971 (D. Mass. Apr. 30, 2026) (contrary to law*); Presidents' All. on Higher Educ. & Immigr. v. Noem*, 824 F. Supp. 3d 168, 200 (D. Mass. 2026) (collecting cases), some have analyzed the claim under the arbitrary and capricious standard. *See Roe v. Mayorkas*, No. 22-CV-10808-ADB, 2023 WL 3466327, at *12 (D. Mass. May 12, 2023) (arbitrary and capricious, but citing cases supporting both views). Should the Court determine that Plaintiffs' *Accardi* claim is properly viewed as an

The regulations provide that refugees will be adjusted to lawful permanent resident status so long as (1) their refugee admission has not been terminated in accordance with 8 C.F.R. § 207.9, which includes a provision of notice and an opportunity for refugees to respond; and (2) they are not found, upon inspection after one year of physical presence in the United States, to be inadmissible. *See* 8 C.F.R. § 209.1. Neither regulation mentions, much less mandates, detention. Rather, it is only under limited and independent circumstances not present here that refugees may be arrested and detained, and only then for a maximum of 48 hours. *See id.* § 287.8(c)(2)(i) (authorizing immigration officers to make an arrest only if they have "reason to believe that the person to be arrested has committed an offense against the United States or is a[] [noncitizen] illegally in the United States."); *id*. §287.3(d) (following a warrantless arrest, requiring that "a determination will be made within 48 hours of the arrest, except in the event of an emergency or other extraordinary circumstance in which case a determination will be made within an additional reasonable period of time, whether the [noncitizen] will be continued in custody or released on bond or recognizance and whether a notice to appear and warrant of arrest as prescribed in 8 CFR parts 236 and 239 will be issued."). These regulations, consistent with the INA, embody the acknowledgment that refugees are in lawful status and should not be treated as government enforcement targets simply because they have been physically present in the United States for at least a year. Ordering the warrantless arrest and indefinite detention of unadjusted refugees who are physically present in the United States for one year is directly inconsistent with these binding regulatory protections and renders the policy unlawful.

\*\*\*

---

arbitrary and capricious claim, then Plaintiffs submit it as another reason by the Refugee Detention Policy is arbitrary and capricious. *See infra* 27–36.

Because the Refugee Detention Policy is in excess of statutory authority granted by § 1159 or any other provision of the INA, and because it violates agency regulations, it violates Section 706(2)(C).

### B.  The Refugee Detention Policy is Arbitrary and Capricious.

The Refugee Rescission and Refugee Detention Memos are arbitrary and capricious. In issuing a rule, an agency must "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quotation omitted). An agency action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id*. Moreover, an agency must provide a "reasoned explanation" for departing from prior policy and must provide "a more detailed justification than what would suffice for a new policy" when "its prior policy has engendered serious reliance interests that must be taken into account." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). Although an agency need not "consider all policy alternatives in reaching [its] decision," where the agency is "not writing on a blank slate, . . . it [is] required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 33 (2020) (citation modified).

Applying these standards, the Refugee Rescission and Detention Memos are arbitrary and capricious for multiple reasons.

27

a. The Administrative Record Alone Shows the Policy is Arbitrary and Capricious.

As an initial matter, the Certified Administrative Record underscores that the Refugee Detention Policy is arbitrary and capricious. The record is mainly comprised of Westlaw printouts of federal cases, but even those do not include any published decisions from *U.H.A. v. Bondi* or any of the cases finding the policy of detaining unadjusted refugees unlawful under section 1159. *See* SUF ¶ 71; *see also Am. Hosp. Ass'n v. Kennedy*, 820 F. Supp. 3d 30, 40 (D. Me. 2025) ("the anemic administrative record alone" supported a strong showing on arbitrary and capricious claim). The only new, not previously public document in the CAR is a memo summarizing the "USCIS Review" of recently admitted refugees, which purportedly justifies a need for mandatory re-vetting of all refugees who entered during the Biden Administration. SUF ¶ 76. But, as discussed below, *infra* 33–34, that Review is deeply flawed.

b. The Refugee Rescission Memo Is Arbitrary and Capricious.

