**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

JEAN A., *et al.*,

      *Plaintiffs*,

v.

KRISTI NOEM, in her official capacity as
Secretary of Homeland Security, *et al.*,

      *Defendants*.

Case No. 3:26-cv-30031-RGS

**PLAINTIFFS' STATEMENT OF UNDISPUTED MATERIAL FACTS**

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1, Plaintiffs set forth the following undisputed facts material to their motion for partial summary judgment.

## I.    Refugee Adjustment of Status and Termination of Refugee Status

1. A "refugee" is defined in the Immigration and Nationality Act (INA) as a person "who is persecuted or who has a well-founded fear or persecution on account of race, religion, nationality, membership in a particular social group, or political opinion" and is either "outside any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided."

   a. 8 U.S.C. § 1101(a)(42).

2. In 1980, Congress amended the INA by enacting the Refugee Act, which embodies "the historic policy of the United States to respond to the urgent needs of persons subject to persecution in their homelands, including, where appropriate, humanitarian assistance for their care and maintenance in asylum areas, efforts to promote opportunities for resettlement or voluntary repatriation, aid for necessary transportation and processing, admission to this country of refugees of special humanitarian concern to the United States, and transitional assistance to refugees in the United States."

   a. Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102, (1980); *id.* § 101(a).

3. Through the Refugee Act, Congress sought to "provide a permanent and systematic procedure for the admission . . . of refugees of special humanitarian concern to the United States, and to provide comprehensive and uniform provisions for the effective resettlement and absorption of those refugees who are admitted."

   a. *Id*. § 101(b).

4. The Department of Homeland Security (DHS) Secretary is authorized to admit to the United States "any refugee who is not firmly resettled in any foreign country, is determined to be of special humanitarian concern to the United States, and is admissible . . . as an immigrant."

   a. 8 U.S.C. § 1157(c)(1); *see* 8 C.F.R. §§ 207.1–207.7.

5. A refugee's "spouse or child . . . shall . . . be entitled to the same admission status as such refugee if accompanying, or following to join, such refugee and if the spouse or child is admissible . . . as an immigrant under this chapter."

   a. 8 U.S.C. § 1157(c)(2)(A).

6. Refugee status does not expire, as confirmed by a U.S. Citizenship and Immigration Services (USCIS) Handbook for Employers: "Refugees ... are employment eligible incident to their status and are authorized to work indefinitely because their immigration status does not expire."

   a. Ex. A to the Declaration of Pedro Sepulveda ("Sepulveda Decl.") at 1.

7. Once a refugee is admitted, their refugee status may be terminated only if DHS determines that the noncitizen "was not in fact a refugee within the meaning of section 1101(a)(42) of this title at the time of… admission."

    a. 8 U.S.C. § 1157(c)(4); *see* 8 C.F.R. § 207.9.

8. USCIS is required to "notify a [refugee] in writing of its intent to terminate [their] refugee status."

    a. 8 C.F.R. § 207.9.

9. USCIS will provide the refugee "30 days from the date notice is served upon him or her in accordance with 8 CFR 103.8, to present written or oral evidence to show why [their] refugee status should not be terminated."

    a. *Id.*

10. If USCIS terminates a noncitizen's refugee status, the agency then "process[es] the [individual for removal] under sections 235, 240, and 241 of the Act."

    a. *Id.*

11. All individuals admitted as refugees may adjust their status to that of a lawful permanent resident so long as their refugee status has not been terminated and they are not found, upon inspection after one year, to be inadmissible to the United States.

    *a.* 8 U.S.C. § 1159(a)(1); 8 C.F.R. § 209.1; *see* Sepulveda Decl. Ex. S at 68; Sepulveda Decl. Ex. T at 68.

12. One year after entry, a refugee "shall . . . return or be returned to the custody of the Department of Homeland Security for inspection and examination for admission to the United States as an immigrant."

    a. 8 U.S.C. § 1159(a); *see* 8 C.F.R. § 209.1(a)(1).

13. To adjust status to that of lawful permanent resident, refugees must submit an adjustment application and the results of a medical exam, as well as have up-to-date biometrics results.

    a. 8 C.F.R. § 209.1(b)-(c).

14. USCIS determines, on a case-by-case basis, whether an interview is necessary to determine "the refugee's admissibility for permanent resident status."

    a. *Id.* § 209.1(d).

15. USCIS "will notify the refugee in writing of its decision" on their application to adjust status to a lawful permanent resident.

    a. *Id.* § 209.1(e).

16. If the refugee applicant is found to be admissible for permanent residence, USCIS must approve the application, admit the refugee applicant for lawful permanent residence as of the date of the refugee's arrival in the United States, and issue proof of lawful permanent resident status.

   a.  *Id.*; *see* 8 U.S.C. § 1159(a)(2).

17. If USCIS denies the application, it must "notify an applicant of the right to renew the request for permanent residence" in full removal proceedings under 8 U.S.C. § 1229a.

   a.  8 C.F.R. § 209.1(e).

## II.    Defendants' Historical Practice Toward Refugee Adjustment and Detention

18. Following the enactment of the Refugee Act in 1980, the statute's implementing regulations contemplated that a "[n]otice [would] be sent to all refugees after one year to report for an interview."

   a.  Sepulveda Decl. Ex B at 2; *see* Sepulveda Decl. Ex. C at 1.

19. In 1997, the Immigration and Naturalization Service (INS) General Counsel David A. Martin issued a legal opinion entitled "Opinion on whether a personal interview is required for all refugee and asylee adjustment of status applications under INA § 209." ("1997 Martin Opinion").

   a.  Sepulveda Decl. Ex D.

