**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| JEAN A.; HAMAD B.; MONA C.; YASMINE D.; SAM E.; ABDO F.; INTERNATIONAL INSTITUTE OF NEW ENGLAND; and JEWISH FAMILY SERVICE OF WESTERN MASSACHUSETTS,<br><br>Plaintiffs,<br><br>v.<br><br>MARKWAYNE MULLIN,[1] in his official capacity as Secretary of the Department of Homeland Security; UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; TODD LYONS, *in his official capacity as Senior Official Performing the Duties of the Director of ICE*; and JOSEPH B. EDLOW, *in his official capacity as the Director of USCIS*,<br><br>Defendants. | Civil Action No. 3:26-cv-30031-RGS<br><br>*Leave for Excess Pages Granted 3/23/26 (ECF No. 51)* |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

[1] Secretary of Homeland Security Markwayne Mullin has been automatically substituted for former Secretary Kristi Noem. Fed. R. Civ. P. 25(d).

# TABLE OF CONTENTS


INTRODUCTION ........................................................................................................ 7

BACKGROUND ........................................................................................................ 9

A. Background on the Current Refugee Policy ........................................................ 9

B. Procedural History ............................................................................................ 13

LEGAL STANDARDS ............................................................................................. 15

A. Administrative Procedures Act .......................................................................... 15

B. Summary Judgment ........................................................................................... 16

ARGUMENT ........................................................................................................... 16

A. The Current Refugee Policy Is Within DHS' Statutory Authority and Is Not Contrary to Law 16

1. Section 1159 Provides for Arrest and Detention Pending Inspection and Examination for Admission........................................................................................................ 17

2. Alternatively, Section 1159(a)'s Cross-Reference of Section 1225 Provides a Basis for Detention.......................................................................................................... 21

3. The Current Refugee Policy Does Not Violate Agency Regulations. ......................... 22

B. The Current Refugee Policy Is Not Arbitrary and Capricious.......................................... 23

C. The Current Refugee Policy is Not a Legislative Rule Subject to the Notice and Comment Requirement. ................................................................................................. 28

CONCLUSION ........................................................................................................ 30

**TABLE OF AUTHORITIES**

Page(s)

Cases

*Am. Paper Inst., Inc. v. Am. Elec. Power Serv. Corp.*,
461 U.S. 402 (1983) ........ 19

*Andric* v. *Crawford,*
No. CV06-0002, 2006 WL 1544184 (D. Ariz. May 31, 2006) ........ 26

*Azar v. Allina Health Servs.*,
587 U.S. 566 (2019) ........ 19

*Battle v. F.A.A.*,
393 F.3d 1330 (D.C. Cir. 2005) ........ 23

*Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*,
419 U.S. 281 (1974) ........ 25

*Chrysler Corp. v. Brown*,
441 U.S. 281 (1979) ........ 29

*Dean v. United States*,
556 U.S. 568 (2009) ........ 21

*FCC v. Prometheus Radio Project*,
592 U.S. 414 (2021) ........ 23, 24, 28

*Garcia-Garcia v. Comfort*,
66 F. App'x 155 (10th Cir. 2003) ........ 19

*Garland v. Cargill*,
602 U.S. 406 (2024) ........ 18

*Garside v. Osco Drug, Inc.*,
895 F.2d 46 (1st Cir. 1990) ........ 16

*Griggs-Ryan v. Smith*,
904 F.2d 112 (1st Cir. 1990) ........ 16

*Heckler v. Chaney*,
470 U.S. 821 (1985) ........ 25

*I.C.C. v. Bhd. of Locomotive Eng'rs*,
482 U.S. 270 (1987) ........ 25

*Idle H. v. Bondi*,
No. 26-CV-315 (LMP/SGE), 2026 WL 266462 (D. Minn. Feb. 2, 2026) ........ 20, 26

*In re U.S.*,
197 F.3d 310 (8th Cir. 1999) .................................................................................. 24

*Irving v. Clark*,
758 F.2d 1260 (8th Cir. 1985) ................................................................................ 18

*Jennings v. Rodriguez*,
583 U.S. 281 (2018)................................................................................. 18, 19, 21, 26

*Loper Bright Enterprises v. Raimondo*,
603 U.S. 369 (2024)................................................................................................. 15

*Luong* v. *Gonzales,*
No. CV07-146, 2007 WL 3342727 (D. Ariz. Nov. 8, 2007) .................................... 26

*Mack v. Great Atl. & Pac. Tea Co.*,
871 F.2d 179 (1st Cir. 1989)..................................................................................... 16

*Massachusetts v. National Institutes of Health*,
770 F.Supp.3d 277 (D. Mass. 2025) ......................................................................... 29

*Mesnick v. Gen. Elec. Co.*,
950 F.2d 816 (1st Cir. 1991)..................................................................................... 16

*Motor Vehicle Manufacturers Association of the* United States, Inc. v. State Farm Mutual Automobile Insurance Company,
463 U.S. 29 ............................................................................................................... 24

*Omanovic v. Crawford,*
No. CV06-0208, 2006 WL 2256630 (D. Ariz. Aug. 7, 2006) .................................. 26

*Perez v. Mortgage Bankers Ass'n*,
575 U.S. 92 (2015).................................................................................................... 29

*Regents of the Univ. of Cal.*,
591 U.S. 1 (2020)...................................................................................................... 24

*Serhii L. v. Bondi*,
No. 26-cv-463, 2026 WL 184736 (D. Minn. Jan. 24, 2026) .................................... 20

*Shalala v. Guernsey Memorial Hospital,*
514 U.S. 87 (1995).................................................................................................... 29

*Syncor Int'l Corp. v. Shalala*,
127 F.3d 90 (D.C. Cir. 1997)............................................................................... 29, 30

*Trump v. United States*,
603 U.S. 593 (2024)........................................................................................................ 24

*United States ex rel. Accardi v Shaughnessy*,
347 U.S. 260 (1954)........................................................................................................ 14

*United States v. El Herman*,
971 F.3d 784 (8th Cir. 2020) ......................................................................................... 20

*United States v. Lee*,
274 F.3d 485 (8th Cir. 2001) ......................................................................................... 24

*United States v. Texas*,
599 U.S. 670 (2023)........................................................................................................ 24

*Wash. Mkt. Co. v. Hoffman*,
101 U.S. 112 (1879)........................................................................................................ 19

*Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*,
586 U.S. 9 (2018)............................................................................................................ 24

*Zadvydas v. Davis*,
533 U.S. 678 (2001)........................................................................................................ 19

Statutes

5 U.S.C. § 553................................................................................................................... 28

5 U.S.C. § 553(b)(3)(A).................................................................................................... 29

5 U.S.C. § 553(b)(A)......................................................................................................... 29

5 U.S.C. § 701(a)(2).......................................................................................................... 24

5 U.S.C. § 706................................................................................................................... 15

5 U.S.C. § 706(2)(A)......................................................................................................... 15

8 U.S.C. § 1157(c) ............................................................................................................ 22

8 U.S.C. § 1159.................................................................................................. 12, 13, 25, 26

8 U.S.C. § 1159(a) ......................................................................................................... passim

8 U.S.C. § 1159(a)(1)..................................................................................................... passim

8 U.S.C. § 1159(a)(2)........................................................................................................ 18

8 U.S.C. § 1159(a)(l) ... 26

8 U.S.C. § 1159(b) ... 21

8 U.S.C. § 1225 ... 17, 21

8 U.S.C. § 1225(b) (1980) ... 22

8 U.S.C. § 1225(b)(1) ... 21

8 U.S.C. § 1226(c) ... 19

8 U.S.C. §§ 1226(a) ... 18

Rules

Fed. R. Civ. P. 25(d) ... 1

Fed. R. Civ. P. 56(a) ... 16

Regulations

8 C.F.R § 209.1(a) ... 9

8 C.F.R § 209.1(b) ... 9

8 C.F.R. § 207.4 ... 17

8 C.F.R. § 207.9 ... 22, 23

8 C.F.R. § 209.1 ... 22, 23

8 C.F.R. § 209.1(d) ... 23

8 C.F.R. § 287.3(d) ... 11

Other Authorities

Executive Order 14163 ... 11

Defendants, by and through their attorney, Leah B. Foley, United States Attorney for the District of Massachusetts, respectfully move this Court, under Rule 56 of the Federal Rules of Civil Procedure, for partial summary judgment in their favor on Counts I-IV of the Complaint (ECF Doc. No. 1), and oppose Plaintiffs' motion for partial summary judgment on the same counts.

**INTRODUCTION**

When a refugee is admitted into the United States, that admission is conditional with a crucial milestone at the one-year mark. After a year, the refugee "*shall* … return or *be returned* to *the custody* of the Department of Homeland Security [("DHS")] for inspection and examination for admission" as a lawful permanent resident ("LPR"). 8 U.S.C. § 1159(a)(1) (emphases added). Two aspects of the statutory text are particularly crucial here: (1) if a refugee does not voluntarily present himself to DHS at the end of the year, Congress mandates that he "be returned" to "custody" (*i.e.*, arrested and detained) by DHS; and (2) Congress authorizes DHS to keep him in custody "for" (*i.e.*, during or throughout) "inspection and examination."

Section 1159's detain-and-inspect mandate ensures that refugees are re-vetted at the one-year mark. This makes sense for two reasons. First, it ensures that refugees fleeing persecution are quickly admitted and then can later be vetted like any other person seeking admission. Second, it ensures public safety. Amidst concerns about insufficient screening, widescale fraud, and public safety threats, the government reassessed its vetting procedures and practices.

DHS's historical position, as documented in a 2001 memo from Bo Cooper, then general counsel of Immigration and Naturalization Service ("INS"),[2] was that a refugee who has not voluntarily submitted himself or herself for examination and inspection pursuant to an application

---

[2]INS was the predecessor agency to three current agencies under DHS, namely U.S. Citizenship and Immigration Services ("USCIS"), Immigration and Customs Enforcement ("ICE") and U.S. Customs and Border Protection ("CBP").

for adjustment of status may be taken into custody by the Service for the purpose of such examination and inspection and, if found removable, may be placed in removal proceedings. (USCIS_AR002).[3]

On May 10, 2010, James Chaparro, then Director of Detention and Removal Operations at ICE, issued a memo related to the detention of refugees. (USCIS_AR021-24). That memo provided that failure by a refugee to obtain LPR status, by itself, was not treated as a basis for removal and was not considered a proper basis for detention. (USCIS_AR022).

However, on March 25, 2025, USCIS conducted a review of 31,000 individuals from Ecuador, El Salvador, Guatemala, Honduras, and Venezuela, who were admitted into the United States as refugees from 2021-2024. (USCIS_AR074-75). The review identified significant issues related to improper vetting of refugees for Public Safety concerns. *Id.*

In order to address the concern with a population of conditional refugees who had not been properly vetted, with associated public safety and national security risks, DHS rescinded the Chaparro Memo on December 18, 2025. (USCIS_AR021). In addition, DHS issued new guidance in a February 18, 2026 Memo from USCIS Director Joseph Edlow and Acting ICE Director Todd Lyons. (USCIS_AR077-83). The current DHS Policy returns to the historical interpretation of 8 U.S.C. § 1159(a)(1) and sets forth a thorough rationale for the new agency policy, explaining that "changes are designed to better enforce the statutory requirement that aliens admitted as refugees who have been present in the United States for at least one year return or be returned to DHS custody for inspection and examination for admission as an LPR." (USCIS_AR078). Furthermore, as the agency explained, the changes "further reflect the public policy interest in

[3] Defendants produced a Certified Administrative Records ("CAR") for USCIS and a CAR for ICE. While citations here are to USCIS's CAR, the same documents also appear in ICE's CAR.

thorough vetting of aliens admitted as refugees, including vetting for national security, public safety, and fraud-related issues." (USCIS_AR078-79). In making these changes, DHS considered any potential reliance interests," and "DHS believes that any perceived interests are strongly outweighed by the public policy reasons." (USCIS_AR079).

Plaintiffs attempt to attack the Current Refugee Policy, which they call the "Refugee Detention Policy"[4] under the Administrative Procedures Act ("APA") on a number of grounds, each of which is meritless and should be rejected.

Defendants respectfully request that this Court grant its motion for partial summary judgment on Counts I-IV and deny Plaintiffs' motion for partial summary judgment on the same counts.

