**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

JEAN A., *et al.*,

*Plaintiffs*,

v.

MARKWAYNE MULLIN, in his official capacity as Secretary of Homeland Security, *et al.*,

*Defendants*.

Case No. 3:26-cv-30031

**REPLY BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND VACATUR UNDER 5 U.S.C. § 706**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........ ii

INTRODUCTION ........ 1

ARGUMENT ........ 2

1. The Refugee Detention Policy is Reviewable ........ 2

2. The Refugee Detention Policy is Contrary to Law ........ 3

   a. Section 1159(a) does not authorize detention of unadjusted refugees. ........ 4

   b. Section 1225 does not authorize detention of lawfully admitted refugees. ........ 9

   c. The Refugee Detention Policy Violates Agency Regulations. ........ 10

3. The Refugee Detention Policy is Arbitrary and Capricious. ........ 11

   a. The Refugee Rescission Memo is Arbitrary and Capricious. ........ 11

   b. The Refugee Detention Memo is Arbitrary and Capricious. ........ 12

4. The Refugee Detention Policy Failed to Follow Notice and Comment. ........ 15

5. Defendants Do Not Dispute that Vacatur and Declaratory Relief Are Appropriate Remedies. ........ 18

CONCLUSION ........ 19

**TABLE OF AUTHORITIES**

Page(s)

**CASES**

*Aleksander B. v. Trump*, No. 26-CV-170, 2026 WL 172435 (D. Minn. Jan. 22, 2026)................. 4

*Am. Hosp. Ass'n v. Kennedy*, 164 F.4th 28 (1st Cir. 2026) ........................................................ 14

*Andric v. Crawford*, No. CV06-0002, 2006 WL 1544184 (D. Ariz. May 31, 2006) .................... 12

*Aviators for Safe & Fairer Regul., Inc. v. FAA*, 221 F.3d 222 (1st Cir. 2000) ............................. 17

*Bowser v. Noem*, No. 26-CV-10382-AK, 2026 WL 555624 (D. Mass. Feb. 27, 2026)............... 14

*Citizens to Pres. Overton Park Inc. v. Volpe*, 401 U.S. 402 (1971) ................................................ 2

*Clark v. Martinez*, 543 U.S. 371 (2005)........................................................................................ 3, 5

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799 (2024) .......................... 18

*DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1 (2020) .......................................................... 2, 3

*Dist. Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46 (D.C. Cir. 2015) ........................................... 13

*Doe v. Noem*, 817 F. Supp. 3d 27 (D. Mass. 2026) ...................................................................... 14

*Hamdan v. Rumsfeld*, 548 U.S. 557 (2006)...................................................................................... 6

*Heckler v. Chaney*, 470 U.S. 821 (1985) .................................................................................. 2, 17

*Idle H. v. Bondi*, No. 26-CV-315, 2026 WL 266462 (D. Minn. Feb. 2, 2026) .............................. 5

*Jama A.O. v. Bondi*, No. 26-420, 2026 WL 185767 (D. Minn. Jan. 23, 2026)............................. 4

*Jennings v. Rodriguez*, 583 U.S. 281 (2018)..................................................................................... 6

*Jerson A.D.G. v. Bondi*, No. 26-516, 2026 WL 207352 (D. Minn. Jan. 27, 2026)........................ 4

*La Casa Del Convaleciente v. Sullivan*, 965 F.2d 1175 (1st Cir. 1992)....................................... 15

*Liban G. v. Noem*, No. 26-CV-0301, 2026 WL 185334 (D. Minn. Jan. 23, 2026) ........................ 5

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024)................................................................. 8

*Luong v. Gonzales*, No. CV07-146, 2007 WL 3342727 (D. Ariz. Nov. 8, 2007) ........................ 13

*Matter of D-K-*, 25 I. & N. Dec. 767 (BIA 2012) .................................................................... 9, 10

*Matter of Garcia-Alzugaray*, 19 I. & N. Dec. 407 (BIA 1986) ................................................... 10

*Mohamednoor A. v. Bondi*, No. 26-CV-525, 2026 WL 221926 (D. Minn. Jan. 28, 2026) ....................................................................................................................... 4

*New Hampshire Hospital Ass'n v. Azar,* 887 F.3d 62 (1st Cir. 2018)......................... 15, 16, 17, 18

*New York v.*, 804 F. Supp. 3d 294 (D.R.I. 2025) ....................................................................... 17

*Omanovic v. Crawford*, No. CV06-0208, 2006 WL 2256630 (D. Ariz. Aug. 7, 2006) ................ 12

*Rotinsulu v. Mukasey*, 515 F.3d 68 (1st Cir. 2008) .................................................................... 10

*Smith v. City of Jackson, Miss.*, 544 U.S. 228 (2005) .................................................................. 6

*Syncor Int'l Corp. v. Shalala*, 127 F.3d 90 (D.C. Cir. 1997)........................................................ 18

*Tah L. v. Trump*, No. CV 26-00171, 2026 WL 184524 (D. Minn. Jan. 19, 2026) ......................... 5

*U.H.A. v. Bondi*, 817 F. Supp. 3d 752 (D. Minn. 2026)................................................................. 4

*U.H.A. v. Bondi*, 819 F. Supp. 3d 946 (D. Minn. 2026)............................................................ 4, 8

*U.H.A. v. Bondi*, 822 F. Supp. 3d 1007 (D. Minn. 2026)............................................................... 6

*U.S. ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954) ........................................................... 10

*United States v. Pizarro-Berríos*, 448 F.3d 1 (1st Cir. 2006) ....................................................... 12

*Warder v. Shalala*, 149 F.3d 73 (1st Cir. 1998)............................................................................ 17

