**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

JEAN A.; HAMAD B.; MONA C.; YASMINE D.; SAM E.; ABDO F.; INTERNATIONAL INSTITUTE OF NEW ENGLAND; and JEWISH FAMILY SERVICE OF WESTERN MASSACHUSETTS,

Plaintiffs,

v.

U.S. CITIZENSHIP AND IMMIGRATION SERVICES, MARKWAYNE MULLIN,[1] in his official capacity as Secretary of the Department of Homeland Security; UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT; TODD LYONS, *in his official capacity as Senior Official Performing the Duties of the Director of ICE*; and JOSEPH B. EDLOW, *in his official capacity as the Director of USCIS*,

Defendants.

Civil Action No. 3:26-cv-30031-RGS

**DEFENDANTS' REPLY BRIEF IN FURTHER SUPPORT OF THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

Defendants, by and through their attorney, Leah B. Foley, United States Attorney for the District of Massachusetts, respectfully submit this Reply brief in further support of their motion for partial summary judgment on Counts I-IV of the Complaint (ECF Doc. No. 1), and in response to Plaintiffs' Reply Brief in support of their motion for partial summary judgment.

[1] Secretary of Homeland Security Markwayne Mullin has been automatically substituted for former Secretary Kristi Noem. Fed. R. Civ. P. 25(d).

## ARGUMENT

### A. The Current Refugee Policy Comports with Immigration Law

The Court should reject Plaintiff's argument that the Current Refugee Policy (which Plaintiffs call the "Refugee Detention Policy")[2] is "contrary to law." The Current Refugee Policy is not only supported by the plain language of the applicable statute, 8 U.S.C. § 1159(a), but DHS's current interpretation is the most reasonable reading of that statute.

8 U.S.C. § 1159(a) provides:

> (1) Any alien who has been admitted to the United States under section 1157 of this title –
>
> (A) whose admission has not been terminated by the Secretary of Homeland Security or the Attorney General pursuant to such regulations as the Secretary of Homeland Security or the Attorney General may prescribe,
>
> (B) who has been physically present in the United States for at least one year, and
>
> (C) who has not acquired permanent status,
>
> *shall, at the end of such year period, return or be returned to the custody of the Department of Homeland Security for inspection and examination for admission to the United States as an immigrant in accordance with the provisions of section 1225, 1229a, and 1231 of this title.*

8 U.S.C. § 1159(a) (emphasis added).

Plaintiffs do not dispute that the class members whom they seek to represent meet the criteria set forth in 8 U.S.C. § 1159(a)(1)(A)-(C). Indeed, their proposed class includes "all

---

[2] The Current Refugee Policy, which Plaintiffs call the "Refugee Detention Policy," refers to the December 18, 2025, memorandum from Marcos Charles, titled, *Recission of ICE Policy No. 11039.1, Detention of Refugees Admitted Under INA § 207 Who Have Failed to Adjusted to Lawful Permanent Resident Status dated May 10, 2010*, which rescinded a May 10, 2010, memorandum from James Chaparro ("Rescission Memo"), along with the February 18, 2026, memorandum from Joseph B. Edlow and Todd M. Lyons entitled, *Detention of Refugees Who Have Failed to Adjust to Lawful Permanent Resident Status* ("Edlow Memo"), which outlined the detention of refugees.

individuals with refugee status who have not yet adjusted to lawful permanent resident ("LPR") status and who have been or will be detained pursuant to the Refugee Detention Policy." (ECF Doc. No. 76 at 6).

The dispute is over the italicized language above: what Congress meant when it provided that individuals who met the criteria for being refugees who have not yet adjusted to LPR status after being present in the United States for a year, "shall . . . return or *be returned to the custody* of the Department of Homeland Security for inspection and examination for admission to the United States as an immigrant." 8 U.S.C. § 1159(a)(1) (emphasis added). The crux of the dispute is whether "custody" includes physical detention when the refugee does not return on his or her own.

Plaintiffs cannot avoid the fact that the language of the statute plainly calls for detention in the circumstances set forth therein. Moreover, even if it were not plain from the text of the statute, Defendant's Current Refugee Policy is the best reading of the statute.