The Refugee Rescission Memo of December 18, 2025 is arbitrary and capricious because it reverses a 16-year-old policy with no explanation. *See* Refugee Rescission Memo, SUF ¶ 43. The only rationale for the one-sentence decision to rescind the 2010 ICE Policy was a reference to a December 16, 2025 Presidential Proclamation that "[does] not apply . . . to a refugee who has already been admitted to the United States." Proclamation No. 10998 § 8(d), 90 Fed. Reg. at 59728, SUF ¶ 44. An agency action that includes "no explanation for the about-face in agency-wide policy" has the "hallmarks of arbitrary and capricious decision-making." *Am. Pub. Health Ass'n v. NIH*, 145 F.4th 39, 54 (1st Cir. 2025); *see also Fox Television*, 556 U.S. at 515 (an agency cannot "depart from a prior policy *sub silentio* or simply disregard rules that are still on the books"); *Massachusetts v. NIH*, 770 F. Supp. 3d 277, 305–06 (D. Mass. 2025), *aff'd*, 164 F.4th 28

28

(1st Cir. 2026) (agency action was arbitrary and capricious where explanations were "conclusory" and "failed to provide any reasoning, rationale, or justification at all").

c. The Refugee Detention Memo Is Arbitrary and Capricious.

Perhaps recognizing that it failed to provide any explanation for abandoning prior policy in the Refugee Rescission Memo, DHS issued the Refugee Detention Memo. *See* Refugee Detention Memo at 2 (while ICE "believes" the Refugee Rescission Memo was "valid," DHS undertook a "fresh look at the past policies and rescinds them anew"), SUF ¶¶ 46, 48. The Refugee Detention Memo went farther than the Rescission Memo; it purported to authorize indefinite detention of any refugee who had not yet adjusted to lawful permanent resident after one year, even if the refugee had applied and there were no grounds for removability. DHS's "fresh look" is thus still arbitrary and capricious because the Refugee Detention Memo both reverses DHS's longstanding interpretation regarding the detention of refugees who had not yet applied for adjustment and creates a new policy of detaining unadjusted refugees awaiting action on their adjustment applications without providing a "reasoned explanation" for departing from its prior policy or "a more detailed justification than what would suffice for a new policy." *Fox Television*, 556 U.S. at 515.

First, DHS mischaracterizes the Refugee Detention Memo, saying that "prior policy decisions and operational guidance resulted in ***incomplete*** implementation of" the requirements of § 1159 (emphasis added). Refugee Detention Memo at 1, SUF ¶ 46. But the Refugee Detention Memo does not implement § 1159. Rather, it upends DHS's prior longstanding interpretation that limited the detention of refugees to circumstances where they are removable and replaces it with a default mandatory detention policy for refugees who have been in the United States for more

29

than one year.[5] Moreover, the 2010 ICE Policy properly implemented § 1159, because refugee status is not conditional and the failure to adjust status at the one-year mark is not a basis for removal or detention. *See supra* 10–18, 20–23. The 2010 ICE Policy did not even address detention of refugees who had pending adjustment applications, SUF ¶ 33, addressing only the possibility of serving notices to appear in immigration court if there were evidence of inadmissibility or deportability.

Second, DHS claims that the Refugee Detention Memo better enforces the statutory requirement in § 1159, but that is wrong: § 1159 does not say that refugee admission is conditional, require mandatory review after one year of physical presence, or impose mandatory detention after one year. *See* Refugee Detention Memo at 2, SUF ¶ 46. And even if § 1159 permitted detention of refugees (it does not), the Memo fails to explain why mandatory detention better enforces the statutory requirement that refugees apply to adjust their status after one year than the prior policy. The Refugee Detention Memo presents no evidence that detention is necessary to implement § 1159's adjustment of status provision or show that the policy that applied for over 45 years—non-detained adjustment of status interviews, termination of refugee status, and removal proceedings—was insufficient. *Massachusetts*, 770 F. Supp. 3d at 307 (agency failed to provide the "reasoned explanation [] needed for disregarding facts and circumstances that underlay or were engendered by the prior policy") (quotation omitted).