20. The 1997 Martin Opinion considered "the terms of INA sections 209 and 235 together" in order "[t]o determine whether refugees applying for adjustment of status must receive a personal interview."

   a.  *Id.* at 2.

21. The 1997 Martin Opinion stated that ""it seems doubtful that Congress intended the Service to detain refugees applying for adjustment of status. . . . [I]t is reasonable to interpret the term "custody" in § 209(a) to mean something other than physical restraint. It should be understood to mean sufficient control over a [noncitizen] to carry out the purpose of section 209(a)—that is, sufficient control to make a determination of a refugee's admissibility to the United States as an immigrant . . . ."

   a.  *Id.* at 3–4.

22. In 1998, the INS amended the regulations to require interviews not for all refugee applicants seeking adjustment of status, but only on a case-by-case basis.

   a.  Sepulveda Decl. Ex. E.

23. In amending the regulations to require interviews only on a case-by-case basis, the INS explained that "[t]he 'custody' requirement for refugees applying for adjustment of status can be met if the Service maintains sufficient control over the applicants to make a determination of their admissibility to the United States as immigrants and to institute removal procedures if they should be found to be inadmissible for permanent resident status. Additionally, a procedure that requires refugees to apply for adjustment of status

and gives the Service the authority to compel them to appear before an officer of the Service satisfies the requirements of the Act."

   a.  *Id.* at 2.

24. The INS further states that "[i]n requiring refugees seeking permanent residence to submit a Form I-485, the Service constructively places them under its custodial control. At the same time, the direct filing of a Form I-485 with the service center enable the INS to exercise discretion in determining when an in-person interview with the applicant is necessary. With this streamlined process, the Service can enhance customer service and make more effective use of Service resources."

   a.  *Id.*

25. On November 9, 2001, INS General Counsel Bo Cooper issued a memorandum entitled "Removal of Persons Admitted as Refugees Pursuant to Section 207" ("2001 INS Memo").

   *a.*  Sepulveda Decl. Ex. S at 1–6; Sepulveda Decl. Ex. T at 1–6.

26. The 2001 INS Memo explained that the "use of the phrase 'return or be returned to the custody of the Service' indicates that the Service has authority to detain a refugee for the purpose of inspection and examination of the refugee for adjustment of status if the [noncitizen] fails to apply. The statutory language both imposes a requirement on the [noncitizen] and empowers the Service with the means to enforce the requirement."

   a.  Sepulveda Decl. Ex. S at 3; Sepulveda Decl. Ex. T at 3.

27. The 2001 INS Memo further states that Service officers, however, must comply with the requirements of 8 CFR § 287.3(c) when it takes a refugee into custody for examination and inspection. This provision requires Service officers to make a determination, within 48 hours of arrest, whether to continue to maintain custody of the [noncitizen] and whether to issue a notice to appear."

   a.  *Id.*

28. The 2001 INS Memo further states that "a refugee may be inspected and examined for adjustment of status under § 209 even if he or she refuses to submit a Form I-485."

   a.  Sepulveda Decl. Ex. S at 4; Sepulveda Decl. Ex. T at 4.

29. On May 10, 2010, ICE Director James Chaparro issued a memorandum entitled "Detention of Refugees Admitted under INA § 207 Who Have Failed to Adjust to Lawful Permanent Resident Status" ("2010 ICE Policy").

   a.  Sepulveda Decl. Ex. S at 21–25; Sepulveda Decl. Ex. T at 21–25.

30. Through the 2010 ICE Policy, DHS maintained the position that a refugee's failure to "apply for adjustment of status under [section 209(a) of the INA]] is not a sufficient ground to place them in removal proceedings, and "therefore not a proper basis for detaining them."

     *a.* Sepulveda Decl. Ex. S at 22; Sepulveda Decl. Ex. T at 22.

31. Accompanying implementation guidance to the 2010 ICE Policy, entitled "When to Detain Refugees Admitted Under INA § 207 Who Have Failed to Adjust to Lawful Permanent Resident Status: Key Points," ("Implementation Guidance") more broadly states that a "[f]ailure to adjust status in accordance with the provisions of INA § 209(a) does not in itself constitute grounds for removability for an unadjusted refugee" and instructs officers to "not take an unadjusted refugee into custody unless you have a 'reasonable belief' that the [noncitizen] is removable."

     a. Sepulveda Decl. Ex. S at 25; Sepulveda Decl. Ex. T at 25.

32. The Implementation Guidance further states that "[r]emovability will generally relate to criminal misconduct or immigration fraud, including, possibly fraud related to the initial resettlement in the United States. *See* INA §§ 212(a)(2), (a)(6)(C), 237(a)(1)(A), or (a)(2)."

     a. *Id.*

33. The 2010 ICE Policy did not address the government's detention authority over refugees who had applied for adjustment of status, but whose applications had not yet been adjudicated.

     a. *See* Sepulveda Decl. Ex. S at 21–25; Sepulveda Decl. Ex. T at 21–25.

34. The government's authority to detain certain noncitizens is codified at 8 U.S.C. §§ 1225, 1226, 1231, and 1357.

     a. *See* 8 U.S.C. § 1225; 8 U.S.C. § 1226; 8 U.S.C. § 1231; 8 U.S.C. § 1357.

35. Under 8 U.S.C. § 1225(b), DHS's detention authority is limited to the "inspection" process for certain "applicants for admission" who are "arriving in the United States" and certain others "who have not been admitted or paroled" and who are detained for removal proceedings.

     a. 8 U.S.C. § 1225(a), (b).

36. Under 8 U.S.C. § 1226, DHS may only detain a noncitizen "[o]n a warrant issued by the Attorney General . . . pending a decision on whether the [noncitizen] is to be removed from the United States."

     a. *Id.* § 1226(a).