## BACKGROUND

### A. Background on the Current Refugee Policy

When a refugee is admitted into the United States, that admission is conditional. After the refugee has been present in the United States for one year, he or she must "return or be returned" to Department custody and be re-vetted for "inspection and admission" as a lawful permanent resident. 8 U.S.C. § 1159(a). Every admitted refugee "is required to apply to USCIS one year after entry in order for USCIS to determine his or admissibility. . . ." 8 C.F.R § 209.1(a). This application must be submitted in accordance with applicable form instructions, and the relevant application is Form I-485, Application to Register Permanent Residence or Adjust Status. 8 C.F.R

[4] The Current Refugee Policy (which Plaintiffs call the "Refugee Detention Policy") refers to the December 18, 2025 memo rescinding the Chaparro Memo ("Rescission Memo") along with the February 18, 2026, memo from Edlow and Lyons ("Edlow Memo"). (ECF Doc. 74 at 15-16).

§ 209.1(b). Despite its clear text, § 1159(a)'s requirement of a return has been subject to differing interpretations.

**Nov. 9, 2001: Cooper Memo**

In a Memorandum of November 9, 2001, Bo Cooper, the General Counsel of the INS, advised that "Section 209(a)( I )(C) of the Act requires a refugee to submit to inspection and examination by the Service for admission to the United States as an immigrant at the end of the one-year period following the refugee's admission into the United States. A refugee who has not voluntarily submitted himself or herself for examination and inspection pursuant to an application for adjustment of status may be taken into custody by the Service for the purpose of such examination and inspection and, if found inadmissible, may be placed in removal proceedings." (USCIS_AR002).

**May 10, 2010: Chaparro Memo**

On May 10, 2010, James Chaparro, who was the Director of Detention and Removal Operations at ICE, issued Policy No. 11039.1: Detention of Refugees Admitted under INA § 207 Who Have Failed to Adjust to Lawful Permanent Resident Status. ("Chaparro Memo") (USCIS_AR021-24). Although the policy explained that, under INA § 209(a)(1), refugees who are physically present in the United States for at least one year are to return, or be returned, to the custody of DHS for inspection and examination, it restricted the legal authority of officers to maintain custody of refugees who failed to present themselves for inspection. (USCIS_AR021-22). Under the Chaparro Memo, failure by a refugee to obtain LPR status, by itself, was not treated as a basis for removal and was not considered a proper basis for detention. (USCIS_AR022). Furthermore, if an unadjusted refugee was arrested, DHS was required, within 48 hours, to either: (1) release the individual or (2) initiate removal proceedings by issuing a Notice

to Appear, consistent with the requirements of 8 C.F.R. § 287.3(d). (USCIS_AR022). If it became apparent earlier that no ground of inadmissibility or deportability applied, the individual was to be promptly released. (USCIS_AR022).

**January 20, 2025: Executive Order 14163**

On January 20, 2025, the President issued Executive Order ("EO") 14163, Realigning the United States Refugee Admissions Program, which suspended the U.S. Refugee Admissions Program ("USRAP") until the admission of refugees aligns with the interests of the United States. EO 14163 highlights that the United States needs to ensure public safety and national security are strongly considered in the administration of the USRAP and only admit refugees who can fully and appropriately assimilate into the United States. *Id.*

**March 25, 2025: Stateside Review of Refugee Cases 2021-2024**

On March 25, 2025, USCIS conducted a review of 31,000 recently individuals from Ecuador, El Salvador, Guatemala, Honduras, and Venezuela, who were admitted into the United States as refugees from 2021-2024. (USCIS_AR074-75). The review identified 1,597 cases (consisting of 3,735 aliens) with indicators of potential Public Safety concerns that are consistent with suspected gang membership. (USCIS_AR074). Out of the 14,633 (31,497 individuals) Stateside Refugee cases reviewed, 42.3% had been subject to insufficient questions about Potential Public Safety concerns, while 7.7 % had evidence of Public Safety concerns and 3.2% had strong evidence of Public Safety concerns. (USCIS_AR075).

**December 18, 2025: Rescission of Chaparro Memo**

On December 18, 2025, ERO's Acting Executive Associate Director Marcos Charles issued a memorandum to all Field Office Directors rescinding the Chaparro Memo, effectively immediately. ("Rescission Memo"). *Id.* The reason for this rescission was to act consistently

with "the policy of the United States to protect its citizens from terrorist attacks and other national security and public safety threats, including through screening and vetting protocols and procedures associated with visa adjudications and other immigration processes, as reflected in the December 16, 2025 Presidential Proclamation, *Restricting and Limiting the Entry of Foreign Nationals to Protect the Security of the United States*." *Id.*[5]

**February 18, 2026: Edlow Memo**

On February 18, 2026, USCIS Director Edlow and Acting ICE Director Lyons issued a Memorandum titled: "Detention of Refugees Who Have Failed to Adjust to Lawful Permanent Resident Status." ("Edlow Memo") (USCIS_AR077-83). The Edlow Memo noted that:

> USCIS and ICE have determined that prior policy decisions and operational guidance resulted in incomplete implementation of the requirements of section 209 of the Immigration and Nationality Act (INA), 8 U.S.C. § 1159, governing the conditional admission of refugees and their adjustment of status. In practice, refugees who did not file an application for adjustment or did not return for the required inspection and examination were allowed to remain in the United States without undergoing the full, congressionally mandated, second round of vetting. This created a population of conditional refugees who had not been fully re-screened, with associated public safety and national security risks.

(USCIS_AR077).

The Edlow Memo set forth the following new policy:

> When a refugee is admitted to the United States, the admission is conditional and subject to a mandatory review after one year of physical presence in the United States under INA§ 209(a)(l), 8 U.S.C. § 1159(a)(l ). At one year after admission, the refugee must return, or be returned, to Department of Homeland Security (DHS) custody for inspection and examination for admission as an LPR.

[5] In this Proclamation, the President, for reasons of national security, continued limitations on entry for nationals of certain countries and imposed new limitations on the entry of nationals of other countries. *See Restricting and Limiting the Entry of Foreign Nationals to Protect the Security of the United States*, White House, https://www.whitehouse.gov/presidential-actions/2025/12/restricting-and-limiting-the-entry-of-foreign-nationals-to-protect-the-security-of-the-united-states/.

- If the refugee does not voluntarily return, DHS will return the individual to custody (i.e., arrest and detain) for this purpose.

- DHS may maintain custody for the duration of the inspection and examination process.