*Woonasquatucket River Watershed Council v. USDA*, 186 F.4th 25 (1st Cir. 2026) .................... 18

**STATUTES**

5 U.S.C.
§ 553........................................................................................................................ 15
§ 553(b)(A) ............................................................................................................. 15
§ 703........................................................................................................................ 19
§ 706(2).................................................................................................................... 18
§ 706(2)(D) ............................................................................................................. 18

8 U.S.C.
§ 1157(c)(1) ..... 7
§ 1159(a) ..... 2, 9, 16
§ 1159(b) ..... 9
§ 1182(d)(5)(A) ..... 5
§ 1225 ..... 9, 11
§ 1225(b)(1)(B)(iii)(IV) ..... 9
§ 1226 ..... 6, 9, 11
§ 1226(a) ..... 9
§ 1226(c) ..... 6
§ 1357 ..... 5, 9
§ 1357(a)(2) ..... 5

Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, 110 Stat. 3009-546 (1996) ..... 6

Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102 (1980) ..... 6

**REGULATIONS**

8 C.F.R.
§ 207.4 ..... 10
§ 209.1 ..... 10
§ 236 ..... 11
§ 239 ..... 11
§ 287.3 ..... 5, 10, 11
§ 287.3(d) ..... 5, 8, 11
§ 287.8 ..... 11
§ 287.8(c)(2)(i) ..... 5, 11

**OTHER AUTHORITIES**

Joseph B. Edlow & Todd M. Lyons, Detention of Refugees Who Have Failed to Adjust to Lawful Permanent Resident Status (Feb. 18, 2026) ..... 7

Proclamation No. 1099890, Fed. Reg. 59717 (Dec. 16, 2025) ..... 11

## INTRODUCTION

Each of Defendants' arguments in support of their new Refugee Detention Policy depends on their erroneous conclusion that §1159(a) mandates indefinite detention of unadjusted refugees, a nonexistent requirement that Defendants have arbitrarily and unlawfully read into the statute fifty years after its enactment. Defendants' basic premise that they discovered mandatory and indefinite detention authority in §1159 is wrong, and as a result their justifications for the Refugee Detention Policy fall apart.

*First*, the Refugee Detention Policy is not an unreviewable enforcement decision, because there is no detention authority to enforce in §1159; instead, it is a wholly new policy that is reviewable under the APA. *Second*, Defendants' attempt to transform a requirement that refugees apply for adjustment after one year into a mandate to detain them is contrary to any historical, contextual, or common-sense reading of the statute and does not comport with agency regulations. With no other statutory or regulatory authority to detain unadjusted refugees, the Refugee Detention Policy is contrary to law. *Third*, Defendants' stated justifications for their policy changes are unsupported by their thin administrative record or any other evidence, and their dismissal of refugees' reliance interests or any sensible alternatives to mass detention renders their abrupt and dramatic departure from prior agency practice arbitrary and capricious. *Fourth*, Defendants' characterization of the Refugee Detention Policy as an interpretive rule rather than a legislative rule imposing entirely new obligations on resettled refugees cannot be squared with the language of the statute or the agencies' longstanding practice and therefore cannot justify the flouting of notice-and comment requirements. Promulgated without any attempt to follow procedural requirements and without any support in statute, regulation, case law, historical practice or

reasoned decision-making, the Refugee Detention Policy should be set aside and declared unlawful.

## ARGUMENT

### 1. The Refugee Detention Policy is Reviewable

Defendants attempt to evade this Court's review by disingenuously recasting their novel legal interpretations and unprecedented policy changes as enforcement decisions. Defs' Opp'n and Mot. for Partial Summ. J., ECF No. 84 at 24. There is a strong presumption in favor of judicial review of agency action. *Citizens to Pres. Overton Park Inc. v. Volpe,* 401 U.S. 402, 410 (1971). The only exceptions to this presumption are if Congress specifically precluded judicial review–which it clearly did not here–or if the challenged action is committed to agency discretion by law. *Id.* The exception for agency actions committed to discretion by law is extremely narrow, *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16-70 (2020), and the Refugee Detention Policy does not fall within it.

Agency action is committed to discretion by law only when there is no law to apply or no meaningful standard for judicial review. *Heckler v. Chaney*, 470 U.S. 821, 830 (1985). Here, there is law to apply. Using nondiscretionary language, §1159(a) clearly explains the process refugees must go through to adjust their status after one year of physical presence in the United States, as well as the factors the government may consider when adjudicating those applications. The provision makes no mention of detention in conjunction with inspection and examination for adjustment of status. *See* 8 U.S.C. § 1159(a) (requiring that all refugees who have been physically present in the United States for "at least one year . . . shall . . . return or be returned to the custody of the Department of Homeland Security" for adjustment of status and "shall . . . be regarded as lawfully admitted to the United States for permanent residence" provided that they are admissible).

Defendants' argument that their new policy of mandatorily detaining all unadjusted refugees is equivalent to the rescission of a non-enforcement policy and therefore committed to agency discretion by law is meritless. ECF No. 84 at 24. While enforcement decisions are typically actions committed to agency discretion, *Regents*, 591 U.S. at 18, the Refugee Detention Policy is not an enforcement decision, because § 1159(a) nowhere authorizes detention, much less mandatory detention, of unadjusted refugees. *See infra* at 4-8. There is therefore no detention authority to enforce, and "declining" to detain refugees was an application of the law, not an exercise in discretion. Agency practice over the past forty-five years, in which unadjusted refugees were not subject to mandatory detention simply for not having adjusted status, in fact correctly interpreted the statute's plain language; it was not, as Defendants appear to argue, an unarticulated, unpublished, and unproduced policy of prosecutorial discretion. *See infra* at 7-8. The vast majority of courts that have considered the question held that §1159(a) does not authorize detention, and the Supreme Court has clearly held that the term "custody" does not authorize, much less mandate, detention. *See infra* at 5 (discussing *Clark v. Martinez*, 543 U.S. 371 (2005)). The Refugee Detention Policy is not an enforcement decision committed to agency discretion; it is a new and unprecedented policy that is squarely subject to judicial review under the APA.