### 1. **<u>The Current Refugee Policy Is Consistent with Section 1159(a)'s Plain Text</u>**

The Current Refugee Policy starts with the recognition that under the immigration laws, when a refugee is admitted to the United States, the admission is conditional and subject to a mandatory review after the alien has been physically present in the United States for one year pursuant to INA § 209(a)(1), 8 U.S.C. § 1159(a)(1). (USCIS_AR077); *see also* 8 C.F.R. § 207.4 (approval of a refugee application "authorize [U.S. Customs and Protection Protection] to admit the applicant conditionally as a refugee"). The relevant regulations mandate review after one year. *See* 8 C.F.R. § 209.1(a)(1) (stating that every refugee whose status has not been terminated "is required to apply to USCIS one year after entry in order for USCIS to determine his or her admissibility"); 8 C.F.R. § 209.1(b) (providing that this application for LPR status "must be

submitted along with the biometrics . . . and in accordance with the applicable form instructions"). (USCIS_AR077 n.1).

The Current Refugee Policy, tracking the exact words of §1159(a), provides that after one year, the refugee must "return or be returned" to the Department of Homeland Security's (DHS) "custody . . . for inspection and examination for admission" as an LPR. (USCIS_AR078).

Following from this statutory mandate, the Current Refugee Policy provides that "[i]f the refugee does not voluntarily return, DHS will return the individual to custody (i.e., arrest and detain)" for the inspection and examination process contemplated by the statute. *Id.* Furthermore, the Policy provides that "DHS may maintain custody for the duration of the inspection and examination process." *Id.*

As Defendants explained in their Memorandum of Law in Support of its Motion for Summary Judgment ("Defendants' MSJ") (ECF Doc. No. 84), a plain reading of 8 U.S.C. § 1159(a) clearly supports DHS's Current Refugee Policy. (ECF Doc. No. 84 at 18-21). Rather than repeat its detailed arguments, Defendants refer the Court to Defendants' MSJ and incorporate those arguments. Here, Defendants will respond directly to a few points raised by Plaintiffs in their Reply Brief.

Plaintiffs' attempt to argue that "custody" does not mean "detention" in Section 1159(a) fails. For one, Plaintiffs rely on a string of unpersuasive cases from the District of Minnesota that take their position. (ECF No. 87 at 9-10).[3] As Defendants previously explained, another case from that District, *Idle H. v. Bondi*, has the better of this interpretive dispute. No. 26-CV-315

[3] A number of the cases cited by Plaintiff, including *U.H.A. v. Bondi*, 817 F. Supp. 3d 752, 765 (D. Minn. 206), relied on the DHS's prior 2010 policy statement (which has now been rescinded), *id.* at 766, but does not explain why it chose to rely on a rescinded policy.

(LMP/SGE), 2026 WL 266462, at *2 (D. Minn. Feb. 2, 2026) ("As a matter of plain meaning, 8 U.S.C. § 1159(a)(1) provides authority for the Government to detain a refugee like Idle H. who has lived in the United States for at least one year and has not acquired legal permanent residency."). At most, Plaintiffs point out a split among the judges of the District of Minnesota judges – all of which only serve as persuasive authority for this Court.

Plaintiffs attempt to distinguish *Idle H.* by arguing that the court there "required that detention be used only for determining removability, which must occur within 48 hours," whereas Defendants claim "authority to detain all unadjusted refugees without any time limits at all." (ECF Doc. 87 at 10). But the Current Refugee Policy provides no such thing. Instead, the Edlow Memo specifically provides that "detention pursuant to INA § 209(a)(1), 8 U.S.C. § 1159(a)(1), is not indefinite, but it is also not limited to merely 48 hours. Instead, it may last for the reasonable length of time it takes to inspect and examine the alien to determine whether he or she is admissible." (USCIS_AR080). "Upon completion of the inspection, the alien is either admitted as an LPR or placed in immigration proceedings. If placed in immigration proceedings, the alien's detention authority will be determined by the procedural posture of the alien's case." (USCIS_AR080).

Plaintiffs next rely on *Clark v. Martinez*, 543 U.S. 371 (2005). (ECF No. 87 at 10-11). But that decision is inapplicable. *See Idle H.*, 2026 WL 266462, at *3 ("*Clark* is a slender reed on which to build" Plaintiffs' reading). At issue in *Clark* was DHS's authority to detain an inadmissible alien beyond the period prescribed in *Zadvydas v. Davis*, 533 U.S. 678 (2001). Section 1182(d)(5)(A) states that "the alien shall ... be returned to the custody from which he was paroled and thereafter *his case shall continue to be dealt with in the same manner as that of any other applicant for admission*." 8 U.S.C. § 1182(d)(5)(A) (emphasis added). The Court held that § 1182(d)(5)(A) did not authorize detention beyond the period prescribed in *Zadvydas* because any

"other applicant" would be "dealt with" under 8 U.S.C. § 1231(a)(6), which the Supreme Court interpreted in *Zadvydas*. *Clark*, 543 U.S. at 386.