Third, the Refugee Detention Memo is arbitrary and capricious because DHS failed to consider "less sweeping policy changes" to "enforce" the requirement to apply for adjustment of

---

[5] While the Refugee Detention Memo claims detention of refugees is not novel, at 3, the CAR does not contain evidence of any prior policy or practice to detain refugees who have not adjusted status after one year in the United States. In fact, the cases cited in the Memo purporting to authorize detention of refugees involved refugees who were detained following serious criminal convictions not refugees who were detained because they had failed to adjust status in one year. *Id.* at 3–4.

status after one year, such as sending notices to refugees who have not applied for adjustment after a certain period or not detaining refugees while their applications for adjustment of status are pending. *See Regents*, 591 U.S. 1 at 28–29 (finding DACA rescission arbitrary and capricious where the Secretary failed to give any consideration to a less sweeping policy change); *Doe v. Noem*, 784 F. Supp. 3d 437, 465 (D. Mass. 2025) ("*Doe v. Noem I*") (USCIS failed to consider reasonable alternative of performing screening and vetting as part of an adjudication of immigration benefits rather than pausing adjudications).

Fourth, the Refugee Detention Memo is arbitrary and capricious because it relies on an incorrect legal and factual premise. *Ass'n of Am. Univs. v. DOD*, 792 F. Supp. 3d 143, 176 (D. Mass. 2025) (policy lacked rational basis where it relied on an assumption that was wrong). The Memo justifies detention as furthering the "public policy interest in thorough vetting," Refugee Detention Memo at 3, but § 1159 does not permit a re-vetting, let alone the boundless fishing expedition the Memo promotes. Rather, § 1159 requires that a refugee be granted adjustment of status if their status has not been terminated, they have been present in the U.S. for at least one year, and they are admissible. *State Farm*, 436 U.S. at 43 (an agency action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider").

Moreover, the Memo "failed to consider an important aspect of the problem," *id.*, namely that refugees are the most thoroughly vetted group of noncitizens who are admitted to the United States, *see* 8 U.S.C. § 1152 *et seq.*, and that there are mechanisms in place to address any concerns that may arise after a refugee's admission. *Doe v. Noem*, 817 F. Supp. 3d 27, 49 (D. Mass. 2026) ("*Doe v. Noem II*") (USCIS suggestion that minimal vetting justified agency action ignored "extensive vetting" required by programs at issue). For example, refugees must advise USCIS of any address change within 10 days of moving. 8 U.S.C. § 1305. If a refugee poses a public safety

31

threat after they arrive in the United States because they, for example, commit a violent crime, then they can be placed in removal proceedings and potentially detained during those proceedings. *Id*. § 1227(a)(2) (setting forth grounds on which admitted noncitizens can be removed based on criminal offenses); *id*. § 1226(c) (detention of noncitizens with certain criminal convictions); *Matter of D-K-,* 25 I&N Dec. at 769 (finding refugees subject to the grounds of deportability found in 8 U.S.C. § 1227(a)).

In addition, the Refugee Detention Memo makes no mention of USCIS policies to freeze the adjudication of pending adjustment of status applications, including, (1) a USCIS memorandum issued on November 21, 2025, placing an immediate hold on the adjudication of all adjustment of status applications for refugees who had been admitted between January 20, 2021 to February 20, 2025, SUF ¶ 56, and (2) two memoranda, issued on December 2, 2025 and January 1, 2026, placing an adjudication hold on all immigration benefits applications for all individuals from countries listed in two Presidential Proclamations barring entry of nationals from many countries. SUF ¶¶ 57, 58. Thus, USCIS itself has stopped tens of thousands of refugees with pending applications from adjusting status after one year, greatly expanding the number of people subject to the Refugee Detention Memo.

Fifth, the Refugee Detention Memo claims that the prior system "may have failed to flag refugees who posed risks," Refugee Detention Memo at 6, SUF ¶ 52, but DHS cannot rely on speculation to justify a dramatic change in policy. DHS also provides no evidence to support its claim that prior policies "prioritized speed and volume of refugee admissions over depth and quality." Refugee Detention Memo at 6; *see Doe v. Noem II*, 817 F. Supp. 3d at 50 (DHS reliance on "unsupported allegations regarding insufficient vetting and fraud" was arbitrary and capricious).

32

Sixth, the Refugee Detention Memo is arbitrary and capricious because, under DHS's new regime, compliance with § 1159 is impossible. A refugee would have to apply for adjustment of status far enough in advance and have their adjustment application decided no earlier and no later than their 366th day in the United States to avoid potential mandatory detention. This policy makes no sense, because more than 145,000 refugees have adjustment of status applications pending with USCIS and applications take an average of 34.3 months to process.[6] It is even more nonsensical given that those refugees who have adjustment of status applications pending do not qualify as "voluntarily returning to custody" under the Refugee Detention Memo. SUF ¶ 49; *see* Refugee Detention Memo at 3. The Memo does not say, for example, that refugees will have a way to voluntarily appear on their 366th day to be interviewed for adjustment of status to avoid arrest and detention. *See Minnesota v. USDA*, 826 F. Supp. 3d 975, 1003 (D. Minn. 2026) (agency action that made compliance impossible was arbitrary and capricious).