37. Under 8 U.S.C. § 1231, detention is authorized when a "[noncitizen] has been ordered removed."

     a. *Id.* § 1231(a).

38. Under 8 U.S.C. § 1357(a)(2), DHS may make warrantless arrests "if he has reason to believe" that an individual "is in the United States in violation of [the immigration laws] and is likely to escape before a warrant can be obtained for his arrest."

   a. *Id*. § 1357(a)(2).

39. U.S. regulations further provide that a warrantless civil immigration arrest is permissible only when there is "reason to believe that the person to be arrested has committed an offense against the United States or is a[] [noncitizen] illegally in the United States."

   a. 8 C.F.R. § 287.8(c)(2)(i).

40. U.S. regulations further state that in the case of anyone arrested without a warrant, "a determination will be made within 48 hours of the arrest, except in the event of an emergency or other extraordinary circumstance in which case a determination will be made within an additional reasonable period of time, whether the noncitizen will be continued in custody or released on bond or recognizance and whether a notice to appear and warrant of arrest as prescribed in 8 CFR parts 236 and 239 will be issued."

   a. *Id.* § 287.3(d).

41. Additionally, 8 U.S.C. § 1226(c) states: "the Attorney General shall take into custody any [noncitizen] who" is inadmissible or deportable under select grounds, such as based on criminal conduct or terrorist activity, "when the [noncitizen] is released."

   a. 8 U.S.C. § 1226(c).

## III.    Defendants' New Refugee Detention Policy

42. The 2010 ICE Policy prohibiting the detention of unadjusted refugees merely because they had not applied for adjustment of status was in effect from May 10, 2010 to December 18, 2025.
   a. *See* Sepulveda Decl. Ex. S at 21–25, 76; Sepulveda Decl. Ex. T at 21–25, 76.

43. On December 18, 2025, ICE Acting Executive Associate Director Marcos Charles issued a one-paragraph memorandum entitled "Recission ICE Policy No. 11039.1: *Detention of Refugees Admitted under INA § 207 Who Have Failed to Adjust to Lawful Permanent Resident Status*" ("Refugee Rescission Memo"), which rescinded the 2010 ICE Policy.

   a. Sepulveda Decl. Ex. S at 76; Sepulveda Decl. Ex. T at 76.

44. The Refugee Rescission Memo did not include a factual basis or legal analysis for rescinding the 2010 ICE Policy and instead only provided as rationale a one-sentence reference to a December 16, 2025 President Proclamation entitled *Restricting and Limiting the Entry of Foreign Nationals to Protect the Security of the United States*.

   a. *Id.*

45. The Refugee Rescission Memo was not made public until January 31, 2026, after a class action habeas corpus lawsuit, *U.H.A. v. Bondi*, No. 26-417 (JRT/DLM), (D. Minn.), challenging the indefinite detention of refugees in Minnesota was filed in the U.S. District Court of Minnesota.

   a. *See U.H.A. v. Bondi*, 822 F. Supp. 3d 1007, 1025 (D. Minn. 2026).

46. On February 18, 2026, USCIS Director Joseph B. Edlow and Senior Official Performing the Duties of the Director Todd M. Lyons issued a memorandum entitled "Detention of Refugees who have failed to Adjust to Lawful Permanent Resident Status" ("Refugee Detention Memo"), which states that the Refugee Detention Memo, a "new policy," provides "the policy of [USCIS] and [ICE] regarding when, and under what circumstances, immigration officers may detain refugees who have failed to adjust to lawful permanent resident (LPR) status." (Together with the Refugee Rescission Memo, the "Refuge Detention Policy."). It further states that "USCIS and ICE have determined that prior policy decisions and operational guidance resulted in incomplete implementation of the requirements of [8 U.S.C. § 1159]".

   a. Sepulveda Decl. Ex. S at 77–83; Sepulveda Decl. Ex. T at 77–83.

47. The Refugee Detention Memo was made public that same day, on February 18, 2026, through a filing in *U.H.A. v. Bondi*, No. 26-417 (JRT/DLM), (D. Minn.).

   a. *See U.H.A. v. Bondi*, 822 F. Supp.3d at 1025–26, 1026 n.21.

48. The Refugee Detention Memo further states: "DHS rescinded the [2010 ICE Policy] on December 18, 2025.[] While ICE believes the December rescission is valid, DHS has undertaken a fresh look at the past policies and rescinds them anew."

   *a.* Sepulveda Decl. Ex. S at 78; Sepulveda Decl. Ex. T at 78.

49. The Refugee Detention Memo further states that "[w]hen a refugee is admitted to the United States, the admission is conditional and subject to a mandatory review after one year of physical presence in the United States under INA § 209(a)(1), 8 U.S.C. § 1159(a)(1).[] This provision requires that unadjusted refugees 'return or be returned to [DHS] [sic] custody' for inspection and examination for admission to the United States. Refugees may be considered to have voluntarily returned to custody by submitting and application to adjust status and appearing at scheduled interviews or appointments pertaining to their adjustment of status application . . . However, if a refugee does not voluntarily return at the one-year mark" DHS is required "to take the affirmative actions of locating, arresting, and taking the [refugee] into custody."

   a. Sepulveda Decl. Ex. S at 77–78; Sepulveda Decl. Ex. T at 77–79.

50. Furthermore, the Refugee Detention Memo states that refuges are subject "to the same detention-and-inspection framework that applies to other applicants for admission," and "detention during this process is expected and required" merely because 8 U.S.C § 1159(a)(1) "expressly requires that the inspection and examination at the one-year mark be conducted 'in accordance with' INA § 235, 8 U.S.C. § 1225, among other provisions."

a. Sepulveda Decl. Ex. S at 80; Sepulveda Decl. Ex. T at 80.