> This detain-and-inspect requirement ensures that refugees are re-vetted after one year, aligns post-admission vetting with that applied to other applicants for admission, and promotes public safety.

(USCIS_AR078). The Edlow Memo confirmed that it was rescinding the Chapparo Memo and any other policies that conflict with the policies stated in the Edlow Memo. *Id.*

The Edlow Memo set forth extensive rationale for the policy change. In summary, it noted:

> [T]he changes are designed to better enforce the statutory requirement that aliens admitted as refugees who have been present in the United States for at least one year return or be returned to DHS custody for inspection and examination for admission as an LPR. They further reflect the public policy interest in thorough vetting of aliens admitted as refugees, including vetting for national security, public safety, and fraud-related issues. In making these changes, DHS considered any potential reliance interests, and as explained more fully below, DHS believes that any perceived interests are strongly outweighed by the public policy reasons described below.

(USCIS_AR078-79). The Memo then provided detailed explanations for the policy change. (USCIS_AR079-83).

### B. Procedural History

On February 27, 2026, Plaintiffs Jean A.; Hamad B.; Mona C.; Yasmine D.; Sam E.; Abdo F.; International Institute of New England; and Jewish Family Service of Western Massachusetts ("Plaintiffs") filed a Complaint for Vacatur, Preliminary and Permanent Injunctive Relief, and Declaratory Relief Under the Administrative Procedure Act ("APA") and the Constitution against the Defendants in the above-captioned matter. (ECF Doc. No. 1).

Plaintiffs brought six counts. Count One alleged that the Refugee Detention Policy was contrary to law, in violation of the APA. (ECF Doc. No. 1 at 30-32). Count Two alleged that the Refugee Detention Policy was arbitrary and capricious, in violation of the APA. (ECF Doc. No. 1 at 32-33). Count Three alleged that the Refugee Detention Policy had not undergone the Notice and Comment procedural requirement in violation of the APA. (ECF Doc. 1 at 33-34). Count Four alleged that the Refugee Detention Policy failed to comply with the agency's own statutes and regulations, in violation of the APA and also the principles articulated in *United States ex rel. Accardi v Shaughnessy*, 347 U.S. 260 (1954) ("*Accardi* doctrine"). (ECF Doc. 1 at 34-35). Count Five alleged a violation of the Fourth Amendment. (ECF Doc. 1 at 35-36). Count Six alleged violation of the Due Process and Equal Protection Clauses of the Fifth Amendment. (ECF Doc. 1 at 36-38)

On February 27, 2026, Plaintiffs filed a Motion for Leave to Proceed Under Pseudonyms. (ECF Doc. No. 2) and also filed a Motion to Stay under APA Section 705. (ECF Doc. No. 9).

On March 23, 2026, the Court granted the Motion to Stay. (ECF No. 51). In addition, the Court granted the Motion to Proceed Under Pseudonyms. (ECF No. 52).

On May 8, 2026, the Court entered an Electronic Order directing Defendants to produce the Administrative Record by May 15, 2026, directing the parties to meet and confer, and setting forth a schedule for Summary Judgment Motions. (ECF No. 59). On or about May 8, 2026, Defendants produced to Plaintiffs the Certified Administrative Record ("CAR") for ICE. On or about May 15, 2026, Defendants produced to Plaintiffs the Certified Administrative Record ("CAR") for USCIS.

On May 29, 2026, the parties met and conferred over the CAR's and issues related to discovery. (ECF Doc. No. 60 at 1). The parties filed a Joint Motion requesting that the Court

adopt a proposed schedule by which the parties were to file Motions for Summary Judgment on the APA claims and *Accardi* claims only (Count I-IV) (i.e., the non-constitutional claims of the Complaint). *Id.* at 2.

On July 24, 2026, Plaintiffs filed their Motion for Summary Judgment. (ECF Doc. No. 72 & 74). On the same day, Plaintiffs also filed a Motion to Certify Class. (ECF Doc. No. 72 & 76).

## LEGAL STANDARDS

### A. Administrative Procedures Act

Courts reviewing agency decisions under the APA "shall decide all relevant questions of law, interpret constitutional and statutory provisions and determine the meaning or applicability of the terms of an agency action." 5 U.S.C. § 706. A court shall "hold unlawful and set aside" agency actions and findings that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). Additionally, "the court shall review the whole record or those parts of it cited by a party." *Id.*

In *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), the Supreme Court overruled the *Chevron* doctrine, and held that "[c]ourts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires. *Id.* at 412. Careful attention to the judgment of the Executive Branch may help inform that inquiry. "And when a particular statute delegates authority to an agency consistent with constitutional limits, courts must respect the delegation, while ensuring that the agency acts within it. But courts need not and under the APA may not defer to an agency interpretation of the law simply because a statute is ambiguous." *Id*. at 413.

However, the Court clarified that, "we do not call into question prior cases that relied on the *Chevron* framework. The holdings of those cases that specific agency actions are lawful—

including the Clean Air Act holding of Chevron itself—are still subject to statutory *stare decisis* despite our change in interpretive methodology." *Id.* at 412.

**B. Summary Judgment**

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The role of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991) (quoting *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir. 1990)). The court "must view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." *Id*. (quoting *Griggs-Ryan v. Smith*, 904 F.2d 112, 115 (1st Cir. 1990)). However, the Court need not indulge theories that are "the stuff of an opposing party's dreams." *Id*. "On issues where the nonmovant bears the ultimate burden of proof, he must present definite, competent evidence to rebut the motion." *Id*. "This evidence 'cannot be conjectural or problematic; it must have substance in the sense that it limns differing versions of the truth which a factfinder must resolve at an ensuing trial.'" *Id*. (quoting *Mack v. Great Atl. & Pac. Tea Co.*, 871 F.2d 179, 181 (1st Cir. 1989)).

**ARGUMENT**

**A. The Current Refugee Policy Is Within DHS' Statutory Authority and Is Not Contrary to Law**

In moving for summary judgment, Plaintiffs claim that the Current Refugee Policy (namely the Rescission Memo along with the Edlow Memo) is contrary to law because "8 U.S.C. § 1159(a) does not authorize the warrantless arrest and potentially indefinite detention of lawfully admitted refugees who have been physically present for one year and have not yet adjusted status to lawful

permanent residence. Indeed, as this Court already found, the Refugee Detention Policy is likely contrary to law because it erroneously equates "custody" authorized by section 1159 with "detention." (ECF Doc. No. 74 at 20). Plaintiffs also allege that the Current Refugee Policy violates DHS's own regulations. (ECF Doc. No. 74 at 35-37). These arguments should be rejected, and the Court should grant summary judgment to Defendants on Counts One and Four of the Complaint.