**2. The Refugee Detention Policy is Contrary to Law**

The Refugee Detention Policy violates the careful statutory scheme created by Congress. Contrary to Defendants' assertions, neither § 1159(a) nor § 1225 authorizes or even mentions detention of refugees merely because they have not adjusted status after one year, nor do agency regulations contemplate indefinite detention for the purpose of adjudicating adjustment of status applications. And Defendants fail to respond to Plaintiffs' arguments that the policy is contrary to

§§ 1226, 1229a, 1231, 1357 at all, thereby forfeiting those arguments. *See* Pls.' Mot. for Partial Summ. J., ECF No. 74 at 23-25.

**a. Section 1159(a) does not authorize detention of unadjusted refugees.**

Defendants misconstrue not only the express language of § 1159(a), but also the words "plain meaning," when they invent mandatory authority to detain all unadjusted refugees simply because the government has not yet granted them permanent status. ECF No. 84 at 20. First, the word "detention" appears nowhere in section 1159(a), which describes the process for adjusting status to lawful permanent residence and certainly does not authorize or even imply a broad mandatory detention scheme. *Id.*

Indeed, the overwhelming majority of courts to interpret § 1159(a) during the weeks that Defendants implemented their policy of detaining unadjusted refugees in Minnesota found that § 1159(a) did not authorize detention, a fact that Defendants simply ignore. *See, e.g., U.H.A. v. Bondi*, 817 F. Supp. 3d 752, 765 (D. Minn. 2026) (temporarily restraining the detention of a provisional class of unadjusted refugees who had not been charged with removability); *U.H.A. v. Bondi*, 819 F. Supp. 3d 946, 953-55 (D. Minn. 2026) (vacated after voluntary dismissal by Plaintiffs) (enjoining same and noting that Defendants' interpretation would require indefinite detention of unadjusted refugees in violation of the Due Process clause); *Jama A.O. v. Bondi*, No. 26-420, 2026 WL 185767, at *3 (D. Minn. Jan. 23, 2026) (while section 1159(a)(1) permits "custody" of a refugee for a "limited time" for the purpose of inspection and examination for admission as a lawful permanent resident, "[p]er the plain text of the statute, any continued detention … must be based on the provisions of sections 1225, 1229a, and 1231"); *Aleksander B. v. Trump*, No. 26-CV-170, 2026 WL 172435, at *5 (D. Minn. Jan. 22, 2026); *Jerson A.D.G. v. Bondi*, No. 26-516, 2026 WL 207352, at *2 (D. Minn. Jan. 27, 2026); *Mohamednoor A. v. Bondi*,

No. 26-CV-525, 2026 WL 221926, at *2-3 (D. Minn. Jan. 28, 2026); *Liban G. v. Noem*, No. 26-CV-0301, 2026 WL 185334, at *3-4 (D. Minn. Jan. 23, 2026); *Tah L. v. Trump*, No. CV 26-00171, 2026 WL 184524, at *6-7 (D. Minn. Jan. 19, 2026). Instead, Defendants rely on *Idle H. v. Bondi*, No. 26-CV-315, 2026 WL266462 (D. Minn. Feb. 2, 2026), the only decision out of dozens from the District of Minnesota to entertain the possibility that § 1159 allows for a time-limited detention of unadjusted refugees. ECF No. 84 at 20. But even that court required that detention be used only for determining removability, which must occur within 48 hours1–a far cry from Defendants' claimed authority to detain all unadjusted refugees without any time limits at all. *Idle H.*, 2026 WL 266462, at *3-7.

To justify their unsupported assertion of authority to detain all unadjusted refugees, Defendants rewrite the accepted meaning of the term "custody" in section 1159. ECF No. 84 at 19. As Plaintiffs point out, ECF No. 74 at 13-18, in *Clark v. Martinez*, 543 U.S. 371 (2005), the Supreme Court interpreted section 1182(d)(5) of the Immigration and Nationality Act (INA) to distinguish "custody" from "detention" where the statutory language was nearly identical to that in §1159(a). *See* 8 U.S.C. §1182(d)(5)(A) (requiring that a noncitizen whose parole has ended "shall … return or be returned to . . . custody")." In *Clark*, the Court found "nothing in this text [of §1182(d)(5)] that affirmatively authorizes detention," and concluded that a noncitizen whose parole is revoked is subject to detention only to the extent "any other applicant for admission" would be subject to detention under other parts of the INA. 543 U.S. at 385 (emphasis omitted).

[1] *Idle H.* did not address and in fact is contrary to 8 U.S.C. § 1357 and 8 C.F.R § 287.3. Section 1357 restricts warrantless arrest of noncitizens to only when DHS has probable cause to believe the noncitizen is removable and "likely to escape before a warrant can be obtained." *See* 8 U.S.C. § 1357(a)(2); 8 C.F.R §§ 287.3(d); 287.8(c)(2)(i). Failure to apply for adjustment of status after one year is not a basis for removability so cannot provide probable cause for warrantless arrest and detention of refugees. *See* ECF No. 74 at 24-26.