That holding does not control here. First, unlike Section 1182(d)(5)(A), Section 1159(a) does not merely authorize detention "in the same manner" as another statute; it authorizes returning an alien to custody for a specific purpose: "inspection and examination for admission." Section 1159(a) is thus more naturally read as a standalone grant of detention authority. Second, Section 1159(a) requires returning an alien to custody "for inspection and examination for admission … in accordance with the provisions of sections 1225, 1229a, and 1231." And as explained below, Section 1225 authorizes detention here.

Also cutting against Plaintiffs' reliance on *Clark* is the fact that "the Supreme Court has equated the terms 'detain' and 'custody' when interpreting other parts of the INA." *Idle H.*, 2026 WL 266462, at *3. Plaintiffs concede, as they must, that the Supreme Court in *Jennings v. Rodriguez*, 583 U.S. 281, 307-08 (2018), interpreted "custody" to mean detention in the context of 8 U.S.C. § 1226(c)(1), which provides that the "Attorney General shall take into custody any alien" who falls into one of several enumerated categories involving criminal offenses and terrorist activities. (ECF Doc. 87 at 11).

Plaintiffs try to distinguish *Jennings* based on the fact that § 1226(c) is entitled "Detention of Criminal Aliens." (ECF Doc. 87 at 11). This attempt is unavailing. Though a statute's title is an aid in resolving ambiguities, *Berniger v. Meadow Green-Wildcat Corp.*, 945 F.2d 4, 9 (1st Cir. 1991), a title cannot override the plain text, and the operative word—"custody"—is the same in Sections 1159(a) and 1226(c). Plaintiffs also seek support from statutory purpose, but Plaintiffs fail to plausibly explain why the context of the Refugee Act cuts in favor of their reading, which would allow refugees to skip their one-year inspection and examination and leave DHS without

the power to enforce this statutory requirement. *See Oklahoma v. Castro-Huerta*, 597 U.S. 629, 642 (2022) ("Congress expresses its intentions through statutory text passed by both Houses and signed by the President (or passed over a Presidential veto)."). That Congress did not use the word "detention" in Section 1159(a) is of no moment (it did not use it in Section 1226(c) either), it used "custody" and Plaintiffs' interpretation of that term is entirely unreasonable. Moreover, Plaintiffs argue that the *Jennings* Court's interpretation of "custody" in 8 U.S.C. § 1226(c) is distinguishable based on the context and title of 8 U.S.C.§ 1226. Here, as the Defendants explained in their MSJ, it is equally clear that Congress intended § 1159 to authorize temporary detention. (ECF Doc. 84 at 17-19).

The bottom line is, the plain reading of the term "custody" can and does include detention for purposes of the immigration laws, depending on the statutory context. DHS's Current Refugee Policy, which interprets "custody" to mean detention for a reasonable period of time required for inspection and examination of the alien for admissibility as an LPR, is reasonable and is not contrary to law. Indeed, any reading of Section 1159(a) as *not* authorizing detention would undercut the scheme Congress enacted. After all, if the phrase "shall ... be returned to [DHS] custody" did not authorize any detention at all, refugees could simply opt out of re-vetting by refusing to present themselves to DHS after a year in the United States. This is not a plausible interpretation of the statute. *See United States v. Tohono O'Odham Nation*, 563 U.S. 307, 315 (2011) ("Courts should not render statutes nugatory through construction.").

Plaintiffs next argue that Defendants' policy undermines Defendants' interpretation. (ECF No. 87 at 12). Not true. The policy recognizes that a refugee may voluntarily return by applying for adjustment of status **and** returning for an interview. (USCIS_AR079). A simple application is not enough to constitute a return to custody. And for the duration of that interview, a refugee is

not free to leave. Thus, for that period, a refugee who has voluntarily returned for an interview has voluntarily "returned" to DHS's custody. There is no surplusage here; instead, it is Defendants' reading, not Plaintiffs' reading (which strikes "be returned"), that makes the most sense of the statutory scheme as a whole.