Seventh, DHS's reliance on the "USCIS Review" of recently admitted refugees to justify a mandatory, potentially indefinite detention policy is arbitrary and capricious. SUF ¶ 53. Rather than submit the actual "review," the CAR contains just a two-page memo summarizing the review of the records of over 31,000 individuals who were admitted as refugees between 2021 and 2024 from just five Latin American countries (5-Country Refugee Review Memo). SUF ¶ 75. The CAR contains no data from any other country or region, and USCIS does not explain why or how these countries or individuals were selected for the study or disclose anything about the individuals whose files were reviewed, making it impossible to know whether the case sample even of refugees from these five countries is representative. Creating a sweeping policy directed toward hundreds

---

[6] USCIS, *Immigration and Citizenship Data*, *FY22 Appropriations Reporting Requirement - Application Processing Data for April 2026* (June 15, 2026), *available for download at* https://www.uscis.gov/tools/reports-and-studies/immigration-and-citizenship-data.

of thousands of resettled refugees from all over the world, based on a study analyzing individuals from just a small subset of countries from one region and with no discussion of selection criteria for its sample size, is plainly arbitrary and capricious. *See Dist. Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46, 56–57 (D.C. Cir. 2015) ("[R]eliance on a report or study without ascertaining the accuracy of the data contained in the study or the methodology used to collect the data is arbitrary" (citation omitted)).

USCIS says the 5-country USCIS Review was conducted to identify potential public safety concerns, which USCIS identifies as "tattoos that are consistent with suspected gang membership," but there are several problems with this approach. SUF ¶ 76. Initially, USCIS does not explain why evidence of tattoos that are consistent with suspected gang membership found in a small number of cases justifies a policy of indiscriminate mandatory detention. *Id.; see State Farm*, 463 U.S. at 43 (an agency rule is arbitrary and capricious if it "offered an explanation for its decision that runs counter to the evidence before the agency"). Nor does USCIS explain its conclusory statement in the Memo that the review demonstrates a "likelihood of other similar failures in screening of refugees from other parts of the world." SUF ¶ 52. USCIS does not claim, for example, that gangs are prevalent in other parts of the world, or that tattoos are an indicator of gang membership in any other country. In the 5-Country Review, USCIS also does not disclose the substance of the guidance it used to identify public safety indicators with tattoos. USCIS_AR074.[7] Without examining the underlying documents USCIS is relying on to tie particular tattoos with suspected gang membership, it is impossible to know whether those indicators are reasonable or grounded in reliable evidence and so USCIS has failed to justify the policy. In addition, the Review fails to mention let alone consider the significant documented

---

[7] USCIS cites to two documents in a footnote, but the links are inoperable. USCIS_AR074 n.1.

concerns with using tattoos as reliable indicia of gang membership in the first place.[8] *Massachusetts*, 770 F. Supp. 3d at 307 ("failure to grapple with relevant factors and facts" was arbitrary and capricious).

Finally, consideration of reliance interests is "a critical factor in the analysis of an arbitrary-and-capricious claim." *Am. Hosp. Ass'n v. Kennedy*, 164 F.4th 28, 33 (1st Cir. 2026). Yet DHS failed to adequately consider the "serious reliance interests" that its longstanding policy engendered. The Memo first disclaims any valid reliance interest, saying the statutory mandate for detention is clear. SUF ¶ 54. But this is incorrect and runs counter to DHS's longstanding interpretation. *Supra* 11–13. The Memo then relies on a claim that refugees are told that they need to apply for adjustment of status after one year in the United States, *see* Refugee Detention Memo at 6, but does not claim that refugees have been advised that they will be subject to mandatory detention if they fail to do so at exactly the right time. There would be no reason for refugees to receive such notice, because it has never been the policy.