51. The Refugee Detention Memo further states: "Detention under INA § 209(a)(1), 8 U.S.C. § 1159(a)(1), is not novel. Several courts have recognized that the detention of unadjusted refugees is pursuant to INA § 209(a)(1), 8 U.S.C. § 1159(a)(1). [compiling cases *infra* ¶ 72, except for *Jennings v. Rodriguez*, 583 U.S. 281 (2018)] . . . While in detention, such aliens are inspected and examined for admission to the United States as an immigrant. Thus detention, pursuant to INA § 209(a)(1), 8 U.S.C. § 1159(a)(1), is not indefinite, but it is also not limited to merely 48 hours. Instead, it may last for the reasonable length of time it takes to inspect and examine the alien to determine whether he or she is admissible."

a. Sepulveda Decl. Ex. S at 79–80; Sepulveda Decl. Ex. T at 79–80.

52. In support of its rescission of prior policies, including the 2010 ICE Policy, the Refugee Detention Memo states that the "[t]he prior policies significantly impeded full vetting, because refugees were able to avoid reinspection or were subject to only an artificially time-limited vetting process. As a consequence, the system may have failed to flag refugees who posed risks to public safety or national security, who had a background of fraud, or who were ineligible for permanent residency."

a. Sepulveda Decl. Ex. S at 81; Sepulveda Decl. Ex. T at 81.

53. The Refugee Detention Memo further states: "A USCIS review of recently admitted refugees from just the Western Hemisphere illustrates some of the failures that have resulted from [the prior policies]. Specifically, USCIS Fraud Detention and National Security found that of 31,000 refugees admitted to the United States from Ecuador, El Salvador, Guatemala, Honduras, and Venezuela from 2021 to 2024: []10% had evidence of public safety concerns, including gang membership, that were not addressed. []Over 42% had been insufficiently vetted to determine whether they presented a public safety concern due to an inability to fully verify identity. []Less than 47% could be conclusively found to not represent a public safety concern. In light of these known failures, and the likelihood of other similar failures in screening of refugees from other parts of the world, DHS believes the course correction described in this memorandum is critically important."

a. Sepulveda Decl. Ex. S at 81–82; Sepulveda Decl. Ex. T at 81–82.

54. The Refugee Detention Memo further states: "DHS has carefully considered whether any reliance interests may be affected by the new policy", but that "DHS believes any such claimed reliance would be misguided in light of the clear existing statutory and regulatory requirements. Even if any reliance were valid, however, DHS believes these potential interests are strongly outweighed by the public policy interest in full compliance with the statute. Similarly, any such interests are also outweighed by the public interest in thorough vetting for the purposes of protecting national security and public safety, and for reducing fraud."

a. Sepulveda Decl. Ex. S at 82; Sepulveda Decl. Ex. T at 82.

55. The Refugee Rescission Memo and the Refugee Detention Memo were not published as part of a Notice of Proposed Rulemaking for notice and comment or otherwise published in the Federal Register.

    a. *See* Sepulveda Decl. Ex F at 4–6.

## IV.    Defendants' Targeting of Refugees under the Trump Administration

56. On November 21, 2025, USCIS Director Joseph B. Edlow issued a memorandum entitled "Reinterview of Certain Refugees Admitted to the United States and an Immediate Hold on Certain Refugees with a Pending I-485 Application to Register Permanent Residence or Adjust Status" ("November 21 Edlow Memo"), which, "effective immediately" directed USCIS to, "hold all pending Form I-485, Application to Register Permanent Residence or Adjust Status (Form I-485) for [noncitizens] who were admitted as refugees (both principal and derivative refugees) from January 20, 2021, to February 20, 2025," with the purpose, among other things, of "ensur[ing] that all principal refugees admitted to the United States warranted a favorable exercise of discretion[.]"

    a. Sepulveda Decl. Ex. G; *id.* at 2, 3.

57. On December 2, 2025, USCIS issued a policy memorandum entitled "Hold and Review of all Pending Asylum Applications and all USCIS Benefit Applications Filed by Aliens from High-Risk Countries", which "effective immediately" directed USCIS personnel to "[p]lace a hold on pending benefit requests[] for [noncitizens] from countries listed in Presidential Proclamation (PP) 10949, Restricting the Entry of Foreign Nationals To Protect the United States From Foreign Terrorists and Other National Security and Public Safety Threats,[] pending a comprehensive review, regardless of entry date[] and . . . [c]onduct a comprehensive re-review of approved benefit requests for aliens from countries listed in PP 10949 who entered the United States on or after January 20, 2021."

    a. Sepulveda Decl. Ex. H; *id.* at 1.

58. On January 1, 2026, USCIS issued a policy memorandum entitled "Hold and Review of USCIS Benefit Applications Filed by Aliens from Additional High-Risk Countries", which "effective immediately" directed USCIS personnel to "[p]lace a hold[] on all pending benefit applications, for [noncitizens] listed[] in Presidential Proclamation (PP) 10998, Restricting and Limiting the Entry of Foreign Nationals To Protect the Security of the United States,[] pending a comprehensive review, regardless of entry date[] . . .[c]onduct a comprehensive review of all policies, procedures, and screening and vetting . . ."

    a. Sepulveda Decl. Ex. I; *id.* at 1.

59. On January 9, 2026, USCIS announced "Operation PARRIS" to "target[]" "fraudulent refugee applications in Minnesota" by "reexamining thousands of refugee cases through new background checks and intensive verification of refugee claims."

    a. Sepulveda Decl. Ex. J.