Congress made clear—in two different ways—that DHS must arrest and detain a refugee who has been present for over a year for "inspection and examination for admission" as a lawful permanent resident. 8 U.S.C. § 1159(a)(1). First, § 1159(a)(1) expressly provides this authority. Second, § 1159(a)(1) cross-references 8 U.S.C. § 1225, which also mandates detention.

### 1. **Section 1159 Provides for Arrest and Detention Pending Inspection and Examination for Admission.**

8 U.S.C. § 1159(a) governs the adjustment of status of refugees. When a refugee is admitted into the United States, that admission is conditional. *See* 8 C.F.R. § 207.4 (providing that approval of a refugee application authorizes the conditional admission of an alien as a refugee). A refugee who has been physically present in the United States for at least one year, whose refugee statues has not been terminated, and who has not acquired permanent resident status "*shall*, at the end of such year period, *return or be returned to the custody* of the Department of Homeland Security for inspection and examination for admission to the United States as an immigrant in accordance with the provisions of sections 1225, 1229a, and 1231 of this title." 8 U.S.C. § 1159(a)(1) (emphasis added).

The purpose of such "inspection and examination" at the one-year mark is to determine whether the alien should be allowed to remain in the country. As part of the inspection and

examination, DHS may determine that the alien was not a "refugee" at the time of admission and terminate the alien's "refugee" status. DHS may also find grounds for removal and initiate removal proceedings under § 1229a. Alternatively, DHS may determine that the alien should be admitted as an LPR and adjust the alien's status accordingly. *See* 8 U.S.C. § 1159(a)(2) ("Any [individual] who is found upon inspection and examination by an immigration officer … to be admissible ... shall, notwithstanding any numerical limitation ... be regarded as lawfully admitted to the United States for permanent residence.").

Under § 1159, an alien may voluntarily "return" for inspection and examination. 8 U.S.C. § 1159(a)(1). For example, if an alien admitted as a refugee applies of adjustment of status, DHS sometimes schedules an appointment and the alien "return[s]" to custody for an interview. But if an alien fails to voluntarily return, § 1159 requires that the alien "shall ... be returned" to DHS "custody." *Id.*; *see Jennings v. Rodriguez*, 583 U.S. 281, 300 (2018) ("[T]he word 'shall' usually connotes a requirement." (quotation omitted)). And the only way for an alien to "be returned" to DHS custody is for DHS to arrest the alien.

If § 1159 did not authorize arrests, then refugees would be free to flout the statutory requirement that they return for an inspection after a year. Indeed, under Plaintiffs' theory, a refugee could knowingly refuse an interview, and that alone would not be enough to justify an arrest under § 1159(a). Although other arrest authorities could apply in certain circumstances, *see, e.g.*, 8 U.S.C. §§ 1226(a), 1357(a)(2), the Court should not conclude that Congress created a scheme whose effectuation depends on the potential applicability of other statutes. "Congress presumably does not enact useless laws." *Garland v. Cargill*, 602 U.S. 406, 427 (2024) (quotation omitted)); *see Irving v. Clark*, 758 F.2d 1260, 1263 (8th Cir. 1985) ("A statute should be construed to make sense."). Nor does Congress "paralyze with one hand what it sought to promote with the

other." *Am. Paper Inst., Inc. v. Am. Elec. Power Serv. Corp.*, 461 U.S. 402, 421 (1983) (quotation omitted). And reading § 1159 not to permit arrests would render the "or *be returned*" language of the statute superfluous, contrary to the "cardinal rule of statutory construction that significance and effect shall, if possible, be accorded to every word." *Wash. Mkt. Co. v. Hoffman*, 101 U.S. 112, 115 (1879).

Section 1159 also authorizes temporary detention. Section 1159 provides that the alien "shall ... be returned" to DHS's "custody" "*for* inspection and examination for admission to the United States" as a lawful permanent resident. 8 U.S.C. § 1159(a)(1) (emphasis added). Here, as in other detention provisions in the INA, "for" means "during or throughout, as well as with the object or purpose of." *Jennings*, 583 U.S. at 301 (brackets, citation, and internal quotation marks omitted). The statutory language thus authorizes DHS to keep the alien in "custody" during or throughout the "inspection and examination." And "custody," in turn, encompasses not just responsibility and control, but also "physical confinement and restraint." *Id.* at 311 (explaining that *Zadvydas v. Davis*, 533 U.S. 678 (2001), "consistently used the words 'detain' and 'custody' to refer exclusively to physical confinement and restraint"); *see also Garcia-Garcia v. Comfort*, 66 F. App'x 155, 157–58 (10th Cir. 2003) ("Being taken into custody by the INS usually means detention in an INS facility or in a non-Service facility approved by its Jail Inspection Program or under contract with the INS.").

"Custody" means "detention" elsewhere in the INA, including in 8 U.S.C. § 1226(c), where it undisputedly refers to detention. *See Jennings*, 583 U.S. at 307-12. The Court should interpret "custody" to mean the same in § 1159. *See Azar v. Allina Health Servs.*, 587 U.S. 566, 576 (2019) ("[W]hen Congress uses a term in multiple places within a single statute, the term bears a consistent meaning throughout.").