"[W]hen Congress uses the same language in two statutes having similar purposes . . . it is appropriate to presume that Congress intended that text to have the same meaning." *U.H.A. v. Bondi*, 822 F. Supp. 3d 1007, 1030 (D. Minn. 2026) (citing *Smith v. City of Jackson, Miss.*, 544 U.S. 228, 233 (2005)). Accordingly, the word "custody" in § 1159(a) does not refer to detention, just as it did not in § 1182(d)(5).

Ignoring *Clark* entirely, Defendants instead cite *Jennings v. Rodriguez*, 583 U.S. 281, 307-08 (2018), to assert that "custody" means "detention." ECF No. 84 at 19. While the Supreme Court in *Jennings* did interpret the word "custody" in § 1226(c) to mean detention, the context in which the word is used is different and instructive. *Id.* Section 1226(c) is found in a provision of the INA entitled "Apprehension and Detention of Aliens," with the subsection "Detention of Criminal Aliens." 8 U.S.C. §§ 1226, 1226(c). In this context, the use of the word "custody" can be read to mean detention. But § 1226(c) does not apply to Plaintiffs, who are unadjusted refugees, and has no relationship at all to § 1159. Defendants' reliance on a case interpreting the detention provisions of the INA–which were enacted in 1996, sixteen years after the Refugee Act, and for enforcement rather than adjustment purposes–cannot strip the term "custody" in § 1159 of all context and render it capable of their desired meaning. *Compare* Refugee Act of 1980, Pub. L. No. 96-212, § 101(a), 94 Stat. 102, 102 (1980) (declaring the purpose of the act to respond to the "urgent needs" of individuals subject to persecution) *with* Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, § 303, 110 Stat. 3009-546, 3009-585 (1996) (amending 8 U.S.C. § 1226 to add the current framework for detention of noncitizens). Congress's choice not to use "detention" in § 1159 is meaningful. *See Hamdan v. Rumsfeld*, 548 U.S. 557, 578 (2006) ("[A] negative inference may be drawn from the exclusion of language from one statutory provision that is included in other provisions of the same statute."). Defendants' reading of § 1159 is illogical

when read in the context of the Refugee Act as a whole, through which Congress sought to ensure eligible refugees would be entitled to the stability of Lawful Permanent Resident (LPR) status after one year, not place tens of thousands of refugees in indefinite detention on their 366th day in the United States.

Defendants' own position undermines their argument that "custody" in § 1159 means detention. Defendants argue that "DHS must arrest and detain a refugee who has been present for over a year" and that even if they have applied for adjustment, they could be subject to indefinite detention when called in for "inspection and examination." ECF No. 84 at 17. At the same time, they concede (as they must) that § 1159(a) states refugees may voluntarily "return" by applying for adjustment of status.[2] ECF No. 84 at 17-18. To accept otherwise would render the first part of the provision "*return* or be returned to custody" superfluous. If submission of an application for adjustment of status–which, as for all applicants for lawful permanent residence, in no way encompasses physical detention–constitutes a voluntary return to custody, then "custody" cannot be synonymous with "detention."

In any case, as this Court has recognized, Order Granting Stay, ECF No. 51, "return to custody" cannot mean "return to detention," because on initial admission refugees are not detained. Instead, they are inspected at a port of entry and then permitted to enter the country after establishing their admissibility as refugees. 8 U.S.C. §1157(c)(1). So whatever refugees are

[2] Defendants' position that an application for adjustment of status constitutes a voluntary return to custody under § 1159(a) is at odds with the government's stated position in the Refugee Detention Memo, authorizing arrest and detention of any refugees who have not acquired lawful permanent resident status at the one-year mark. While the memo does state that refugees who apply for adjustment of status "may be considered to have voluntarily returned to custody", it does not affirm that these refugees will not be detained. Mem. from Joseph B. Edlow & Todd M. Lyons, Detention of Refugees Who Have Failed to Adjust to Lawful Permanent Resident Status (Feb. 18, 2026) at 3, ("Refugee Detention Memo") (Compl. Ex. 2, ECF No. 1-4).

"returning" to under section 1159, it cannot be detention. *See* ECF No. 51; *U.H.A.*, 819 F. Supp. 3d at 952-53.

A historical interpretation of the statute confirms that § 1159(a) does not authorize detention. For nearly fifty years, no administration has found that section 1159 authorizes indefinite detention of refugees for inspection and examination for adjustment. *See* ECF No. 75, SUF at ¶¶ 18-33. Initial interpretations that have remained "consistent over time" are especially useful in "determining [a] statute's meaning." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394 (2024). Out of the entire historical record, Defendants cherry-pick a lone outlier source that authorized detention of refugees–the 2001 INS Memo–while conveniently ignoring numerous sources pre-and post-dating that memo taking Plaintiffs' position that §1159(a) does not authorize detention. *See* ECF No. 74 at 13 n.3; ECF no. 75, SUF at ¶¶ 18-33.

Still, Defendants' citation to the 2001 INS memo does not support the Refugee Detention Policy. While the memo acknowledged authority to detain refugees who had not applied for adjustment of status after one year, it did not create a mandatory detention requirement, nor did it authorize detention of refugees whose applications for adjustment of status were pending. Moreover, the memo requires a determination on whether to release the refugee or issue a Notice to Appear within 48 hours of arrest, in compliance with 8 C.F.R. § 287.3(d). The memo provides no basis for mandating indefinite detention of all unadjusted refugees regardless of whether they applied for adjustment of status. Defendants' claim to the contrary distorts the historical record.