Plaintiffs argue that a return to custody cannot mean a return to detention because "on initial admission refugees are not detained." (ECF No. 87 at 12-13). However, this statement is based on a misunderstanding of the immigration laws. Until he or she passes an inspection at a port of entry, a refugee is not free to leave DHS's custody. *U.H.A. v. Bondi*, 822 F. Supp. 3d 1007, 1023–24 (D. Minn. 2026) ("Upon arrival, applicants are inspected by U.S. Customs and Border Protection, and *if eligible*, admitted into the United States." (emphasis added)), *opinion vacated, appeal dismissed sub nom. U.H.A. v. Blanche*, No. 26-1482, 2026 WL 2718462 (8th Cir. Apr. 21, 2026).

Plaintiffs also argue that "[a] historical interpretation of the statute confirms that § 1159(a) does not authorize detention." (ECF Doc. 87 at 13). Plaintiffs blithely discount the 2001 INS Memo that authorized detention of refugees under this statute. (USCIS AR001-006).

In any event, although agency practice can be evidence of statutory meaning, *see Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394 (2024), "text and structure take priority," *Coney Island Auto Parts Unlimited, Inc. v. Burton Tr. for Vista-Pro Auto., LLC*, 607 U.S. 155, 161 (2026); *see United States v. Rahimi*, 602 U.S. 680, 718 n.2 (2024) (Kavanaugh, J., concurring) ("Text controls over contrary historical practices."); *Buenrostro-Mendez v. Bondi*, 166 F.4th 494, 506 (5th Cir. 2026) ("[T]he government's past practice has little to do with the statute's text. The text says what it says, regardless of the decisions of prior Administrations. Years of consistent practice cannot vindicate an interpretation that is inconsistent with a statute's plain text."); *cf. Pereira v. Sessions*,

585 U.S. 198, 204-05, 219 (2018) (rejecting government's reading of the statute despite twenty-one years of governmental practice). In the current case, the statutory text and structure support DHS's Current Refugee Policy.

Finally, Plaintiffs argue that Defendants err in relying on the difference between Section 1159(a)—which includes a return-to-custody requirement for refugees—and Section 1159(b), which does not have a similar requirement for asylees. (ECF No. 87 at 13-14). But Plaintiffs' argument only confirms that the two subsections employ different processes and does not provide a reason for the Court to overlook these differences when interpreting Section 1159(a).

In short, Section 1159(a) authorizes DHS to arrest and detain a refugee for the limited duration of the statutorily mandated inspection and examination. This is exactly what DHS is doing pursuant to the Current Refugee Policy.

**2. Alternatively, Section 1159(a)'s Cross-Reference of Section 1225 Provides a Basis for Detention.**

As Defendants previously explained, Section 1159(a)'s cross-reference to Section 1225 (which mandates detention of applicants for admission pending certain proceedings) support the interpretation that Section 1159(a)'s use of the term "custody" includes physical detention. (ECF Doc. 84 at 21-22). This is because, at the one-year mark, refugees are once again applicants for admission. *See U.H.A.*, 822 F. Supp. 3d at 1024 (noting that under the relevant statutory framework, a refugee's conditional admission may ultimately result in two "admissions": the first is the initial conditional admission; the second occurs when the refugee is adjusted to LPR status).

Plaintiffs disagree with Defendants' interpretation of the cross-reference, but they fail to explain their understanding of what the cross-reference accomplishes. Although Section 1159(a) does not use the phrase "applicant for admission," the very fact that Section 1159(a) cross-

references Section 1225 confirms that Congress intended refugees to be treated as applicants for admission during the proceedings contemplated by Section 1159(a). This remains true whether they "revert" back to applicants or become applicants anew. Also supporting Defendants' reading is the fact that a refugee who is found admissible in his second inspection shall "be regarded as lawfully admitted to the United States for permanent residence *as of the date of such alien's arrival into the United States*." 8 U.S.C. § 1159(a)(2) (emphasis added). The statute's relation back to the arrival date implies that the admissions process outlined in section 1159(a) is the culmination of an admissions process initiated when the refugee first entered the country.