DHS also mentions the very real consequences that can flow from detention, such as financial consequences from missing work, unmet household and family obligations, and a delay in securing representation, but then cursorily dismisses them as "strongly outweighed by the public policy interest in full compliance with the statute." *Id.* at 6–7. Detention of unadjusted refugees does not comply with § 1159; it violates that statute. *See supra* 10–18. Moreover, the Memo fails to consider other reliance interests that lawfully admitted refugees developed over 45 years. Lawfully admitted refugees uproot their lives and come to the United States relying on a promise

---

[8] *See, e.g.*, Just Security, *The Missing Due Process for Gang Allegations* (March 26, 2025), https://perma.cc/QR44-8N66 ("[T]here is a long history of immigration agencies using tattoos and a set of notoriously flawed gang databases to bring false or weak claims of gang involvement."); Beth C. Caldwell, *Why tattoos are such an unreliable marker of gang membership*, The Conversation (Apr. 3, 2025), https://perma.cc/PUL3-JU9S.

that they can become lawful permanent residents after one year. Detention was never considered as a potential risk for law-abiding refugees or organizations that serve them when they chose to resettle in the United States. The Memo also ignored that refugee status confers significant benefits, such as indefinite work authorization, access to identification documents such as driver's licenses, and mandatory non-discretionary adjustment of status after one year if they meet the legal requirements set out in § 1159 (as opposed to extra-statutory factors like those identified in the Memo). DHS's failure to consider these significant interests and weigh them against the purported benefits of a mandatory detention regime was arbitrary and capricious. *Bowser v. Noem*, No. 26-CV-10382-AK, 2026 WL 555624, at \*8 (D. Mass. Feb. 27, 2026) (conclusory explanation in USCIS memo placing hold on adjudication of immigration benefits was insufficient to explain how the agency weighed competing factors or considered the consequences and burdens imposed on applicants); *Doe v. Noem II*, 817 F Supp 3d at 46–47 (DHS failed to adequately consider the reliance interests of parolees who were invited to apply by the U.S. government and were in line to adjust to lawful permanent resident status).

Given the very real reliance interests at stake for a vulnerable population invited to this country and the actions of USCIS itself in preventing refugees from adjusting, the Memo falls far short of providing a reasoned explanation or detailed justification necessary to justify departing from 45 years of prior practice and is therefore arbitrary and capricious.

### C. Defendants Failed to Comply with Notice-and-Comment Procedures in Issuing the Memoranda.

The Refugee Detention Policy also violates the APA's notice-and-comment procedures. The APA generally requires substantive or legislative rules to be promulgated through notice-and-comment rulemaking. 5 U.S.C. § 553. "Failure to abide by these requirements renders a rule procedurally invalid." *N.H. Hosp. Ass'n v. Azar*, 887 F.3d 62, 70 (1st Cir. 2018).

The Refugee Rescission Memo and Refugee Detention Memo are legislative rules. "[A] legislative rule is one that creates rights, assigns duties, or imposes obligations, the basic tenor of which is not already outlined in the law itself." *Id*. at 70 (internal quotation omitted). The Refugee Detention Memo assigns duties and imposes obligations on refugees not already outlined in the law by rewriting longstanding policies and practice that until the challenged actions (1) prohibited detaining lawfully admitted refugees for failure to adjust status after one year, (2) understood § 1159(a)(1)'s reference to "custody" to mean that the limited purpose of § 1159 was solely to allow USCIS to determine whether the refugee will be adjusted to lawful permanent resident status, and (3) only permitted ongoing detention of a refugee if removal proceedings had been initiated against them based on their individual circumstances. The Refugee Detention Policy upends the long-settled understanding of the Refugee Act and the INA in ways that impose a significant obligation on refugees: to voluntarily return to the custody of DHS after one year in the United States or be subject to warrantless arrest and indefinite detention.

The Refugee Rescission and Refugee Detention Memos also are legislative rules because they are in tension with and alter obligations imposed by an existing regulation: 8 C.F.R. § 209.1. *N.H. Hosp. Ass'n*, 887 F.3d at 73 (in determining whether a rule is legislative courts "look to whether the rule is 'inconsistent with another rule having the force of law,' or otherwise "alter[s] or enlarg[es] obligations imposed by a preexisting regulation'") (internal quotations omitted). The current regulation addressing refugee adjustment of status does not contemplate the arrest or detention of adjusted refugees if they fail to voluntarily return to "custody" after one year in the United States. In fact, 8 C.F.R. § 209.1 makes no reference to arrest or detention, nor does it even require a refugee to appear for an adjustment of status interview in all cases. 8 C.F.R. § 209.1(b), (d) ("sole and exclusive procedure for adjustment of status by a refugee," provides that USCIS