60. USCIS further announced that "[t]he initial focus [of Operation PARRIS] is on Minnesota's 5,600 refugees who have not yet been given lawful permanent resident

status (Green Cards)."

    a. *Id*.

61. In the days immediately following the January 9, 2026 announcement, the government began a program of arresting and detaining refugees in Minnesota who had not yet adjusted status to that of lawful permanent resident, including refugees who had applied for LPR status and whose applications had not been adjudicated. The refugees arrested and detained were arrested without warrants and without any notice of any charge of removability.

    a. *U.H.A. v. Bondi*, 817 F. Supp. 3d 752, 759-60 (D. Minn. 2026); *U.H.A. v. Bondi,* 822 F. Supp. 3d 1007, 1021-22 (D. Minn. 2026).

62. Dozens of lawfully present refugees were taken without warning from their homes or cars and detained in a facility outside Minneapolis and/or flown in shackles to detention centers in Texas.

    a. *U.H.A. v. Bondi*, 817 F. Supp.3d 752, 760-61 (D. Minn. 2026); *U.H.A. v. Bondi,* 822 F. Supp. 3d 1007, 1021-22 (D. Minn. 2026).

63. On January 24, 2026, five unadjusted refugees residing in Minnesota and a refugee-serving nonprofit organization filed a class action habeas case that also sought to prevent continuation of the warrantless arrest and detention program.

    a. *See U.H.A. v. Bondi*, No. 26-417 (JRT/DLM), (D. Minn.).

64. On January 28, 2026, the U.S. District Court in Minnesota issued a temporary restraining order on behalf of a putative Class defined as "[a]ll individuals with refugee status who are residing in the state of Minnesota, who have not yet adjusted to lawful permanent resident status, and have not been charged with any ground for removal under the Immigration and Nationality Act" and enjoined the practice of "arresting or detaining any member of the Class on the basis that they are a refugee who has not been adjusted to lawful permanent resident status."

    a. *U.H.A. v. Bondi*, 817 F. Supp. 3d 752, 772-73 (D. Minn. 2026).

65. Several other district courts in Minnesota, ruling on individual habeas petitions of unadjusted refugees, came to similar conclusions.

    a. *See, e.g., Darvin M. v. Bondi,* 817 F. Supp. 3d 740 (D. Minn. 2026); *S.M. v. Bondi*, No. CV 26-639 (JRT/DTS), 2026 WL 254582 (D. Minn. Feb. 1, 2026); *Jerson A.D.G. v. Bondi*, No. 26-516 (DWF/SGE), 2026 WL 207352 (D. Minn. Jan. 27, 2026); *Serhii L. v. Bondi,* No. 26-CV-463 (KMM/EMB), 2026 WL 184736 (D. Minn. Jan. 24, 2026); *Aleksander B. v. Trump*, No. 26-CV-170 (KMM/DJF), 2026 WL 172435 (D. Minn. Jan. 22, 2026); *Mohamednoor A. v. Bondi,* No. 26-CV-525 (ECT/ECW), 2026 WL 221926 (D. Minn. Jan. 28, 2026); *Jama A.O. v. Bondi*, 2026 WL 185767 (D. Minn., 2026); *Lah v. Bondi*, 2026 WL 184529 (D. Minn., 2026).

66. On February 2, 2026, the U.S. District Court in Minnesota in *Idle H. v. Bondi*, 2026 WL 266462 (D. Minn., 2026), an individual habeas corpus case involving the detention of an unadjusted refugee in Minnesota, stated that while it "agrees with the baseline conclusion

from those cases [including *U.H.A. v. Bondi*, 817 F. Supp.3d 752 (D. Minn. 2026)], that Section 1159(a)(1) does not authorize indefinite detention untethered from the purpose of the statute but believes that this conclusion derives more naturally from the Due Process Clause, rather than the language of the statute itself." *Idle H. v. Bondi*, 2026 WL 266462, at *3 n.2 (D. Minn. 2026). The Court still found that "[c]ontinued detention is not authorized under Section 1159(a)(1) after 48 hours." *Id.* at *8.

    a.  Sepulveda Decl. Ex. S at 90; Sepulveda Decl. Ex. T at 90.

67. On February 27, 2026, the U.S. District Court in Minnesota preliminarily enjoined Operation PARRIS as a result of the lawsuit *U.H.A. v. Bondi,* No. 26-417 (JRT/DLM), (D. Minn.).

    a.  *See U.H.A. v. Bondi*, 822 F. Supp.3d 1007 (D. Minn., 2026).

68. In *U.H.A. v. Bondi*, the Court held "that 8 U.S.C. § 1159(a)(1) does not authorize federal authorities to arrest and detain refugees who have lived in the United States for more than a year, have not yet adjusted to lawful permanent resident status, and have not been charged with any ground of removability. The Government's startling theory—that the statute silently grants DHS the power to seize a refugee the moment the clock strikes midnight on the 366th day after admission—is wrong. This theory finds no support in the text, the history, or the purpose of § 1159(a)(1) and marks a sharp break from more than four decades of agency practice. Section 1159(a)(1) did not confer such authority in 1980, and it does not confer it now."

    a.  *Id.* at 1048.

69. That same day, the instant lawsuit was filed in the District Court of Massachusetts, challenging the government's Refugee Detention Policy.

    a.  *See Jean A. v. Noem*, No. 3:26-cv-30031 (D. Mass. Feb. 27, 2026).

## V.    Defendants' Certified Administrative Record

70. On May 15, 2026, Defendants USCIS and ICE each produced identical Certified Administrative Records (CARs).

    a.  *See* Sepulveda Decl. Ex. U; Sepulveda Decl. Ex. V.

71. The CARs comprised 12 documents, totaling 91 pages.

    a.  *See generally* Sepulveda Decl. Ex. S; Sepulveda Decl. Ex. T.