And indeed, courts have interpreted "custody" in § 1159 to encompass detention. *See*, *e.g.*, *Idle H. v. Bondi*, No. 26-CV-315 (LMP/SGE), 2026 WL 266462, at *2 (D. Minn. Feb. 2, 2026) ("As a matter of plain meaning, 8 U.S.C. § 1159(a)(1) provides authority for the Government to detain a refugee like Idle H. who has lived in the United States for at least one year and has not acquired legal permanent residency.") (USCIS_AR085); *Serhii L. v. Bondi*, No. 26-cv-463, 2026 WL 184736, at *3 (D. Minn. Jan. 24, 2026) ("The text of § 1159(a) further makes apparent that *continued* detention of a refugee following 'inspection and examination for admission' under § 1159(a) must flow from §§ 1225, 1229a, and 1231." (emphasis added)); *E.E. v. Bondi*, No. 26-cv-314, Dkt. No. 7 at 7 (D. Minn. Jan. 17, 2026) ("Nothing in § 1159 authorizes detention untethered from ... a specific and limited function: to allow DHS to conduct the inspection necessary to adjudicate adjustment of status under § 1159(a)(2).").[6]

The Edlow Memo's interpretation of Section 1159 is not only supported by the plain meaning of that statute, but also by the INS's historical interpretation of the same. In the November 9, 2001 Memo, Bo Cooper, the General Counsel of the INS, advised that "Section 209(a)(1)(C) of the Act requires a refugee to submit to inspection and examination by the Service for admission to the United States as an immigrant at the end of the one-year period following the refugee's admission into the United States. A refugee who has not voluntarily submitted himself or herself for examination and inspection pursuant to an application for adjustment of status may be taken into custody by the Service for the purpose of such

[6] Section 1159(a)'s authorization of detention is evidence in favor of the conclusion that § 1159(a) also authorizes arrest. The grant of a power—here the power to detain—is normally understood to include any subsidiary powers, like the power to arrest, necessary to exercise the principal power. *See United States v. El Herman*, 971 F.3d 784, 786 (8th Cir. 2020) ("The statutory grant of a greater power typically includes the grant of a lesser power.").

examination and inspection and, if found inadmissible, may be placed in removal proceedings." (USCIS_AR002).

Further confirming Defendants' reading is the fact that Congress—in 8 U.S.C. § 1159(b)—did not mandate a "return to custody" for asylees seeking adjustment of status. The Court should interpret § 1159(a) in the light of this difference. *See Dean v. United States*, 556 U.S. 568, 573 (2009) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (alteration adopted and quotation omitted)).

In short, § 1159(a) authorizes DHS to arrest and detain a refugee for the limited duration of the statutorily mandated inspection and examination. This is exactly what DHS is doing pursuant to the Current Refugee Policy.

**2. <u>Alternatively, Section 1159(a)'s Cross-Reference of Section 1225 Provides a Basis for Detention.</u>**

If any doubt remained as to DHS's detention authority, Congress's inclusion in § 1159(a) of a cross-reference to 8 U.S.C. § 1225 dispels it. As explained above, under § 1159(a)(1), any "inspection and examination for admission to the United States as an immigrant" must be done "in accordance" with, among other provisions, § 1225. In turn, 8 U.S.C. § 1225(b)(1) and (b)(2) "mandate detention of applicants for admission until certain proceedings have concluded." *Jennings*, 583 U.S. at 297; *see* 8 U.S.C. § 1225(b)(1)(B)(ii) (providing that aliens processed for expedited removal who have a credible fear of persecution "shall be detained for further consideration of the application for asylum"); *id.* § 1225(b)(2) (providing that certain inadmissible aliens "shall be detained" for removal proceedings).

Even though a refugee is admitted once upon arrival in the country, *see* 8 U.S.C. § 1157(c), § 1159 makes clear that, once returned to DHS custody, the refugee is an applicant for admission, *see* ECF No. 41 at 12-13 (recognizing this second "admission"). Accordingly, the cross-reference to § 1225's detention-and-inspection process supports Defendants' position that detention is required under § 1159. Because § 1225 mandates detention of applicants for admission pending certain proceedings, § 1159's cross-reference to § 1225 implies refugees taken into custody will be detained during the inspection process to determine whether the refugee will be placed into such proceedings.

The statutory history confirms this reading. Since its enactment in 1980, § 1159 has cross-referenced § 1225. 94 Stat. 102, 105 (1980). In 1980, and up until 1996, § 1225 required the detention of "[e]very aliens"—not only "applicants for admission"—"who may not appear to the examining immigration officer at the port of arrival to be clearly and beyond a doubt entitled to land." 8 U.S.C. § 1225(b) (1980). Thus, any doubts that § 1159(a)(1)'s use of the word "custody" encompasses physical detention during the inspection process are eliminated by the explicit cross-reference to § 1225, which mandates detention.[7]

**3. <u>The Current Refugee Policy Does Not Violate Agency Regulations.</u>**

Plaintiffs next argue that the Current Refugee Policy is unlawful as it violates DHS's own regulations, in violation of the APA and the *Accardi* doctrine. (ECF Doc. No. 74 at 35-36). Plaintiffs allege that neither 8 C.F.R. § 207.9 nor 8 C.F.R. § 209.1 "mentions, much less mandate detentions." (ECF Doc. 74 at 36). But this does not create an *Accardi* problem. "*Accardi* has

---

[7] At the least, § 1225 provides a basis for detention for aliens who go through the inspection and examination required by § 1159 and are found to be inadmissible, such that proceedings against them can begin, either through the expedited removal process or removal proceedings before an immigration judge. *See* 8 U.S.C. §§ 1225(b); 1229a.

come to stand for the proposition that agencies may not violate their own rules and regulations to the prejudice of others." *Battle v. F.A.A.*, 393 F.3d 1330, 1336 (D.C. Cir. 2005). And Plaintiffs do not demonstrate any violation. 8 CFR 207.9 describes the process for terminating refugee status, and nothing it says conflicts with any part of the Current Refugee Policy. No conflict with 8 C.F.R. § 209.1—which sets forth the procedures for adjustment of status of refugees—exists either. DHS can comply in full with that regulation, including its provision that requires case-by-case determinations as to "whether an interview by an immigration officer is necessary to determine the applicant's admissibility for permanent resident status under this part," 8 C.F.R. § 209.1(d), while also complying with § 1159(a), which plainly requires that after a year, the refugee "*shall* … return or *be returned* to *the custody* of the Department of Homeland Security [("DHS")] for inspection and examination for admission" as a lawful permanent resident. 8 U.S.C. § 1159(a)(1) (emphases added). For all the reasons set forth above, "custody" encompasses "detention" for purposes of 8 U.S.C. § 1159(a)(1).

The Current Refugee Policy is not contrary to law or its own regulations. The Court should grant Summary Judgment to Defendants on Counts One and Four.

**B. The Current Refugee Policy Is Not Arbitrary and Capricious.**

Plaintiffs claim that the Current Refugee Policy is arbitrary and capricious, alleging that the Administrative Record is insufficient, and that the December 18, 2025 memo rescinding the Chaparro Memo provided "no explanation." (ECF Doc. 74 at 38). However, these arguments are meritless.