Finally, Defendants' argument that meaning is to be drawn from the absence of the word "custody" in a separate provision governing adjustment of status for asylees is meritless. ECF No. 84 at 21. The adjustment of status scheme for asylees differs from refugee adjustment of status in many respects. Unlike refugees, asylees are not required to apply to adjust their status after one

year, and DHS has discretion to approve or deny their adjustment of status applications, even if they meet the minimum requirements. 8 U.S.C. § 1159(b). By comparison, refugees are required to apply for adjustment of status, and DHS lacks discretion to deny their applications as long as they are found to be admissible to the United States. *Id*. § 1159(a). Accordingly, Congress did not require that asylees "return or be returned to custody" for adjustment of status because adjustment of status is not a requirement for asylees at all.[3] The distinction between the two provisions thus has no bearing on whether § 1159(a) authorizes detention, which it cannot do because the INA authorizes detention of individuals lawfully admitted to the country only when there is probable cause to believe that a noncitizen is removable, 8 U.S.C. § 1357, or when a notice to appear initiating removal proceedings based on that probable cause finding is issued. *Id.*, §§ 1225, 1226.

**b. Section 1225 does not authorize detention of lawfully admitted refugees.**

Section 1159(a)'s cross-reference to §1225 does not provide a basis for detention of unadjusted refugees. Defendants fail to address Plaintiffs' arguments that the plain text of § 1225 precludes its application to refugees. *See* ECF No. 74 at 19-20. Section 1225 only authorizes detention of noncitizens who are arriving in the United States or who are present in the United States without admission or parole. 8 U.S.C. § 1225. A previously admitted refugee is neither an applicant for admission under § 1225 nor are they arriving in the United States. *See* ECF No. 74 at 19; *Matter of D-K-*, 25 I. & N. Dec. 761, 769 (BIA 2012).

Defendants argue that refugee admissions are conditional and that consequently refugees revert back to applicants for admission subject to detention under § 1225 at the one-year mark.

---

[3] Defendants' argument can be construed to support Plaintiffs' position that § 1159(a) does not authorize detention of unadjusted refugees. The absence of the word "detention" from § 1159(a) compared to its inclusion in other provisions of the INA indicates that Congress did not intend for § 1159(a) to authorize detention of unadjusted refugees. *Compare* 8 U.S.C. § 1159(a) *with* 8 U.S.C. §§ 1225(b)(1)(B)(iii)(IV), 1226(a).

ECF No. 84 at 22. While DHS's implementing regulations of § 1157 and some Board of Immigration Appeals caselaw describe refugee admission as conditional, 8 C.F.R. § 207.4; *Matter of Garcia-Alzugaray*, 19 I. & N. Dec. 407 (BIA 1986); *Matter of D-K-*, 25 I. & N. Dec. at 767-68, neither these administrative cases, nor the statutory text, judicial precedent, nor legislative history provide any support for Defendants' notion that refugees revert back to initial applicants for admission after one year. ECF No. 74 at 21-22. That refugees must apply for adjustment of status does not alter the fact that they have been previously admitted to the United States as refugees. *See Matter of D-K-*, 25 I. & N. Dec. at 767-68. Therefore, § 1225 does not authorize detention of lawfully admitted refugees solely because they have not yet adjusted their status.

**c. The Refugee Detention Policy Violates Agency Regulations.**

The Refugee Detention Policy violates DHS's own regulations and the *Accardi* Doctrine. *See U.S. ex rel. Accardi v. Shaughnessy,* 347 U.S. 260 (1954) (requiring federal agencies to follow their own binding regulations); *Rotinsulu v. Mukasey*, 515 F.3d 68, 72 (1st Cir. 2008) (same). The regulations governing the procedures for adjustment of status of refugees make no mention of a requirement that refugees be detained for inspection and examination. 8 C.F.R. § 209.1. Defendants' new policy of mandatorily detaining unadjusted refugees upends the regulations' orderly procedure of filing an application for adjustment of status and attending an interview with an immigration officer in certain cases. Aside from a bare assertion that their new regime presents no conflict with the regulations, Defendants fail to provide any meaningful response to Plaintiffs' *Accardi* claim, and they fail to even acknowledge Plaintiffs' argument that the Refugee Detention Policy violates 8 C.F.R. § 287.3's restrictions on warrantless arrest and detention of noncitizens. *See* 8 C.F.R. § 287.8(c)(2)(i) (authorizing immigration officers to make an arrest only upon "reason to believe" that the person arrested has committed an offense or is removable); 8 C.F.R. § 287.3(d)

(requiring that within 48 hours of a warrantless arrest a determination be made whether to release the non-citizen or issue a notice to appear and a warrant of arrest as prescribed in 8 CFR § 236 and 239, regulations governing detention under 8 U.S.C. §§ 1225 and 1226). By authorizing indefinite detention of lawfully admitted refugees in circumstances that plainly fall outside the limited scope of 8 C.F.R. §§ 287.3 and 287.8, Defendants violated the *Accardi* doctrine.

**3. The Refugee Detention Policy is Arbitrary and Capricious.**

The Refugee Detention Policy fails to meet even the bare minimum standards for reasoned decision-making required under the APA. Defendants offer no justification for their actions beyond the scant reasoning contained in the memos themselves. As Plaintiffs have argued, these paltry explanations do not withstand APA review. ECF No. 74 at 28-33. Defendants also wholly fail to address Plaintiffs' arguments that the administrative record is insufficient to show reasoned decision-making. *See* ECF No. 74 at 28.

**a. The Refugee Rescission Memo is Arbitrary and Capricious.**

Defendants fail to defend the Refugee Rescission Memo of December 18, 2025–a one-sentence decision abruptly rescinding a 16-year-old policy. The only explanation provided for the one-sentence decision to rescind the 2010 ICE Policy is a reference to a December 16, 2025, Presidential Proclamation restricting the entry of foreign nationals from designated countries to the United States, but even that proclamation "[does] not apply . . . to a refugee who has already been admitted to the United States." Proclamation No. 10998 § 8(d), 90 Fed. Reg. 59717, 59728 (Dec. 16, 2025).