### 3. The Current Refugee Policy Does Not Violate Agency Regulations.

Defendants have already explained, in their Memorandum in Support of Summary Judgment, why Plaintiffs fail in in their argument that the Current Refugee Policy violates DHS's own regulations and the *Accardi* doctrine, (ECF Doc. No. 84 at 22-23), and Defendants incorporate those arguments here.

In their Reply Brief, Plaintiffs again put up the straw man that the Current Refugee Policy is "authorizing indefinite detention" of refugees and then argue that such "indefinite detention" is contrary to DHS's own regulations. (ECF No. 87 at 16). However, as noted earlier, the Current Refugee Policy nowhere calls for "indefinite detention" and instead provides for detention for the amount of time necessary to inspect and examine the refugee who has been in the country more than a year and who has not yet adjusted to LPR Status.

Plaintiffs also argue that 8 C.F.R. § 209.1 "makes no mention" of detention. (ECF No. 87 at 11). But this does not mean that this regulation thereby *precludes* detention for inspection and examination. Contrary to Plaintiffs' suggestion otherwise, nothing in the new policy indicates that DHS no longer carries out a case-by-case review for interview purposes.

Finally, Plaintiffs cite to other regulations that authorize arrest and detention under different statutes and circumstances. (ECF No. 87 at 10-11). But Section 1159(a) provides an independent ground for detention, and thus DHS's enforcement of Section 1159(a) pursuant to the Current Refugee Policy does not violate any of the other separate regulations, which do not purport to control how DHS can exercise its authority under Section 1159(a).

**B. DHS's Current Refugee Policy is Not Arbitrary and Capricious**

As an initial matter, as set forth in Defendants' Memorandum in Support of Summary Judgment, Plaintiffs' challenge to the Current Refugee Policy is not reviewable, as the attack is the agency's discretionary enforcement decision. (ECF Doc. No. 84 at 24-25). Plaintiffs' response—that the Current Refugee Policy is not committed to agency discretion because it is not an "enforcement decision" (ECF No. 87 at 8)—is downstream from their erroneous reading of the statute. Because the Current Refugee Policy is an "enforcement decision," it is committed to agency discretion. (*Id.*) (Plaintiffs agreeing that "enforcement decisions are typically actions committed to agency discretion").

However, even if reviewable, the Current Refugee Policy is not arbitrary and capricious. A court will generally not disturb an agency action unless "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency," or provided reasoning "so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Veh. Manufacturers Assn. of the U.S., Inc.* v. *State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 43 (1983). This standard of review is "deferential": the "court may not substitute its own policy judgment for that of the agency." *Fed. Commc'ns Comm'n v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).

As explained in detail above, DHS's Current Refugee Policy is consistent with the text of Section 1159(a). Furthermore, DHS provided fulsome explanation for its Current Refugee Policy. As the December 18, 2025, Recission Memo explains, the recission of the 2010 policy—which forbade detention in all circumstances—was motivated by national security and public safety concerns. (USCIS-AR076). For an explanation as to why recission is warranted, the memorandum cites a December 16, 2025, Presidential Proclamation. *Id.*; *see* Proclamation No. 10998, 90 Fed. Reg. 59717 (Dec. 16, 2026). When viewed in the light of this Proclamation, the Recission Memo—which operates only to rescind the flat ban on detention for purposes of enforcing 8 U.S.C. § 1159—is eminently reasonable, and DHS's reasons for acting "may reasonably be discerned." *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974).

In addition, the Rescission Memo was shortly followed up by the February 18, 2026, Edlow Memo which not only confirmed the recission of the Chaparro Memo but also set forth an even more extensive rationale for the policy change. (USCIS_AR078-79). That rationale is summarized in Defendants' Memorandum in Support of Summary Judgment (ECF Doc. No. 84 at 25-28).

As set forth above and in more detail in Defendants' Memorandum in Support of Summary Judgment, Defendants provided a fulsome explanation as to why the Current Refugee Policy is not arbitrary and capricious. Contrary to Plaintiffs' claim (ECF Doc No. 87 at 17), Defendants did not thereby "forfeit" opposition to Plaintiffs' eight arguments on this issue, each of which is meritless. Nevertheless, Defendants address each of those arguments below.

First, Plaintiffs argue that the Refugee Detention Policy erred in stating that the 2010 Chaparro Memo "resulted in incomplete implementation" of Section 1159(a) and similarly erred in claiming that the Refugee Detention Memo "implement[s]" Section 1159(a). (ECF Doc. No. 74

at 39). This argument is downstream from Plaintiffs' erroneous interpretation of Section 1159(a) and provides no basis to question the reasonableness of the policy.