37

decides whether to call in refugees for an interview on a case-by-case basis). The 2010 ICE Policy correctly interpreted 8 C.F.R. § 209.1 to not permit detention of refugees on the basis that they had not adjusted status. By rescinding that Policy, the Refugee Rescission Memo reversed course on that interpretation and therefore altered obligations imposed by that regulation. The Refugee Detention Memo's reinterpretation of a requirement to adjust status after one year into a requirement to voluntarily return to the custody of DHS at the one-year mark or be subject to warrantless arrest and indefinite detention also plainly "alters or enlarges obligations imposed by a preexisting regulation." *N.H. Hosp. Ass'n*, 887 F.3d at 73 (citation modified).

Because the Refugee Rescission and Detention Memos "announce[] a new policy on a matter of considerable import," *id*. at 74, they are legislative rules. DHS' failure to engage in notice and comment rulemaking therefore renders them invalid under Section 706(2)(D).

## II. The Court Should Vacate Both Memos in their Entireties and Declare Them Unlawful.

Because Plaintiffs have demonstrated that they are entitled to summary judgment on their APA claims, the proper remedy is to vacate the Refugee Rescission and Refugee Detention Memos in their entireties, not just as to Plaintiffs, and to declare them unlawful.

The APA directs federal courts to "hold unlawful and set aside" an agency action that is in excess of the agency's statutory authority, is arbitrary and capricious, was issued without observing required procedures, or that otherwise violates the APA. 5 U.S.C. § 706(2). "[T]he text and history of the APA, [and] the longstanding and settled precedent adhering to that text and history," make clear that to "set aside" an unlawful agency action means to "vacat[e]" that action. *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 829 (2024) (Kavanaugh, J., concurring); *see, e.g.*, *Ass'n of Am. Univs. v. DOD*, 806 F. Supp. 3d 79, 120–21 (D. Mass. 2025) (To 'set aside' agency action is to 'annul or vacate' it." (citations omitted)).

38

Vacatur is warranted here. The "normal remedy for a successful APA challenge is vacatur of the rule and its applicability to all those who would have been subject to it." *Ass'n of Am. Univs. v. Nat'l Sci. Found.*, 788 F. Supp. 3d 106, 139 (D. Mass. 2025). And vacatur is the only appropriate remedy because the Refugee Rescission and Refugee Detention Memos are both contrary to law and issued without observance of required procedure. *See Ass'n of Am. Univs.*, 806 F. Supp. 3d at 123–24 (agency action that is contrary to law must be vacated); *Nat. Res. Def. Council v. Wheeler*, 955 F.3d 68, 85 (D.C. Cir. 2020) (agency action issued without notice-and-comment must be vacated). And while remand without vacatur might sometimes be appropriate where an agency action violates the APA because of "flaws in [the] agency's explanation," that is true only where the errors are not particularly severe and can likely be mended on remand. *Cent. Me. Power Co. v. FERC*, 252 F.3d 34, 48 (1st Cir. 2001). Here, for the reasons explained above, the legal flaws in the challenged memoranda were grievous and are not amenable to being cured on remand.

Nor can vacatur be limited to the parties before the Court. Vacatur under the APA is not a party-specific remedy. "When a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed." *Corner Post*, 603 U.S. at 831 (Kavanaugh, J., concurring) (quoting *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989)); *see, e.g.*, *Make the Rd. New York v. Noem*, No. 25-5320, 2025 WL 3563313, at *36 (D.C. Cir. Nov. 22, 2025) (holding that "the APA's remedial [framework]" is not "confined to party-specific remedies"); *Massachusetts v. Dep't. of Ed.*, --- F. Supp. 3d -----, 2026 WL 1114877, at *12 (D. Mass. 2026) (similar); *Illinois v. FEMA*, 801 F. Supp. 3d 75, 97 (D.R.I. 2025) (similar); *Am. Hosp. Ass'n*, 820 F. Supp. 3d at 46–47 (similar); *Massachusetts*, 770 F. Supp. 3d at 329 (similar).