72. Of the 91 pages, 59 consist of Westlaw printouts from federal cases between 2007 and 2026: *Andric v. Crawford*, No. CV06-0002, 2006 WL 1544184 (D. Ariz. May 31, 2006, *Omanovic v. Crawford*, No. CV06-208, 2006 WL 2256630 (D. Ariz. Aug. 7, 2006), *Luong v. Gonzalez*, No. CV07-146, 2007, WL 3342727 (D. Ariz. Nov. 8, 2007), *Jennings v. Rodriguez*, 583 U.S. 281 (2018), *Idle H. v. Bondi*, No. 26-cv-315, 2026 WL 266462 (D. Minn. Feb. 2, 2026).

    a.  *See* Sepulveda Decl. Ex. S at 7–9, 10–15, 16–20, 28–67, 84–91; Sepulveda Decl. Ex. T at 7–9, 10–15, 16–20, 28–67, 84–91.

73. The CAR includes the 2001 INS Memo, the 2010 ICE Policy, the Implementation Guidance, the Refugee Rescission Memo, and the Refugee Detention Memo.

    a.  *See* Sepulveda Decl. Ex. S at 1–6, 21–24, 25, 76, 77–83; Sepulveda Decl. Ex. T. at 1–6, 21–24, 25, 76, 77–83.

74. Additionally, the CAR includes two pages of archived material from the Department of State website documenting requirements on resettlement agencies from 2009 to 2017 through the Reception and Placement Program, but which contain no mention of detention.

    a.  Sepulveda Decl. Ex. S at 26–27; Sepulveda Decl. Ex. T at 26–27.

75. Additionally, the CAR includes five pages of current material from the USCIS website, entitled "Green Cards for Refugees," and which explain that refugees must apply for lawful permanent resident status "after they have been physically present in the United States for at least one year."

    a.  Sepulveda Decl. Ex. S at 68–73; Sepulveda Decl. Ex. T at 68–73.

76. Finally, the CAR includes a document dated October 22, 2025, entitled "Stateside Review of Refugee Cases Admitted Between 2021-2024." ("5-Country Refugee Review Memo"), and submitted by the USCIS Fraud Detection and National Security Directorate and the Refugee, Asylum and International Operations Directorate to the Office of the Director, U.S. Citizenship and Immigration Service [sic].

    a.  Sepulveda Decl. Ex. S at 74–75; Sepulveda Decl. Ex. T at 74–75.

77. The 5-Country Refugee Review Memo summarizes a review of 31,487 individuals from just five countries: Ecuador, El Salvador, Guatemala, Honduras, and Venezuela. It finds that of those 31,497 cases, 1,597 cases were identified "with indicators of potential Public Safety (PS) concerns – namely tattoos that are consistent with suspected gang membership."

    a.  *Id.*

78. The 5-Country Refugee Review Memo does not contain any data about individuals who were admitted as refugees from countries other than Ecuador, El Salvador, Guatemala, Honduras, and Venezuela, nor does it explain why or how these countries or individuals were selected for the study or disclose anything about the individuals whose files were reviewed.

    a.  *See id.*

79. Other than the printout of the decision in *Idle H.*, the CAR does not include any

information related to Operation PARRIS that would inform the government's nationwide operations with respect to the Refugee Detention Policy.

    a. *See generally* Sepulveda Decl. Ex. S; Sepulveda Decl. Ex. T.

80. Additionally, the CAR does not include interagency memoranda related to the Refugee Detention Policy and its application on nationwide scale, including any analysis of capacity needed to indefinitely detain more than a hundred thousand unadjusted refugees nationwide or to evaluate the applications of refugees who would be detained for the purpose of determining whether their status would be adjusted.

    a. *See id.*

## VI.    Plaintiffs and Harms to Plaintiffs

81. Plaintiff Jean A. was born in a refugee camp in Rwanda and was admitted to the United as a refugee in September of 2022. Jean A. has never been charged with a crime or placed in removal proceedings.

    a. Sepulveda Decl. Ex. K ¶¶ 1–2, 14.

82. Jean A. and his family submitted their adjustment of status applications in the spring of 2024. They have not received a request for an interview or a decision on their applications.

    a. *Id.* ¶¶ 11–13.

83. Jean A. lives in a constant state of fear that he will be arrested and detained indefinitely because of the Refugee Detention Policy and USCIS's failure to act on his adjustment of status application, as well as deported to the Democratic Republic of Congo.

    a. *Id.* ¶¶ 15–16, 18, 19.

84. Plaintiff Hamad B. was born in Iraq and was admitted to the United States as a refugee in May of 2023. I am not in removal proceedings.

    a. Sepulveda Decl. Ex. L ¶¶ 3, 6, 14.

85. Hamad B. and his family submitted their adjustment of status applications in March 2025. They have not received a request for an interview or a decision on their applications.

    a. *Id.* ¶¶ 8.

86. In January 2026, Hamad B was arrested by immigration officials near El Paso, Texas. Hamad B. was held in immigration detention in New Mexico for almost a month. Hamad B was released after his attorneys filed a petition for writ of habeas corpus in the District of New Mexico, and after an immigration judge terminated his removal case.

    a. *Id.* ¶¶ 10–14.

87. Hamad B. lives in terror that he will be detained again, and that his wife and son will be arrested and detained while their applications for adjustment of status are pending.

    a. *Id*. ¶¶ 18.

88. Plaintiff Mona C. was born in Syria and was admitted to the United States as a refugee in May of 2023. Mona C. was a derivative on her husband, Hamad B.'s, application for refugee resettlement.

    a. Sepulveda Decl. Ex. M ¶¶ 2–3, 5.