The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). A court will generally not disturb an agency action unless "the agency has relied on factors which Congress

has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency," or provided reasoning "so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Manufacturers Association of the United States, Inc.* v. *State Farm Mutual Automobile Insurance Company*, 463 U.S. 29, 43 1983). This standard of review is "deferential": the "court may not substitute its policy judgment for that of the agency." *Prometheus Radio Project,* 592 U.S. at 423. Here, Plaintiffs' claim fails for two reasons.

First, DHS's enforcement decisions are not reviewable under the APA. Under 5 U.S.C. § 701(a)(2), judicial review is unavailable when "agency action is committed to agency discretion by law." Although this language is construed "quite narrowly," *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 586 U.S. 9, 23 (2018), the Supreme Court has strongly suggested that it applies to "the Rescission of a non-enforcement policy," *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 18 (2020); *see id.* at 19 ("Because the DACA program is more than a non-enforcement policy, its rescission is subject to review under the APA."); *cf. United States v. Lee*, 274 F.3d 485, 493 (8th Cir. 2001) (recognizing that the *Accardi* rule "has not been applied to criminal law enforcement policies and procedure"); *In re U.S.*, 197 F.3d 310, 315 (8th Cir. 1999). This makes good sense given that the Constitution vests in Article II, not Article III, the final say on enforcement decisions. *See, e.g.*, *Trump v. United States*, 603 U.S. 593, 620 (2024); *United States v. Texas*, 599 U.S. 670, 678-79 (2023). Any change with respect to the enforcement and implementation of 8 U.S.C. § 1159(a)'s mandate is like a change in policy as to prosecutorial discretion, and such a

change—which involves a "balancing of a number of factors which are peculiarly within [DHS's] expertise," *Heckler v. Chaney*, 470 U.S. 821, 831 (1985)—is not amenable to judicial review.[8]

Second, even if reviewable, the Current Refugee Policy is not arbitrary and capricious. As the December 18, 2025 Rescission Memo explains, the rescission of the 2010 policy—which forbade detention in all circumstances—was motivated by national security and public safety concerns. (USCIS-AR076). For an explanation as to why rescission is warranted, the memorandum cites a December 16, 2025, Presidential Proclamation. *Id.*; *see Restricting and Limiting the Entry of Foreign Nationals to Protect the Security of the United States*, https://www.whitehouse.gov/presidential-actions/2025/12/restricting-and-limiting-the-entry-of-foreign-nationals-to-protect-the-security-of-the-united-states/. When viewed in the light of this Proclamation, the Rescission Memo—which operates only to rescind the flat ban on detention for purposes of enforcing 8 U.S.C. § 1159—is eminently reasonable and DHS's reasons for acting "may reasonably be discerned." *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974).

In addition, the Rescission Memo was shortly followed up by the February 18, 2026, Edlow Memo which not only rescinded the Chaparro Memo, but also set forth a fulsome and extensive rationale for the policy change. In summary, the Edlow Memo noted:

---

[8] The fact that DHS's prior enforcement policy was based on a certain interpretation of 8 U.S.C. § 1159(a) does not mean DHS's decisions are reviewable. *Cf. I.C.C. v. Bhd. of Locomotive Eng'rs*, 482 U.S. 270, 283 (1987) (rejecting "the principle that if the agency gives a 'reviewable' reason for otherwise unreviewable action, the action becomes reviewable"). For example, a "common reason for failure to prosecute an alleged criminal violation is the prosecutor's belief (sometimes publicly stated) that the law will not sustain a conviction." *Id.* Even though that belief is "an eminently 'reviewable' proposition, in the sense that courts are well qualified to consider the point," it remains "entirely clear that the refusal to prosecute cannot be the subject of judicial review." *Id.* The same is true here.

> [T]he changes are designed to better enforce the statutory requirement that aliens admitted as refugees who have been present in the United States for at least one year return or be returned to DHS custody for inspection and examination for admission as an LPR. They further reflect the public policy interest in thorough vetting of aliens admitted as refugees, including vetting for national security, public safety, and fraud-related issues. In making these changes, DHS considered any potential reliance interests, and as explained more fully below, DHS believes that any perceived interests are strongly outweighed by the public policy reasons described below.

(USCIS_AR078-79). The Edlow Memo then provided detailed explanations for the policy change, starting with the need to comply with the statutory framework of 8 U.S.C. § 1159. (USCIS_AR079). The Memo noted that under 8 U.S.C. § 1159, DHS is required to take the affirmative actions of locating, arresting, and taking the alien into custody. (USCIS_AR079), and that custody," as used in INA§ 209(a)(l), 8 U.S.C. § 1159(a)(l), means detention. *See Jennings*, 583 U.S. at 307-08 (relying on "ordinary English usage" to equate "detain" and "custody"). (USCIS_AR079). Furthermore, the Memo explained,

> Detention under INA§ 209(a)(l), 8 U.S.C. § 1159(a)(l), is not novel. Several courts have recognized that the detention of unadjusted refugees is pursuant to INA § 209(a)(l), 8 U.S.C. § 1159(a)(l). *See, e.g., Idle H v. Bondi,* No. 26-cv-315, 2026 WL 266462, at *2-3 (D. Minn. Feb. 2, 2026); *Omanovic v. Crawford,* No. CV06-0208, 2006 WL 2256630, at *5 (D. Ariz. Aug. 7, 2006) (distinguishing between detention pending an admissibility determination under INA§ 209(a)(l) and detention pending a removal proceeding and concluding that detention pending the admissibility determination was under INA§ 209(a)(l)); *Andric* v. *Crawford,* No. CV06-0002, 2006 WL 1544184, at *2 (D. Ariz. May 31, 2006) (same); *see also Luong* v. *Gonzales,* No. CV07-146, 2007 WL 3342727, at *4 (D. Ariz. Nov. 8, 2007) (noting that the immigration court did not have jurisdiction over custody of an alien detained pursuant to INA§ 209, 8 U.S.C. § 1159, and that the petitioner's INA§ 209, 8 U.S.C. § 1159, detention was not indefinite and lasted only for the amount of time to determine his admissibility to the United States).