Puzzlingly, Defendants claim that the Refugee Rescission Memo becomes "eminently reasonable" in the light of this inapposite proclamation, and the agency's reasons for acting "may reasonably be discerned." ECF No. 84 at 25. But contrary to Defendants' fanciful suggestion, the

rationale for a policy of detaining refugees *in the United States* cannot be discerned from a citation to a proclamation barring entry of non-citizens that does not even apply to resettled refugees. The Refugee Rescission Memo's lack of any explanation, with no indication of how Defendants reasoned they had the authority to detain unadjusted refugees already inside the United States or why such a change in policy was necessary, is apparent in the text of the memo.

**b. The Refugee Detention Memo is Arbitrary and Capricious.**

Plaintiffs' brief outlines in extensive detail the myriad ways in which the Refugee Detention Memo runs afoul of the APA, listing eight independent bases for finding the memo arbitrary and capricious. ECF No. 74 at 29-36. Defendants respond to none of them and have therefore forfeited any opposition. *See United States v. Pizarro-Berríos*, 448 F.3d 1, 5 (1st Cir. 2006) ("We have consistently held that, except in extraordinary circumstances, arguments not raised in a party's initial brief and instead raised for the first time at oral argument are considered waived"). Instead, their brief repeats verbatim the reasoning contained in the Refugee Detention Memo, claiming that it is sufficient to satisfy the arbitrary and capricious standard. ECF No. 84 at 23-28. Not so. First, the Memo argues that its interpretation of § 1159(a) is not novel, based on *Idle H. v. Bondi* (a district court decision that outright rejected Defendants' argument for indefinite detention on due process grounds *see supra* at 5) and three inapposite, outdated cases that concerned refugees arrested following a criminal conviction that made each refugee removable and therefore subject to detention under § 1226. *Andric v. Crawford*, No. CV06-0002, 2006 WL 1544184 (D. Ariz. May 31, 2006); *Omanovic v. Crawford*, No. CV06-0208, 2006 WL 2256630 (D. Ariz. Aug. 7, 2006); *Luong v. Gonzales*, No. CV07-146, 2007 WL 3342727 (D. Ariz. Nov. 8, 2007).

Defendants next argue that the Detention Memo's citation of the USCIS Stateside Review of Refugee Cases 2021-2024–covering a small fraction of refugees from just five countries–is sufficient to demonstrate that *all* refugees who entered between 2021-2025 might pose a national security risk and require further vetting. ECF No. 84 at 27. Defendants fail to address any of Plaintiffs' arguments regarding the insufficiency of this review, ECF No. 74 at 33-34, including the lack of explanation as to how USCIS determined whether sufficient vetting had occurred, the disconnect between the Policy and the memo's conclusion that less than ten percent of reviewed cases contained evidence of public safety concerns, and the failure to explain what those "concerns" consisted of. *Id.*; *See Dist. Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46, 56-57 (D.C. Cir. 2015) ("an agency's reliance on a report or study without ascertaining the accuracy of the data contained in the study or the methodology used to collect the data is arbitrary" (quotation mark omitted). The memo provides no evidence of widespread issues in vetting or fraud and certainly does not explain why an inconclusive review of a small number of refugees from five Latin American countries has any bearing on the sufficiency of the refugee admissions process for individuals from other parts of the world. Even if further vetting of already-admitted refugees were necessary, the memo provides no explanation for why mandatory detention of all refugees who have not adjusted status after one year is necessary to achieve this goal.

Indeed, Defendants present no evidence to show that detention is necessary to implement § 1159(a)'s adjustment of status provision or that prior policies were insufficient. *See* ECF No. 84 at 18. Their conjecture that absent detention refugees would be free to flout adjustment of status interviews, *id.*, is purely speculative and unsupported by evidence, not to mention illogical given that adjustment of status provides refugees with permanent status and a pathway to citizenship.

Nor have Defendants provided evidence to show that they considered any alternative to detention. This failure alone renders the policy arbitrary and capricious.

Defendants further failed to adequately consider reliance interests in their longstanding policy, "a critical factor in the analysis of an arbitrary-and-capricious claim." *Am. Hosp. Ass'n v. Kennedy*, 164 F.4th 28, 33 (1st Cir. 2026). Defendants' circular argument that refugees have no valid reliance interest because the statutory mandate for detention is clear depends entirely on their erroneous view of the meaning of § 1159. ECF No. 84 at 27-28. But nearly 50 years of immigration authorities' application of an orderly adjustment process plainly engenders reliance interests in those who have gone through years-long application processes to seek safety, and who have spent not a single unauthorized moment inside the United States. *See* ECF No. 74 at 35.

Moreover, Defendants dismiss the consequences of detention as "outweighed by [the] public policy interests in complying with the statute." ECF No. 84 at 28. But their failure to even consider the significant interests of loss of liberty, financial hardship, and separation from family members and to weigh them against the purported benefits of a mandatory detention regime was arbitrary and capricious. *Bowser v. Noem*, No. 26-CV-10382-AK, 2026 WL 555624, at *8 (D. Mass. Feb. 27, 2026) (conclusory explanation in USCIS memo placing hold on adjudication of immigration benefits was insufficient to explain how the agency weighed competing factors or considered the consequences and burdens imposed on applicants); *Doe v. Noem*, 817 F. Supp. 3d 27, 46-47 (D. Mass. 2026) (DHS failed to adequately consider the reliance interests of parolees who were invited to apply by the U.S. government and were in line to adjust to lawful permanent resident status).