Second, Plaintiffs dispute that the Edlow Memo "better enforces the statutory requirement in § 1159." (ECF No. 74 at 40). But the Memo explains why the new policy is in accord with the best reading of the statutory text. (USCIS_AR079-080). Furthermore, bringing agency policy in accord with statutory requirements is a reasonable decision for the agency to make. Even if the agency's prior practices prove adequate in most cases moving forward, that does not render unreasonable Defendants' decision to ensure that detention is available when necessary.

Third, Plaintiffs allege that DHS failed to consider "less sweeping policy changes" to "enforce" the requirement to apply for adjustment of status after one year "such as sending notices to refugees." (ECF Doc. 74 at 40-41). This argument rests on a misconception as to the statutory requirement. Section 1159(a)'s mandate, and the purpose of the policy, is to ensure the inspection and examination of conditional-admitted refugees—rather than the act of filing for adjustment of status. The policy achieves this purpose by authorizing arrest and detention for those who do not voluntarily "return." Nothing more. The "alternatives" that Plaintiffs pitch are not real alternatives to ensuring that DHS has the tools it needs to do the job the statute requires. *See MediNatura, Inc. v. Food & Drug Admin.*, 998 F.3d 931, 943–44 (D.C. Cir. 2021) ("An agency is not required to consider all policy alternatives or every alternative device and thought conceivable by the mind of man. An agency must consider only significant and viable and obvious alternatives") (quotation omitted).

Fourth, Plaintiffs contend that 1159 "does not permit re-vetting." (ECF Doc. No. 74 at 41). But Section 1159(a)'s inspection and examination is done "in accordance with," among other statutes, Section 1229a—the statute that governs removal proceedings—and thus clearly

authorizes detention for revetting and removal, subject to the limited exception in Section 1159(c). Indeed, the main point of Section 1159(a)'s process is to determine whether an alien should be allowed to remain in the country. Consideration of whether an alien was in fact a refugee to begin with, or if there are grounds for removal, comes squarely within this inquiry. That there may be other mechanisms for addressing these concerns (ECF No. 74 at 41) is no moment. And finally, the policies on freezing an adjustment of status application does not render the Current Refugee Policy unreasonable either (ECF No. 74 at 42). It remains the case that under the Policy, detention is only allowed for as long as it takes to inspect and examine the alien to determine whether the alien should be admitted to the United States.

Fifth, Plaintiffs argues that "DHS cannot rely on speculation to justify a dramatic change in policy." (ECF Doc. 74 at 42). However, far from speculation, DHS relied on statistical evidence, including the findings of the March 25, 2025, Stateside Review of Refugee Cases 2021-2024, to conclude that security concerns warranted a policy change.

Sixth, Plaintiffs argue that compliance with Section 1159(a) "is impossible." (ECF Doc. No. 74 at 43). This argument is simply wrong. Compliance is not impossible. A refugee can comply by voluntarily returning, in which case an arrest and detention would not be required to perform the inspection and examination required by Section 1159(a). For those who do not voluntarily return, DHS can comply with § 1159 by detaining those individuals for a reasonable amount of time in order to complete inspection and examination. Plaintiffs are simply wrong in arguing that because detention may occur for some refugees, that "compliance" is impossible. That is not a compliance issue, but instead the sometimes what is required to carry out the inspection and examination that 1159(a) mandates. Finally, Plaintiffs argue that "a refugee would have to apply for adjustment of status far enough in advance to have their adjustment

application adjudicated no later than their 366th day in the United States to avoid mandatory detention." (ECF Doc. 85 at 20). However, it remains USCIS policy to accept adjustment applications from refugees filed at any time after their admission, though USCIS field offices are instructed not to adjudicate these applications until one year has elapsed from the time of admission. https://www.uscis.gov/policy-manual/volume-7-part-l-chapter-2 . (See footnote 7). So refugees should have ample time to file their adjustment of status applications, and they are not in the position of having to file for adjustment of status on and only on day 365 or risk detention the next day.