39

In addition, the Court should declare the challenged memoranda contrary to law. *See* 5 U.S.C. § 703 (permitting "declaratory judgments" under the APA); Compl., ECF 1, Prayer for Relief, ¶ 1 (requesting such relief). Specifically, for the reasons explained above, the Court should declare that the Refugee Rescission and Refugee Detention Memos are contrary to law because (1) Defendants lack legal authority under the INA to arrest or detain refugees absent pending removal proceedings, (2) the memoranda did not undergo required notice and comment procedures, and (3) the memoranda are arbitrary and capricious under the APA. Issuing declaratory relief is appropriate and necessary even where vacatur is an available remedy in APA cases. *See, e.g.*, *Union de Empleados de Muelles de P.R., Inc. v. Int'l Longshoremen's Ass'n*, 884 F.3d 48, 58 (1st Cir. 2018) (explaining purpose of declaratory judgment "is to determine the rights and obligations of the parties so that they can act in accordance with the law"); *Ass'n of Am. Univs.*, 788 F. Supp. 3d at 143 (issuing declaratory relief in APA case).

Accordingly, the Court should vacate the challenged memoranda without limiting that relief to the parties before the court and declare them unlawful for the reasons explained above.

## CONCLUSION

For these reasons, the Court should declare the Memos unlawful, vacate them, and grant Plaintiffs summary judgment on Counts I–IV.

40

Dated: July 24, 2026                     By:

Ghita Schwarz (NY Bar No. 3030087)*
Guadalupe Aguirre (NY Bar No. 5536107)*
Mevlüde Akay Alp (NY Bar No. 5149653)*
Kimberly Grano (NY Bar No. 5858808)*
Pedro Sepulveda (NY Bar No. 6198550)*
**INTERNATIONAL REFUGEE
ASSISTANCE PROJECT**
One Battery Plaza, 33rd floor
New York, New York 10004
(646) 939-9169
gschwarz@refugeerights.org
laguirre@refugeerights.org
makayalp@refugeerights.org
kgrano@refugeerights.org
psepulveda@refugeerights.org
mhauptman@refugeerights.org

Dalia Fuleihan (IL Bar No. 6335082)*
**INTERNATIONAL REFUGEE
ASSISTANCE PROJECT**
P.O. Box 47611
Chicago, IL 60647
646-740-6271
dfuleihan@refugeerights.org

John Nathanson (NY Bar No. 2630697)*
Andrew Tannenbaum (NY Bar No. 3940434)*
Leila Siddiky (NY Bar No. 5225164)*
**ALLEN OVERY SHEARMAN STERLING
US LLP**
599 Lexington Avenue
New York, NY 10022
212-848-4000
john.nathanson@aoshearman.com
andrew.tannenbaum@aoshearman.com
leila.siddiky@aoshearman.com

Emily Westridge Black (TX Bar No. 24060815)*
**ALLEN OVERY SHEARMAN STERLING
US LLP**
300 West 6th Street
Austin, TX 78701
512-647-1909

*/s/ Erez Reuveni*
Erez Reuveni (CA Bar No. 264124)*
Jennie L. Kneedler (DC Bar No. 500261)*
Ryan Cooper (DC Bar No. 1645301)*
Kali Schellenberg (MA BBO No. 694875)
Steven Y. Bressler (DC Bar No. 482492)*
Robin F. Thurston (DC Bar No. 1531399)*
**DEMOCRACY FORWARD FOUNDATION**
P.O. Box 34553
Washington, DC 20043
Phone: (202) 316-9538
ereuveni@democracyforward.org
jkneedler@democracyforward.org
rcooper@democracyforward.org
kschellenberg@democracyforward.org
sbressler@democracyforward.org
rthurston@democracyforward.org

*Counsel for All Plaintiffs*
* Admitted *pro hac vice*

emily.westridgeblack@aoshearman.com

Gideon J. Duke-Cohan (BBO# 716358)
**ALLEN OVERY SHEARMAN STERLING**
**US LLP**
One Beacon Street
Boston, MA 02108
212-610-6353
gideon.duke-cohan@aoshearman.com

**CERTIFICATE OF SERVICE**

I hereby certify that on this July 24, 2026, I caused the foregoing to be electronically filed with the clerk of the court for the U.S. District Court for the District of Massachusetts by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record, a true and correct copy of the foregoing instrument and all attachments.

*/s/ Erez Reuveni*
Erez Reuveni