89. Mona C. and her family applied for adjustment of status in March 2025. They have not received a request for an interview or a decision on their applications.

    a. *Id.* ¶ 7.

90. In January 2026, immigration officials detained Mona C.'s husband, Hamad B. near El Paso, Texas. Mona C. did not know how to contact her husband for several days. Mona C.'s husband was held in detention for nearly a month. During that time, Mona C. and her children were without any income as Hamad B. is the sole earner in their family.

    a. *Id.* ¶¶ 9–12,15–16.

91. Mona C. lives in constant fear that she and her family will be arrested and that no one will be there to care for her children, one of whom is a U.S. citizen with a serious illness.

    a. *Id.* ¶¶ 19–21.

92. Plaintiff Yasmine D. was born in Iraq and was admitted to the United States as a refugee in April 2023 along with her husband and son. Yasmine D. was a derivative on her husband's application for refugee resettlement.

    a. Sepulveda Decl. Ex. N ¶¶ 3, 5.

93. Yasmine D. and her family submitted applications for adjustment of status in March 2025. They have not received a request for an interview or decisions on their applications.

    a. *Id.* ¶ 7.

94. In January 2026, Yasmine D.'s husband was detained by immigration officials near El Paso, Texas. He was held in immigration detention in New Mexico for nearly three weeks. Yasmine D.'s husband was released after his petition for writ of habeas corpus was granted by a federal judge in the District of New Mexico.

    a. *Id.* ¶ 8, 16.

95. Yasmine D. lives in constant fear that ICE will arrest, detain, and deport her husband, herself, or son.

    a. *Id.* ¶¶ 17–22.

96. Plaintiff Sam E. was born in Afghanistan and admitted to the United States as a refugee in October 2024. Sam E. has never been charged with a crime or placed in removal proceedings.

    a.  Sepulveda Decl. Ex. O ¶¶ 1–2, 9.

97. Sam E. submitted his application to adjust status in June 2026. He has not yet received a request for an interview or a decision on his application.

    a.  *Id.* ¶ 6.

98. Sam E. is terrified that he and his family members will be arrested, detained, separated from another, and/or deported to either dangerous conditions in Afghanistan or to a third country where they do have not ties or support.

    a.  *Id.* ¶¶ 10–11.

99. Plaintiff Abdo F. was born in Sudan and was admitted to the United States as a refugee in May 2024. He has never been charged with a crime or placed in removal proceedings.

    a.  Sepulveda Decl. Ex. P ¶¶ 1–2, 12.

100. Abdo F. submitted his application to adjust his status in April 2026. He has not yet received a request for an interview or a decision on his application.

    a.  *Id.* ¶ 11.

101. Abdo F. was diagnosed with Parkinson's disease, which requires treatment.

    a.  *Id.* ¶¶ 5–7.

102. Because of the Refugee Detention Policy, he lives in fear that he will be arrested and detained without access to treatment, which may result in a loss of ambulatory function, or that he will be deported to Sudan, where his life would be at tremendous risk.

    a.  *Id.* ¶¶ 13–18.

103. Plaintiff International Institute of New England (IINE) is a non-profit social service organization headquartered in Boston, Massachusetts that exclusively serves refugees and immigrants in New England, and that provides various services to approximately 1,062 refugees who have not yet adjusted to lawful permanent resident status.

    a.  Sepulveda Decl. Ex. Q at 1–2, 5.

104. Prior to the District Court's stay on the Refugee Detention Policy, IINE was forced to divert resources from providing refugee clients with life-saving assistance like food distribution to proactively engaging all refugees they resettled between January 20, 2021 and February 19, 2025, such through the provision of Know-Your-Rights (KYRs) trainings and materials. For instance, prior to the announcement of the Refugee Detention Policy, IINE only provided one KYR training per year; after, and due to the Refugee Detention Policy, KYR trainings have been integrated into all client-facing programming.

    a.  *Id.* at 5, 6–7.

105.    Additionally, "IINE staff are devoting significant tie to prepare for and accompany [their] refugee clients to proposed re-vetting and green card interviews. Preparation includes: dedicating significant time to research and developing resources to prepare for re-vetting interviews; contacting clients to determine what access to documents or information they have from their refugee application(s) and interview process(es); and offering to file Freedom of Information Act (FOIA) requests to obtain that individual information. If the Refugee Detention Policy is lifted, the need to urgently obtain this information will increase exponentially as our clients are subject to having their refugee status questioned or revoked while in detention." "If IINE staff were not engaging as heavily in this line of work, they would be doing their regular case management work."

   a.  *Id.* at 7–8.

106.    Because the District Court has stayed the Refugee Detention Policy, "IINE staff have been able to resume their normal day-to-day operations." But, if the District Court's stay on the Refugee Detention Policy is lifted, IINE "anticipate[s] returning to the disaster mitigation posture [they] were in when the Refugee Detention Policy was announced in early 2026." The entire organization was impacted, and staff, including the senior management team, were pulled in to "assess IINE's response to the Refugee Detention Policy."

   a.  *Id.* at 8.

107.    Plaintiff Jewish Family Service of Western Massachusetts (JFS-WMA) is non-profit social services organization that plays a leading role in refugee resettlement and other immigration services in Massachusetts. "[R]efugee resettlement work is "core to [JFS-WMA's] mission." "Since January 2021, JFS has welcomed and served 1,298 refugees into the geographic area served by JFS-WMA."

   a.  Sepulveda Decl. Ex. R at 1, 5.

108.    Among the services that JFS-WMA "continues to provide is assistance to refugees in filing their applications for lawful permanent residency after they have been in the United States for more than one year."

   a.  *Id.* at 5.