(USCIS_AR079-80).[9]

---

[9] The cases cited in the Edlow Memo are included in the CAR. *Jennings v. Rodriguez* is at USCS_AR028-067; *Idle H v. Bondi* is at USCIS_AR084-91. *Omanovic v. Crawford* is at

The Edlow Memo noted that the policy changes was critical to ensure full and thorough vetting of refugees who had been admitted to the United States to prevent immigration fraud; reduce the likelihood of adjusting the status of individuals who could threaten the national security of the United States; to protect public safety, and to comply with laws and policies. (USCIS_AR081). The Memo cited to USCIS's Stateside Review of Refugee Cases 2021-2024 and the findings that:

- 10% had evidence of public safety concerns, including gang membership, that were not addressed.
- Over 42% had been insufficiently vetted to determine whether they presented a public safety concern due to an inability to fully verify identity.
- Less than 47% could be conclusively found to not represent a public safety concern.

(USCIS_AR081-82).

Thus, "[i]n light of these known failures, and the likelihood of other similar failures in screening of refugees from other parts of the world," DHS believed "the course correction described in this memorandum is critically important." (USCIS_AR082).

Finally, the Edlow Memo noted that "DHS has carefully considered whether any reliance interests may be affected by the new policy. DHS notes that the statute is clear that refugees must 'return or be returned' to custody upon one year of presence in the United States, and this policy simply implements that clear statutory requirement." (USCIS_AR082). Beyond statutory clarity, refugees are also, "upon conditional admission," "provided notice that they must apply for adjustment of status to become LPRs. This notice is provided on the USCIS website and may

USCIS_AR010-15; *Andric* v. *Crawford* is at CAR at USCIS_AR007-9; and *Luong* v. *Gonzales* is at USCIS_AR016-20.

also come from CBP upon the refugee's admission at a U.S. Port of Entry or from nonprofit resettlement agencies who are charged by the U.S. Department of State through cooperative agreements to assist refugees." (USCIS_AR082).[10] Thus, the Memo explained, "DHS believes that refugees are, and have been, on notice of this requirement and cannot have valid reliance interests in any prior lax enforcement." (USCIS_AR082). DHS therefore concluded that if refugees had valid reliance interests, those interests were outweighed by public policy interests in complying with the statute as well as in through vetting for the purposes of protecting national security and public safety, and for reducing fraud. (USCIS_AR083).

For these reasons, Plaintiff's claim that the Current Refugee Policy is arbitrary and capricious fails. This Policy which follows straight from the plain text of § 1159(a) and is predicated on clear national security concerns, is both "reasonable and reasonably explained." *Prometheus Radio Project*, 592 U.S. at 423. The Court should grant summary judgment to Defendants on Count Two.

### C. The Current Refugee Policy is Not a Legislative Rule Subject to the Notice and Comment Requirement.

Finally, Plaintiffs attempt to characterize the Current Refugee Policy, comprised of the Edlow Memo and the Rescission Memo, as "legislative rules" that are subject to the APA's Notice and Comment Requirement. This argument is meritless. The Court should grant summary judgment to Defendants on Count Three.

The Notice and Comment requirement of the APA appears in the section titled "Rule making," 5 U.S.C. § 553. The Notice and Comment requirement therefore applies only to

[10] The USCIS, Green Card for Refugees website page is included in the CAR at USCIS_AR068-073).

"legislative rules" that have the force and effect of law. *See Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 96 (2015) ("Rules issued through the notice-and-comment process are often referred to as 'legislative rules' because they have the 'force and effect of law.'") (quoting *Chrysler Corp. v. Brown*, 441 U.S. 281, 302-303 (1979)).

On the other hand, the APA specifically exempts interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice, from the Notice and Comment requirement. 5 U.S.C. § 553(b)(3)(A). As the Supreme Court has recognized:

> Not all "rules" must be issued through the notice-and-comment process. Section 4(b)(A) of the APA provides that, unless another statute states otherwise, the notice-and-comment requirement "does not apply" to "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice." 5 U.S.C. § 553(b)(A). …. [T]he critical feature of interpretive rules is that they are "issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers." *Shalala v. Guernsey Memorial Hospital,* 514 U.S. 87, 99 (1995) (internal quotation marks omitted).

*Perez*, 575 U.S. at 96-97; *see Massachusetts v. National Institutes of Health*, 770 F.Supp.3d 277, 312 (D. Mass. 2025) ("Generally speaking, 'interpretative rules, general statements of policy, or rules of agency organization, procedure or practice' are exempted from notice-and-comment rulemaking;" and contrary to a legislative rule which "has the force of law," an interpretative rule is "merely a clarification or explanation of an existing statute or rule." (internal citations omitted)).

In the present case, the Current Refugee Policy qualifies as an interpretative rule. The Policy—as set forth in the Rescission Memo and the Edlow Memo—"reflects [DHS's] construction of" § 1159(a), "a statute that has been entrusted to [DHS] to administer." *Syncor Int'l Corp. v. Shalala*, 127 F.3d 90, 94 (D.C. Cir. 1997). Through the Memos, DHS has acted inform the public—and most importantly conditionally-admitted refugees—about DHS's interpretation, but in no way has DHS purported to "engage in lawmaking." *Id.* Instead, DHS has merely advised

the public that it is now interpreting § 1159(a) in accord with the legal norm "that Congress has devised." *Id.* Thus, these Memos, just like past agency statements on this subject, are not legislative rules and notice and comment is not required. This Court should reject Plaintiffs' arguments to the contrary. The Court should grant summary judgment to Defendants on Count Three.

## CONCLUSION

For the reasons set forth above, Defendants respectfully request that the Court grant Defendants' motion for summary judgment on Counts I-IV of the Complaint and deny Plaintiffs' motion for partial summary judgment on these counts.

Respectfully submitted,

LEAH B. FOLEY
United States Attorney

Dated: September 14, 2026

By: */s/ Shawna Yen*

Shawna Yen
Assistant United States Attorney
United States Attorney's Office
1 Courthouse Way, Suite 9200
Boston, MA 02210
Tel.: 617-748-3100
Email: Shawna.Yen@usdoj.gov

## CERTIFICATE OF SERVICE

I, Shawna Yen, Assistant United States Attorney, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

Dated: September 14, 2026

By: */s/ Shawna Yen*
Shawna Yen
Assistant United States Attorney