Finally, Defendants do not address Plaintiffs' arguments that the Refugee Detention Memo relies on an incorrect legal and factual premise–that detention is justified by a need for re-vetting–

even though § 1159(a) does not contemplate re-vetting. *See* ECF No. 74 at 31. They do not acknowledge that refugees are the most thoroughly vetted group of noncitizens admitted to the United States, and that USCIS's current indefinite suspension of adjudications of pending refugee adjustment of status applications stopped tens of thousands of refugees from adjusting their status after one year. *See id*. at 31-32. And they fail to grapple with the impossibility of compliance with the new regime, because a refugee would have to apply for adjustment of status far enough in advance to have their adjustment application adjudicated no later than their 366th day in the United States to avoid mandatory detention. *Id.* at 33. Indeed, it is hard to imagine how Defendants would be able to counter these arguments in support of this senseless policy. The Refugee Detention Policy is arbitrary and capricious and must be set aside.

**4. The Refugee Detention Policy Failed to Follow Notice and Comment.**

The APA requires legislative rules to be promulgated through notice and comment. 5 U.S.C. § 553. As the First Circuit explained in *New Hampshire Hospital Ass'n v. Azar*, a legislative rule is "one that 'creates rights, assigns duties, or imposes obligations, the basic tenor of which is not already outlined in the law itself.'" 887 F.3d 62, 70 (1st Cir. 2018) (quoting *La Casa Del Convaleciente v. Sullivan*, 965 F.2d 1175, 1178 (1st Cir. 1992). The government seemingly does not dispute that the Refugee Detention Policy satisfies this basic test. Nor could it: the policies impose a new obligation on all refugees to submit to indefinite detention after one year in the United States. ECF No. 74 at 36-37. Instead, the government invokes the narrow exception to notice and comment for interpretative rules. ECF No. 84 at 29; *see also* 5 U.S.C. § 553(b)(A). But it does not cite, much less apply, the controlling legal framework. In *Azar*, the First Circuit set forth a five-factor test for distinguishing between legislative and interpretive rules. All five *Azar*

factors confirm that the Refugee Detention Policy was required to comply with notice and comment.

First, "the words of the statute" do not compel the Refugee Detention Policy. *Azar*, 887 F.3d at 71. As discussed above, the plain language of 8 U.S.C. § 1159(a) does not authorize the warrantless arrest and potentially indefinite detention of lawfully admitted refugees. *See supra* Section 2.a. This is not a case where "the only plausible interpretation of the statutory and regulatory scheme" is "the one advanced" by the agency. *Azar*, 887 F.3d at 71. And, even if § 1159(a) could be read to permit the detention of refugees in some circumstances (and it cannot), the words of the statute do not require mandatory detention of all refugees. Here, the agency is at best "making a discretionary policy judgment" untethered from any "statutory command." *Id.* Under *Azar*, such discretionary policy judgments must comply with notice and comment.

Second, the agency's explanation of the Refugee Detention Policy shows that the policy is not "the result of a strictly interpretive exercise." *Id.* at 72. The Refugee Detention Memo, citing a wide variety of "[p]olicy [i]mplications" related to "[f]raud [p]revention," "[n]ational [s]ecurity," and "[p]ublic [s]afety," makes clear that the new policy was not animated entirely by the agency's interpretation of its statutory obligations. Refugee Detention Memo at 5. The memo criticizes prior policies that purportedly "prioritized speed and volume of refugee admissions over depth and quality of refugee adjudications," and asserts that the new policy will somehow serve to rectify "known failures" in the "screening of refugees." *Id.* at 5-6. The agency's own invocation of wide-ranging policy considerations shows that it was engaged in "policymaking"–not mere "interpretation." *Azar*, 887 F.3d at 72. Indeed, the government's own brief characterizes the Refugee Detention Policy as an exercise of "agency discretion" that requires "a 'balancing of a number of factors which are peculiarly within [DHS]'s expertise.'" ECF No. 84 at 25 (quoting

*Heckler*, 470 U.S. at 831. And when, as here, an agency exercises its policymaking *discretion* to announce "a new policy out of whole cloth," it must abide by notice and comment. *Azar*, 887 F.3d at 72.

Third, the Refugee Detention Policy "is 'inconsistent with another rule having the force of law." *Id.* at 73 (quoting *Warder v. Shalala*, 149 F.3d 73, 81 (1st Cir. 1998)). As discussed above, the policy contravenes the agency's own regulations. *Supra* at 10-11. Existing regulations governing refugee adjustment of status do not contemplate the arrest or detention of refugees after one year in the United States. ECF No. 74 at 25-27, 37-38. As discussed, the relevant regulations make no reference to arrest or detention, and do not even require a refugee to appear for an adjustment of status interview in all cases. *See supra* Section 2.c. The fact that the Refugee Detention Policy "alter[s] or enlarg[es] obligations imposed by a preexisting regulation," provides further confirmation that the policy is a legislative rule subject to notice and comment. *Azar*, 887 F.3d at 73 (quoting *Aviators for Safe & Fairer Regul., Inc.* v. *FAA*, 221 F.3d 222, 226-27 (1st Cir. 2000)).

Finally, the fourth and fifth *Azar* factors, which consider where an agency's actions "fit within the statutory and regulatory scheme" broadly and other "pragmatic considerations," *id.* at 73, confirm that the Refugee Detention Policy is a legislative rule subject to notice and comment. In essence, the final *Azar* factors require the Court to ask, "how 'big of a deal' the regulation is." *New York v. DOJ.*, 804 F. Supp. 3d 294, 317 (D.R.I. 2025). The Refugee Detention Policy is a dramatic departure from the agency's past practice that will require thousands of lawfully present refugees to submit to indefinite detention. That is a big deal, and the *Azar* framework does not allow an agency to take an action of such "considerable import" without first providing the public notice and an opportunity to provide comment. *Azar*, 887 F.3d at 74.