Seventh, Plaintiffs take issue with U.S. Citizenship and Immigration Services ("USCIS")'s Review of recently admitted refugees, which is summarized in the March 25, 2025, Stateside Review of Refugee Cases 2021-2024 (USCIS AR074-075), as the justification for a "potentially indefinite detention policy." (ECF Doc. No. 74 at 43). Here, Plaintiffs once again mischaracterize the Current Refugee Policy as authorizing "indefinite detention" when it does not such thing. Instead, the Policy allows for only detention for the mandated inspection and examination. In any event, the Stateside Review is merely illustrative of the potential consequences of refusing to ensure the proper vetting of refugees. The Current Refugee Policy aligns with the clear statutory commands of Section 1159(a) and supplies DHS with the tools necessary to address the security risks posed by the failure to properly vet refugees. It is not unreasonable for an agency to order its affairs to guard against security risks that follow from insufficient vetting. Therefore, Plaintiffs' allegations of perceived flaws in the review are no reason to vacate the policy.

Finally, Plaintiffs allege that DHS failed to take adequately reliance interests. (ECF Doc. No. 74 at 45). However, this allegation is contradicted by the record. The Edlow Memo made

clear that DHS carefully considered perceived reliance interests and found that they were outweighed by important public policy interests. (USCIS_AR082-083).

For these reasons, Plaintiff's claim that the Current Refugee Policy is arbitrary and capricious fails. The Policy, which follows straight from the plain text of § 1159(a) and is predicated on clear national security concerns, is both "reasonable and reasonably explained." *Prometheus Radio Project*, 592 U.S. at 423.

### C. The Current Refugee Policy is Not a Legislative Rule Subject to the Notice and Comment Requirement

Finally, Plaintiffs reiterate their futile argument that the Edlow Memo and the Recission Memo are "legislative rules" subject to the APA's Notice and Comment Requirement. As Defendants set forth in detail in their Memorandum in Support of Summary Judgment, the Edlow Memo and the Recission Memo are interpretive and not "legislative rules," and thus they are not subject to the APA's Notice and Comment Requirement. (ECF Doc. No. 84 at 28-30).

Plaintiffs disagree, and claim that the Memos are "legislative rules" under the five-factor test of *New Hampshire Hospital Ass'n v. Azar*, 887 F.3d 62, 70 (1st Cir. 2018). The application of the *Azar* test, however, results in the opposite conclusion. The Current Refugee Policy (1) is compelled by the "words of the statute," *id.* at 71; (2) "the result of a strictly interpretative exercise," *id.* at 72; (3) is not "inconsistent" with other laws or regulations and does not "alter or enlarge" a refugee's pre-existing obligation to return or be returned after a year, *id.* at 73; and (4) fits within the broader statutory and regulatory scheme regarding refugee admissions. In addition, (5) there are no other pragmatic considerations that would support the memos being treated as legislative rules. All of this weighs in favor of Defendants, even though, relevant to the fifth factor, the Current Refugee Policy differs from previous agency policy. *See id.* at 73-74. With at least

four out of the five factors, the Edlow Memo and the Recission Memo, just like past agency statements on this subject, are not legislative rules and notice and comment is not required. This Court should reject Plaintiffs' arguments to the contrary.

**D. Any Potential Remedies Should Not Exceed Redress of Harm to Plaintiffs**

Plaintiffs allege that if the Current Refugee Policy were found to be unlawful, that they are entitled to vacatur of the Policy and declaratory relief. But even if this Court agrees with Plaintiffs on the merits—which it should not—Plaintiffs would only be entitled to relief of a breadth necessary to redress their stated harms. *See Trump v. CASA, Inc.*, 606 U.S. 831, 854 (2025) ("Complete relief is not a guarantee—it is the maximum a court can provide.").

## CONCLUSION

For the reasons set forth above, Defendants respectfully request that the Court grant Defendants' motion for summary judgment on Counts I-IV of the Complaint and deny Plaintiffs' motion for partial summary judgment on these counts.

Respectfully submitted,

LEAH B. FOLEY
United States Attorney

Dated: November 5, 2026

By: */s/ Shawna Yen*
Shawna Yen
Assistant United States Attorney
United States Attorney's Office
1 Courthouse Way, Suite 9200
Boston, MA 02210
Tel.: 617-748-3100
Email: Shawna.Yen@usdoj.gov

## CERTIFICATE OF SERVICE

I, Shawna Yen, Assistant United States Attorney, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

Dated: November 5, 2026

By: *<u>/s/ Shawna Yen</u>*
Shawna Yen
Assistant United States Attorney