109.    Prior to the District Court's stay on the Refugee Detention Policy, JFS-WMA's work was impacted, leading to the organization "obtain[ing] training for how to represent any refugee who may be called in for re-vetting."

   a.  *Id.* at 6.

110.    If the District Court's stay on the Refugee Detention Policy is lifted, "JFS-WMA staff will need to devote significant time to preparing for and accompanying [their] refugee clients to [re-vetting] interviews." Because JFS-WMA has "just one staff person who does this work . . . [they] would need ten of her in addition to translators, case workers, and drivers to serve more than 1000 refugees with pending applications. There is no question that [JFS-WMA] would have to divert current resources from other programs to protect [their] clients."

    a.  *Id.* at 6–7.

111.     Additionally, if the District Court's stay on the Refugee Detention Policy is lifted, and the "refugees [JFS-WMA] serve[s] are arrested, detained, and placed in removal proceedings, JFS-WMA staff will spend large amounts of time searching for and contacting possible legal referrals to represent these individuals in removal proceedings and/or federal habeas petitions, as detained removal work is outside the scope of the legal services [they] can provide. It is very time-consuming for [their] staff to identify and secure low- or pro-bono referrals for these types of cases. Additionally, given the intense fear that the Refugee Detention Policy has created in our refugee client community, [they] anticipate increasing the number of Know-Your-Rights trainings and diverting already precious staff time and resources to do so."

    a.  *Id.* at 7–8.

112.     Additionally, if the District Court's stay on the Refugee Detention Policy is lifted, and "[their] refugee clients are detained and unable to work, their families will be left without their income. Most of [JFS-WMA's] refugee clients do not have significant financial resources and their families rely on their paychecks to survive. [JFS-WMA] ha[s] already had to divert resources to help with benefit eliminations that began with refugees being removed from SNAP in November, 2025 and will continue with the elimination of access to Medicaid that will occur in October, 2026. To support these families who will have lost their only source of income and access to critical benefits because of their detention or at the very least due to the delay in issuing their green card, JFS-WMA will have to dip further into [their] limited emergency funds to provide financial assistance to refugee families affected by the Refugee Detention Policy."

    a.  *Id.* at 8.

113.     Additionally, "JFS-WMA also employs a significant number of refugees, including those who may be targeted by the Refugee Detention Policy because their adjustment of status applications have not been adjudicated. [Their] work will be further strained if [their] employees—lawfully present refugees who are helping their communities—are targeted for arrest and detention."

    a.  *Id.*

114.     In essence, the Refugee Detention Policy "will create an intentionally sustained emergency for the community JFS-WMA serve[s] as well as for [the] organization itself."

    *a.  Id.*

Dated: July 24, 2026                          By:


Ghita Schwarz (NY Bar No. 3030087)*           */s/ Erez Reuveni*
Guadalupe Aguirre (NY Bar No. 5536107)*       Erez Reuveni (CA Bar No. 264124)*
Mevlüde Akay Alp (NY Bar No. 5149653)*        Jennie L. Kneedler (DC Bar No. 500261)*
Kimberly Grano (NY Bar No. 5858808)*          Ryan Cooper (DC Bar No. 1645301)*
Pedro Sepulveda (NY Bar No. 6198550)*         Kali Schellenberg (MA BBO No. 694875)
**INTERNATIONAL REFUGEE**                     Steven Y. Bressler (DC Bar No. 482492)*
**ASSISTANCE PROJECT**                        Robin F. Thurston (DC Bar No. 1531399)*
One Battery Plaza, 33rd floor                 **DEMOCRACY FORWARD FOUNDATION**
New York, New York 10004                      P.O. Box 34553
(646) 939-9169                                Washington, DC 20043
gschwarz@refugeerights.org                    Phone: (202) 316-9538
laguirre@refugeerights.org                    ereuveni@democracyforward.org
makayalp@refugeerights.org                    jkneedler@democracyforward.org
kgrano@refugeerights.org                      rcooper@democracyforward.org
psepulveda@refugeerights.org                  kschellenberg@democracyforward.org
mhauptman@refugeerights.org                   sbressler@democracyforward.org
                                              rthurston@democracyforward.org

Dalia Fuleihan (IL Bar No. 6335082)*
**INTERNATIONAL REFUGEE**                     *Counsel for All Plaintiffs*
**ASSISTANCE PROJECT**                        * Admitted *pro hac vice*
P.O. Box 47611
Chicago, IL 60647
646-740-6271
dfuleihan@refugeerights.org


John Nathanson (NY Bar No. 2630697)*
Andrew Tannenbaum (NY Bar No. 3940434)*
Leila Siddiky (NY Bar No. 5225164)*
**ALLEN OVERY SHEARMAN STERLING**
**US LLP**
599 Lexington Avenue
New York, NY 10022
212-848-4000
john.nathanson@aoshearman.com
andrew.tannenbaum@aoshearman.com
leila.siddiky@aoshearman.com


Emily Westridge Black (TX Bar No.
24060815)*
**ALLEN OVERY SHEARMAN STERLING**
**US LLP**
300 West 6th Street
Austin, TX 78701

512-647-1909
emily.westridgeblack@aoshearman.com

Gideon J. Duke-Cohan (BBO# 716358)
**ALLEN OVERY SHEARMAN STERLING
US LLP**
One Beacon Street
Boston, MA 02108
212-610-6353
gideon.duke-cohan@aoshearman.com

## CERTIFICATE OF SERVICE

I hereby certify that on this July 24, 2026, I caused the foregoing to be electronically filed with the clerk of the court for the U.S. District Court for the District of Massachusetts by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record, a true and correct copy of the foregoing instrument and all attachments.

*/s/ Erez Reuveni*

Erez Reuveni