Accordingly, all five *Azar* factors confirm that the Refugee Detention Policy is a legislative rule that was required to follow notice and comment. While the government ignores the *Azar* framework, it cites *Syncor Int'l Corp. v. Shalala*, 127 F.3d 90, 95 (D.C. Cir. 1997). But that case does not point in a different direction. It holds that an agency has enacted a legislative rule and must comply with notice and comment when it has "engaged in lawmaking." *Id.* Under *Syncor*, an agency is engaged in lawmaking when it "*modifies* or *adds* to a legal norm" or "gives content to the legal norm in question." *Id.* at 94 & n.6 (emphasis in original). The Refugee Detention Policy modifies an existing legal norm and constitutes a legislative rule under *Syncor* for all the same reasons it constitutes a legislative rule under *Azar*. The policy therefore was "without observance of procedure required by law" and must be set aside. 5 U.S.C. § 706(2)(D).

**5. Defendants Do Not Dispute that Vacatur and Declaratory Relief Are Appropriate Remedies.**

Defendants do not dispute that if the Refugee Detention Policy is unlawful, the Court should vacate the memos in their entireties and issue a declaratory judgment. With good reason, given that the First Circuit recently held that 5 U.S.C. § 706(2) "has long been understood to authorize vacatur of" unlawful agency actions. *Woonasquatucket River Watershed Council v. USDA*, 186 F.4th 25, 54 (1st Cir. 2026) (citing *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys*., 603 U.S. 799, 826 (2024)) (Kavanaugh, J. concurring). Vacatur is not "limited to redressing only party-specific harm" and "may be universal in nature." *Id*. at 55. Therefore, this Court should vacate the Refugee Rescission and Refugee Detention Memos in their entireties.

Nor do Defendants dispute that declaratory relief is available, again for good reason as the APA explicitly authorizes such relief. *See* 5 U.S.C. § 703 (permitting "declaratory judgments" under the APA). As explained in Plaintiffs' initial memorandum, issuing declaratory relief is

appropriate and necessary even where vacatur is an available remedy in APA cases. ECF 74 at 40 (collecting cases).

## CONCLUSION

For these reasons, the Court should deny Defendants' motion for summary judgement, declare the Refugee Recission and Detention Memos unlawful, vacate them, and grant Plaintiffs summary judgment on Counts I-IV.

Dated: October 15, 2026

By:


Ghita Schwarz (NY Bar No. 3030087)*
Guadalupe Aguirre (NY Bar No. 5536107)*
Mevlüde Akay Alp (NY Bar No. 5149653)*
Kimberly Grano (NY Bar No. 5858808)*
Pedro Sepulveda (NY Bar No. 6198550)*
**INTERNATIONAL REFUGEE ASSISTANCE PROJECT**
One Battery Plaza, 33rd floor
New York, New York 10004
(646) 939-9169
gschwarz@refugeerights.org
laguirre@refugeerights.org
makayalp@refugeerights.org
kgrano@refugeerights.org
psepulveda@refugeerights.org
mhauptman@refugeerights.org

Dalia Fuleihan (IL Bar No. 6335082)*
**INTERNATIONAL REFUGEE ASSISTANCE PROJECT**
P.O. Box 47611
Chicago, IL 60647
646-740-6271
dfuleihan@refugeerights.org

John Nathanson (NY Bar No. 2630697)*
Andrew Tannenbaum (NY Bar No. 3940434)*
Leila Siddiky (NY Bar No. 5225164)*
**ALLEN OVERY SHEARMAN STERLING US LLP**

*/s/ Erez Reuveni*
Erez Reuveni (MA BBO No. 666769)
Jennie L. Kneedler (DC Bar No. 500261)*
Ryan Cooper (DC Bar No. 1645301)*
Kali Schellenberg (MA BBO No. 694875)
Steven Y. Bressler (DC Bar No. 482492)*
Robin F. Thurston (DC Bar No. 1531399)*
**DEMOCRACY FORWARD FOUNDATION**
P.O. Box 34553
Washington, DC 20043
Phone: (202) 316-9538
ereuveni@democracyforward.org
jkneedler@democracyforward.org
rcooper@democracyforward.org
kschellenberg@democracyforward.org
sbressler@democracyforward.org
rthurston@democracyforward.org

*Counsel for All Plaintiffs*


* Admitted *pro hac vice*

599 Lexington Avenue
New York, NY 10022
212-848-4000
john.nathanson@aoshearman.com
andrew.tannenbaum@aoshearman.com
leila.siddiky@aoshearman.com

Emily Westridge Black (TX Bar No. 24060815)*
**ALLEN OVERY SHEARMAN STERLING US LLP**
300 West 6th Street
Austin, TX 78701
512-647-1909
emily.westridgeblack@aoshearman.com

Gideon J. Duke-Cohan (BBO# 716358)
**ALLEN OVERY SHEARMAN STERLING US LLP**
One Beacon Street
Boston, MA 02108
212-610-6353
gideon.duke-cohan@aoshearman.com

**CERTIFICATE OF SERVICE**

I hereby certify that on this October 15, 2026, I caused the foregoing to be electronically filed with the clerk of the court for the U.S. District Court for the District of Massachusetts by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record, a true and correct copy of the foregoing instrument and all attachments.

*/s/ Erez Reuveni*
Erez Reuveni